UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA    )   DOCKET NO. 5:12-CR-49
                         )
      vs.              )   VOLUME NO. I
                         )
MARTIN MARTINEZ SALDANA,    )
                         )
        Defendant.     )
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
MARCH 4, 2014

APPEARANCES:

On Behalf of the Government:

     STEVEN KAUFMAN, ESQ.
     United States Attorney's Office
     227 West Trade Street, Suite 1700
     Charlotte, North Carolina

On Behalf of the Defendant:

     DENZIL H. FORRESTER, ESQ.
     Law Office of Denzil Forrester,
     P.O. Box 32511
     Charlotte, North Carolina

     JESUS RICARDO CANALES, ESQ.
     Law Office of Rick Canales
     845 East Harrison Street
     Brownsville, Texas

Cheryl A. Nuccio, RPR, RMR, CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

1                          I N D E X

2    GOVERNMENT'S WITNESSES                        PAGE

3    DUSTIN HARMON
         Direct Examination By Mr. Kaufman          42
4        Cross Examination By Mr. Canales           81
         Redirect Examination By Mr. Kaufman       131
5        Recross Examination By Mr. Canales        153

6

7                        E X H I B I T S

8    GOVERNMENT'S EXHIBITS

9    NUMBER                                     ADMITTED

10   1A ..............................................58
     1B ..............................................58
11   1C ..............................................58
     1D ..............................................58
12   1E ..............................................58
     1F ..............................................58
13   1G ..............................................58
     17 ..............................................79
14   19 ..............................................77
     30 ..............................................67
15   30A .............................................70
     31 ..............................................73

16

17

18

19

20

21

22

23

24

25

1      P R O C E E D I N G S

2 TUESDAY MORNING, MARCH 4, 2014

3           (Court called to order at 9:45 a.m.)

4           THE COURT:  Now, then, we'll take up the two motions

5 in limine.  The first one having to do with statements

6 concerning the gun, that would be document number 70.  Would

7 the defendant want to add anything to what has already been

8 set forth?

9           MR. FORRESTER:  I think it's well briefed, Your

10 Honor, concerning -- I just want to make sure this one is

11 dealing with the religious -- actually, 70 would deal with --

12           THE COURT:  Right.

13           MR. FORRESTER:  -- the statements -- the religion or

14 the gun?  I think 70 deals with the -- specifically the guns.

15           THE COURT:  Both.

16           MR. FORRESTER:  Both, okay.  Okay.

17           Concerning religion, Your Honor, certainly in my

18 motion I outlined less than -- or approximately less than

19 10 percent of the population in this community is Roman

20 Catholic.  And to bring up an issue that is confusing in and

21 of itself, as my exhibit will say, it certainly would almost

22 prejudice the defendant.  And the harm that exists is that in

23 a rural part of North Carolina where -- and I'm not, here

24 again, making any sort of disparaging remark to any potential

25 venire persons, but I am saying the reality is this, is that

1   his faith should not become an argument or an issue in this

2   matter.  And to bring up some sort of worshiping of patron

3   saints, that would skew it against my client.  And certainly I

4   would argue in the spirit of *Batson*, it certainly brings up

5   some protected issues that should not necessarily go into the

6   deliberation.

7           THE COURT:  Well, let me say that I wouldn't expect

8   a law enforcement officer testifying from his experience to

9   say much, if anything, about worshiping or about Roman

10  Catholicism or anything about religion as such.  I would think

11  he might say something to the effect that this religious

12  artifact was found with other items belonging to the defendant

13  indicating that he would have had knowledge that it was there

14  and that it is commonly found in the possession of people who

15  deal in drugs.

16          Is that a fair statement of what the government

17  intends to show?

18          MR. KAUFMAN:  Yes, Your Honor, that is.  And I

19  believe that the commonly used term in the courts where it has

20  been admitted is that Santa Muerte, she's known as the

21  narco-trafficking saint.  That's the term of art that we've

22  seen in the case law.  But we're not going into anything about

23  any particular religion, whether it's Catholicism or

24  otherwise.  And in fact, if I'm not mistaken, Santa Muerte is

25  not a sanctioned saint in the Catholic church.  But we're

staying far away from that, from the topic of Catholicism.

These are tokens that are used almost as a good luck or protectionary token by trafficking -- traffickers.  As we stated in our response to the motion in limine, and I believe also in our initial notice to the defense, Agent Harmon, who is actually to my right right now, I anticipate that part of his testimony will be that there are people who are not traffickers who will also have the Santa Muerte token.  So that there is a balance to the testimony.  It's not a conclusion.  It's just simply based on training and experience.

THE COURT:  The motion will be denied.  And of course, at the time it comes up, if the -- I mean, obviously the defendant may want to object at that point, although you'll be given a continuing objection about it and that is done as of now.  But if the foundation is not adequate or something otherwise is insufficient about the offer of the government, then the court would deal with it at that time.

MR. FORRESTER:  Can I now address the gun?

THE COURT:  Yes, sir.

MR. FORRESTER:  Okay.  Your Honor, to be brief, I think the Supreme Court addressed this issue and the Fourth Circuit certainly did in a case called *United States versus Robinson*, 625 3d Edition 920 -- I'm sorry, 941, at page 953. And certainly, I'm making reference when I speak about the

1  Supreme Court, the case is *Watson versus United States*.  It's
2  a 2007 case that specifically is saying that even in the
3  conveyance where someone is trading drugs for guns, that
4  certainly does not necessarily reach the prima facie evidence
5  to say that a weapon was used in furtherance of drug
6  trafficking.

7       So certainly when -- we just want to basically
8  preclude testimony of a client who is carrying a gun in his
9  waist or a client who is shooting a gun at his property
10  because certainly those mundane acts, meaning that certainly
11  if someone has a weapon or is alleged to have a weapon on
12  their property, certainly there's nothing -- I'm not saying
13  it's all that innocuous, but there is certainly nothing
14  malicious about that nor is there anything malicious about
15  someone who is cutting their grass and have a -- and has a
16  weapon in his or her waistband.

17       And I think certainly it's important because if you
18  cannot in the midst of a drug deal -- if the Supreme Court has
19  said, well, you know what, we have to look to see if the gun
20  was used in furtherance of drug trafficking.  Then certainly
21  pushing your lawn mower or shooting a weapon in the back yard
22  is remote from drug trafficking.

23       So my thing is that that bridge, that barrier has
24  not been crossed and we don't necessarily want to cross it on
25  any sort of speculation or innuendo.  That's why I think any

1  such statements like that should be kept out, Your Honor.  I

2  think I stand firmly on the Supreme Court's ruling concerning

3  that.

4          THE COURT:  All right, sir.  I think the rulings to

5  which you refer are not apposite in this context.  They go as

6  far as they go, but they don't reach the testimony that's

7  being offered here.  So that motion will be overruled.

8          If it turns out that the government goes beyond what

9  we believe from the motion that it will offer, we'll take that

10  up at the time.

11          Anything else the attorneys would like to have the

12  court address at this point before we recess to get the jury

13  assembled properly?

14          MR. KAUFMAN:  Your Honor, with regard to the

15  proposed voir dire by the defense, which is document 76 in the

16  docket, while it's not required for them to provide that in

17  advance, I do thank the defense for doing that and it may help

18  make things go smoothly.

19          We do take issue with some of the questions and so

20  if we can hash these out now, it may make voir dire smoother.

21          THE COURT:  All right.

22          MR. KAUFMAN:  First of all, with regard to on page 1

23  of the document, number 4, defense asks, Do you all understand

24  that a jury -- sorry, as a jury you are each equal among peers

25  and not followers among a leader?

1          And my concern is that it's telling -- it's trying
2    to get the jury to agree that they are almost to make their
3    own decisions, which is true, but not listen to that of
4    others.  And I think that our concern is that the jury has to
5    be able to listen to others, keep their minds open and
6    deliberate with the possibility of either keeping their
7    initial opinion the same or changing it.  Otherwise, people
8    will have a -- and I believe that the judge's -- Your Honor's
9    instructions to the jury say keep an open mind; whereas, this
10   one almost makes it sound like you can't follow what other
11   people are saying.

12         THE COURT:  Well, I make a comment about that and I
13   trust the attorneys to abide by -- generally speaking you
14   accurately stated the duty to deliberate, that is, to hear
15   what all jurors have to say and then make up one's mind.  But
16   talking about leaders and followers, I think, is probably over
17   the line in an effort to place in the juror's mind something
18   they're not required or -- to do or not appropriately doing,
19   and that is looking for somebody to be their leader.  In any
20   event, I think the attorneys -- the defense attorneys can
21   handle that without any difficulty.

22         MR. KAUFMAN:  Thank you, Your Honor.

23         With regard to number 7, the proposed voir dire
24   starts off talking about a personal experience, being the
25   victim of a breaking and entering, and then transitions into

1   asking if the jurors would be uncomfortable in a firearms
2   trial.

3       I think that injecting that personal component not
4   only is irrelevant and unnecessary, it's also a non sequitur
5   to the ultimate question of the jury regarding firearms.  I
6   think -- I would ask that, you know, in order -- it almost is
7   trying to inject sympathy for the defense counsel and I don't
8   think it furthers the questioning of the jury.

9       THE COURT:  I think it's quite normal to have
10  questions to the jurors about whether they have any experience
11  that might affect their ability to be fair.  I don't know that
12  it's necessary to bring up that trial counsel may have been
13  the victim of a home invasion in particular.  I think it might
14  be best to suggest hypothetically that someone who might have
15  been the victim of a home invasion might not be a good juror
16  for that type of case.  But having said that, I think the
17  attorneys can abide by that commentary.

18      MR. KAUFMAN:  Thank you, Your Honor.

19      THE COURT:  Anything further?

20      MR. KAUFMAN:  With regard to number 9, the second
21  question is, "Who would think that the defense did not put on
22  any evidence if we did not call a witness?"

23      Ultimately I think it's actually a true statement.
24  If they do not call a witness and aren't presenting exhibits,
25  they're not putting on evidence.  Obviously, part of the

1    evidence that the government is putting on is the direct and
2    cross examination.  But I think that it's kind of a trick
3    question to the jury.  If they don't put on a witness, they're
4    not putting on evidence in their own case.

5                THE COURT:  Well, it is kind of awkwardly worded the
6    way number 9 is worded.  I wouldn't expect counsel to follow
7    that exact wording.  The idea to convey to the jurors is that
8    they're expected to -- it's often -- strike that.

9                It's often asked of jurors if they would hold it
10   against the defendant if he did not take the stand.  And
11   moreover, they would be -- could be advised during questioning
12   that the court would instruct them that they would not
13   properly consider the fact that he didn't take the stand if he
14   did not.

15               But as far as it being negative evidence, that's one
16   way of saying a proper instruction, but I don't know that
17   defense counsel would want to suggest that to the jury, that
18   it might be negative evidence -- by asking the question you
19   might put that in their minds that it is negative evidence.

20               MR. KAUFMAN:  And, Your Honor, the last question,
21   number 10, "Do you all promise not to incorporate any
22   information learned about the defendant other than evidence at
23   trial in your deliberations of his guilt or innocence?"

24               And ultimately the only information that they'll
25   have about the defendant is from the evidence presented.  So I

think this is also something that may confuse the jury as to what they learn about the defendant they can and cannot consider. And only that which Your Honor admits, which means all of the evidence presented is what they should consider.

THE COURT: Well, the court will handle this by instruction. Jurors will be told more than once that they are not to consider anything that they don't learn from evidence here at trial, and they'll be expected to follow that instruction. The attorneys can obviously refer to that in their voir dire questioning if they see fit. It would be kind of awkward to think -- to ask them to promise that they won't use information that they aren't supposed to have in the first place. We'll ask them -- we certainly appropriately ask jurors to promise that they will apply only the evidence they hear at the trial and nothing else.

But the way this question is phrased, it does sort of suggest that they might very well have information already learned from outside the trial. We will hopefully screen them from that by the time they get to this point. They will hear the preliminary instructions before we do the voir dire as the court normally does. So counsel can listen to my preliminary instructions as we go through them. And you've heard them before, I'm sure. And you may, of course, incorporate any of that information in your questions to jurors.

All right. Anything further, then?

1          MR. KAUFMAN:  Nothing from the United States, Your

2    Honor.

3          MR. FORRESTER:  Your Honor, if I can just be heard

4    just for the record.

5          THE COURT:  Yes, sir.

6          MR. FORRESTER:  Put this on the record.

7          Concerning question number 4, and I'll read it.  I'm

8    not sure if the interpreters have it.  The question says, "Do

9    you all understand that as a jury you each are equal among

10   peers and not followers among a leader?"

11         I just want to put on the record that certainly from

12   the defendant's point of view, the prosecution might be front

13   running or referencing to matters that would be contained in

14   an *Allen* charge because the question doesn't ask anyone to get

15   into a state of mind of blind determination and that's

16   basically for one, you know -- for *Allen* charge matters

17   really.

18         So the question doesn't ask anyone to dig in and

19   say, hey, blind determination, you are on an island here.  The

20   question just says to people -- venire persons that, look,

21   whether you're a mechanic, whether you're a president of a

22   company, just don't be intimidated by anyone else because of

23   their station in life, whether you have a GED or whether you

24   have five doctorates.  The question --

25         THE COURT:  The idea that the jurors are to consider

1   themselves equal among peers in terms of their deliberations
2   is perfectly all right.
3          MR. FORRESTER:  Okay.  And for the record, the other
4   one is not -- the point in that question -- and the court is
5   certainly correct in saying it might have been awkwardly
6   worded.  But the point in that is to let the jurors know that
7   certainly evidence is matter that's elicited and admitted into
8   the trial by the court that comes from the witness stand.  And
9   so in cross examination, whether we put someone on or not, we
10  can elicit evidence via testimony from the witness stand.
11  Simple as that.
12         But additionally, if I submit a document and mark it
13  for identification purposes only and foundation is laid, and
14  this is -- and I present it to a prosecution witness,
15  certainly after their case in chief, without putting a
16  defendant on the stand or a defendant witness on the stand, if
17  the foundation is proper and every other evidentiary rules are
18  proper, certainly it's fine to ask for that to be admitted
19  into evidence and submitted.
20         So I think to just paint a broad stroke and say,
21  well, that question is wrong as the prosecution has said, I
22  think that's swinging the pendulum all the way to the other
23  end to where it does the opposite intention of fairness or
24  justice.  And I'll just leave that for the record.  But I
25  think everything else -- no need to argue about that.  But I

1    think certainly 9 and 4, just want to leave those for the

2    record.

3              THE COURT:  Well, obviously the defense can argue

4    any evidence that has come in, whether -- whatever witness it

5    may have come from.  And if the defendant didn't offer any

6    evidence as such by way of testimony, defendant nevertheless

7    can argue what is in evidence and argue inferences from what

8    is not in evidence.  But obviously you wouldn't want to draw

9    attention -- undue attention to the fact that the defendant

10   didn't take the stand other than to make clear to the jury

11   that he's not required to and that the jury cannot hold that

12   against him or otherwise draw any adverse inference from that.

13             All right.  Thank you very much.

14             Anything further?

15             MR. CANALES:  May I have a second, Your Honor?

16             THE COURT:  Yes, sir.

17             (Defense counsel conferred.)

18             MR. CANALES:  For the record, Rick Canales, Judge.

19             Your Honor, I have a question -- if I can have some

20   type of leave from the court where it is the defendant's

21   intention for Mr. Forrester to do the jury selection, Judge.

22   If there's any time allowed or if there is any time left over

23   or any issues or something occurs, that I will be allowed to

24   address the jury panel as well?

25             THE COURT:  Well, usually the examination of the

1  jurors takes about a half an hour.  If it went twice that, I
2  think I'd be concerned about it.
3          MR. CANALES:  Yes, sir.  Like if -- I guess if both
4  of us can do some -- if I feel the need if I -- if the court
5  would allow me also to do some type of --
6          THE COURT:  Yes, sir.
7          MR. CANALES:  -- questioning --
8          THE COURT:  You may.
9          MR. CANALES:  -- as well.
10         Thank you, Judge.
11         THE COURT:  Mr. Forrester, are you -- I take it you
12  are familiar with the process by which the court goes through
13  jury selection.
14         MR. FORRESTER:  Yes, I am, Your Honor.  I think
15  Mr. Canales was basically -- he was just showing reverence to
16  the court by saying, Your Honor, certainly if I join in or tag
17  team, will the court be offended by it.  That's all.
18  Certainly he's a part of the defense and basically he's lead
19  counsel, so -- but I just thought it would be a good
20  opportunity for him to introduce himself again.  I know
21  yesterday he spoke to the court.  So that's all.
22         THE COURT:  All right.  Well, I think that's
23  appropriate and usually one attorney on a given side of the
24  case will ask the questions of a given witness without having
25  two counsel doing that.  But in voir dire I have no objection

1  to co-counsel participating as they see fit.

2         But the main thing about jury selection, the way

3  it's done in this courtroom, the government asks its questions

4  of the jury; and if it has peremptory strikes, it announces

5  those and the stricken jurors take a seat in the spectator

6  area and the clerk replaces those jurors.  But at that point

7  the government has passed on all the other jurors.  So then

8  the government examines the new jurors until it's satisfied

9  with them.  Then the case goes over to the defense and they do

10  likewise until they are satisfied.  If someone has a strike

11  for cause, sometimes you can just say motion because it's an

12  obvious reason.  If it's not obvious, you might want to --

13  feel free to say it out loud or you can say it at the sidebar

14  if you would rather.

15         MR. KAUFMAN:  Your Honor, I don't know if Your Honor

16  has changed your procedure somewhat from the last time I

17  appeared before you in trial.  My concern about having one

18  side do all of its potential strikes before the other and not

19  alternating sides is that potentially we could establish a

20  situation where the government has used any peremptory strikes

21  it has and then the defense could in theory wipe out all of

22  those jurors and then start selecting their own.  Since we

23  need to have a unanimous verdict and the defense only needs in

24  theory one juror, what I would ask is if it could be

25  alternating.  The government obviously using its first series

1    of peremptories on the panel.  Then the defense announces

2    theirs.  And after those individuals are excused, to then have

3    the defense go first and then the United States go so that

4    both sides are considering the same jurors at the same time.

5              THE COURT:  Well, I'd simply say that that's never

6    come up in my 25 years on the bench.  I don't think that's a

7    realistic concern on your part.  If it were, we might have to

8    tinker with the rule a little bit.  The court has some

9    discretion.  But by and large, if you go through the jurors

10   and strike those that you are concerned about, you have to

11   make your own calculations as to how many strikes you want to

12   save.

13             MR. KAUFMAN:  Oh, so, Your Honor, then I would be

14   able to save some peremptories?  My concern is that --

15             THE COURT:  You would still have your peremptories

16   as to any jurors that he's not passed on.

17             MR. KAUFMAN:  I understand.

18             MR. FORRESTER:  Ten and one, right, Your Honor?  Ten

19   peremptories and then the alternate?

20             THE COURT:  There's one for the two alternates.

21             MR. FORRESTER:  Oh, okay.  Two alternates.

22             THE COURT:  Ten for the defense and six for the

23   government.

24             MR. FORRESTER:  Okay.

25             THE COURT:  All right.  Thank you.

1          (Brief recess at 10:12 a.m.  Defendant not present.)

2          THE COURT:  Okay.  Are the parties ready to begin?

3   We can bring in the jury.

4          MR. KAUFMAN:  Yes, Your Honor.

5          MR. FORRESTER:  Your Honor, the defendant is not

6   here, sir.

7          THE COURT:  You're quite right.  Thank you.

8          (Pause.)

9          MR. KAUFMAN:  Your Honor, there is one issue and we

10  can wait until the defendant arrives if Your Honor prefers.

11  Has to do with a technological issue with the two recordings

12  that we intend to present.

13         (Defendant entered the courtroom.)

14         MR. KAUFMAN:  Your Honor, I'll note for the record

15  that Mr. Saldana has returned to the courtroom.

16         The one technological issue we're having, Your

17  Honor, is that our trial laptop which has the Sanctions

18  software so that we can have the streaming transcript of these

19  two recordings -- and I just should note these are, from our

20  perspective, the key pieces of evidence in the case.  Murphy's

21  Law, Your Honor.  The Sanctions system is on the trial laptop

22  and we're having a hardware problem.  It seems that the part

23  of the laptop that would connect into the court's sound system

24  is broken.  It's not a driver issue or something that can be

25  fixed technologically here.  We'd have to have a whole new

1    laptop.

2            I've spoken with the defense about this, and what
3    we're proposing to try is -- I'll have to work on this over
4    the lunch break, but we're hoping to use the visible portion
5    of Sanctions on the trial laptop to show the streaming
6    transcript using a second laptop which I just happened to
7    bring with me that has the sound audio and then hit play on
8    both at the same time so that it will work as if it ordinarily
9    would work.

10           In the meantime, I've asked a colleague of mine to
11   make photocopies, 14 copies.  And actually, I'll have to make
12   more for the court and for counsel as well even though it's
13   been provided to counsel in discovery, but make additional
14   copies so that as a backup, they'll have the hard copy to
15   review along with the sound which they'll be able to hear.
16   That's the backup plan.

17           I've discussed with counsel that because it's in
18   English, it would not be, other than a demonstrative aid for
19   the jury, not an actual exhibit so therefore they would only
20   be allowed to review the transcript while listening to the
21   audio.  It would not be an exhibit that would go back to them
22   to be reviewed independently.  So I think that the parties are
23   in agreement with that procedure.

24           MR. CANALES:  That's correct, Your Honor.

25           THE COURT:  All right, sir.  Thank you.

1    Okay.  May we have the jury, please.

2        (Jury selection.)

3    TUESDAY AFTERNOON, FEBRUARY 4, 2014

4        (Court resumed at 1:50 p.m.)

5        THE COURT:  Are the parties ready to resume

6    business?

7        MR. FORRESTER:  Defense is ready.

8        MR. CANALES:  Yes, Your Honor.

9        THE COURT:  May we have the jury, please.

10       (Jury entered the courtroom.)

11       THE COURT:  All right.  Members of the jury, the

12   court will first ask that the clerk impanel the jury.

13       (All 14 jurors were duly impaneled.)

14       THE COURT:  Thank you, Madam Clerk.

15       Now, the object, of course, is to conduct a fair and

16   impartial trial resulting in a fair and impartial verdict.  So

17   to that I'll give you a little bit of a road map by way of

18   jury instructions that will guide you in your participation in

19   the trial.

20       It will be your duty to find from the evidence what

21   the facts are.  You and you alone are the judges of the facts.

22   You will then apply to the facts that you find from the

23   evidence the law that the court gives to you.  The court

24   refers to the presiding judge.  You must follow the law

25   whether you agree with it or not and that, of course, ensures

1  that we all abide by the same law.

2          Nothing that the court may say or do during the
3  course of the trial is intended to indicate or should be taken
4  by you as indicating what your verdict should be.  The
5  evidence from which you will find the facts consists of the
6  witnesses who are sworn and testify in front of you and also
7  the documents and other things received into the record as
8  exhibits and any facts that the lawyers agree to or stipulate
9  to or that the court may instruct you to find.

10          Certain things, on the other hand, are not evidence
11 and must not be considered by you in arriving at your verdict.
12 The statements, the arguments and the questions by the lawyers
13 are not evidence, so you have to make a distinction in your
14 mind between what is said from the witness stand which is
15 evidence and that which is said by counsel which is not.

16          The objections to questions are not evidence.
17 Lawyers have an obligation to their respective clients to make
18 objection when they think something being offered in evidence
19 may be improper under the rules of evidence.  You should not
20 be affected by the objection or by the court's ruling on it.

21          If you are instructed that some item of evidence is
22 to be received for a limited purpose only, you must follow
23 that instruction.

24          Testimony that the court excludes or tells you to
25 disregard is not evidence and must not be considered.

1        Anything you may have seen or heard outside the

2 courtroom is not evidence and must be disregarded.  You are to

3 decide the case solely on the basis of the evidence presented

4 to you here in the courtroom.

5        There are two kinds of evidence, it is sometimes

6 said:  Direct and circumstantial.  Direct evidence is direct

7 proof of a fact such as testimony of an eye witness.

8 Circumstantial evidence is proof of facts from which you may

9 infer or conclude that other facts exist.  I'll give you other

10 instructions on these as well as other matters toward the end

11 of the case.  Keep in mind you may consider both types of

12 evidence on an equal footing.

13        It will be up to you to decide which witnesses to

14 believe or which not to believe or how much of any witness's

15 testimony to accept or reject.  I'll give you other guidelines

16 for determining the credibility of witnesses toward the end of

17 the case.

18        Now, as I indicated earlier, this is a criminal case

19 and there are three basic rules about it which it won't hurt

20 to go over once more.

21        First, the defendant is presumed innocent until

22 proven guilty.  The indictment brought by the government

23 against him is only an accusation, nothing more.  It is not

24 proof of guilt or anything else.  Defendant therefore starts

25 out with a clean slate.

1     Secondly, the burden of proof is on the government
2  throughout the case.  The defendant has no burden to prove his
3  innocence or to present any evidence or to testify.  And since
4  the defendant has that right, the law prohibits you from
5  arriving at your verdict by considering that he may not have
6  testified.

7     Third, the government must prove the defendant's
8  guilt beyond a reasonable doubt before there could be a
9  conviction.  I'll give you other instructions on this point
10  later, but keep in mind that in this respect a criminal case
11  is different than a civil case where there is a different
12  standard of proof.

13     Now, a few words about your conduct as jurors.  You
14  as jurors must decide this case based solely on the evidence
15  presented here within the four walls of this courtroom.  This
16  means that during the trial you must not conduct any
17  independent research about the case or anything involved in
18  the case, the individuals or institutions about which you may
19  hear during the case.  In other words, you would not consult
20  dictionaries or reference materials, search the internet,
21  websites, blogs or use any other electronic tools whatsoever
22  to obtain information about this case or to help you decide
23  this case.

24     Please do not try to find out information from any
25  source outside the confines of this courtroom.

1    Until you retire to deliberate, you may not discuss
2 this case with anyone, even your fellow jurors.  If someone
3 should ask you about the case at home overnight, you would
4 tell them that you have been instructed by the judge not to
5 discuss it until it's over.  When it is over, you may discuss
6 it all you wish.  That will be entirely up to you at that
7 time.  So you cannot discuss the case with anyone until you
8 have returned a verdict and the case is at an end.

9    Now, you may think I'm going over this too much, but
10 the fact of the matter is if somebody violates one of these
11 rules, the trial may have to be done all over again at wasted
12 expense and difficulty for everybody concerned.  So I'll go
13 over it with you.

14    Many of you use cell phones, BlackBerrys, the
15 internet, and other tools of technology.  You must also not
16 talk to anyone at any time about this case or use these tools
17 to communicate electronically with anyone about the case.
18 This includes your family and friends.  You may not
19 communicate with anyone about the case on your cell phone,
20 through email, BlackBerry, iPhone, text messaging or Twitter,
21 or any blog or website, including Facebook, Google, Myspace,
22 LinkedIn or YouTube.  You may not use any similar technology
23 of social media even if I haven't mentioned it.  I expect you
24 will inform me as soon as you become aware of anyone's
25 violation of these instructions.  A juror who violates these

1  instructions jeopardizes the fairness of these proceedings and

2  a mistrial could result which could require the entire trial

3  process to start over.

4          And finally, do not form any opinion until all the

5  evidence is in.  So you must keep an open mind until you start

6  your deliberations at the end of the case.  Then you make up

7  your minds in deliberation with your fellow jurors.

8          Obviously, we can't have all the testimony come in

9  in the twinkling of an eye.  It has to come in witness by

10  witness and so on, so keep an open mind about it until it's

11  over.  That's just common sense.

12         Now, if you do take notes during the trial, you may

13  do that.  Keep in mind it may be difficult to take detailed

14  notes and pay attention to what the witnesses are saying at

15  the same time.  Sometimes observing how the witnesses testify

16  is just as important in determining their credibility as it is

17  important to know what they are saying.  So if you do take

18  notes, be sure that your note taking does not interfere with

19  your listening to and considering all of the evidence.

20         Also, do not -- that is, if you do take notes, you

21  would not discuss them with anyone before you begin your

22  deliberations.  Do not take your notes with you at the end of

23  the day.  You would leave them either there at your seat where

24  you're sitting now or the jury room.  They'll be secure either

25  way.

1          And if you choose not to take notes, remember, it's

2    your own individual responsibility to listen carefully to the

3    evidence.  You can't give that responsibility to someone who

4    may be taking notes.  We depend on the judgment of all the

5    members of the jury and you must all remember the evidence in

6    the case as it comes in.

7          Now, the order of trial will be as follows:

8          First, the government will have an opportunity to

9    make an opening statement which would be simply an outline to

10   help you understand the evidence as it comes in.

11         Next, the defense attorney may, but he does not have

12   to, make an opening statement at this time or he may reserve

13   an opening statement until later.  Opening statements are

14   neither evidence nor arguments.  As I said, they're just sort

15   of a road map to show you where they -- the attorneys think

16   the evidence may go.

17         The government would then present its witnesses and

18   counsel for the defendant may cross examine them.  Following

19   the government's case, the defendant may, if he wishes,

20   present witnesses whom the government may cross examine.

21         And after all the evidence is in, the attorneys

22   would present their closing arguments to you to summarize and

23   interpret the evidence for you, and the court would then

24   instruct you on the law.  And then you would retire to

25   deliberate on your verdict.

1          Thank you for your attention to these matters.

2          Will the government have an opening statement?

3          MR. KAUFMAN:  We do, Your Honor.

4          THE COURT:  You may begin.

5          MR. KAUFMAN:  Thank you, Your Honor.

6          May it please the court, counsel:

7          Ladies and gentlemen, the defendant, Martin Martinez

8     Saldana, was a major methamphetamine trafficker.  You're going

9     to hear that he was responsible for well in excess of

10    500 grams of methamphetamine.  And in fact, that's what's

11    charged in the indictment.  You're going to hear that the

12    amount is multiple times that amount.  And more than that,

13    you're going to hear that it's more than just what we call a

14    mixture and substance containing some amount of

15    methamphetamine.  That, in fact, most of the methamphetamine

16    that he sold was either near pure or pure methamphetamine.

17         You'll be hearing from Special Agent Dustin Harmon

18    and he'll talk about how methamphetamine is distributed, how

19    it's packaged, how it's cut, if you will, or stepped on.  The

20    purity level is modified to extend it so you can sell more

21    product.  But he'll go into a discussion of the business and

22    of the drug trafficking.

23         But ladies and gentlemen, one of the key things that

24    you're going to be hearing in this trial is statements that

25    the defendant himself has made.  You're going to hear the

words coming out of his own mouth during two different
conversations with different people involved in this
conspiracy.  And I might add, you're going to be hearing from
those two people as well, and they're going to be testifying
under oath about their involvement in the conspiracy with the
defendant.

        Now, how do we get here?  Law enforcement had
Mr. Saldana on their radar screen for a couple of years.  They
didn't get the break through until late 2012.  What you're
going to hear is that law enforcement was purchasing
methamphetamine from a man named Danny Eller.  Mr. Eller was
selling to law enforcement through an informant, another
informant.

        And what happened is on October 26, 2012, they
searched Mr. Eller's home.  They found firearms.  They found
methamphetamine.  And he immediately agreed to cooperate with
law enforcement against Mr. Saldana in whatever law
enforcement needed in order to stop further crimes by anybody
involved in methamphetamine trafficking.

        So what he did, you'll hear this recording.  The
first of the two recordings that I mentioned was on
December 11th of 2012.  Now, remember, this is over a month
after he was, in fact, stopped by law enforcement.  They went
into his home and all of that.  Not surprising, word got out.
Word got back to Mr. Saldana.  So when Mr. Eller went to meet

1    with Mr. Saldana, he kept asking him, Now, tell me about this
2    arrest.  What, oh, it was your neighbor?  Are you sure?  Who?
3    What happened?  He wanted more details.  Why is that?  Because
4    he kind of knew what was going on.

5            In fact, you're going to hear that he was selling to
6    Mr. Eller through another individual named Jose Pina, and
7    Mr. Pina had stopped basically returning the calls.  Everyone
8    kind of knew the jig was up when it came to Danny Eller, that
9    he was not somebody who could be trusted because as would be
10   imagined, if he got stopped, then he might be working for law
11   enforcement at that point.  But you can tell that he was very
12   concerned about it, repeatedly asking questions about this
13   arrest.

14           Now, that's December 11th.  I'm about to go to
15   December 12th.  Let's go back a little bit before that.

16           You'll hear that law enforcement was also buying
17   methamphetamine from Bobby Shore.  He, too, will take the oath
18   and swear to tell the truth, whole truth, and nothing but the
19   truth and testify in this case.

20           And you're going to hear that on December 12th, so
21   the day after Danny Eller tried to get that recording and
22   tried to purchase narcotics from Mr. Saldana.  Obviously he
23   was burned.  You're going to hear that Mr. Shore's house was
24   searched based on a federal search warrant and they found --
25   what did they find?  More methamphetamine.  Purity levels

1  again consistent.  High, high levels of methamphetamine.

2  Agent Harmon will be able to explain what that kind of means

3  to you in terms of the source of the drugs.

4          But anyway, what did Mr. Shore do?  He agreed

5  immediately to cooperate with law enforcement against

6  Mr. Saldana.  And what did he do then?  That very same day,

7  December 12th, he agreed to wear a recording device just like

8  Mr. Eller had the day before and go and meet with Mr. Saldana.

9          By the way, in terms of the timing here, you're

10 going to hear that starting the summer of 2012 Mr. Saldana had

11 left Mr. Pina as basically his subordinate to help do the drug

12 transactions on his behalf because Mr. Saldana was going back

13 and forth to visit family in Mexico.  So he's back.

14         And then the December 11th conversation with

15 Mr. Eller and Mr. Saldana happened.  And then the next day

16 Mr. Shore's stopped and he agrees to cooperate and he goes to

17 Mr. Saldana's home and he has the recording.  And that

18 recording, ladies and gentlemen, corroborates everything

19 because what does Mr. Saldana do?  He keeps asking Mr. Shore,

20 This guy, Danny, Danny, you know, the guy with the blue truck,

21 I don't know, I think that he got busted.

22         And you'll hear Mr. Shore thinking on his toes.  And

23 he goes, Oh, yeah, yeah, I heard that too -- even though I'm

24 an informant.  But he says, I heard that too.  He's dirty.

25         Mr. Saldana says, You know what, I don't trust him.

1  I don't trust anybody but you, Bobby Shore.  I'm only going to

2  sell methamphetamine to you.  So you contact my guy Jose Pina

3  and he'll sell to you.

4        Okay.  And that's something you'll hear that a drug

5  trafficker does often to shield themselves, to avoid

6  detection, they sell through another person.  And that's

7  exactly what he was doing and you can tell that from the

8  conversation.

9        In fact, one very interesting quote from near the

10  end of the conversation because he's so concerned about Danny

11  Eller and other people who are being arrested because there is

12  a wave of arrests happening, Mr. Saldana tells Mr. Shore--

13        MR. FORRESTER:  Object to the evidence, Your Honor.

14        THE COURT:  Overruled.

15        MR. KAUFMAN:  -- I'm afraid they might squeal.  They

16  might tell on me.

17        What's there to tell unless you've got consciousness

18  of guilt, ladies and gentlemen?

19        Now, so that's what happened with Mr. Shore.

20        You're going to be hearing from law enforcement

21  officers.  You're going to be hearing from Agent Harmon and

22  from ATF, Agent Schauble.  And the two of them actually -- I

23  may be getting ahead of myself for a moment.  So after the

24  Bobby Shore conversation, law enforcement, in fact, arrested

25  the defendant.  They also searched his residence.  After that

1  lawful search, what did they find?

2          Well, there were no drugs found in the residence.

3  There were, however, four firearms found.  They were found in

4  the defendant's bedroom.  And one of them was between the

5  mattress and box springs, a handgun.  And then there were two

6  other handguns in the dresser drawer and there was also a

7  short-barrel sawed-off shotgun in there as well.  There was a

8  set of drawers like a filing cabinet.  And in the top one

9  there were -- there was a 12 gauge shotgun shell which matched

10  that sawed-off shotgun that was in the dresser.  And on top of

11  the dresser, actually, there were three rounds of .22 caliber

12  ammunition which fit all three of the handguns found in his

13  room.  The guns didn't have the bullets in them at the moment.

14  At that very moment they didn't, but there was ammunition for

15  all of the weapons there.

16          And you'll hear from Agent Harmon.  He'll testify to

17  you about tools of the drug trafficking trade and explain the

18  significance of the firearms.  Although as we discussed during

19  voir dire, your knowledge and ways of the world will come into

20  play during your deliberations as well.

21          So during that arrest of Mr. Saldana on

22  December 12th, Agent Harmon and Agent Schauble did, in fact,

23  interview the defendant and during that interview, he admitted

24  that all four of those firearms were his.

25          You're going to be hearing some stipulations about

1    all the drugs seized throughout this investigation, and that

2    they are, in fact, methamphetamine.  That they've been lab

3    tested and that their purity level, you'll be hearing, was at

4    or near a hundred percent purity.

5            You're also going to be hearing from Detective

6    Jeremy Williams from the Ashe County Sheriff's Office.  And

7    he'll testify about the use of Mr. Eller and of Mr. Shore,

8    he'll talk about the searches at Mr. Saldana's residence.

9            And interestingly, you'll also hear from Mr. Jose

10   Pina himself who was working for Mr. Saldana, the one that

11   Mr. Saldana had working for him while he was in Mexico.

12           All of the cooperating defendants, they have pled

13   guilty.  They've taken responsibility for their actions.  And

14   they're going to be testifying under oath to describe what

15   happened.  In fact, Mr. Pina at one point after he had gotten

16   on board and was cooperating with law enforcement after his

17   arrest, he even told law enforcement about money and drugs

18   that the defendant had hidden on the property while he was

19   away.  And based on his information, law enforcement was able

20   to seize $50,000 that was hidden in kind of PVC piping dug

21   down and hidden in the earth on Mr. Saldana's property as well

22   as ounces of this high purity methamphetamine.

23           So after listening to the testimony of these

24   witnesses, seeing the photographs from searches and, very

25   importantly, listening to Mr. Saldana's own words when he met

1    with Mr. Danny Eller and when he met with Mr. Bobby Shore,

2    we'll be concluding and asking you to return a verdict as

3    charged.

4            Thank you.

5            THE COURT:  Okay.  Will the defendant have an

6    opening statement at this time?

7            MR. FORRESTER:  We do, Your Honor.

8            Good afternoon again, ladies and gentlemen.  My name

9    is Denzil Forrester.  Along with co-counsel, Rick Canales,

10   we're officers of the court.  Our duty is to help in the

11   administration of justice.

12           Today we have the privilege of representing

13   Mr. Martin Martinez Saldana.  The government has accused

14   Mr. Saldana of taking part in a drug trafficking case,

15   specifically methamphetamine.  They've also accused

16   Mr. Saldana of being in possession of a sawed-off shotgun, and

17   also being in possession of another weapon in furtherance of

18   drug trafficking.  They have to prove that beyond a reasonable

19   doubt.  It's almost like crime 101.  You have a crime, a

20   perpetrator, and a victim.  Or there's CSI, Law and Order.

21           But in this matter, the victim is not necessarily --

22   that's steady.  We know the government is the victim.  They

23   make the laws.  If they're broken, they're victimized.

24           However, the concentration is going to come from the

25   witness stand concerning who the perpetrator is.  And we know

1  who the alleged perpetrator is.  And it's also going to come

2  in concerning was there a crime?

3         So that's why it's important to pay attention, to

4  watch them.  And when I say pay attention, watch them, watch

5  the testimony from the witness stand.

6         It's important because you have to watch them

7  because the government has already advised you that they're

8  going to use basically informants.  They're going to use

9  people who have done or admitted that they've done wrong in

10  the past.

11        And you have to watch them because you want to see

12  who's saying Mr. Saldana committed some sort of crime?  You

13  have to watch them because it's important to understand on

14  what side were they, on whose side were they on at the time of

15  the alleged crime and whose side they're on now.

16        You have to watch them because it's important to

17  find out why.  Why would they change their story?  You have to

18  watch them.  It's important.

19        You have to watch them because it's important the

20  testimony they're going to bring forth, whether they have an

21  expectation to gain anything from it.  You have to watch them.

22        You have to watch the law enforcement officers who

23  take the stand and testify.  It's important to pay attention

24  to it.

25        It's important to pay attention to whether the terms

1  they use such as hoarding money, such as possession of
2  weapons, you have to watch them to see if those form the
3  basis, those general statements form the basis of any crime.
4          You have to watch the law enforcement officers to
5  see if they perceive Mr. Saldana in any sort of hand-to-hand
6  transaction.  You have to watch them.  You have to pay
7  attention to the evidence even from the prosecution.  Because
8  the evidence is going to show you that basically charges were
9  filed and charges were dismissed.
10          MR. KAUFMAN:  Objection.
11          MR. FORRESTER:  You have to watch --
12          MR. KAUFMAN:  Objection.
13          THE COURT:  Overruled.
14          MR. FORRESTER:  You have to watch them.  The
15  superseding bill of indictment gets to be exposed in this case
16  so you have to watch that.
17          You have to understand that in the government's
18  case, they're going to parade a whole bunch of people who have
19  done bad acts in the past.  And now because they're all of a
20  sudden friendly with the government, they're going to testify
21  and want you to believe their story.
22          This is why I'm glad we have a fair jury system
23  because it's your job to check and test the credibility of the
24  government's case.  People watch it.  It's going to be a
25  story -- it's going to be like a fancy commercial, full of

1 bells and whistles.  It always is.

2          But at the end of it, I'll be back to argue

3 concerning any evidence that's been presented.

4          Thank you.

5          MR. KAUFMAN:  Your Honor, may we have a brief

6 sidebar?

7          THE COURT:  Yes.

8          Excuse us, please, members of the jury.  You may be

9 at ease.

10          (Sidebar conference as follows:)

11          MR. KAUFMAN:  Your Honor, in the defense's opening

12 statement, they made reference to the bill of indictment and

13 the superseding bill of indictment; and as the court has

14 instructed the jury, that is not evidence.  They are just

15 merely charges.  And now the defense seems to be trying to

16 inject that as evidence, the indictment, the legal process;

17 and I would move for the court to preclude any sort of

18 evidence, if we can call it evidence, but presentation to the

19 jury regarding any kind of charges that may have been

20 dismissed by the United States.  It's not evidence of

21 innocence or guilt on the remaining charges against the

22 defendant.

23          THE COURT:  Right.  So let me ask the defense what,

24 if anything, you might be attempting to pursue in that regard?

25          MR. FORRESTER:  We're not trying to pursue anything,

1  Your Honor.  As -- in most criminal federal matters, the jury
2  gets to take a look at basically the charging document.  And
3  my point is just to draw attention -- for them to pay
4  attention to it because the fact is in my closing I can argue
5  whether the government has a sound case, whether they
6  equivocated on anything.  I certainly can argue the
7  government's case, the government's strength of their case.
8  And that is one of many different parcels or one component of
9  that.
10          THE COURT:  Well, obviously you can argue whether
11  the government has met its burden of proof on the present
12  indictment on which we are proceeding.
13          MR. FORRESTER:  Yes.
14          THE COURT:  But as far as any previous indictment
15  before the current superseding indictment or any charges that
16  were dismissed, I don't believe that's relevant unless you can
17  show me a good reason why it might be.
18          MR. FORRESTER:  I think any evidence tending to
19  prove or disprove -- and here's the thing, at least my
20  argument.  Okay.  In a superseding bill of indictment where
21  you have gun charges that were dismissed and then you have
22  remaining gun charges, certainly I can argue that basically
23  the soundness of the government's case hinges on that.  So
24  certainly it's relevant concerning you have at least one gun
25  charge, then you have other charges -- gun charges that were

1   dismissed.

2          In my closing I can argue basically this is a case
3   where the government already said there aren't going to be any
4   trace evidence.  There aren't going to be any -- if I can --
5   the government basically told the jury in its introduction to
6   them there's not going to be any DNA evidence, and I think
7   any -- there's three things they mentioned.  And certainly I
8   can argue concerning the strength or lack thereof of the
9   government's case and concerning their equivocation on
10  certainly the charging documents.

11         THE COURT:  Well, I'm going to grant the
12  government's motion to limit inquiry or other presentation by
13  the defense concerning charges that are not going forward in
14  the current indictment.

15         MR. FORRESTER:  Okay.

16         THE COURT:  I think to do otherwise would be unduly
17  confusing to the jury.  It wouldn't have any probative value.
18  And it would complicate matters greatly for a jury trying to
19  decide if the government has met its burden of proof on the
20  charges on which it is going forward.  That's always a
21  government prerogative to dismiss charges on its own accord if
22  it sees fit to do that.  As a matter of fact, if we got into
23  other charges that aren't even going to this jury, I'm sure
24  your client would be complaining bitterly about that on appeal
25  if he happened to be convicted, contending that matters

1  totally outside the indicted charges were brought up and that

2  that was the basis on which he was convicted.

3          MR. FORRESTER:  And to be clear, Your Honor, in my

4  closing am I precluded from addressing the actual charging

5  documents and any -- yes, no, maybe so?

6          THE COURT:  The charging documents on which we're

7  going forward?

8          MR. FORRESTER:  Yes.

9          THE COURT:  Obviously -- the jury will have a copy

10  of the indictment with it in the jury room.

11          Now, I would bring up the one matter that has to do

12  with the second charge of using and carrying and possession in

13  furtherance.  As you said earlier in this matter, you're not

14  pursuing the using and carrying prong of that statute.

15          MR. KAUFMAN:  That's correct, Your Honor.

16          THE COURT:  So it would seem to me appropriate to

17  delete it from the language -- that language about using and

18  carrying from the indictment as surplusage.

19          Would you be objecting to that?

20          (Defense counsel conferred.)

21          MR. FORRESTER:  No, Your Honor.

22          THE COURT:  Okay.  I mean, that's what normally

23  happens in these cases.  And since that -- there's not going

24  to be any contention about using and carrying, at least the

25  government is not going to argue that, let the evidence be

DUSTIN HARMON - DIRECT

1    what it is on the question of further -- possession in
2    furtherance or not.
3              MR. CANALES:  I'm sorry, Judge.
4              THE COURT:  Yes, sir.
5              MR. CANALES:  So the language is going to read in
6    possession of, in furtherance of.
7              THE COURT:  Yeah, possession in furtherance of.
8    That language will be in there.
9              MR. CANALES:  Possession in furtherance of.
10             THE COURT:  Right.  The using and carrying language
11   will come out.
12             MR. FORRESTER:  There's two prongs.
13             MR. CANALES:  Okay.
14             THE COURT:  Ms. Goodrich can show you.
15             MR. CANALES:  I got it, Judge.  I understand you.
16             MR. KAUFMAN:  And with Mr. Forrester's reapproach on
17   what he can and can't do, so that all the parties are clear on
18   this, he's not to mention the dismissed 922(g) charges; is
19   that correct, Your Honor?
20             THE COURT:  Right.
21             MR. KAUFMAN:  Thank you.
22             THE COURT:  Okay.  Thank you.
23             (End of side-bar conference.)
24             THE COURT:  The government may call its first
25   witness.

1          MR. KAUFMAN:  Thank you, Your Honor.

2          The United States calls Special Agent Dustin Harmon.

3   And I'll just note for the record, Your Honor, we will be

4   asking the he be subject to recall later in the trial.

5          THE COURT:  All right.

6          <u>DUSTIN HARMON, GOVERNMENT WITNESS, SWORN,</u>

7                    DIRECT EXAMINATION

8   BY MR. KAUFMAN:

9   Q.   Please state your full name and introduce yourself to the

10  jury.

11  A.   Dustin Harmon, special agent with the Drug Enforcement

12  Administration.

13  Q.   Can you tell the jury about your background in law

14  enforcement.

15  A.   Yes, sir, I sure could.

16         Probably -- trying to think back -- 1997, 1998 I was a

17  deputy sheriff up in Virginia.  After that I went to work as a

18  police officer also in Virginia.

19         Then moved on to the DEA, to the Drug Enforcement

20  Administration, where I practiced -- or my post was in

21  Virginia for a while.  I was then transferred to South America

22  and to the Bogota, Columbia area, and I did almost four years

23  in Columbia and South America, different parts.

24         And then I just recently within the last two years moved

25  back up to God's country in North Carolina.

1  Q.   Do you recall what month you came back to North Carolina?

2  A.   April 2012, if I'm not mistaken.  April/May time frame of

3  2012.

4  Q.   Now, to the extent you can discuss this in open court,

5  can you tell the jurors what you were doing in Columbia and

6  South America.

7  A.   Yes, sir.  I was at -- there was a small specialized

8  group, narco-terrorism group in Bogota, Columbia, based out of

9  the United States embassy.  We were assigned the task of

10 investigating narco-terrorism throughout South America and to

11 different parts of the world.  And I was a member of that

12 group for, again, almost four years.

13 Q.   And I believe that you stated you've been in law

14 enforcement for a little bit over 16 years, 17 years; is that

15 right?

16 A.   Yes, sir.

17 Q.   How many of those years have involved drug investigations

18 and arrests?

19 A.   In some form or fashion, all those years have involved

20 some type of drug arrests or investigations.

21 Q.   And can you give a rough estimate as to how many involved

22 methamphetamine?

23 A.   Hundreds.

24 Q.   Have you received any sort of specialized training that

25 relates in some way to methamphetamine?

DUSTIN HARMON - DIRECT

1  A.   Yes, sir, I have.  I received specialized training, but

2  I've also received general training of methamphetamine and

3  general drugs throughout my basic academies that I attended,

4  continuing education classes that I was able to attend and

5  some are required.  I did take some advance classes on

6  methamphetamine at Quantico, Virginia, at the FBI academy and

7  DEA academy.  I've received numerous hours of training on

8  methamphetamine specifically.

9  Q.   Can you tell the jury what kinds of methamphetamine there

10  are if there are more than one.

11  A.   Sure.  In general, meth comes in different forms.  There

12  is the pharmaceutical form, obviously, that -- Desoxyn, I

13  think it's called.

14      But there are illicit forms that come out that involve

15  the manufacturing of methamphetamine, and this is the

16  prevalent form that we see in the United States that's

17  manufactured in Mexico and imported into the United States.

18      There's also a domestic type of Mexican -- of

19  methamphetamine that's manufactured here in the United States.

20      They're all similar in the fact that they're

21  methamphetamine, their base component is methamphetamine.

22  Some are similar in -- but differ in appearance.  Some are

23  crystalized rock, ice looking methamphetamine.  Higher purity.

24  More clear.  And some of the domestic methamphetamine that

25  you'll see is more of a powdery, off-white chunk substance.

DUSTIN HARMON - DIRECT

1    So there's a variance of the nature of methamphetamine,
2  but the effect is a stimulant in methamphetamine.
3  Q.   If methamphetamine can be manufactured domestically,
4  based on your training and experience, why is methamphetamine
5  imported from Mexico?
6  A.   Why is it imported?  It's -- the larger quantities are
7  imported from Mexico.  Very rarely do you have the
8  capabilities or find laboratories that are equipped to produce
9  the large sum of methamphetamine that's pumped out of Mexico.
10  In DEA it's classified as a super lab.  I think the official
11  definition is a laboratory that produces more than 10 pounds
12  in a 24-hour period.  You just don't find those type of labs,
13  although there have been seized labs of this size in the
14  United States, just not very common, especially on the east
15  coast.  Therefore, the prevailing methamphetamine distribution
16  comes from Mexico, importation thereof.
17  Q.   Are you familiar with the term "shake and bake"?
18  A.   Yes, sir.  Yes, sir, I am.
19  Q.   In this context, what does that mean?
20  A.   It's a little watered down version of making
21  methamphetamine.  Unfortunately, I was in South America when
22  it rose to popularity, but I did receive some training on it.
23  And it's a lot easier one-step method to making
24  methamphetamine.  You can -- it's all circumstantial as far as
25  the time that it takes to make methamphetamine.  But, you

DUSTIN HARMON - DIRECT

1  know, a few guys can get together and put some precursor

2  chemicals, and generally those precursor chemicals involve the

3  diverted product of pseudoephedrine.  Pseudoephedrine is used

4  in making methamphetamine, especially domestically.  They'll

5  condense a lot of the steps to get to a final product of

6  methamphetamine with a shake and bake method.

7       It's essentially in a bottle and they'll shake it up with

8  diversionary products and the product is methamphetamine.  But

9  again, those yield smaller amounts of methamphetamine compared

10 to a larger amount that you will get from Mexico.

11 Q.   Is there a general comparison of purity or quality level

12 that you can make between, say, shake and bake and a Mexican

13 lab or super lab?

14 A.   Domestic methamphetamine, depending on the cook -- and

15 again, it's circumstantial -- it can be a higher purity.  I

16 found personally that the higher purity comes from Mexico.

17 You will find some cooks domestically that can reach a higher

18 purity.  But in general, they're not quite as pure because of

19 the machinery, the equipment, and the diversionary products

20 that they use, the chemicals, the precursors, and they have

21 specific labs set up for that in other parts of the world too,

22 including Mexico.

23 Q.   Are you familiar with the acronyms either CI or CS?

24 A.   Yes, sir, I am.

25 Q.   What do those stand for in your opinion?

1   A.    We refer to a CI as a confidential informant or a
2   confidential source.  These are people that provide
3   information through various means to law enforcement,
4   specifically to us in DEA that we utilize to help us do our
5   job.  We utilize information from various facets to include
6   sources of information and informants and sometimes
7   cooperating defendants.
8   Q.    Can you give a rough estimate as to how many CI's, CS's
9   that you've debriefed with or had informational meetings with?
10  A.    Yes, sir.  Again, it's a lot.  A high number.  I would
11  have to say hundreds.
12  Q.    And based on debriefings with them, based on your
13  training, your experience, have you come to be familiar with
14  issues related to methamphetamine such as dosage units,
15  pricing, packaging?,
16  A.    Yes, sir, I have.
17  Q.    Can you start off with -- let's talk about an end user,
18  the consumer.  What is the amount or general amount or range
19  that is considered a dosage unit?
20  A.    Okay.  Again, forgive me for the generalizations, but
21  it's circumstantial again because the user may be a veteran
22  user, for lack of a better term, and he may have a higher
23  tolerance that he may need to try to reach a higher or richer
24  high.  So I can't paint a broad stroke and say a dosage unit
25  is A, B or C.  But I can tell you they range from, like, a

1  tenth of a gram.  Tenth of a gram would cost about $10 if you

2  want to get into pricing.  I can kind of just brief while we

3  go.

4  Q.    Whatever makes sense to you.

5  A.    And you would evolve up into maybe a gram, which is about

6  a hundred dollars in general, hundred dollars a gram.

7         Now, having said this, this can happen throughout the

8  day.  Once a day, two or three times a day a user may use this

9  type of drug and this quantity.

10        So again, it's -- forgive me for not being able to

11  pinpoint exactly what a dosage amount would be, but it would

12  be somewhere in that range of a tenth of a gram up to a gram

13  and several times throughout that day depending on their

14  tolerance.

15  Q.    You started to talk about pricing for those dosage units.

16  How does the pricing for methamphetamine change, if at all,

17  from those small dosage units to larger trafficking amounts?

18  A.    It does change and you can almost insert your own

19  favorite business model because it is -- it's generally a

20  business in the fact that you have a wholesaler, a larger

21  distributor, down to a retailer or reseller, down to a user.

22        So as we are familiar with from a Costco or a Walmart

23  type scenario, the wholesaler may sell this product, in this

24  case a pound of methamphetamine, for a general price of 16, 20

25  thousand dollars.  A retailer or another distributor may buy

1  that for $16,000, turn around and sell it at a gram level.

2  And since they're incurring more fees or more risks, they

3  would generally bump up the price of a gram, of an ounce, of a

4  pound if they resell it.  Because what you'll find is from the

5  wholesaler it's a lot cheaper just like it is in anything that

6  we do daily and -- because we're selling them in large

7  quantities.  The wholesalers are pushing them out to the

8  distributors in larger quantities so they can turn -- and you

9  may pick a pound of methamphetamine up, 5 pounds of

10 methamphetamine up on the border for $2,000 and turn around

11 and sell it for $20,000 in the mountains of Virginia or North

12 Carolina.

13      So the wholesaler will take that, push it out to a

14 retailer.  The retailer will perhaps gram it out and if he

15 sold a typical pound, he bought it for $20,000 and perhaps he

16 wants to sell this $20,000 pound in gram amounts at a hundred

17 dollars a gram, because there are 28 grams in an ounce, will

18 take that $2,800 for an ounce that he just sold, 16 ounces

19 into a pound -- and math wasn't my strong suit, but it's

20 somewhere north of 40 -- $44,000.

21      So again, it's a general business model.

22 Q.   Agent Harmon, you were throwing out some weight amounts.

23 You mentioned an ounce.  Just in case others are similarly

24 challenged as I am with regard to weights, how many grams are

25 in an ounce?

DUSTIN HARMON - DIRECT

1    A.    28 grams in an ounce.

2    Q.    You also talked about pounds, but there are also

3    kilograms.  How many pounds are in 1 kilogram?

4    A.    2.2 pounds in 1 kilogram, yes, sir.

5    Q.    So is it accurate to say that if you are talking about

6    2.2 pounds, that was the equivalent of a thousand grams?

7    A.    Yes, sir.

8    Q.    Okay.  Let's see.  In terms of -- in discussing some

9    weights, are you familiar with the term "cut"?

10   A.    Yes, sir.

11   Q.    What is that?

12   A.    I sure am.

13        In this world of drug trafficking, oftentimes the

14   distributor, the next level from the wholesaler may want to

15   expand his profit margin.  In doing that they will generally

16   take methamphetamine, a pound of methamphetamine, for

17   instance, let's just stick with the same example.  They'll

18   take that pound of methamphetamine and add an adulterant or a

19   cutting agent.  On the streets they call it walking on it or

20   stepping on it.

21        It's simply adding an adulterant, a filler to spread out

22   your product, to spread out.  So I may take that 1 pound that

23   we bought for $20,000 and I'll take that pound and turn it

24   into a pound and a half or 2 pounds if I'm going to sell it.

25   A nasty product.

1    But essentially, you're just increasing your profit

2  margin.  So they'll cut it to increase their profit margin --

3  increase the weight of the drug and just take the life of

4  their product and expand it a little bit.

5    And it's a general -- it's a general cutting agent of

6  MSM, vitamins, lactose, baking soda.  It's simple things that

7  look -- and sometimes what's important with methamphetamine is

8  that it has the same boiling temperature that methamphetamine

9  would have.  So if they burn it, it's not -- you know, you

10  won't see the adulterant sitting still in the pipe or on their

11  aluminum foil or whatever it is they want to use or to inhale

12  or smoke or inject.  It's got to have a similar chemical

13  makeup so they use that similarly with methamphetamine,

14  something that's very akin to meth's boiling point and a

15  regeneration temperature when it comes back together.

16  Q.    Have you found there are certain methods used for

17  packaging methamphetamine for distribution, and, if so, why?

18  A.    I have.  Generally speaking it's -- a good foundation of

19  meth or a foundation of methamphetamine packaging is plastic

20  wrap or baggies.

21    Now, some people will go a step further and include

22  something that may mitigate the smell of meth or the

23  adulterants that are in the meth and they'll wrap it with

24  something, maybe tape or put something in there, coffee

25  grounds or dryer sheets, something that will mitigate in their

1  minds the smell that it emits for a possible canine detection.

2  And this is explained through numerous interviews of why they

3  would add something like a dryer sheet or coffee grounds or

4  mustard seeds or something like that to divert any kind of

5  olfactory detection.

6  Q.   With regard to distribution, are you familiar with the

7  term "mule"?

8  A.   Yes, sir.

9  Q.   Can you describe to the jury what that's about.

10  A.   I sure can.  Again, going back to the example of taking

11  that pound of methamphetamine from Mexico.  In general, this

12  distributor here locally is not going to take the risk or

13  incur the risk of transporting the drug himself.  So what he

14  does is use a lower level member in the drug trafficking

15  organization to do that for him or someone else disassociated

16  to do that for him, a partner to do that for him.  And

17  sometimes they'll use a lower level member, a mule or a

18  courier to say, hey, here's $5,000.  Go pick said pound of

19  methamphetamine up from whatever part on the U.S. border and

20  bring it back to me, or 5 of them, 10 pounds, however the

21  example would be.

22       But in general, a courier is somebody a little bit

23  further removed from the top echelon of a drug trafficking

24  organization.  For obvious reasons, to insulate himself from

25  the actual risk of driving 2,300 miles to pick up a pound of

1   methamphetamine.

2   Q.   Is such a courier used only on that wholesale level or

3   have you found in your training and experience they also can

4   be used on a lower level?

5   A.   It trickles down.  It sure does.  It comes from the top

6   all the way down, and depending on how intricate the

7   organization will be as to how many different moving parts a

8   drug trafficking organization has.

9        And people that may have an ounce -- that may be ounce

10  dealers, which are just regular dealers in areas such as the

11  Western District of North Carolina, Virginia, they use

12  couriers also.  So it's not for the elite or the upper

13  echelon, top of the food chain, DTO members.

14  Q.   Are you familiar in this context with the term "stash"?

15  A.   Yes, sir, I am.

16  Q.   Can you describe what that means and why it's used.

17  A.   Sure.  Stash is a description or a word that we use or

18  the community and drug trafficking organizations use for the

19  same aforementioned reasons that I'm going to use a courier.

20  If I'm a drug dealer, I'm going to use a courier to transport

21  said drugs.  I will also use a different location to store

22  those drugs.  I won't want to take the drugs and leave them

23  out on my bedroom table or in a nightstand.  If I can, I'm

24  going to stash them somewhere, and that may be somewhere like

25  a void in a wall or a hole in the ceiling or a hole in the

1  floor, ceiling.  In the ground is very, very common.  Outside
2  digging holes in the ground.  These are various ways that drug
3  trafficking organization members utilize to hide their product
4  for obvious reasons, again, like I said before, to kind of
5  insulate themselves from the actual product.
6  Q.   Have you heard the expression "tools of the drug
7  trafficking trade"?
8  A.   Yes, sir.
9  Q.   Can you describe what that means to you.
10 A.   Just like any other business or any other job that we
11 would have, there's tools of the trade.  In drug distribution,
12 tools of the trade would be things such as cell phones and
13 guns.  I think that it's very common for drug trafficking
14 organizations, drug trafficking distributors, members to
15 utilize phones.  Sometimes more than one phone.  Sometimes
16 it's -- they'll utilize guns.  And sometimes more than one
17 gun.
18      And they do this for obvious reasons, and maybe obvious
19 to me and maybe not so obvious to someone else, but they're
20 utilizing phones to talk to other members of the drug
21 trafficking organizations.  Sometimes they'll take those
22 phones and put them in other people's names.  This is very,
23 very typical.  Matter of fact, it's atypical if it's done
24 another way.  But they'll usually put it in another name and,
25 again, insulate themselves.  Kind of like we were explaining

DUSTIN HARMON - DIRECT

1  on the courier and the stash location, they'll insulate

2  themselves by putting it in different names.  I've seen them

3  put it in various names, mothers' names, brothers' names, kin,

4  partners.

5      My point is they'll put it in different names.  They'll

6  take those funds -- phones, excuse me, and communicate with

7  other members:  Drivers, retailers, resellers, sources.  And

8  some phones they'll utilize for one or two things and nothing

9  else.  The same thing with guns.  They'll utilize guns to

10 protect themselves, to protect their stash.

11      MR. CANALES:  Your Honor, I'm going to object to the

12 narrative.  I mean, it's going on and on and on, Judge.  I ask

13 that it be a question and answer.

14      THE COURT:  Well, overruled.  But I would ask

15 counsel to control that a little more.

16      MR. KAUFMAN:  Yes, Your Honor.  I believe we're

17 nearing the end of this portion of his testimony.

18 Q.  So Agent Harmon, with regard to firearms, again, I think

19 you earlier said it may be self-evident, but can you explain

20 how guns can be characterized as tools of the drug trafficking

21 trade.

22 A.  Yes, sir.  They're used to protect themselves, to protect

23 stash locations, to protect themselves from law enforcement in

24 many cases.  They're essentially a tool of the trade in the

25 fact that it's a tool for protection.

DUSTIN HARMON - DIRECT

1    Q.    Are you familiar with the term Santa Muerte?

2    A.    Yes, sir, I am.

3    Q.    Can you tell the jury what that means to you.

4    A.    Santa Muerte.  I received training on Santa Muerte.  It's

5    an idle.  It's a small statue sometimes.  It's a folk saint to

6    some that is worshiped by drug trafficking members, drug

7    trafficking organizations.  Although, it is also followed by

8    law-abiding citizens, it's very commonly found in drug stash

9    houses, drug couriers, drug transportation organizations.

10   It's a very common deity in the criminal drug trafficking

11   organization.

12   Q.    And is Santa Muerte always something that's sinister?

13   A.    No, sir.  Again, I'll say it again.  It is also followed

14   by law-abiding citizens.

15   Q.    Let me turn your attention, you said that -- to the

16   investigation itself.  I believe you said that you had arrived

17   in North Carolina DEA in April of 2012?

18   A.    Yes, sir.

19   Q.    Do you see in the room Martin Martinez Saldana?

20   A.    I do.

21   Q.    Can you tell us where he's sitting and what he's wearing.

22   A.    He's sitting between Mr. Canales and Mr. Forrester.  He's

23   wearing a plaid type shirt, button up, with a white T-shirt

24   underneath it with the headphones on.

25             MR. KAUFMAN:  Your Honor, may the record reflect an

DUSTIN HARMON - DIRECT

1  in-court identification of the defendant.

2          THE COURT:  It will so reflect.

3          MR. KAUFMAN:  Thank you.

4  Q.    Agent Harmon, when did Mr. Saldana kind of get on to your

5  radar screen as a target of any of your investigations?

6  A.    Shortly after I arrived in the Western District of North

7  Carolina, as I explained earlier, I received a phone call from

8  both law enforcement officials in Virginia and law enforcement

9  officials up in Ashe County, North Carolina.  Based on

10  intelligence we received, we opened a case on Mr. Martinez

11  Saldana in the Western District of North Carolina out of my

12  office.

13  Q.    All right.  I'd like to show you some photographs that

14  have been marked for identification purposes as 1A through G.

15  I'm going to scroll through them.  1A, 1B, 1C, 1D, 1E, 1F, 1G.

16          Do you recognize these images?

17          Oh, I'm sorry.

18  A.    I didn't quite get it there.

19  Q.    My apologies.  Let me...

20          Okay.  Now everybody but the jury and the gallery.  1A,

21  1B, 1C, 1D, 1E, 1F, and 1G.

22  A.    Yes, sir, I sure do.

23  Q.    And how do you recognize these individuals?

24  A.    These are also people who we investigated during this

25  investigation with Mr. Saldana, the defendant.

DUSTIN HARMON - DIRECT

1    Co-conspirators.

2            MR. KAUFMAN:  Your Honor, at this time we would move

3    to admit and publish 1A through 1G.

4            THE COURT:  Let them be --

5            MR. CANALES:  No objection, Your Honor.

6            THE COURT:  Let them be admitted.

7            (Government's Exhibits Nos. 1A, 1B, 1C, 1D, 1E, 1F,

8    and 1G were received into evidence.)

9    Q.   All right.  1A, who is this?

10   A.   Mr. Danny Eller.

11   Q.   And have you had an opportunity to meet with him in the

12   past?

13   A.   Yes, sir, I have.

14   Q.   1B?

15   A.   Bob Shore.

16   Q.   1C?

17   A.   Jose Pina.

18   Q.   1D?

19   A.   Humberto Pina.

20   Q.   1E?

21   A.   James Hawkins.

22   Q.   And you mentioned this for 1A, but for 1D through E, have

23   you had an opportunity to meet with all these individuals?

24   A.   Yes, sir, I sure have.

25   Q.   And have you, in fact, debriefed with them about

DUSTIN HARMON - DIRECT

1    Mr. Saldana and others?

2    A.    Yes, sir, I sure have.

3    Q.    1F?

4    A.    Mr. Martinez Saldana.

5    Q.    And 1G?

6    A.    Ms. Clara Caudell.

7    Q.    And you've had an opportunity to meet with her, without

8    going into any details --

9    A.    Yes.

10   Q.    -- about Mr. Saldana and others?

11   A.    Yes, sir, I did.

12             MR. KAUFMAN:   And, Your Honor, I have what's been

13   marked as Government's Exhibit 14B for identification.   We

14   plan to leave it as an item for identification only for Agent

15   Harmon.   We're proposing to admit it and publish it at a later

16   time in the trial.

17             THE COURT:   All right.

18             MR. KAUFMAN:   Images of it have been provided to

19   defense counsel in discovery.

20             And, Your Honor, throughout the trial may I approach

21   the witnesses on the stand?

22             THE COURT:   Yes, sir.

23   Q.    Again, Agent Harmon, I'm showing you what's been marked

24   for identification purposes 14B.   It's not to be shown to the

25   jury at this point in time.   But if you could review it and

1   see if you recognize the images.  There are two tokens and

2   then there is a bag that has something inside of it as well.

3   A.   Yes, sir.

4   Q.   All right.  And if you could -- without going into any

5   other detail, do you recognize images in that container, 14B?

6   A.   Yes, sir, I do.

7   Q.   And what are they?

8   A.   In the bag or more specifically in general?

9        The two small tokens?

10  Q.   Yes.

11  A.   I recognize them to be small idols of Santa Muerte.

12  Q.   All right.  And inside of the bag -- I'm sorry, you've

13  already stated this.  What's inside of that?

14  A.   It's another picture of Santa Muerte.

15  Q.   All right.

16  A.   With small tokens and a cross.

17  Q.   All right.  Agent Harmon, next I'd like to show you what

18  have been marked -- one disk has Exhibits 7 and 8 and then

19  there's another disk with 7A, 8A, and then two documents, 7B

20  and 8B.

21       Do you recognize all these documents -- these disks and

22  documents?

23  A.   Yes, sir, I do.

24  Q.   Can you tell us how you recognize them.

25  A.   7B and 8B are transcripts from previous recordings that

DUSTIN HARMON - DIRECT

1   we had made with confidential sources, cooperating defendants.

2   And these are the applicable compact disks applying to each

3   transcript that was taken from those recordings.

4   Q.   And so 7 and 8, are they the full recordings?

5   A.   Yes, sir.

6   Q.   And then are 7A and 8A clips that are --

7   A.   Clips.

8   Q.   -- accurate clips of those recordings?

9   A.   They're accurate clips of what's included on 7A.

10  Q.   And then have you personally gone over these recordings

11  and the clips and confirmed that the transcripts in 7 -- 7B

12  and 8B are accurate?

13  A.   Yes, sir, I have.

14  Q.   All right.  Now, did you also recognize the voices in

15  those two recordings?

16  A.   I did.

17  Q.   And with regard to the 7 series, who are the voices that

18  you recognized from that?

19  A.   I recognized Danny Eller and Martin Saldana, the

20  defendant.

21  Q.   And then in 8, the 8 series.

22  A.   I recognized Bobby Shore and Martin Martinez Saldana, the

23  defendant.

24  Q.   Okay.  We'll get back into details in a moment, but did

25  you have the opportunity to, in fact, speak with Mr. Saldana

1  during the course of your investigation?

2  A.   Yes, sir, I did.

3  Q.   Okay.  And by the way, the disks that have 7, 7A, 8, and

4  8A, did you recognize your initials on those recordings?

5  A.   I sure did, yes, sir.

6  Q.   All right.  Let's go to the date that you had the

7  conversation with Mr. Saldana.  Let's turn to December 12,

8  2012.

9       Can you please tell us what happened that day.

10  A.   December 12th, 2012, we executed a search warrant,

11  federal search warrant on the property of Bob Shore in Ashe

12  County, North Carolina.

13  Q.   And what happened as a result of that?

14  A.   As a result of that, we ended up applying for and

15  executing another search warrant at the property of 148 and

16  178 Ervin Houck Drive in Ashe County, North Carolina, the

17  defendant's property.

18  Q.   And is, in fact -- is Mr. Saldana, in fact, the owner of

19  those properties?

20  A.   Yes, he is.

21  Q.   Have you seen deeds for those two properties that show

22  him as the owner?

23  A.   Yes.

24  Q.   And are there also two adjacent or connecting properties

25  of 212 Ervin Houck and one that's identified as a PIN

DUSTIN HARMON - DIRECT

1  number --

2  A.   Sure.

3  Q.   -- 131, et cetera?

4  A.   Yes, sir, I have.

5  Q.   And are those also -- do those also belong to

6  Mr. Saldana?

7  A.   Yes, sir.

8  Q.   All right.  When you executed the search warrant at

9  Mr. Saldana's residence, what, if anything, did you find?

10 A.   The search warrant at Saldana's or Shore's, I'm sorry?

11 Q.   At Saldana's.

12 A.   Saldana's.  We found various guns and identifications,

13 cell phones specifically at the 148 residence, to include

14 Mr. Saldana in the residence.

15 Q.   Did you find any cell phones on Mr. Saldana himself?

16 A.   I did, yes, sir.

17 Q.   Now, you said that you had an opportunity to interview

18 Mr. Saldana.  Can you tell us about how that happened.

19 A.   Yes, sir.  Once we made entry into the house and secured

20 the location, I sat down with Mr. Saldana and advised

21 Mr. Saldana of his *Miranda* warnings via a small yellow DEA-13A

22 card that I keep on my person.  It's actually sitting at my

23 desk.  The card is utilized just to advise them of their

24 *Miranda* warnings.  I did that with Mr. Saldana and we spoke

25 subsequent to that.

DUSTIN HARMON - DIRECT

1   Q.   And were you alone?

2   A.   No, sir.

3   Q.   Who was with you?

4   A.   I had several different investigators.  Myself, when I

5   spoke with Mr. Saldana was Special Agent David Schauble with

6   ATF, Bureau of Alcohol, Tobacco and Firearms.

7   Q.   All right.  In what language did the interview take

8   place?

9   A.   With Mr. Saldana?

10   Q.   Yes.

11   A.   In English.

12   Q.   Can you tell us why.

13   A.   Because he spoke perfectly good English in my opinion and

14   he actually preferred English when I asked for the option

15   because I speak Spanish.

16   Q.   I was going to ask about that.  Can you tell us about

17   your Spanish speaking ability.

18   A.   I like to think it's pretty decent, but, you know, I

19   don't know.  I had training.  I had five months of training

20   and I do speak fluent Spanish.

21   Q.   And despite your humility, are you able to conduct

22   translations between English and Spanish?

23   A.   Yes, sir.

24   Q.   And in fact, do you routinely use that as an effective

25   part of your job?

DUSTIN HARMON - DIRECT

1  A.   Yes, sir.

2  Q.   All right.   During the interview did you address with

3  Mr. Saldana the firearms that were found in the residence?

4  A.   Yes, we did.

5  Q.   And can you tell us about that part of the conversation.

6  A.   Yes, sir.   Mr. Saldana stated that there were firearms in

7  his house.   I think specifically myself and Agent Schauble

8  asked Mr. Saldana if there were firearms in the house and he

9  said that there were.

10      He explained to me and Mr. Schauble, ATF Agent Schauble,

11  Special Agent Schauble, that the firearms, two of them -- if

12  I'm not mistaken, two of them were given to him by Betty

13  Houck, a lady that he shared the residence with.   A shotgun

14  and a .22 pistol were given to him.   And two others he had won

15  at a punch board game sometime in his stay in the states here

16  or during -- I think it was won here domestically, I'm sorry,

17  as opposed to in Mexico because he was traveling back and

18  forth.

19  Q.   And the four firearms that he discussed with you, are

20  those the same firearms that -- or at least consistent with

21  the same four firearms that you found in his bedroom?

22  A.   Yes, sir, they were.

23  Q.   With regard to Mr. Saldana's phones, can you tell us,

24  what do you do when you seize a phone from a target?

25  A.   Sure.   Immediately we'll look into the phone to make

DUSTIN HARMON - DIRECT

1  sure -- especially -- depending on the situation,

2  circumstantial situation.  In this case we had information

3  leading us to believe that other things were happening.  It

4  was a very fluid situation.  That Mr. Saldana may be leaving

5  the country.  So we immediately look into phones to see if

6  there's anything that we can do to salvage safely evidence

7  that may get destroyed.  And we did that with the phones that

8  were seized off of Mr. Saldana.

9  Q.   And is that a legal standard operating procedure --

10  A.   Yes, sir.

11  Q.   -- for law enforcement?

12  A.   Yes, sir.

13  Q.   Now, is there any way in addition to reviewing -- just by

14  looking at the phone, is there any other effort that you will

15  often take with regard to preserving the evidence in a phone?

16  A.   Yes, sir.  We have a -- not to get too much into the

17  weeds, we have a device that downloads the phone to --

18  essentially so we won't have to sit and poke through the phone

19  because so many phones are different and I have a hard time

20  with some of these smart phones.  They're a lot smarter than I

21  am.  So we'll download a phone into an easy readable format.

22  Q.   All right.  I'd like to show you what's been marked as

23  Government's Exhibit 30 for identification.  And for the time

24  being, everybody except for the jury and the gallery can see

25  it.  And I'm going to increase a certain portion in the middle

DUSTIN HARMON - DIRECT

1    or just near the middle.

2        This is a multi-page document.  Are you familiar with

3    this?

4    A.    Yes, sir, I am.

5    Q.    Can you describe what Exhibit 30 for identification is.

6    A.    This is the product of a device that we used to download

7    our cell phones.  It essentially prints it out in a nice,

8    clean, readable, user-friendly format.

9    Q.    And this particular one you recognize?

10   A.    Yes, sir, I do.

11   Q.    And what is it?

12   A.    This is the phone that I retrieved off Mr. Saldana's

13   person.

14   Q.    And did he have only one phone?

15   A.    No, he had two phones on his person.

16   Q.    All right.  So with regard to this one --

17        MR. KAUFMAN:  By the way, Your Honor, we'd move to

18   admit and publish Exhibit 30.

19        THE COURT:  Let it be admitted.

20        (Government's Exhibit No. 30 was received into

21   evidence.)

22   Q.    All right.  I'm increasing the size of the portion just

23   above -- two-thirds of the way up the page.

24        Are you familiar with the number that's now appearing on

25   the right side starting with 336?

1   A.   Yes, sir, I am.

2   Q.   What is that?

3   A.   That's the telephone number corresponding to this phone

4   that we seized.

5   Q.   From Mr. Saldana?

6   A.   Yes.

7   Q.   Did you -- we went through Exhibit 1A through G and you

8   recognized certain individuals in this investigation.  Did you

9   find any of those people's phones and phone numbers -- I'm

10  sorry, phone numbers in Mr. Saldana's phone?

11  A.   I did.  I found all of the aforementioned people through

12  those pictures.  I found -- I'm sorry, the pictures that we

13  just showed.  I found those people in his contact list.

14  Q.   Okay.  I'd like to go in Exhibit 30 to page 3.  And I'm

15  going near the bottom of the page.

16       This number ending 3830 stated for Bob.

17  A.   Yes, sir.

18  Q.   Do you know whose phone that was?

19  A.   That was Bob Shore's.  This is the phone that he had on

20  him when we arrested him that same day.

21  Q.   Okay.  Going to the next page, 4, at the very bottom.

22       Do you recognize this one that indicates Danny and then

23  1808?

24  A.   I do.

25  Q.   Whose is that?

DUSTIN HARMON - DIRECT

1   A.   This is Danny Eller's and this is the phone that he had
2   on him when we arrested him also.
3   Q.   And then two-thirds of the way down the page.
4        States Clara, ending in 5562.
5   A.   Yes, sir.  There are actually two phone numbers for Clara
6   that we had determined through the investigation.  Both of
7   those belong to Clara Caudell in Virginia.
8   Q.   Going to the next page, 5, about halfway down.
9        It says Don Jose and Don Jose 2 with a couple of phone
10  numbers.  Do you recognize either of those?
11  A.   I do.  Those are Jose Pina in the previous pictures.
12  These are cell phones that he has utilized.  And he had the
13  phones also with him when we arrested him.
14  Q.   Okay.  Going to page 8, near the top, second from the
15  top.
16       States Jimmy Hawkins and ending 2714.  And whose phone is
17  that?
18  A.   Mr. James Hawkins, the gentleman in the picture.  And
19  this is the phone that he had when officers of the State
20  Bureau of Investigation talked to Mr. Hawkins.
21  Q.   I didn't go through all the photos of people that you've
22  already testified about, but in 1E that's James Hawkins --
23  A.   Yes, sir.
24  Q.   -- whose phone was in Mr. Saldana's --
25  A.   Contact list.

DUSTIN HARMON - DIRECT

1  Q.   Now, did you also have an opportunity to review other

2  data that was downloaded from the phone, that is, images?

3  A.   Yes, sir, I did.

4  Q.   Can you describe what you found.

5  A.   I found several images on the phone belonging to

6  Mr. Saldana, the phone that I retrieved off his person, to

7  include -- and forgive me if it's not the right -- selfies, I

8  guess is the term they're using.  A picture that he appeared

9  to be taking of himself in that cell phone I seized off his

10 person.

11 Q.   And I'd like to show you what's been marked for

12 identification purposes as 30A, and the jury can't see it yet.

13 Page 1, page 2, page 3, page 4, page 5.

14      Do you recognize these images?

15 A.   Yes, sir, I do.

16 Q.   How do you recognize them?

17 A.   Those are the -- consistent with the images found on his

18 cell phone when we seized the cell phone from Mr. Saldana.

19 Q.   Okay.  Now --

20      MR. KAUFMAN:  Your Honor, we'd move to admit and

21 publish 30A.

22      THE COURT:  Let it be admitted.

23      MR. KAUFMAN:  Thank you, Your Honor.

24      (Government's Exhibit No. 30A was received into

25 evidence.)

DUSTIN HARMON - DIRECT

1  Q.    Okay.  I believe you mentioned selfies.  Is that

2  referring -- this is now page 5.  I'll go backwards.

3        Five?

4  A.    Yes, sir.

5  Q.    Four?

6  A.    Yes, sir.

7  Q.    Three?

8  A.    Yes, sir.

9  Q.    And two?

10 A.    Yes, sir.

11 Q.    Now, on page 1, is this also from his cell phone?

12 A.    Yes, sir.

13 Q.    Now, unfortunately, the electronic exhibit sticker is on

14 the bottom right.  What I'd like to do is show a printout

15 version of the very same image.

16       Okay.  What's showing now on the ELMO, on the overhead

17 image capture, is this the same as page 1 of Exhibit 38 --

18 A.    Yes, sir.

19 Q.    -- 30A?

20 A.    Yes, sir.

21 Q.    Okay.  Now, do you see the bottom right corner where the

22 exhibit -- electronic exhibit sticker was just shown to you?

23 A.    Yes, sir, I do.

24 Q.    Do you know what's in the bottom right corner or what it

25 appears to be?

DUSTIN HARMON - DIRECT

1   A.   Appears to be a box of latex gloves, yes, sir.

2   Q.   What's that belief based on if there is anything more

3   than just looking at this image?

4   A.   The night we did the search warrant, we seized a box of

5   latex gloves from that actual position off that table.

6   Q.   In that same building?

7   A.   In that same vicinity, yes, sir.  General area.

8   Q.   And that's on Mr. Saldana's property?

9   A.   Yes, sir.

10  Q.   Oh, and I apologize.  I'm not sure if the jury actually

11  saw 30A so I'm going to go back and run through them very

12  quickly.

13       So 30A, page 1.  There's that exhibit sticker on the

14  bottom right.

15       And then page 2.

16       Page 3.

17       Page 4.

18       And page 5.

19       Now, in addition to the physical phone, is it customary

20  when -- during your investigation to also obtain from the

21  actual phone company certified subscriber and other records?

22  A.   Yes, sir, sure is.

23  Q.   And is that done via subpoena?

24  A.   Yes, sir, administrative subpoena.

25  Q.   All right.  Did you, in fact, obtain the subscriber

1  records for this phone?

2  A.   I did.

3  Q.   Okay.  And this is the phone where the last four are

4  1155?

5  A.   Yes, sir.

6  Q.   All right.  I'd like to show you what's been marked as

7  Exhibit 31 for identification purposes for everyone but the

8  jury at this point.  Do you recognize this?  And I'll

9  highlight the top third.

10  A.   Sure.  Yes, sir, I do.

11  Q.   What is that?

12  A.   This is the returned product that Carolina Wireless or

13  their subsidiary Neustar returns to us via an administrative

14  subpoena to let us know who the phone is registered to or who

15  purchased the phone.

16  Q.   All right.

17           MR. KAUFMAN:  Your Honor, at this time we'd move to

18  admit and publish Exhibit 31.

19           THE COURT:  Let it be admitted.

20           (Government's Exhibit No. 31 was received into

21  evidence.)

22  Q.   All right.  I am going to highlight that top third

23  portion again.

24       And so when it says "Target details," the phone number

25  there, that is the phone that you seized off of Mr. Saldana?

DUSTIN HARMON - DIRECT

1  A.   Yes, sir, I did.

2  Q.   The customer name?

3  A.   Francisco Lopes.

4  Q.   Do you know or have you heard of anybody in the

5  investigation with that name?

6  A.   No, sir.

7  Q.   With regard to the customer address, 1 South Street,

8  Jefferson, North Carolina 28640, are you familiar with that

9  address?

10 A.   No, sir.  We actually checked that address and did not

11 find a valid address at 1 South Street, Jefferson, North

12 Carolina.

13 Q.   So your testimony is that's actually a fake address?

14 A.   Yes.

15 Q.   And there are other numbers for other individuals as part

16 of the investigation that are on Exhibit 31; is that right?

17 A.   Yes.

18 Q.   Now, after the so-called takedown or mass arrests that

19 were taking place on December 12th, 2012, that time period,

20 did you have an opportunity to debrief with Jose Pina?

21 A.   Yes, sir, I did.

22 Q.   And was one of those debriefings on February 12th of

23 2013?

24 A.   Yes, sir, sure was.

25 Q.   So basically, two months after the arrests took place.

DUSTIN HARMON - DIRECT

1  A.   Yes, sir.

2  Q.   What sort of information did he provide to you that

3  caused you to take further actions after leaving the jail?

4  I'm sorry.  Let me take a step back.

5        Where did your debriefing with Mr. Pina take place?

6  A.   Caldwell County Sheriff's Office.

7  Q.   Okay.  And basically, what did he tell you?

8            MR. CANALES:  I'm going to object, Your Honor.

9  Hearsay.

10           THE COURT:  Overruled.

11           MR. CANALES:  He's going to testify as to what

12 somebody else told him.

13 Q.   And specifically with regard to what you did --

14 A.   Based on information I received --

15           THE COURT:  Wait just a minute.

16           THE WITNESS:  I'm sorry.

17           (Pause.)

18           THE COURT:  Go ahead.

19           MR. KAUFMAN:  Thank you, Your Honor.

20           The intention here is to ask what he was told to

21 indicate what he then did.  This is not for the proof of the

22 matter asserted.  This has to do with subsequent search

23 activity.

24           THE COURT:  All right.  Overruled.

25 Q.   And so, Agent Harmon, specifically, although you may have

DUSTIN HARMON - DIRECT

1  discussed many topics with Mr. Pina, if you could focus in on

2  just the information he provided to you that caused you to

3  then conduct certain activities.

4  A.   He explained to us that there were stash locations

5  around --

6          MR. CANALES:  I'm going to object, Your Honor.

7  Again, I'm going to renew my objection.  Now, if he's going to

8  testify that based on the conversation that he had, he took

9  certain actions, I can see that, Judge.  But for him to

10  testify as to what was said, that he's basically saying what

11  somebody else told him, Judge, that's plain hearsay.

12          THE COURT:  Sustained.  Don't consider the last

13  answer, members of the jury.

14  Q.   (By Mr. Kaufman) So without saying what Mr. Pina

15  specifically said to you --

16  A.   Yes, sir.

17  Q.   -- can you tell us after speaking with him, what did you

18  do?

19  A.   Based on an interview with Mr. Pina, we applied for and

20  received two state search warrants for the properties of 148

21  and 147 and their curtilage -- 178, I'm sorry, and 148 Ervin

22  Houck Road and their surrounding curtilage.

23  Q.   And, Agent Harmon, just to confirm, I believe that

24  there's been testimony about four immediately adjacent

25  properties.

DUSTIN HARMON - DIRECT

1  A.   Yes, sir.

2  Q.   And so did the search warrants also cause you to search

3  more than just 148 and 178 Ervin Houck?

4  A.   Yes, sir.

5  Q.   Okay.

6  A.   It's just a simple small square of property that's kind

7  of subdivided.

8  Q.   And actually, while we're talking about that, let me show

9  you -- let's see.  Sorry, I'm going the wrong way.  Here we

10  go.

11      Let me show you briefly what's been marked for

12  identification purposes as 19 for identification.  Do you

13  recognize what this is?

14  A.   I do.

15  Q.   What is it?

16  A.   That's a satellite image of the property that we've been

17  discussing, 148 and 178 Ervin Houck Road.

18  Q.   All right.

19          MR. KAUFMAN:  Your Honor, we'd move to admit and

20  publish 19.

21          MR. CANALES:  No objection.

22          THE COURT:  Let it be admitted.

23          (Government's Exhibit No. 19 was received into

24  evidence.)

25  Q.   All right.  Can you tell us what properties are indicated

DUSTIN HARMON - DIRECT

1    on this image.

2    A.    148 and 178 and the two aforementioned properties, the

3    PIN number parcel and the other -- forgive me for not knowing

4    the address, Mr. Kaufman.

5    Q.    Is it 212?

6    A.    212 Ervin Houck Drive.

7    Q.    Okay.  Let's see.

8         And so you were starting to discuss how you obtained a

9    couple search warrants for these properties.  Were you, in

10   fact, present during the search?

11   A.    Yes, sir, I was.

12   Q.    Just in general terms, what, if anything, did you find?

13   A.    We found approximately $50,000 in United States

14   currency -- I believe it was 49,980, $20 shy of 50,000 --

15   buried in the ground and several ounces of methamphetamine

16   buried in the ground or hidden in various places throughout

17   the property; some other stash locations, meaning some empty

18   PVC pipe tubes that were placed there consistent with that

19   which we found the $50,000 in; and some ammunition and, if I'm

20   not mistaken, magazines for a long gun.

21   Q.    All right.  After the seizure of the money, did you

22   obtain a bank check for the money that you turned in?

23   A.    Yes, sir, I did.

24   Q.    I'd like to show you what's been marked for

25   identification purposes as Government's Exhibit 17.

DUSTIN HARMON - DIRECT

1      Do you recognize what this is?

2  A.   This is the cashier's check or the official check

3  published receipt of the money that we turned over to Yadkin

4  Valley Bank.

5          MR. KAUFMAN:  Your Honor, we'd move to admit and

6  publish.

7          THE COURT:  Let it be admitted.

8          (Government's Exhibit No. 17 was received into

9  evidence.)

10 Q.   So this was for the funds that were seized as a result of

11 your conversations with Mr. Pina from Mr. Saldana's property?

12 A.   Yes, sir.

13 Q.   Now, approximately a year later, now, February 6th of

14 2014, did you have a subsequent -- did you have a subsequent

15 debrief with Mr. Pina?

16 A.   Yes, sir, I did.

17 Q.   And what additional information did you learn then?

18 A.   Based on information we provided -- based on information

19 gained during an interview with Mr. Pina, we spoke with

20 April -- I'm sorry, the name escapes me.  A female friend of

21 Mr. Pina, and realized under -- and basically -- I'm trying to

22 be careful here, Your Honor, excuse me.

23      Essentially, we -- based on the interview, we spoke with

24 April Blevins, a friend of Mr. Pina's, and recovered a $20,000

25 pickup truck, and spoke with her and debriefed Mrs. Blevins

1  concerning her knowledge of the involvement of Mr. Saldana and

2  Mr. Pina.

3  Q.    Did you come to learn where Ms. Blevins had obtained that

4  money for the truck?

5  A.    From the properties that we just saw up on the screen.

6  Q.    And did you then -- what did you do with regard to that

7  truck?

8  A.    We seized it.  Administratively seized the pickup truck.

9             MR. KAUFMAN:  Your Honor, we have no further

10  questions.

11            THE COURT:  Wait just a minute.

12            I beg your pardon.

13            MR. KAUFMAN:  I'm sorry.

14            THE COURT:  We're going to take a recess.

15            MR. KAUFMAN:  Yes, Your Honor.  And I will just note

16  that we have no further questions for Agent Harmon at this

17  time.  When his testimony is over, we'd ask that he be subject

18  to recall.

19            THE COURT:  All right.  That's suitable.

20            We'll take a recess, members of the jury.  We'll

21  call for you in about 15 minutes.  Remember the usual

22  instructions.  Keep an open mind.  Don't discuss the case.

23  Thank you.

24            (Brief recess at 3:20 p.m.)

25            THE COURT:  Are the parties ready to proceed?

1          MR. KAUFMAN:  Yes, Your Honor.

2          MR. CANALES:  Yes, Your Honor.

3          THE COURT:  May we have the jury, please.

4          (Jury entered the courtroom.)

5          THE COURT:  All right, sir.  The jury is settled.

6    Cross examination.

7          MR. CANALES:  Yes, Your Honor, if I may.

8                      DUSTIN HARMON

9                   CROSS EXAMINATION

10   BY MR. CANALES:

11   Q.   Mr. Harmon, I'm going to be asking you some questions.

12   Sometimes I have a tendency to speak really fast.  If I do,

13   please ask me to repeat the question.  I'd be more than happy

14   to.  You're not going to insult me.  Just anything that -- the

15   way -- how I say words you don't understand them, let me know.

16   I'd be more than happy to repeat them time after time.  Deal?

17   A.   The same to you.

18   Q.   Now, Officer, you said that you arrived -- did you arrive

19   here in North Carolina in April or May of 2012?

20   A.   Yes, sir.  In that time frame, yes, sir.

21   Q.   So you were in -- and then this arrest happened when?

22   A.   December 2012.

23   Q.   December of 2012.  Now, so it's -- and prior to that you

24   had been gone for years?

25   A.   Yes, sir.

DUSTIN HARMON - CROSS

1  Q.   Are you originally from here?

2  A.   No, sir.

3  Q.   Where are you from originally?

4  A.   Virginia.

5  Q.   Virginia.  So would it be fair to say that your knowledge

6  of who's who in this county or in this area in April or May of

7  2012 was just as good as mine?  Meaning you were new.

8  A.   No, sir.  And I can explain that if you would like.

9  Before I went to South America, Columbia, I was stationed in

10 the Roanoke, Virginia, DEA office.

11 Q.   Yes, sir.

12 A.   And their area of responsibility borders North Carolina's

13 area of responsibility.  So the Western District of Virginia

14 is where I was working.  It bordered the Western District of

15 North Carolina.  Moreover, I actually did undercover work in

16 North Carolina, specifically in Ashe County, North Carolina,

17 against Mexican methamphetamine.

18 Q.   Okay.  But let me ask you this question, then.  In April

19 and May of 2012 when you first got here, did you already know

20 about Mr. Eller?

21 A.   Mr. Eller?

22 Q.   Yeah.  Had you met him before prior to that date?

23 A.   Prior to me arriving, no, sir.

24 Q.   Have you ever -- prior to that date have you ever met

25 Hawkins?

1  A.    No, sir.

2  Q.    What about Ms. Caudell?  Clara.

3  A.    Her specifically?  No.

4  Q.    Okay.  How about the Pinas?

5  A.    No, sir.

6  Q.    Okay.  So is it fair to say that the first time you even

7  heard of these people was in April or May of 2012?

8  A.    Yes, sir, fair statement.  Absolutely.

9  Q.    And then by, say -- you testified that in February of --

10 in February of 2013, two months after the arrests, you're

11 already talking to Pina; is that correct?

12 A.    Yes, sir.

13 Q.    As a matter of fact, you testified you spoke to one of

14 the Pinas, but in reality you had a chance to speak to both of

15 them; is that correct?

16 A.    I did.

17 Q.    Okay.  So you had been here, like, say, ten months, eight

18 months when you were relying on the Pinas; is that fair to

19 say?

20 A.    No, sir.

21 Q.    You got here in April, May of 2012.  You spoke to them on

22 or about February 2013, right?  How long -- you had been here

23 how long?

24 A.    Your time frame is right, but your statement of me just

25 relying strictly on the Pinas I don't agree with.

1   Q.   No, of course.  Of course.  There's different -- you

2   testified also earlier that you got your information from --

3   in different ways.

4   A.   Yes, sir.  Yes, sir.

5   Q.   Okay.  That's a fair statement?

6   A.   Maybe I misunderstood the question, I apologize.

7   Q.   Now, is Jose Pina an honest person?

8           MR. KAUFMAN:  Objection.

9           THE COURT:  Overruled.

10  A.   He is -- he was eventually an honest person, yes, sir.

11  Q.   Eventually?

12  A.   Yes, sir.

13  Q.   How about Humberto Pina?

14  A.   He was also eventually an honest person, yes, sir.

15  Q.   And Bobby Shore?

16  A.   He was an honest person to my knowledge, yes, sir.

17  Q.   Was he an honest person always?

18  A.   I'm sorry?

19  Q.   Has he always been an honest person?

20  A.   From the times that I've talked to him, Mr. Canales, I

21  can say that he corroborated a lot of my investigation, yes,

22  sir.

23  Q.   Do you think he was a good and honest person in October

24  of 2012?

25  A.   October of 2012?

1  Q.   Uh-huh.

2  A.   I didn't know Mr. -- Mr. Shore, is that who we're talking

3  about?  I didn't know Mr. Shore in October 2012.

4  Q.   How about --

5  A.   Personally.

6  Q.   How about Mr. Hawkins in, say, November 2012, a month

7  prior to the arrest of my client, was he a good person?

8  A.   I didn't have a chance to talk to Mr. Hawkins in November

9  of 2012, I apologize.

10  Q.   Okay.  Now, do you think they're honest now?

11  A.   Yeah, they are now, yes, sir.

12  Q.   And do you think they're reliable?

13  A.   They are now, yes, sir.

14  Q.   Do you know approximately the date in which Pina became

15  honest?

16  A.   I couldn't specify the date, Mr. Canales, but I can tell

17  you that it's not a very uncommon occurrence for somebody to

18  mitigate their role and eventually tell the truth.

19  Q.   But right now we're talking about honesty.

20  A.   Yes, sir.

21  Q.   Which is something the jury is going to have to decide

22  whether people are being --

23          MR. KAUFMAN:  Objection.

24          THE COURT:  Overruled.

25  A.   Undoubtedly, yes, sir.

1    Q.    Honesty is an issue that -- credibility is something that
2    will be up to the jurors to decide --
3    A.    Sure.
4    Q.    -- of a person, right?
5    A.    Yes, sir.
6    Q.    All right.  So do you think that Mr. -- let's talk about
7    Ms. Clara Caudell, Clara.  Is she honest?
8    A.    She was eventually honest with us, yes, sir.
9    Q.    Okay.  How about Mr. -- how about trustworthy?  Is she
10   trustworthy?
11   A.    Eventually I can corroborate information.  And that's
12   what I do for a living with confidential sources and
13   informants is I corroborate their information.  That's when I
14   decide whether I should use them or not.  And I decided to use
15   them.
16   Q.    And I understand you make an honest evaluation --
17   A.    Sure.
18   Q.    -- and a fair evaluation of what's given to you and from
19   there you make a decision.
20   A.    Yes, sir.
21   Q.    I'm not questioning that at all, Officer.  What I am
22   asking you is about a person's integrity:  What's in their
23   heart, what's in their soul.  Do you think that the Pinas --
24   the Pinas are good in their heart as far as honesty?
25              MR. KAUFMAN:  Objection, Your Honor.  This testimony

1  about what's in someone's soul and their heart, let's stick

2  with the facts.

3          THE COURT:  Overruled.  Cross examination.

4  Q.   Okay.  Now, let me put it this way.  When was Hawkins

5  arrested?

6  A.   Forgive me, Mr. Canales, I don't know the date.  I can't

7  remember exact dates.

8  Q.   Okay.  When did Humberto Pina get arrested?

9  A.   It was also December 12, 2012.

10 Q.   December 12, 2012.  Now --

11 A.   Yes, sir.

12 Q.   -- what about Jose Pina?

13 A.   It was the same day.

14 Q.   How about Bobby Shore?

15 A.   Yes, sir, same day.

16 Q.   And Mr. Eller?

17 A.   No.  Now, if I'm not mistaken, it was the day before --

18 no, I'm sorry, it was weeks before.  It was weeks before the

19 12th.

20 Q.   Bobby Shore or Mr. Eller?

21 A.   Mr. Eller.

22 Q.   Weeks before?

23 A.   If I'm not mistaken.  And forgive me for not knowing the

24 dates.

25 Q.   So in reality, you hadn't spoken to none of them prior to

1  the date of their arrest, correct?

2  A.   Fair to say.

3  Q.   Okay.  Now, is it fair to say that they have a reason for

4  coming and testifying today, right?

5  A.   I'm sorry?

6  Q.   I mean, do they have a motive to testify today?  What's

7  in it for them?  They all have something in common, right?

8  A.   Sure.  And I'm sure their desire is to have a reduction

9  in their sentence by telling the truth to the judge.

10  Q.   Wouldn't you -- would it be fair to say that criminals

11  would go out of their way, forego honesty just to get what

12  they want?

13  A.   The generalization could be that; understanding with

14  these particular individuals that if they do not tell the

15  truth, they're in worse harm, worse shape, and we've explained

16  that to them.

17  Q.   Well, the truth is something the jury is going to decide.

18  A.   Yes, sir.

19          MR. KAUFMAN:  Objection, Your Honor, to this line of

20  questioning.  It's not about facts as perceived by the

21  witness.

22          THE COURT:  Overruled.

23  Q.   Now, as a matter of fact, what they are going to come and

24  testify as to is what they previously have told authorities;

25  is that correct?

1  A.    They're going to testify to the truth, as I understand

2  it.

3  Q.    Now, it's common knowledge in the jail that if you're

4  there and you help prosecute a case, there's going to be a

5  benefit for you as far as a sentence reduction, right?

6  A.    I've never been in jail.  I couldn't tell you that.

7  Q.    No, I know that.  But I know you've dealt with enough

8  criminals in all your years of experience to know that those

9  guys in jail know that if they cooperate, they're going to get

10  something in return.

11  A.    I can speak to what I've -- who I have spoke to

12  specifically and explain to you how I talk to them about it.

13  And I explain to them if they tell the truth, the only

14  consideration they're going to get is from His Honor, from the

15  courts.

16      Now, if they -- and conversely, Mr. Canales, if I -- I

17  explain to them every time that if they do not tell the truth,

18  there is a -- in fact, a punishment that they would receive

19  for not telling the truth in federal court.

20  Q.    And I believe you say that.

21  A.    I do.

22  Q.    And I also believe that you believe that.  However, I'm

23  coming from a different angle.  I'm coming from their angle,

24  their motives.  I mean, would you agree with me that there's a

25  strong motivation for them to testify in court?

1    A.    There would be a motivation for them to testify in court

2    provided they tell the truth.  Because again, I explain to

3    them if they don't tell the truth, then they're going down a

4    different path.  So the motivation would be to tell the truth

5    in court.

6    Q.    All right.  Then let me put it this way.  When they

7    provide substantial assistance is when they get their sentence

8    reduced, right?

9    A.    Yes.

10   Q.    Okay.  And when they come and testify in court, to your

11   knowledge and experience as an officer, is that considered

12   substantial assistance?

13   A.    That's not for me to decide.  It's always the discretion

14   and the consideration of the court to provide a 5K or Rule 35

15   which is substantial assistance.  I can only say if they will

16   come testify honestly, the judge or the court will consider

17   that testimony and hence dish out a Rule 35 or a 5K.

18   Q.    Actually, Officer, it's not -- the one who decides to

19   file a motion to reduce the sentence is the U.S. Attorney's

20   Office, the prosecutor, right?

21   A.    Again --

22   Q.    I can't move to file a motion to reduce a sentence, can

23   I?

24   A.    Nor can I.

25   Q.    The one who moves to say, Hey, Judge, this sentence

1  should be reduced is the U.S. Attorney's Office, right?

2  A.   The U.S. Attorney's Office.

3  Q.   Meaning the prosecutor.

4  A.   The prosecutor asks for the judge's --

5  Q.   Right?

6  A.   -- and court's consideration.

7  Q.   And ultimately, the one who decides is the judge.  But

8  the one who moves --

9  A.   Is definitely not you and I.

10 Q.   Yes, sir, that's for sure.

11      Okay.  Now, have you had a chance to look at the

12 indictment that was --

13           MR. KAUFMAN:  Your Honor, we object.  Your Honor's

14 explained to the jury that the indictment isn't evidence in

15 this case.

16           THE COURT:  I'll wait for a question and then I'll

17 consider an objection.

18 Q.   Are you familiar with the charges that my client is

19 facing today?

20 A.   Yes, sir.

21 Q.   What are they?

22 A.   Conspiracy, possession of a sawed-off shotgun, and a

23 924(c), which is a possession of a firearm in furtherance of a

24 drug trafficking crime.

25 Q.   Conspiracy to what?

1    A.    Import methamphetamine.  Distribute methamphetamine.

2    Q.    Okay.  Now -- and what's the other charge?

3    A.    Again, possession of a sawed-off shotgun.

4    Q.    Okay.  Now, let's talk about that.  Let's talk about --

5    now, are you sure -- are you sure that he's being charged with

6    importation of meth?

7    A.    Distribution of methamphetamine.

8    Q.    So not importation, right?

9    A.    I'm not sure if it's importation or not, but I know it's

10   distribution of meth.  It's a distribution charge.

11   Q.    This is your case, right, Agent?

12   A.    Yes, sir.

13   Q.    You're the lead agent?

14   A.    Yes, sir.

15   Q.    I mean, as far as decisions to be made in this case,

16   evidence to be presented, it's based on your investigation and

17   knowledge, right?

18   A.    Yes, sir.

19   Q.    Okay.  So it's not importation.  It's possession,

20   distribution?

21   A.    Distribution.

22   Q.    All right.

23   A.    Conspiracy to distribute, I think.

24   Q.    Now, would it be fair to say that you're not -- you never

25   seen my client possess drugs?

1   A.   Fair to say, yes, sir.

2   Q.   Right.  You never seen him touch meth or -- right?

3   A.   Yes, sir.

4   Q.   You never seen any in his possession or sell it, right?

5   A.   Yes, sir.

6   Q.   Okay.  As a matter of fact -- as a matter of fact, your

7   knowledge -- or most of your knowledge or some of your

8   knowledge comes from what's coming from the mouth of the

9   informants, right?

10  A.   We have different faucets of the investigation, and

11  cooperating defendants, confidential sources, and confidential

12  informants are part of that, yes, sir.

13  Q.   Whatever evidence there is in this case, most likely it's

14  going to be presented today, right?

15  A.   Yes.

16  Q.   So if a major chunk of that comes from the informants, I

17  mean, that will be up to the jury to decide, right?

18  A.   Yes.

19  Q.   Okay.  So Francisco Pina, Sr. -- we'll call him Pina Sr.

20  because we have father and son, right?

21  A.   Sure.

22  Q.   Pina Sr., has he been sentenced?

23  A.   Not to my knowledge, no, sir.

24  Q.   Has he pled guilty?

25  A.   Yes, sir.

1  Q.   Okay.  Let's talk about -- Francisco Jimenez Pina, is he

2  known by other names?

3  A.   I'm sorry?

4  Q.   Pina Sr., is he known by different names?

5  A.   Jose Pina, Francisco Pina, Jose Francisco maybe.

6  Q.   Yeah, but do you know if he used aliases before to hide

7  his identity?

8  A.   I apologize, I don't.  I don't remember that.

9  Q.   Okay.  Now, is he -- is he an illegal alien in this

10  country?  Meaning, did he break the immigration laws of the

11  United States of America?

12  A.   I don't know his immigration status; but if I'm not

13  mistaken, he is illegally here in this country.

14  Q.   Now, are you aware that my client, Mr. Saldana, is an

15  American citizen?

16  A.   Yes, sir.

17  Q.   Okay.  Now, let's talk about Mr. Hawkins.  Has he been

18  convicted?

19  A.   I don't think that he has been convicted.  And he's not

20  part of this charge of this indictment.

21  Q.   All right.  Fair enough.

22  A.   So apologies for not knowing the ins and outs of his case

23  as far as his current status whether he's been convicted or --

24  I apologize, I do not know the status of that.

25  Q.   So better yet, Hawkins is not even -- not part of this

1  group of people that's getting charged for this offense,

2  right?

3  A.    He's not been charged under this indictment.

4  Q.    Okay.  He's coming from -- now, has he been sentenced?

5  A.    Again, I apologize for not knowing the ins and outs of

6  Mr. Hawkins' current status.

7  Q.    How about Clara?

8  A.    Clara has been sentenced.

9  Q.    Is she part of this conspiracy?

10  A.    In this indictment?  She's not on this indictment.

11  Q.    Okay.  Has she been sentenced?

12  A.    Again, yes, sir, she has been sentenced.

13  Q.    Now, if she has been sentenced, is there a benefit for

14  her to testify today?  I mean, she's doing her time already,

15  right?

16  A.    She is in federal prison at this time, yes, sir.

17  Q.    All right.  She's -- okay.

18       Now, so is there incentive for her to testify today?  Is

19  there something going to be given to her assuming she comes

20  and gives her version of the truth?

21  A.    Just like the other five defendants -- witnesses that

22  will be here today, they can hope for the consideration of the

23  court.

24  Q.    Or better yet, hope for a motion to be filed for the

25  sentence to be reduced and granted by the court?

1    A.    They can hope for consideration of the court.

2    Q.    Now, were you the one that arrested my client?

3    A.    Yes, sir.

4    Q.    Okay.  Now, when drugs -- you said that drugs were

5    ultimately found after the search warrant?

6    A.    In the investigation, yes.

7    Q.    That was -- when you arrested my client, did you arrest

8    him with drugs?

9    A.    No, sir.

10   Q.    So as a matter of fact, the drugs that were found were

11   found two months later; is that correct?

12   A.    Some of the drugs that were found were found two months

13   later, yes, sir.

14   Q.    Okay.  Now, this money that you're talking about, this

15   49,000 plus that was found, this was also found two months

16   after my client was in jail; fair to say?

17   A.    Fair to say, yes, sir.

18   Q.    So do you know -- do you know who put the drugs where

19   they were found?

20   A.    I'm sorry, who put the drugs?

21   Q.    Like in other words, yes, there were drugs that were

22   found two months later, right?

23   A.    Right.

24   Q.    Now, do you know who's responsible for putting those

25   drugs there?

1    A.    Based on my investigation?

2    Q.    Yes, sir.

3    A.    Mr. Jimenez Pina, Mr. Jose Pina, and Mr. Martin Saldana.

4    Q.    Well, somebody was the one that put them there.  Now,

5    let's talk about this property.

6    A.    Okay.

7    Q.    Right?  Right now we saw Exhibit Number -- an aerial

8    photograph.

9    A.    30A maybe?

10   Q.    I believe it was Exhibit Number 19.  The satellite view

11   of Saldana's residence and surrounding area.  Do you remember

12   that one?

13   A.    Yes, sir.

14   Q.    Okay.  Can you see it?

15   A.    Yes, sir, I can.

16   Q.    Same one over here?

17   A.    Yes, sir.

18   Q.    Can you elaborate on these properties?

19   A.    Can I elaborate in what form or fashion?  I can say that

20   they're on --

21   Q.    Describe it.

22   A.    It's a small house on the corner of Ervin Houck Drive,

23   221.

24   Q.    I'm sorry, say it again.

25   A.    It's a house.

1    Q.    Where?

2    A.    Right there (indicating).

3    Q.    Which is the house of my client?

4    A.    Right there (indicating).

5    Q.    Okay.  I'm sorry, you're pointing to the blue dot.

6    Sorry.

7          And describe the property.

8    A.    This is the driveway.  This is the driveway leading in.

9    This whole property, my understanding, is Mr. Saldana's

10   property.

11   Q.    Okay.  Now, there's a trailer, right?

12   A.    Yes, sir.

13   Q.    Where is the trailer?

14   A.    (Witness indicated.)

15   Q.    Okay.  Who was residing in the trailer?

16         MR. KAUFMAN:  And, Your Honor, just to protect the

17   record, there is now an arrow pointing towards the trailer.

18   And we'll be asking the court to take a photograph of that.

19         THE COURT:  All right.  I take it the jury can see

20   the blue markings on there?

21         THE JURY:  (Affirmative nods.)

22         THE COURT:  Thank you.

23   Q.    Now, who lives -- who resided in that trailer?

24   A.    Jose Pina.

25   Q.    Huh?

1  A.   Mr. Pina and his son -- or Pina Jr. and Sr., I think
2  that's what we agreed on.
3  Q.   Now, this information was given to you by Pina himself,
4  the one you spoke to two months later, right?
5  A.   Yes, sir.
6  Q.   Any reason why he didn't speak to you a week after his
7  arrest?
8  A.   Why he didn't?
9  Q.   Uh-huh.
10 A.   I don't recall the circumstances of when he called or
11 when his attorney contacted us and set up a proffer.
12 Q.   Now --
13 A.   But sometimes, as most of us know, the government moves
14 kind of slow, and I don't recall.
15 Q.   I mean, did he -- did he in any way maybe use his honesty
16 for the truth to talk to you the day of his arrest?
17 A.   I'm not sure I understand the question.
18 Q.   In other words, this honesty that we're talking about him
19 to tell the truth, this honesty to -- this duty to come
20 forward, he didn't find -- he didn't find it on December the
21 12th, right?  He didn't decide to talk to you until two months
22 later, right?
23 A.   Very common.
24 Q.   Was there a deal made at that point?
25 A.   No, sir.

1  Q.   Has a deal been made since?

2  A.   No, sir.

3  Q.   I mean, he's already pled guilty, right?

4  A.   Yes, sir.

5  Q.   And you -- are you familiar with the terms of the

6  agreement?

7  A.   No, sir.

8  Q.   How about -- let me put it this way.  Pina Jr. also pled

9  guilty, right?

10 A.   Yes, sir.

11 Q.   Are they looking at the same punishment or different

12 punishment?

13 A.   I'm not sure, Mr. Canales.  I apologize.

14 Q.   Now, Officer, you know how it's important, right, to know

15 what a witness's possible incentive would be, right?  I mean,

16 what they're pleading guilty to, whether they got a break and

17 what they pled to or -- strike that.  Let me ask you this way.

18      In federal court, right, the amount, meaning less than

19 500 grams, more than 500 grams makes a huge difference as to

20 the type of punishment or range of punishment you ultimately

21 could receive, right?

22 A.   Fair enough, yes, sir.

23 Q.   Right.  Now, if a person gets a role adjustment, meaning

24 if it's decided that he's a minor participant or minimal

25 participant, that's an even greater gift or benefit.

1   A.   It's the law, yes, sir.

2   Q.   Yeah.  I mean, right?

3        Now, do you know if Pina Jr. was given a role adjustment?

4   A.   I do not know that.

5   Q.   You don't know that?

6   A.   No, sir.

7   Q.   Would you be surprised if I was to tell you that he got a

8   four-level reduction?

9   A.   No, sir.

10  Q.   Or they're recommending that he get a four-level

11  reduction?

12  A.   No, sir.

13  Q.   Okay.  Would you be surprised if I told you that he's

14  pleading to less than 500 grams?

15  A.   No, sir.

16  Q.   Okay.  All right.

17       Then let's talk about this property.  You know that --

18  did you have a chance -- were any neighbors around?

19  A.   I'm not sure of the neighbor situation at the time.  I

20  know it shows some cars over here.

21  Q.   Say that again, I'm sorry.

22  A.   I'm not sure of the neighbor situation at the time that

23  we were on the property.  It shows some cars over in this

24  area, this far area (indicating).

25  Q.   I mean, to the right?

DUSTIN HARMON - CROSS

1    A.    Yeah, over here to the right, yes, sir.

2    Q.    I mean, there's neighbors there, right?  Did you --

3    A.    That would be south.

4    Q.    Okay.  Do you -- did you know how long the Pinas have

5    resided there?

6    A.    I found out it was probably the summer of 2012.

7    Q.    Okay.  So the Pinas were new, right?

8    A.    New to...

9    Q.    To the area, there.  To that house.  They were renting,

10   right?

11   A.    They were renting, yes, sir.

12   Q.    They told you, We are renting from defendant Saldana,

13   right?

14   A.    Mr. Saldana.

15   Q.    They were paying rent.

16   A.    Yes, sir.

17   Q.    Okay.  Now, did you -- did you investigate how many other

18   families have resided in that exact trailer?

19   A.    No, sir.

20   Q.    Well, wouldn't you think that's important, sir?

21   A.    If I would I probably would have investigated it.  I

22   didn't deem it relevant at that time.

23   Q.    And there were other officers involved, right?  Local

24   authorities, right?

25   A.    There were local authorities involved, yes.

1   Q.   Right?  I believe we have Gene Parsons, right?

2   A.   Yes, sir.

3   Q.   He's more local to the area, right?

4   A.   State police.

5   Q.   Now, did anyone find it relevant to investigate how many

6   people had lived in that trailer, how many people have rented

7   and how many times in the previous years?

8   A.   They may have.  I'm not privy to that knowledge, to that

9   information.

10  Q.   Okay.  Now, is it fair to say that whatever money was

11  found, right, because you said that two months later you all

12  came back and searched, right?  Two months later, whatever

13  money was found was found on the property behind the trailer

14  of the Pina brothers -- father and son.

15  A.   It was near the Pina trailer, yes, sir.

16  Q.   Can you point to how close.

17  A.   In this general area.  Somewhere under this tree

18  somewhere.  We found several different things in this area.

19  But if I'm not mistaken, it was in that area (indicating).

20  Q.   And the drugs?

21  A.   We found drugs also in this area here.  We also found

22  drugs up here (indicating).

23  Q.   Okay.

24  A.   And some stashes in this area (indicating).

25  Q.   Okay.

1  A.   Maybe on the side there, I should point out.

2  Q.   Okay.  Now --

3           MR. KAUFMAN:  And just for the record, the last

4  areas that the witness testified to were the three dots below

5  the arrows and then the witness testified about additional

6  locations.  It's the four dots higher up in the squarish area

7  located on the image.

8           THE WITNESS:  Yeah, and I apologize not knowing

9  specifically as in those four dots, obviously I can't hold

10 that to scale.

11 Q.   (By Mr. Canales) So it could be lower down?  It could be

12 lower down?

13 A.   No, it's up around this outbuilding also.

14 Q.   All right.  Let me ask you this now.  What was the --

15 now, these properties have different addresses; is that

16 correct?

17 A.   Yes, sir.

18 Q.   As a matter of fact, what's the address for -- what's the

19 address for my client?

20 A.   This area here, if I may circle this little area here, is

21 148 Ervin Houck Drive (indicating).

22 Q.   148?

23 A.   Sorry, it would actually be up around this area, I think,

24 if I'm not mistaken (indicating).

25 Q.   But do you know that for a fact?

1    A.    No, I don't.

2    Q.    Okay.  Then -- is it your testimony today that you have

3    personal knowledge that it includes the shed?

4    A.    Which shed?

5    Q.    The one to the right.

6    A.    This one -- the last arrow I touched, that one

7    (indicating)?

8    Q.    Are you a hundred percent correct?

9    A.    I'm not a hundred percent sure about that.

10   Q.    Okay.

11   A.    But I'm a hundred percent sure it's under Martin

12   Saldana's name.

13   Q.    Yes, we know that.  But -- that he -- now also, the other

14   property, the trailer had a different address, right?

15   A.    This trailer had a different address.

16   Q.    What's the address?

17   A.    178 Ervin Houck.

18   Q.    178.  And then also, there was another -- another -- the

19   other section across -- that's a different deed, different

20   property.

21   A.    A little parcel, yes.

22   Q.    Which one?

23   A.    In this area over here, if I'm not mistaken (indicating).

24   Q.    Okay.  So --

25   A.    And it may go further up, I apologize.  I don't know

1  the -- the zone.

2  Q.   Officer, when people rent properties, landlords, when you

3  rent a house, whether it be next to you or not, are you

4  allowed just to go into the trailer and do whatever you want

5  if you rented that property?

6  A.   If you have an agreement with the person renting the

7  property, yes.

8  Q.   But most of the time when a property is rented, that's

9  under the control of whoever is renting the property, am I

10  mistaken?

11  A.   Whoever is renting the property?

12  Q.   Yes, right?

13  A.   The landlord can come in with their key and fix, change,

14  open, access, to my understanding.  And again, I'm not a

15  police officer in North Carolina.  I'm actually a special

16  agent, so I couldn't...

17  Q.   Well, do we have any evidence to that effect that that

18  happened in this case, that my client was there fixing

19  anything?  We don't, right?  There's nothing.

20  A.   I don't have anything --

21  Q.   Okay.

22  A.   -- to say that he was fixing anything.

23  Q.   All right.  So as far as we know, it was the Pinas who

24  had control of 178.

25  A.   The fact that he owned it and other evidence in the case

1   showed that he had a key and had access to 178.

2   Q.   Okay, sir.  That's an inference that can be made, right?

3   A.   I'm going off of the case, the facts of the case that I

4   received.

5   Q.   The facts of the case are that -- correct me if I'm

6   wrong, that the Pinas told you that they were renting their

7   property.  That they had been there since the summer of 2012,

8   and they were paying rent.

9   A.   Yes, sir.

10  Q.   Right?

11       And it's also undisputed that it was the Pinas who led

12  you to the drugs and the money that was found on their side of

13  the property, at least the money.  All that was found there,

14  right?

15  A.   The money but not the drugs.

16  Q.   Okay.  But --

17  A.   The stash locations.

18  Q.   The investigation, as a matter of fact -- there was

19  money -- it was brought to your attention afterwards, right,

20  that somebody had been to the property and retrieved some of

21  the money, right?

22  A.   Yes, sir.

23  Q.   And you were told that it was Pina's girlfriend, right?

24  A.   Yes, sir.

25  Q.   And did she admit to it?

1  A.    Yes, sir.

2  Q.    And that was prior to him finding it in his heart to be

3  truthful or afterwards?

4  A.    Which part?

5  Q.    Like in other words, did he first state I am going to

6  talk to the government; I am going to be honest?  Or the first

7  thing he thought was let me tell my girlfriend where the money

8  is at?  What happened first?

9  A.    Let me tell the girlfriend where the money is at.

10  Q.    Okay.  And the girlfriend went for it, right?  I mean --

11  and he was -- now, it's undisputed that my client did not --

12  strike that.

13      What did the girlfriend do with the money?

14  A.    She purchased a pickup truck.

15  Q.    Did you confiscate that truck?

16  A.    I did.

17  Q.    And what else did she do with the money?

18  A.    She put $15,000, supposedly, and this is her information,

19  on his lawyer's bill.

20  Q.    Whose lawyer?

21  A.    Mr. Pina's.

22  Q.    Pina Sr.

23  A.    Yes.

24  Q.    So here we have Pina Sr. telling the girlfriend go get

25  the money, this is where it's at.  And pick -- get a lawyer or

1   pay for a lawyer and buy a truck.  And Pina knew about this,

2   right?

3   A.   Yes.

4   Q.   It didn't come to a surprise to him how the money was

5   spent, right?

6   A.   Right.  Right.

7   Q.   Ms. Caudell, Clara, she's got a history of substance

8   abuse, right?

9   A.   I don't recall her criminal history.

10  Q.   No, no, no.  Not -- well, other than her criminal history

11  because we do -- we agree she's got felony convictions, right?

12  A.   I'm sorry?

13          MR. KAUFMAN:  Objection.

14          THE WITNESS:  I have no idea.

15          THE COURT:  Overruled.

16          THE WITNESS:  I have no idea.

17  Q.   Now, I'm talking about drug usage, not convictions.

18  People can be using drugs all their life and never get busted.

19  A.   Yes.

20  Q.   Excuse me, never get arrested, right?

21  A.   Yes.

22  Q.   Okay.  Does she have a lengthy history of substance

23  abuse?

24  A.   She explained to me that she is a user of

25  methamphetamine.

1    Q.   All right.  I mean, at one point that was her life,

2    right?  I mean --

3    A.   I don't know if it was her life.  She didn't say that,

4    but she told me she used methamphetamine, yes, sir.

5    Q.   To your knowledge and experience as an officer, was that

6    a substantial addiction?  Was it like an addiction?

7    A.   Yes, sir, she had an addiction to methamphetamine, yes.

8    Q.   She's a recovering addict, right?

9    A.   Undoubtedly.

10   Q.   A recovering addict that is in jail now.

11        Now, let's talk about Hawkins.  Does Hawkins have a

12   history of drug usage as well?

13   A.   I'm quite certain that he does.  I don't recall it.  I

14   don't recall how extensive or experimental.  I couldn't tell

15   you.

16   Q.   Now -- okay.  Did you ever listen to the -- Bobby Shore

17   wore a wire, right?

18   A.   Yes.

19   Q.   Okay.  Meaning he was there in an attempt to get evidence

20   for you all, right?

21   A.   Yes, sir.

22   Q.   Do you remember the substance of -- without telling the

23   jury, do you remember the substance of the recording?

24   A.   Yes, sir.  It's a lengthy recording, but I remember the

25   gist of it, yes, sir.

1  Q.   Do you remember the first words that were told to Bobby

2  Shore prior to him going close to my client?

3  A.   No, sir.

4  Q.   Do you know who's the investigator -- Investigator

5  Williams?

6  A.   Yes, sir.

7  Q.   Who is that?

8  A.   Ashe County Investigator Sergeant Williams with Ashe

9  County Sheriff's Office.

10  Q.   Local guy -- local gentleman?

11  A.   Yes.

12  Q.   Okay.  Do you remember him telling him, Look, don't

13  worry.  Go for the truth.  Go for honesty.  Go for what's

14  right.  Do you remember him saying that?

15  A.   Not saying he didn't, Mr. Canales.  I do not remember

16  that.

17  Q.   Or do you remember him telling him, It's what we need;

18  it's what we need?

19  A.   No, sir.

20  Q.   Why would -- why would -- why would an office -- why

21  would an officer of the law tell that to a person wearing a

22  wire:  This is what we need; this is what we need?  Why would

23  that officer's first words out of his mouth be, This is what

24  we need; this is what we need?  Do you understand why?

25  A.   You mentioned that he asked for the truth.  Didn't you

1   say he asked for the truth and this is what we need?  It

2   evolved into this is what we need.  I'm assuming that would be

3   it.  I don't remember him saying that.  Not that he didn't.  I

4   just couldn't answer that.

5   Q.   If we have a recording of that conversation between Bobby

6   Shore and my client, right, that happened on December 12th,

7   which is the day that my client was arrested.  I mean, what

8   the officer is telling this person wearing a wire, that's

9   important, right?

10  A.   Yes, sir.  And make no mistake, I'm not saying that he

11  didn't say that.  I'm just telling you my honest recollection

12  is I do not remember that part of the recording.

13  Q.   Fair enough.  But -- do you know if my client is a drug

14  user?

15  A.   I'm sorry?

16  Q.   Do you know -- do you have any evidence whether or not my

17  client is a drug user?

18  A.   I received information that he -- I received information

19  that he did drugs.

20  Q.   Okay.  Now, he -- he was local, right?  My client is from

21  this area, right?

22  A.   I'm not sure originally where he was born, but this is

23  where he's resided for several years.

24  Q.   Let me ask you, do you have -- give me one second.

25       Were you aware that my client and his daughters -- were

DUSTIN HARMON - CROSS

1  you aware that my client has been residing at that address for

2  the last 28 years, he's been a member of this community?

3  A.   I just heard him say that, but before that I didn't

4  realize that.

5  Q.   Okay.  Were you aware that his daughters were born here

6  in North Carolina?

7  A.   No, sir.

8  Q.   No?  Okay.  Were you aware -- do you know where he used

9  to work?

10  A.   Adams Construction and maybe Vannoy Construction.

11  Q.   Okay.  Now, let me ask you this very important question.

12  I mean, did you know -- based on your investigation, was there

13  any financial need why my client would have to be even

14  involved in drug dealing?

15  A.   He quit -- he quit work in 2011.

16  Q.   He got arrested in 2012, right?

17  A.   Yes, sir.

18  Q.   Okay.  So -- I mean, the economy hit everybody, right?

19  A.   (Affirmative nod.)

20  Q.   Now I'm asking you, but prior to that he had always been

21  working, right?

22  A.   I'm sorry?

23  Q.   Now prior to 2011 he had always been working.

24  A.   I couldn't say.  I just know that he did work for Adams

25  Construction and Vannoy Construction according to him, and we

DUSTIN HARMON - CROSS

1   have corroborative information that he was working at Adams

2   Construction prior to 2011.

3   Q.   Now, this address, the one where he resides, he's been

4   making mortgage payments for how long?

5   A.   Not sure exactly.  I don't recall.

6   Q.   But do you know -- did you know the property is not paid

7   for?

8   A.   Is now paid for?

9   Q.   Is it paid for?

10  A.   I'm not sure.  I can't remember exactly.

11  Q.   I mean, this is something that would be relevant, right?

12  I mean, especially if they're going to go after the property.

13           MR. KAUFMAN:  Objection.  Argumentative.

14           THE COURT:  Overruled.

15  Q.   I mean, right?

16  A.   Thank goodness in my case it's compartmentalized.  In DEA

17  we have somebody that works on the asset forfeiture side of

18  the house.  So as far as like mortgage payments and the

19  amortization charts, I wouldn't handle that.  And I apologize

20  for not knowing how many years he's paid for that.

21  Q.   Were you aware that this property up until now is still

22  not paid for?

23  A.   No, sir.

24  Q.   Were you aware that he's been for, I don't want to say

25  decades, but for year after year after year he's been making

1   mortgage payments like everybody else?

2   A.   I couldn't tell you one way or the other.  I apologize

3   for not knowing that.

4   Q.   Were you aware that my client was making 48 to 50

5   thousand dollars a year in Adams Construction?

6           MR. KAUFMAN:  Objection.  Your Honor, may we have a

7   sidebar?

8           THE COURT:  No, sir.  Overruled.

9   Q.   Officer, who made the call that December 12th, 2012, was

10  the day to arrest my client?  And I mean that in a good way.

11  I mean, it could have been made December 11th, December 13th

12  or 20th.  I mean, who made the call to make the arrest on

13  December 12th?

14  A.   It was probably a conglomeration of several people, but I

15  probably made the final call.

16  Q.   Okay.  Now, who made the call on -- some cases are

17  more -- some criminal cases are more complicated than others,

18  do you agree?

19  A.   Sure, absolutely.

20  Q.   All right.  In some criminal cases, I mean, there will be

21  recording after recording after recording for years, for

22  months.  Would you agree with me?

23  A.   Yes, sir.

24  Q.   In some criminal cases there will be -- the phones will

25  be tapped, right?

DUSTIN HARMON - CROSS

1    A.    Sure.

2    Q.    Now, in this case was there a recording made of my

3    client's phone, his conversations?

4    A.    Title III intercept?

5    Q.    Yes, sir.

6    A.    No, sir.

7    Q.    Now, you said that you found a couple of his phones,

8    right?

9    A.    Yes, sir.

10   Q.    Okay.  You said that there was at least two numbers,

11   right?

12   A.    Yes, sir.

13   Q.    Now, he's got at least two daughters, right?

14   A.    Yes, sir.

15   Q.    Young daughters, right?

16   A.    Okay.  Yes, sir.

17   Q.    Okay.  Now, was there a chance to get -- did you ever

18   decide to get a wiretap on those phones?  Intercepts?

19   A.    No, sir.

20   Q.    You made that call?

21   A.    I did.

22   Q.    Okay.  Now, as far as the type of -- as far as the type

23   of people that would be used, what I mean type of people, I

24   mean -- yes, the type of people that would be used who make

25   the call, who would wear a wire and who wouldn't wear a wire?

1  A.   Yeah, I can say I made the call.  And I will clarify, I'm

2  not making the call to intercept his phone simply because time

3  had ran out.

4  Q.   All right.  Then --

5  A.   So my goal was to go and do whatever we could to exploit

6  the information.  But time had ran out and that's why I made

7  the call to make the arrest.

8  Q.   Okay.  The one in charge of this investigation is you.

9  A.   Yes, sir.

10  Q.   If time runs out or doesn't run out, it was your call,

11  right?

12  A.   No.  Unfortunately, we were forced -- our hand was forced

13  that day.

14  Q.   Okay.

15  A.   He was going back to Mexico.

16  Q.   Now, sir, you had information that he had been to Mexico

17  several times in the past.

18  A.   Sure.

19  Q.   I mean, him going to Mexico was not a new thing, right?

20  A.   Yeah, under this case it was.

21  Q.   Okay.  Well --

22  A.   Because he was on to law enforcement.

23  Q.   He was what?

24  A.   You'll hear that in the audios.  He was on to law

25  enforcement.  He was aware that law enforcement had made

DUSTIN HARMON - CROSS

1  recent arrests and he said that he was going back to Mexico.

2  So taking the culmination of the evidence, I made the call to

3  make the arrest because he's going back to Mexico at this

4  point in my mind for the reason of one thing, to escape

5  justice and go back to Mexico.

6  Q.   And again, you're the one making the calls.

7  A.   Sure.

8  Q.   You made that call.  And also look at the area, look at

9  his neighborhood where he comes from.  Is this considered

10  like -- I'm not familiar with North Carolina so this is my, I

11  don't know, fifth time in North Carolina maybe.

12  A.   Yes, sir.

13  Q.   But this is -- this is considered the hills, right?

14  Country?

15  A.   Country, yes, sir.  Absolutely beautiful.

16  Q.   I mean, this is a small community, right, where he comes

17  from?

18  A.   Yes, sir.

19  Q.   Bobby Shore, where is he from?

20  A.   Ashe County.  Same thing.  Same kind of area.

21  Q.   All right.  How about Eller?

22  A.   Same kind of area.

23  Q.   I mean, don't you think that a community this small is

24  going to know who gets arrested, who doesn't get arrested?  I

25  mean, this is bigger than Statesville, right?

1    A.    What's bigger than Statesville?

2    Q.    This area -- I mean, Statesville is more populated than

3    where my client was residing for the last 20 years, right?

4    A.    Per capita, yes, sir, I'd say you're right.

5    Q.    I mean, because Statesville, it's a medium size town, but

6    people know what happens to other people, I mean, right?

7    A.    Sure.

8    Q.    In the community.  Wouldn't you think --

9    A.    That's part of the reason I think he wanted to leave so

10   fast.

11   Q.    Wouldn't you think the same applies as to what happens to

12   people in Ashe County?

13   A.    Yeah.  Again, I think that's part of the reason that I

14   made the call to make the arrest.

15   Q.    Okay.  I mean, that would be news, right, somebody from

16   Ashe County getting arrested?

17   A.    Coupled with the fact that he says, "I'm leaving to go

18   back to Mexico tonight.  I'm not going to tell anybody else.

19   Do not tell anybody else."  That's why I made the decision to

20   end the investigation early.

21   Q.    Okay.  You made your call on the day of his arrest.

22   A.    Yes, sir.

23   Q.    Right?

24   A.    Yes, sir.

25   Q.    On...

1  A.   December 12th, 2012.

2  Q.   December the 12th.

3       On December 12th did you search 1 -- did you search 148,

4  his home?

5  A.   Did I search it personally?

6  Q.   Or did anybody?

7  A.   No, somebody did, yes, sir.

8  Q.   And what was found there?

9  A.   Four of Mr. Saldana's guns.

10 Q.   Okay.  Where were they?

11 A.   In his bedroom.  One under the mattress and then the rest

12 in his clothing drawer.  Chest of drawers I think is what we

13 call it.

14 Q.   And did you have -- was the shotgun found there?

15 A.   Yes, sir.

16 Q.   Okay.  Did you have a chance to examine whether or not it

17 was working, operable?

18 A.   I did not.  I did not.

19 Q.   Well, today, March, I don't know, the 4th, right?

20 A.   Yes, sir.

21 Q.   Months -- or a year and some time later --

22 A.   Yes.

23 Q.   -- have you had a chance to examine whether or not the

24 shotgun was operable at the time?

25 A.   I personally have not, no, sir.

1  Q.   Now, this -- what caliber was this pistol?

2  A.   I'm sorry?

3  Q.   The handguns that you found, what caliber?

4  A.   Caliber was a .22, if I'm not mistaken, Mr. Canales.

5  Q.   All three guns were .22s?

6  A.   The shotgun was not a .22, but the three pistols -- or

7  pistols and revolvers were .22s, yes, sir.

8  Q.   I call them handguns --

9  A.   Handguns.

10  Q.   -- versus a rifle or a shotgun.

11       But they were caliber  .22, right?

12  A.   Yes, sir.

13  Q.   Now, those -- as far as the calibers in guns, .22 is the

14  smallest caliber you're going to find, right?

15  A.   It is the smallest caliber, yes, sir.

16  Q.   I'm a gun aficionado myself.  I love guns.

17  A.   Most concealable smallest caliber.

18  Q.   But as far as calibers versus .45 versus .38 special

19  versus .357 magnum, you know --

20  A.   Yes.

21  Q.   -- that is the smallest caliber of weapon, right, of

22  handgun?

23  A.   It is -- maybe there is a smaller, but it's one of the

24  smallest, yes.

25  Q.   But to your knowledge, is there a smaller one?

DUSTIN HARMON - CROSS

1    A.    Not that I'm aware of, but I just don't want to box
2    myself in saying there is.
3    Q.    Based on your knowledge of the Ashe County area, would it
4    be uncommon for people to have a .22 or an old shotgun?
5    A.    No, sir.
6    Q.    It's something you expect to find in a lot of those homes
7    even that live in the country?
8    A.    Absolutely, I agree.
9    Q.    Especially people that lived there for 10, 15, 20 years.
10   A.    Yes, sir, fair to say.
11   Q.    Let me talk about the exhibit that you were describing
12   earlier about the Santa Muerte.
13   A.    Yes, sir.
14   Q.    Without getting into too much detail.
15        Now, you're saying that's derived from being Catholic,
16   right?
17   A.    Did not say that.
18   Q.    Okay.  From what religion is Santa Muerte?
19   A.    I'm sorry?
20   Q.    From what religion is the Santa Muerte?
21   A.    I think it's his own religion.
22   Q.    Are you a hundred percent sure?
23   A.    My understanding based on my training it is
24   non-sanctioned.
25            MR. CANALES:  May I approach, Your Honor?

1    THE COURT:  Beg your pardon?

2    MR. CANALES:  May I approach to get an exhibit?

3    THE COURT:  You may approach.

4  Q.   If I may have the exhibit on Santa Muerte.  Do you have

5  it?

6  A.   No, I don't have it.

7    MR. CANALES:  Do you have it, the exhibit of Santa

8  Muerte?

9  Q.   You've had a chance to see this, right, what's inside

10  here?

11  A.   Yeah.

12  Q.   Does it have a prayer on the back?

13  A.   I'm not sure.

14  Q.   I'm sorry, it's got an image and a prayer on the back,

15  right?

16  A.   I'm not sure if it's a prayer.

17  Q.   Do you know what it is?

18  A.   No.

19  Q.   It's in Spanish, right?

20  A.   Yeah.

21    It's a -- well, it looks like a prayer to Santa Muerte,

22  the saint of death.

23  Q.   Fair enough.  Now, South America does not go to --

24  Brownsville, Texas, where I am from, there's different

25  practices, right, of the Catholic religion?

DUSTIN HARMON - CROSS

1    A.    Absolutely, yes.

2    Q.    Now, you were testifying earlier that -- have you ever

3    heard of La Virgen de Guadalupe?

4    A.    I'm sorry?

5    Q.    Have you ever heard of La Virgen de Guadalupe?

6              THE COURT REPORTER:  La what, I'm sorry?  La what?

7              THE WITNESS:  Vatican?

8              MR. CANALES:  De Guadalupe

9    Q.    Have you ever heard --

10   A.    Are you saying Vatican?

11   Q.    No, Virgen de Guadalupe.  Virgen de Guadalupe.

12   A.    Oh, Virgen de Guadalupe.  Yes.

13   Q.    Okay.  Is it familiar for people in the Catholic religion

14   to carry -- to carry religious things in their wallet, do you

15   know?

16   A.    I'm not sure.

17   Q.    Would it surprise you that a lot of Catholics from

18   different Hispanic origins would believe in carrying images of

19   saints in their wallet?

20   A.    Of true saints, I agree, yes.

21   Q.    Well, who determines who's a true saint?

22   A.    Well, I think the Vatican of the Catholic church condones

23   the cult of Santa Muerte.

24   Q.    Okay.  Do you know who's the Virgen de San Juan?

25   A.    I'm sorry?

1   Q.   Do you know who's the Virgen de San Juan?

2   A.   No, sir.

3   Q.   Would it surprise you that she's got thousands and

4   thousands of followers among the Catholic people from Texas,

5   South Texas all the way down to Mexico?

6   A.   Not knowing her, I can't answer that educationally.

7   Q.   There was a pole camera that was installed, right, on

8   this property?

9   A.   Yes, sir, in the vicinity of his property.

10   Q.   Okay.  Would you please tell this jury -- would you

11   elaborate to the jury what's a pole camera.

12   A.   It is a camera utilized that has the appearance of a

13   junction box on a telephone pole that is utilized to be able

14   to view certain things in said area.  It's a discreet camera.

15   Q.   Okay.  So was there a street camera in this property?

16   A.   To my knowledge there was a camera across the street.

17   Q.   Would you please point.

18   A.   I don't know the exact location.

19   Q.   Okay.  But obviously, if there's a camera -- how long was

20   this camera used?

21   A.   It was -- I think it was used a little before I got

22   involved in the true depths of the case so I couldn't say

23   exactly how long the camera was utilized.

24   Q.   Would it be fair to say it had been there for months?

25   A.   Weeks -- weeks is fair to say to my knowledge.

1  Q.   At least weeks, right?

2  A.   For several weeks.

3  Q.   So it would be fair to say that if there was evidence of

4  my client drug dealing, of cars coming in and out all times of

5  night or money being exchanged, I mean, it would be recorded

6  on that camera, right?  It would be fair to bring it to the

7  jury so the jury can see, hey, we were watching for 24 hours

8  for several weeks.  This is -- this is the evidence that we

9  have that we got when we watched it on camera?

10 A.   If it were caught on camera and if it were done at that

11 house in the day.

12 Q.   Well, I mean, certainly the camera would catch lights of

13 cars at night?

14 A.   I'm not sure we had a recording mechanism on the camera.

15 It was probably identification.

16 Q.   Somebody was watching -- I'm sorry for interrupting you.

17      Somebody was watching it, right?

18 A.   That's okay.

19      Unfortunately, we didn't have it manned 24/7.  It's a

20 small town sheriff's office.  Short man staff of the DEA.  We

21 didn't have it manned.

22 Q.   Okay.  Were we watching or were we not watching?

23 A.   I was not ever watching.

24 Q.   Somebody was responsible for watching, right?

25 A.   At certain times I'm sure they were watching.

DUSTIN HARMON - CROSS

1    Q.    It wasn't my client who was responsible for that, right?

2    He wasn't responsible for the camera, right?  It was the

3    authorities.

4    A.    Of placing the camera?

5    Q.    Yes.

6    A.    Yes, sir.

7    Q.    And it was the authorities who would decide to bring that

8    as evidence or not bring it as evidence, right?

9    A.    Lot of times it's used for identification purposes,

10    vehicles driven, other cars coming out -- in and out of the

11    area.  And it would just be simply individuals noticed, two

12    white pickups, one Chevrolet Blazer, that kind of stuff.

13    Q.    I mean, how many times --

14    A.    If --

15    Q.    If Bobby Shore is visiting or Bobby Shore is sitting on

16    the porch drinking a beer with my client because they're

17    friends or if Eller goes there during the day because they are

18    having a barbecue and they know each other.  I mean, that

19    would be important for the jury to see, right, if it was

20    caught on tape?

21    A.    I'm sorry?

22    Q.    If it was caught on tape, it would be important for the

23    jury to see that, right?

24    A.    If it were caught on tape --

25    Q.    Right.

1  A.  -- yeah, we would probably bring it.

2  Q.  Okay.

3  A.  Again, I --

4  Q.  Do I have possession of that camera?

5  A.  I'm not sure we have any recorded -- matter of fact,

6  there was no recorded images from the camera to my knowledge.

7  Q.  Okay.  But the ability to watch was there, right?

8  A.  I'm sorry?

9  Q.  The ability to watch, see what Saldana is doing for 24

10 hours a day or at least during the day hours for several weeks

11 was there.

12 A.  If we had the manpower, yes, sir.

13 Q.  The people that are going to come -- some of the people

14 that are going to come and testify today, like Eller, Shore,

15 Caudell, and the Pinas and Hawkins, what are they referred to

16 as?

17 A.  I'm sorry?  Witnesses.

18 Q.  Witnesses?  But on the street what are they known as?  Or

19 in jail what are they known as?

20       MR. KAUFMAN:  Objection.

21       THE WITNESS:  Caudell, Pina, Shore.  I'm sorry, I

22 may not understand the question.

23 Q.  Okay.  Your witnesses, the ones that have --

24       MR. KAUFMAN:  Objection.  Characterization among

25 individuals in the jail are not relevant to this case, Your

1  Honor.

2          MR. CANALES:  Your Honor, obviously this type of --

3          THE COURT:  Overruled.

4  Q.   Obviously cooperating witnesses are different from a lay

5  witness, right?

6  A.   Cooperating defendants and cooperating witnesses, yes.

7  Q.   Meaning, an old lady comes to court or a teacher or an

8  electrician or realtor person comes to court and says I saw

9  this.  I was -- for whatever reason I have nothing to do with

10 this case.  I have nothing to do with anything.  I have

11 nothing to gain.  That's a straight witness, right?  A lay

12 witness, right?

13 A.   It's a witness for us, yes, sir.

14 Q.   But in this case the people coming forward today, those

15 are not lay witnesses, right?

16 A.   I wouldn't characterize them as not lay or unlay.

17 They're a witness.

18 Q.   How would you characterize them as?

19 A.   They're witnesses for us.  And trust me, we discussed the

20 case in the last couple weeks and we would say, you know, I'm

21 going to put this witness on.  I'm not going to put this

22 witness on.  So that's really how we talk about the witnesses.

23 Q.   Okay.  Would you -- would you characterize them as

24 witnesses with a vested interest to testify?

25 A.   Again, if we want to go through it again, it's witnesses

1   with the hope of consideration.

2   Q.   All right.

3   A.   I can't dress it up any further.

4   Q.   Now -- so you also talked about -- about phone records

5   earlier, right?

6   A.   Yes.

7   Q.   Now, given the fact that Bobby -- that Mr. Eller is from

8   Ashe County --

9   A.   Yes, sir.

10  Q.   -- given the fact that Bobby Shore is from Ashe County,

11  given the fact that my client has been residing in that county

12  for years also, would it be uncommon for them to have each

13  other's phone number in that context?  Is that -- I mean, is

14  that uncommon?

15  A.   In certain circumstances it is uncommon.  And I can

16  explain if you would like.  I have a biker individual in touch

17  with a Mexican in touch with a -- it just -- it was a little

18  odd.  Not saying they couldn't be in touch.  Just explaining

19  the differences that we would say, like, it's a little...

20  Q.   And again, they could have a lot of similarities.  I

21  mean --

22  A.   Sure.

23  Q.   -- right?

24       But the one thing that we're bringing forward or the

25  government is bringing forward is the fact that they knew each

DUSTIN HARMON - REDIRECT

1   other and they're from the same area, correct?

2   A.   A little bit more we're bringing forward.

3   Q.   And they all did drugs, basically.

4   A.   I'm sorry?

5   Q.   That's another thing in common, right?

6   A.   That they all got their drugs from a certain person.

7   Q.   Well, that's assuming they're telling the truth, right?

8   A.   Yes, sir.

9          MR. CANALES:  No further questions, Your Honor.

10  Pass the witness.

11         MR. KAUFMAN:  Thank you, Your Honor.

12                    REDIRECT EXAMINATION

13  BY MR. KAUFMAN:

14  Q.   Agent Harmon, you were asked repeatedly regarding your

15  perception of what the truth is from various witnesses in this

16  case.  The defense didn't ask you about your perception of the

17  truth of the recordings with the defendant on December 11th

18  and December 12th of 2012.  Do you have any reason to believe

19  those recordings between the defendant and Mr. Eller on the

20  11th of December and the recording between the defendant and

21  Mr. Shore were in any way untrue?

22  A.   No, sir.

23  Q.   You were initially asked about whether you were relying

24  on the Pinas in terms of deciding to arrest the defendant.

25  Was that the only reason based on what the Pinas said that you

DUSTIN HARMON - REDIRECT

1    arrested the defendant?

2    A.   No, sir.  The defendant was arrested before I talked to

3    the Pinas.

4    Q.   And since the defense asked you about that, why did you?

5    A.   I'm sorry?

6    Q.   Why did you?  The defense asked --

7    A.   Why did I?

8    Q.   Yeah, why did you arrest the defendant?

9    A.   Because I had information he was moving large amounts of

10   methamphetamine in the Western District of North Carolina and

11   Virginia, both districts.

12   Q.   And what information was that?

13   A.   I'm sorry?

14   Q.   What information specifically?

15   A.   Based on analytical data from cooperating defendants,

16   cooperating sources, information gleaned from other

17   investigations and in surrounding areas, law enforcement

18   officials in the Western District of Virginia, law enforcement

19   officials in Ashe County, and then put together an

20   investigation against Mr. Saldana.

21   Q.   All right.  Now, by the way, with regard to these -- you

22   mentioned other investigations.  The defense lawyer asked you

23   whether certain individuals were part of the same indictment

24   that Mr. Saldana is.  I believe that they specifically asked

25   you about Ms. Caudell, about Mr. Hawkins.  Can people be in

1   different indictments but in the same conspiracy?

2   A.   Yes, sir.

3   Q.   Is that what the case is here?

4   A.   Yes, sir.

5   Q.   While the DEA -- you were leading the DEA component of

6   this investigation, in the same general area of Ashe County

7   and other neighboring counties, were there any other federal

8   agencies from the Charlotte area investigating methamphetamine

9   trafficking?

10  A.   Yes, sir.

11  Q.   And in fact, are you familiar with an investigation by

12  Homeland Security?

13  A.   Yes, sir.

14  Q.   To include Special Agent Joe Barringer who was mentioned

15  as one of the potential witnesses in this case although he's

16  unlikely to be called?

17  A.   Yes, sir, I am.

18  Q.   And in fact, did Agent Barringer lead to the arrest and

19  then eventual guilty plea by Mr. Hawkins?

20  A.   Yes, in the concurrent methamphetamine -- federal

21  methamphetamine investigation.

22  Q.   And had Mr. Hawkins, in fact, been arrested well before

23  Mr. Saldana?

24  A.   Yes, sir.

25  Q.   You were asked about some of the language of the

DUSTIN HARMON - REDIRECT

1  indictment.  Who drafts up the indictment?

2  A.    Like I told Mr. Canales, I wish I had the answer for you.

3  I do not know, but I assume it's the U.S. Attorney's Office.

4  Somebody compartmentalized in your office or maybe you.

5  Q.    Or maybe me?

6  A.    Sure.

7  Q.    So if my signature appears on the indictment, does that

8  mean I'm the one who drafted it, not you?

9  A.    Yes, sir.

10  Q.    All right.  You were asked about whether the drug

11  trafficking conspiracy, what we call the objects of the scheme

12  and the specific actions of this conspiracy, whether it

13  involved importation.  And then you were confronted with how

14  it may have involved distribution and possession with intent

15  to distribute but not by name importation.

16      Do the facts of your investigation support that he did,

17  in fact, import?

18  A.    Yes, sir.

19  Q.    And what facts are those?

20  A.    The fact that we were dealing with pound amounts of

21  methamphetamine.

22          MR. CANALES:  Your Honor, I'm going to object if

23  he's going to testify as to hearsay.

24          MR. KAUFMAN:  Your Honor --

25          MR. CANALES:  If he's going to testify -- if he's

1  got personal knowledge, then, yes, those questions can be

2  asked.  But for him to testify to something that maybe other

3  officers have heard somewhere else and through the grapevine

4  is passed to him.  I mean, I ask that whatever it is, that he

5  have personal knowledge of whatever he's going to testify.

6          MR. KAUFMAN:  Your Honor, the defense was -- I was

7  objecting routinely during the cross examination.  The defense

8  has been opening the door repeatedly asking these kinds of

9  open-ended questions of the witness regarding his

10 investigations, why he made decisions that he made, why he did

11 and didn't do certain things.  So I think this is fair game.

12         THE COURT:  I'll sustain the objection.

13         MR. CANALES:  Thank you, Your Honor.

14 Q.   (By Mr. Kaufman) Your understanding of importation, would

15 that be included in what you defined as drug trafficking?

16 A.   Yes, sir.

17 Q.   Now, you were asked repeatedly whether certain

18 individuals were honest people.  As a threshold matter, do you

19 think -- do you ordinarily refer to people who are selling

20 drugs as honest people?

21 A.   I'm not sure I understand the question.

22 Q.   Well, if somebody is selling methamphetamine or

23 trafficking in drugs, do you ordinarily characterize them as

24 honest people?

25 A.   I'm sure that they can sell methamphetamine honestly, but

1    I wouldn't characterize them as an honest person because they

2    sell methamphetamine.

3    Q.   Now, when you are considering whether to rely in part

4    based on numerous factors in an investigation, but to use a

5    particular individual as a potential witness, to gather

6    information from and further the investigation, what's the

7    most important thing in your mind?

8    A.   Corroboration.

9    Q.   Okay.  Let's talk about corroboration.  You were asked if

10   all of the potential witnesses in the case, whether they were

11   honest people.  And you were stating whether you believed

12   certain people were or were not honest people.

13        First of all, putting aside the generalization, what was

14   that conclusion based on?  For example, for Mr. Shore.

15   A.   Speaking with Mr. Shore subsequent to his arrest.

16   Q.   And how did corroboration fit into that?

17   A.   He explained to me what I already knew, the majority of

18   the case concerning Mr. Shore.  Obviously, we didn't pick his

19   name out of a phone book per se.  We went there because we

20   knew what he had been doing, who he had been purchasing

21   methamphetamine off of.  He corroborated it by explaining it

22   to us.

23   Q.   When you do an interview of a cooperating witness or

24   confidential source, confidential informant, do you -- what is

25   the direction of the information flow, if that makes sense?

1    A.    I let them speak.

2    Q.    Do you ever give them any facts about your investigation?

3    A.    No, I make that -- as a matter of fact, it's an uncommon

4    practice.

5    Q.    Why is that?

6    A.    Just because someone may be fishing for information that

7    we have or what we're doing.  So I may divulge something in an

8    investigation that doesn't need to be out there for the

9    general public at that time.

10   Q.    You mentioned that you got information from Mr. Shore

11   even though you already knew the answer.  Why do you do that?

12   A.    Why do I do that?  For corroboration.  To prove that he's

13   going -- and I'll explain it to them.  Say, look, you've

14   got -- there's a lot of things I'll ask you that I already

15   know the truth to or know the answers to.  You've got to tell

16   me the truth so we can decide what information we can use from

17   your statements.  And he was -- he laid it out to -- in

18   general exactly what we knew to be happening in purchasing the

19   methamphetamine.

20   Q.    And is that the way that you do your interviews?  Do you

21   do it in a relatively standardized way?

22   A.    Yes, sir.

23   Q.    Why is that?

24   A.    So I can do it the same way every time.

25   Q.    And the methods that you use, is that based on your

DUSTIN HARMON - REDIRECT

1   training in law enforcement?

2   A.   Sure it is.   Training and experience.

3   Q.   And you accompany, I take it, other law enforcement

4   officials in their interviews?

5   A.   Yes, sir.

6   Q.   And have you found that to be the standard operating

7   procedure not only for you but for others?

8   A.   Yes, sir.

9   Q.   Did you have objective evidence that corroborated

10  Mr. Shore?

11  A.   I'm sorry, like...

12  Q.   Well, how did the recording that Mr. Shore --

13  A.   Oh, yes.

14  Q.   -- made, how did that play into your decision making?

15  A.   Mr. Shore explained to us what had happened in the past,

16  how he had been dealing in methamphetamine.

17         MR. CANALES:   I'm going to object for him to testify

18  as to what Mr. Shore will testify.

19         THE COURT:   Overruled.

20         THE WITNESS:   We took that information, elected to

21  give Mr. Shore a body wire because he had corroborated what I

22  knew in the investigation, sent him in to the residence of

23  Mr. Saldana for further corroboration.   So the two married up

24  perfectly.

25  Q.   In terms of Mr. Eller, did you obtain any corroboration

DUSTIN HARMON - REDIRECT

1    from him?

2    A.    Same thing.

3    Q.    When you say the same thing, what?

4    A.    We spoke to Mr. Eller.  We knew what the facts were of

5    the case.  We married the two with facts from this case, from

6    other enforcement activities, from other cooperating

7    defendants who were cooperating sources of information,

8    married that up with what we knew in the investigation, and

9    sent him in with a body wire also.  The body wire, the

10   recording further corroborated what we knew, what he had

11   already said.

12   Q.    So when, for example, Mr. Eller was arrested on

13   October 26, 2012, was Mr. Hawkins in the room, Ms. Caudell in

14   the room, Mr. Shore in the room, Mr. Jose Pina, Sr., in the

15   room?

16   A.    No, sir.

17   Q.    So is there any way that any of those individuals could

18   have told him what to say when he was speaking with law

19   enforcement on October 26, 2012?

20   A.    No, sir.

21   Q.    Same question for Mr. Shore.  When he was arrested on

22   October -- sorry, on December 12 of 2012, were any of the

23   other cooperating witnesses in the room with him to tell him

24   their version of the facts?

25   A.    No, sir.

DUSTIN HARMON - REDIRECT

1    Q.    You were asked a lot of questions about the motivations

2    of cooperating witnesses when they testified.

3    A.    Yes, sir.

4    Q.    Let's touch upon that just a little bit.  The defense

5    asked you whether the United States files a motion asking the

6    court to reduce an individual's sentence for providing

7    truthful testimony.  Do you remember when you were asked about

8    that?

9    A.    Yes, sir.

10   Q.    Okay.  Who ultimately decides whether to grant that

11   motion at all?

12   A.    I do not.  The U.S. Attorney's Office.

13   Q.    Well, to grant the motion, who decides?

14   A.    Oh, to grant the motion, the courts.

15   Q.    Okay.  When you say "the courts," for -- except for

16   Ms. Caudell who's already in the Bureau of Prisons, but for

17   these other witnesses that we've discussed today, do you know

18   which judge it is who makes that decision as to whether their

19   testimony was truthful and whether to give a downward

20   departure?

21   A.    His Honor.

22   Q.    His Honor.  Can you say their name, please?

23   A.    Mr. Voorhees.  Judge Voorhees.

24   Q.    Judge Voorhees.  Okay.  Now, who is the one who decides

25   whether -- the amount, if any, that their sentence gets

1   reduced to?

2   A.   Judge Voorhees.

3   Q.   And you've talked about how you explain the risks and the

4   benefits to potential witnesses.  Can you be specific.  You

5   talked -- you started to relate a little bit about what

6   happens if they say anything that is anything but truthful.

7   If somebody -- if a witness says something that's not

8   truthful --

9   A.   Yes, sir.

10  Q.   -- what do you tell them would happen?

11  A.   I explain to them that they are facing another charge if

12  they tell -- if they come into our court -- or into court

13  during our case and explain something that is not the truth,

14  that they will receive another charge.  There's a possibility

15  that they would get another charge put on them.

16  Q.   So are you familiar with the term perjury?

17  A.   Yes, sir.

18  Q.   Obstruction of justice?

19  A.   Yes, sir.

20  Q.   Contempt of court?

21  A.   Yes, sir.

22  Q.   Did any of those expressions come into that conversation?

23  A.   Sure.

24  Q.   And what, if anything, do you explain will happen to them

25  in terms of the plea agreement that they already have?

DUSTIN HARMON - REDIRECT

1    A.    We actually tell them we'll rip it up, shred it up.  It

2    will be null and void if they compromise the plea agreement by

3    not telling the truth.

4    Q.    And you were asked some details about what one witness's

5    plea agreement might have had or another witness's plea

6    agreement might have.  Are you involved in any way in the

7    drafting or review of plea agreements?

8    A.    No, sir.

9    Q.    Are any agents ever involved in that process?

10   A.    No, sir.

11   Q.    You were asked a lot of questions about the two Pinas,

12   the father and son.  First of all, you were confronted with

13   the idea that the son in his plea agreement received a role

14   reduction.

15   A.    Yes, sir.

16   Q.    And is that a decision you would make?

17   A.    No, sir.

18   Q.    Is that a decision I would make?

19   A.    For role reduction?

20   Q.    Yes.

21   A.    To offer the role reduction, but not grant a role

22   reduction.

23   Q.    Okay.  And because the role reduction is ultimately

24   granted or not granted by the court, right?

25   A.    By the court, Judge Voorhees, yes, sir.

DUSTIN HARMON - REDIRECT

1  Q.   Now, if Mr. -- if the junior, the son, actually did

2  receive a role reduction, would that be consistent with your

3  understanding of the facts of the case?

4  A.   If he received a role --

5  Q.   If he were to receive a role reduction.

6  A.   Yes, sir.

7  Q.   So it wouldn't be some sort of overly favorable deal.  It

8  would -- would it be a fair characterization of the actual

9  case?

10  A.   Sure, absolutely.

11  Q.   And if all of the other witnesses had received -- had

12  pled guilty to over 500 grams of methamphetamine but Mr. Jose

13  Pina, Jr., pled to a lesser amount of drugs, would that be

14  consistent with your investigation as well?

15  A.   Yes, sir.

16  Q.   You were asked about who took the money from the property

17  after the December 12th, 2012 arrest, and you were confronted

18  with the money that Mr. Jose Pina Sr.'s, girlfriend had

19  obtained.

20  A.   Yes, sir.

21  Q.   Did you also receive any other information about any

22  other individuals who took money from the property?

23  A.   Yes, sir.

24  Q.   Who were they?

25  A.   Mr. --

DUSTIN HARMON - REDIRECT

1          MR. CANALES:  Judge -- Judge, I would ask if this
2     witness testifies, he's got personal knowledge of his
3     testimony, Judge, or is this something he heard through the
4     grapevine?
5          MR. KAUFMAN:  Well, Your Honor, the question the
6     defense asked was his understanding as to who took money from
7     the property to include Ms. Blevins, Jose Sr.'s girlfriend.
8     It's the same issue.
9          MR. CANALES:  But that's because Pina, the
10    boyfriend, who's a cooperating witness, was the one that told
11    him, Judge, at a debrief.  So he had personal knowledge
12    because he was present and so he could testify to that.
13         THE COURT:  Sustained.
14         MR. KAUFMAN:  And so, Your Honor, from the same
15    source, we're asking from the same source that the defense has
16    already asked.
17         THE COURT:  I'll sustain the objection.
18         MR. CANALES:  Thank you, Judge.
19    Q.   (By Mr. Kaufman) You were asked about immigration --
20    potential immigration charges against the Pinas.  Agent
21    Harmon, based on your training and experience, would an
22    immigration charge against anybody increase their sentence at
23    all if they're pleading to a drug charge?
24    A.   No, sir.
25    Q.   You were confronted with the concept that after the

DUSTIN HARMON - REDIRECT

1   December arrest, that Mr. Pina, Sr., did not, in fact,

2   actually meet with you and debrief with you until

3   approximately two months later.  Based on your training and

4   experience, would you characterize that as normal, relatively

5   quickly, relatively slowly?

6   A.    That's -- that time frame, relatively quickly considering

7   the holidays.  It was relatively quickly for a proffered

8   interview.

9   Q.    And there are legal procedures that have to happen before

10  that to include the plea and organizing lawyers' schedules; is

11  that right?

12  A.    And I'm the last one to know, yes, sir.

13  Q.    You were asked about Mr. Saldana's income, and you were

14  asked whether it was true that his income was between 45 and

15  50 thousand dollars.  But did you, in fact, obtain from his

16  own residence tax records regarding his income at Adams

17  Construction?

18  A.    Yes, sir.

19  Q.    And did those documents, in fact, indicate a far lower

20  number?

21  A.    Yes, sir.

22  Q.    And if you recall off the top of your head, the ballpark

23  about that it was?

24  A.    I don't remember.  Twenty, thirty thousand.

25  Q.    Okay.  So -- okay.

DUSTIN HARMON - REDIRECT

1   A.   It's been several years.   I do not remember the exact
2   amount, I apologize.
3   Q.   Now, the defense asked you if you knew about his
4   employment at Adams Construction.   What, if any, other
5   information had led you to that understanding that he worked
6   there?
7   A.   Simply because of the fact that he was distributing drugs
8   at that employment place.
9   Q.   Now, the defense was asking you about his financial need
10  based on that employment and you testified that he no longer
11  had that job.   I think -- was it after 2011?
12  A.   He told me after 2011 he quit his job.
13  Q.   Okay.   Did he tell you whether he had any other sort of
14  legitimate employment after that?
15  A.   No, sir.
16  Q.   Have you ever experienced -- based on your training and
17  experience, have you ever had people who actually have an
18  otherwise legitimate job but also sell drugs?
19  A.   Absolutely.
20  Q.   You were asked whether you did any wiretaps of
21  Mr. Saldana.   Is a wiretap an easy thing to get?
22  A.   No, sir, not very common --
23  Q.   Is that something you can do on your own?
24  A.   -- in the Western District of North Carolina.
25       I'm sorry, ahead.

DUSTIN HARMON - REDIRECT

1  Q.   Is a wiretap something you can do on your own?

2  A.   No, sir.

3  Q.   Can you explain to the jury the process and what's

4  involved and what's required in order to get a wiretap.

5  A.   It's a lengthy, painstaking process, if I can be so blunt

6  about it.  It's a process that I'm not against considering the

7  case is favorable for a wiretap.  But it takes a lot of

8  manpower and a lot of issues before you can ever initiate the

9  wire interception and the wiretap of that particular phone.

10 It's very lengthy and drawn out and, quite frankly, not out of

11 the question in this case.  We just were forced -- our hand

12 was forced because of the fact that we got information from

13 his mouth that he was leaving that night.  We had to make an

14 arrest.

15 Q.   Who has to approve a wiretap anyway?

16 A.   A judge.

17 Q.   Does Washington, DC, get involved in all wiretaps?

18 A.   Yes, sir.  You have to send off your draft, 30, 40 page

19 write-up to Washington, DC, and bureaucracy at its best gets

20 involved.  And DC sends it back to you and says make these

21 changes.  You send it back to DC and DC sends it back to you

22 and you take it to the judge.  It's pretty drawn out.

23 Q.   How did the fact you discovered Mr. Saldana was going

24 back to Mexico impact your decision to apply for a wiretap?

25 A.   Especially that night in question because of the

1  recording that we made the day before, the intelligence that

2  we were getting, the recording that we made on that day about

3  Mr. Saldana's concerns for law enforcement and detection, and

4  the recording of Mr. Saldana saying, Don't tell anybody, but

5  I'm going to back to Mexico.  And when I heard that, I knew

6  that we needed to act fast, and we did.

7  Q.   How did your understanding as to Mr. Jose Pina, Sr.'s,

8  involvement as a seller for Mr. Saldana play into your

9  decision as to whether or not it would be fruitful to do a

10  wiretap of Mr. Saldana's phone?

11  A.   Yeah, it was -- it was based on the fact that -- again, I

12  mentioned this early on in the testimony.  A lot of times

13  they'll insulate themselves from talking on certain phones or

14  letting a lower member of the organization do the distributing

15  for them.  However, the case showed that Mr. Martinez was

16  delivering methamphetamine or selling methamphetamine also,

17  but it also evolved into Mr. Pina taking care of that business

18  for him when he went back to Mexico.

19  Q.   Are you familiar with the term "two dirty calls"?

20  A.   Yes.

21  Q.   What's that?

22  A.   It's something that's a requisite in the fact when you

23  apply for a wiretap, you have to have certain dirty calls -- a

24  minimum number of dirty calls that would happen to -- have to

25  happen on that telephone specifically.

DUSTIN HARMON - REDIRECT

1    Q.   Can you describe what a dirty call is.

2    A.   Yeah, I apologize.  A dirty call, someone saying, hey --

3    a dirty call is an incriminating phone call made by the target

4    telephone which would be the telephone in question and that

5    dirty call or the incriminating call must involve certain --

6    has to have certain requisite elements to include pretty laid

7    out verbal conversation of I will move the drugs here, I will

8    sell the drugs to you, that kind of call that we didn't have

9    also.

10   Q.   Is that often obtained by having an informant call the

11   target of the investigation and obtain a dirty call that way?

12   A.   Yes, sir.

13   Q.   When Mr. Eller tried to make phone calls to Mr. Saldana,

14   what happened?  And in fact, to Mr. Pina.

15   A.   Mr. Pina, yeah, didn't answer.

16   Q.   So did you have any dirty calls on which to go up on a

17   wiretap?

18   A.   No, sir.

19   Q.   With regard to the pole camera, I believe you testified

20   that it wasn't actually on Mr. Saldana's property; is that

21   right?

22   A.   Right.

23   Q.   It was across the street.

24   A.   Across the street, yes, sir.

25   Q.   So would that pole camera have been able -- based on your

DUSTIN HARMON - REDIRECT

1  training and experience, are there times based on the

2  topography and the neighborhood that it's simply impossible to

3  get a valuable pole camera put up?

4  A.   Absolutely.  It's more common than not.

5  Q.   And so based on the placement of the pole camera in this

6  case, was it actually going to be able to capture any

7  hand-to-hand transactions in the residence?

8  A.   No, sir.

9  Q.   Any near the outside of the residence on the property?

10  A.   Again, I say no.  I think that it was more for

11  intelligence purposes of types of vehicles that were coming in

12  and out of the property just because of the general nature of

13  how far back it was sitting.

14  Q.   And is that quite common in law enforcement to use

15  various techniques, but to assess them such as this pole

16  camera as to their value?

17  A.   Yes, sir.

18  Q.   You were asked whether you reviewed the sawed-off shotgun

19  in this case, the short-barreled shotgun, and you said that

20  you hadn't.  Why not?

21  A.   There's a special agent with Alcohol, Tobacco and

22  Firearms that is also assigned to this case that was there

23  that night.  I like to fancy myself as knowing a lot, but, you

24  know, that's his specialty and that's what he's doing in this

25  case.

DUSTIN HARMON - REDIRECT

1  Q.    And is that also common for the subject matter expert to
2  be the one to do the review?
3  A.    Yes, sir.
4  Q.    Are you aware of whether he conducted a test fire of all
5  the weapons to see if they were operable?
6  A.    I'm not -- I'm not sure.
7  Q.    You were asked about the caliber of the three handguns
8  that were found in the defendant's room to include the one
9  between the mattress and the box spring.
10 A.    Yes, sir.
11 Q.    Based on your understanding, you said -- did you say you
12 were an aficionado of firearms?
13 A.    No, Mr. Canales --
14 Q.    Oh, I'm sorry.
15 A.    -- stated that, but --
16 Q.    But based on your understanding, can a .22 caliber bullet
17 kill a man?
18 A.    Yes, sir.
19 Q.    You were asked about what you would expect to find in the
20 defendant's home.  Would you have expected to -- the idea that
21 people in the Ashe County area may possess firearms, would you
22 expect to find a short-barreled shotgun?
23 A.    Not at all.
24 Q.    Regarding Santa Muerte, how often have you debriefed with
25 drug traffickers regarding the Santa Muerte?

DUSTIN HARMON - REDIRECT

1    A.    I've had several debriefs of drug traffickers and

2    cooperating defendants, cooperating sources.  Just recently

3    had a cooperating source go in with an individual where the

4    individual made him pray with him before -- or pray as they

5    asked for protection during a drug transaction.

6    Q.    During any of your debriefs -- you were asked a lot of --

7    some questions about a lot of other saints and virgin figures

8    in Catholicism.  The Virgin of Guadalupe and some others.

9    During any of your debriefings with drug traffickers, have

10   these other images and concepts ever come up as being

11   associated with drug trafficking?

12   A.    No, sir.

13   Q.    And you were asked about your decision to arrest the

14   defendant on that date, December 12th, 2012.  And the defense

15   pointed out that the defendant had been consistent with the

16   information you received from CS's, CI's, cooperating

17   witnesses, that the defendant had been going back and forth

18   between Mexico.  What, if anything, about the statements the

19   defendant made in that Shore recording with Mr. Shore was

20   different?

21   A.    It was very different.  Again, I reiterate that he was

22   acknowledging law enforcement detection.  He was acknowledging

23   the fact that Mr. Eller may be cooperating against him.  He

24   acknowledged the fact that he was afraid somebody was going to

25   squeal on him.  He was afraid that somebody was going to

1  tell -- that they were going to tell on him, the people that

2  were getting arrested, and that he was going back to Mexico.

3  With the totality of the circumstances at that point and

4  several other statements made during that conversation and the

5  conversation on the 11th of December, we made the decision to

6  arrest Mr. Saldana.

7           MR. KAUFMAN:  Nothing further, Your Honor.

8           THE COURT:  All right.

9           MR. CANALES:  If I may just very shortly.

10          THE COURT:  Yes, sir.

11          MR. CANALES:  Okay.

12                    RECROSS EXAMINATION

13  BY MR. CANALES:

14  Q.   Officer, on the issue of -- I'll come back to the issue

15  of beliefs and stuff and all that, but let me ask you about

16  this.

17       Debriefs, right?

18  A.   Yes, sir.

19  Q.   Debriefs.

20  A.   Yes, sir.

21  Q.   Is a person -- isn't it correct that when there's a

22  debrief, usually -- debrief meaning when a person is

23  cooperating, giving testimony to the authorities, right?

24  Usually are lawyers present?

25  A.   I'm sorry, are debriefs --

DUSTIN HARMON - RECROSS

1  Q.    Yes.  Isn't it true that lawyers are always present?

2  A.    No, sir.

3  Q.    You mean to tell me that in the state of North Carolina

4  in federal court when cooperating agents or people, defendants

5  cooperate, they sit down without a lawyer?

6  A.    Yes, sir.

7  Q.    So when Bobby Shore spoke, there was not a lawyer

8  present?

9  A.    Are you asking about proffers?

10 Q.    I'm talking about cooperation.

11 A.    Subsequent to arrest?

12 Q.    Debriefs.  Debriefs.

13       THE COURT:  Well, wait just a minute.  You mentioned

14 the word "proffer" several times.  Why don't you tell the jury

15 what that is.

16       THE WITNESS:  It's an agreement that the courts

17 use -- I'm sorry, that the -- it's an agreement between the

18 defense and the U.S. Attorney's Office that their client, the

19 defense client will come in and give a proffer of their

20 information regarding their involvement in the case.  That

21 will not be used against them in the court proceedings.

22 They're also reminded not to speak of anything of a violent

23 nature, killings or anything like that.  It's just a simple

24 proffer of information that they provide to the government

25 with their attorneys present during a proffer.  And I'm sure

1    that they may call it something different in different

2    localities so it's no -- nothing different.  It's just that a

3    proffer occurs with an agreement between the U.S. Attorney's

4    Office and the defense counsel to -- for their client to

5    provide information.

6    Q.   To make it more clear to the jury, I mean, Danny Eller

7    was represented by a lawyer in court, right, when he pled

8    guilty?

9    A.   When he pled -- I'm assuming that he was, yes, sir.

10   Q.   I mean, right?  The honorable judge would have never

11   allowed anybody to plead guilty without the assistance of a

12   attorney, right?

13   A.   Yes, sir.

14   Q.   True or not true?

15   A.   I'm sure that they can represent themselves.

16   Q.   Okay.  But do you have --

17   A.   I'm just saying -- you're asking me to definitively say

18   people can't plead guilty without a lawyer.  I think that

19   that's not the truth.

20   Q.   Let me get case specific.  In this case isn't it true

21   that when Bobby Shore, Danny Eller, the Pinas, when they pled

22   guilty, they were assisted by a lawyer, true or not true?

23   A.   To my knowledge, yes, sir.

24   Q.   And isn't it true that the one that negotiated the plea

25   bargain agreements for Eller, for Shore, for the Pinas, and

1  for Caudell was the attorney dealing with the U.S. Attorney's

2  Office?  It's the attorney who makes the plea bargain

3  agreements with the U.S. Attorney's Office like in this case,

4  right?

5  A.   In my understanding.

6  Q.   Okay.  And it is the attorneys also who also have an

7  understanding as to whether or not a benefit is going to be

8  derived from their testimony, right?

9  A.   The attorneys decide that?

10  Q.   I mean, the attorneys are present and it's negotiated

11  through the U.S. Attorney's Office whether a motion for

12  downward departure is going to be filed.

13  A.   Maybe I should explain the process a little bit more

14  because the defense attorney sits with the U.S. Attorney's

15  Office and they negotiate outside of the presence of a DEA

16  agent or an ATF agent or an HSI agent.  They negotiate and

17  decide what's best for their client with the U.S. Attorney's

18  Office during this plea agreement.  I'm not privy to that

19  conversation nor the granting because I know that granting the

20  plea is ultimately up to His Honor.

21  Q.   I really would like for us to get case specific on this

22  case.

23  A.   Yes, sir.

24  Q.   Not other cases or how it happens generally.  But on this

25  case, plea bargains were struck; is that correct, for all of

1  them?

2  A.   They pled guilty.  The only one going to trial is

3  Mr. Saldana.

4  Q.   Okay.  My question, sir, again, is isn't it true that all

5  of them cut deals, all of them had plea bargain agreements in

6  writing with certain benefits in that writing?

7  A.   That's fair to say that they pled guilty.

8  Q.   Is it fair to say that's the truth in this case?

9  A.   That they pled guilty.  I don't know what bargains that

10  you're speaking of.

11  Q.   All right.  That's fair.  And you know a lot about the

12  aspects of the investigation, right, in this case?

13  A.   Yes, sir.

14  Q.   And you were asked questions right now -- let me give an

15  example of what happens in the debriefs or when a client is

16  cooperating.  When a person is cooperating, who's asking the

17  questions?  Is an officer asking the questions to elicit

18  information from a possible...

19  A.   Yes, sir.

20  Q.   Right?

21  A.   Yes, sir.

22  Q.   I mean, an officer has a target, right?  And then when

23  you speak to a person, it is the officer who is asking the

24  questions and decides what route that question is going to

25  take, right?

1  A.   General questions.

2  Q.   Right?  Now, in this case --

3  A.   Personally I do not -- in this case, case specific, I do

4  not lead down any road.  I ask generally.  General questions.

5  Q.   Okay.  Let me ask you about this one.  Have you spoken to

6  Caudell, Clara Caudell?

7  A.   Yes.

8  Q.   Okay.  When was the first time you spoke to her?

9  A.   The date?  I spoke to her only one time so I would have

10  to refer to my notes to know the exact date.

11  Q.   Okay.

12  A.   Maybe July.

13  Q.   Of this year?

14  A.   No, no, no.

15  Q.   Last year?

16  A.   2012.

17  Q.   2012.  But then by July of 2012 Saldana was already

18  arrested.  So he was more than a target; he was a defendant,

19  right?

20  A.   July 2012?

21  Q.   I mean, excuse me, by July of 2012 -- I apologize.  July

22  of 2012 when you spoke to Ms. Caudell, my client was already a

23  target.

24  A.   A target of the investigation?

25  Q.   Yes.  He was a target because you testified earlier that

DUSTIN HARMON - RECROSS

1    when you got here --

2    A.    Sure.

3    Q.    -- he was already given to you, right?

4    A.    Sure.

5    Q.    As a target.

6    A.    Sure.

7    Q.    Okay.  And when you spoke to Bobby Shore, when was that?

8    A.    December 12th, 2012.

9    Q.    That was the first time you spoke to Bobby?

10   A.    Yes, sir.

11   Q.    Well, isn't -- my client was more than a target on

12   December 12.  He was arrested on December 12.

13   A.    Not before I spoke to Bobby Shore.

14   Q.    I mean, minutes before, hours before he gets arrested?

15   A.    No, I spoke to Bobby Shore on the morning of December 12

16   and that night he was arrested.  So yeah, specifically you're

17   crossing before and after.  It was after, yes.

18   Q.    You met this credible, reliable person and based on this

19   information, this drug user, this person, then we arrest

20   Mr. Saldana based on a lot of factors.

21   A.    Corroboration.

22   Q.    Okay.  And --

23          THE COURT:  Counselor, I think we're going to have

24   to break it off because it's a quarter after 5:00.  We usually

25   break at 5:00.

1          Members of the jury, please hold what you've got, so
2    to speak.  Keep an open mind about the case.  Don't discuss
3    it.  And remember the other instructions.  Ask you to be with
4    us at 9:30 in the morning.  Come on in the jury room and we'll
5    call for you at that time.  Thank you.
6          (Jury exited the courtroom.)
7          THE COURT:  If I read you correctly, counselor, you
8    have mentioned a number of other areas in addition to the one
9    you are already taking up that you wanted to go into with this
10   witness.
11         MR. CANALES:  Only as to -- only as to what was
12   covered by the government on redirect.  Only those areas.
13         THE COURT:  Well, I would ask you to stick to
14   redirect.
15         MR. CANALES:  Yes, Your Honor.
16         THE COURT:  I don't know that that -- in the light
17   of the fact that we've already covered considerable territory
18   about the nature of the investigation and this witness's role
19   in it, I want you to keep that in mind --
20         MR. CANALES:  Yes, Your Honor.
21         THE COURT:  -- in terms of whether we're beating a
22   dead horse, so to speak, as far as the jury is concerned.
23         MR. CANALES:  Yes, Your Honor.  I will -- I
24   specifically labeled my notes redirect subjects that were
25   covered by the prosecutor.  And only -- just this much.  Yes,

1    I will -- I will limit it, Judge.  I will find a way to clean
2    it up.
3            THE COURT:  That's what I'd ask you to do.
4            MR. CANALES:  Okay.
5            THE COURT:  I don't -- I try not to tell counsel how
6    to try their cases.
7            MR. CANALES:  Yes, Your Honor.
8            THE COURT:  And we want you to have adequate scope
9    to bring out things that are important.  But when you started
10   going witness by witness over ground that we have covered,
11   that sounded like it might be getting afoul of judicial
12   economy if nothing else.  Normally the government has -- well,
13   an attorney who calls a witness normally has the last word
14   with that witness, but in this case we're allowing your
15   response and other questions that you had to the redirect.
16           Yes, sir.
17           MR. KAUFMAN:  Your Honor, in light of the rather
18   lengthy recross-examination and new topics, I've noted very
19   briefly three areas I would like to ask so far at this point,
20   just very brief one or two questions on each subject matter on
21   re-redirect based on counsel's recross.  I promise to be
22   brief.
23           THE COURT:  Well, as I said, you normally would have
24   the last word with your own witness.
25           MR. KAUFMAN:  Thank you.

1          THE COURT:  You've already said you may recall this
2   witness.  Defense counsel could also recall the witness.  So
3   we'll go from there.
4          Thank you all for considering these matters.
5          (Evening recess at 5:21 p.m.)
6                          *****
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF NORTH CAROLINA

3   CERTIFICATE OF REPORTER

4

5

6           I, Cheryl A. Nuccio, Federal Official Realtime Court

7   Reporter, in and for the United States District Court for the

8   Western District of North Carolina, do hereby certify that

9   pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16          Dated this 10th day of August 2015.

17

18

19                      s/Cheryl A. Nuccio

20                      _____
                        Cheryl A. Nuccio, RMR-CRR
                        Official Court Reporter

21

22

23

24

25