UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA    )   DOCKET NO. 5:12-CR-49-1
                             )
       vs.              )   VOLUME II
                             )
MARTIN MARTINEZ SALDANA,    )
                             )
        Defendant.     )
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
MARCH 5, 2014


APPEARANCES:

On Behalf of the Government:

    STEVEN KAUFMAN, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    DENZIL H. FORRESTER, ESQ.
    Law Office of Denzil Forrester
    P.O. Box 32511
    Charlotte, North Carolina

    JESUS RICARDO CANALES, ESQ.
    Law Office of Rick Canales
    845 East Harrison Street
    Brownsville, Texas




        Cheryl A. Nuccio, RPR, RMR, CRR
            Official Court Reporter
         United States District Court
          Charlotte, North Carolina

1                                   I N D E X

2      GOVERNMENT'S WITNESSES                                    PAGE

3      DUSTIN HARMON
        Recross Examination By Mr. Canales                        167
4       Redirect Examination By Mr. Kaufman                       172
        Recross Examination By Mr. Canales                        178
5
       JEREMY WILLIAMS
6       Direct Examination By Mr. Kaufman                         184
        Cross Examination By Mr. Canales                          250
7       Redirect Examination By Mr. Kaufman                       305
        Recross Examination By Mr. Canales                        321
8
       CLARA JEAN CAUDELL
9       Direct Examination By Mr. Kaufman                         327
        Cross Examination By Mr. Canales                          338
10      Redirect Examination By Mr. Kaufman                       345
        Recross Examination By Mr. Canales                        347
11      Redirect Examination By Mr. Kaufman                       350

12     DAVID SCHAUBLE
        Direct Examination By Mr. Kaufman                         351
13      Cross Examination By Mr. Canales                          360

14                                E X H I B I T S

15     GOVERNMENT'S EXHIBITS

16     NUMBER                                              ADMITTED

17     2A .........................................................193
        2B .........................................................193
18      2C .........................................................193
        2D .........................................................193
19      2E .........................................................193
        2F .........................................................193
20      2G .........................................................193
        2H .........................................................196
21      2I .........................................................200
        3A .........................................................204
22      3B .........................................................204
        3C .........................................................204
23      3D .........................................................204
        3E .........................................................206
24      4A .........................................................208
        4B .........................................................208
25      4C .........................................................210

1                        E X H I B I T S

2    GOVERNMENT'S EXHIBITS

3    <u>NUMBER</u>                                              <u>ADMITTED</u>

4    5A ..................................................212
     5B ..................................................212
5    5C ..................................................212
     5D ..................................................212
6    5E ..................................................216
     5F ..................................................216
7    6A ..................................................222
     6B ..................................................222
8    6D ..................................................222
     6C ..................................................223
9    7A ..................................................220
     8A ..................................................227
10   9 ...................................................228
     10 ..................................................355
11   11 ..................................................355
     12 ..................................................355
12   13 ..................................................355
     14A .................................................233
13   14B .................................................233
     15 ..................................................358
14   16A .................................................241
     16B .................................................241
15   16C .................................................241
     16D .................................................241
16   16E .................................................241
     16G .................................................242
17   24 ..................................................346
     32 ..................................................194
18   33 ..................................................337
     34 ..................................................359
19   35 ..................................................359

20

21

22

23

24

25

DUSTIN HARMON - RECROSS

1                    P R O C E E D I N G S

2  WEDNESDAY MORNING, MARCH 5, 2014

3              (Court called to order at 9:50 a.m.)

4              THE COURT:  Okay.  Are the parties ready to resume

5  business?

6              MR. KAUFMAN:  Yes, Your Honor.

7              THE COURT:  All right.  May we have the jury,

8  please.

9              MR. KAUFMAN:  Should Agent Harmon take the stand?

10             THE COURT:  Yes.

11             (Witness resumed the witness stand.)

12             (Jury entered the courtroom.)

13             THE COURT:  Good morning, members of the jury.

14             THE JURY:  Good morning.

15             THE COURT:  I believe the defense counsel,

16  Mr. Canales, had a few more questions.

17             MR. CANALES:  Yes, sir.

18      DUSTIN HARMON, GOVERNMENT WITNESS, PREVIOUSLY SWORN,

19                  RECROSS EXAMINATION (Cont'd.)

20  BY MR. CANALES:

21  Q.   Officer, good morning.

22  A.   Good morning, Mr. Canales.

23  Q.   Good morning, sir.  Just for the record, are you the same

24  person who was testifying here in court yesterday?

25  A.   Yes, sir.

1  Q.   Upon questioning from the government, you touched on a

2  very important issue that is called corroboration; is that

3  correct?

4  A.   Yes, sir.

5  Q.   Okay.  And also upon questioning from the government,

6  when you were asked as to why you needed to act on the arrest

7  of my client, you gave several reasons.

8  A.   Yes.

9  Q.   You stated that because of information, meaning

10  analytical data, is that what you said?  Analytical data from

11  law enforcement in Virginia and Ashe County, you decided to

12  put up an investigation; is that correct?

13  A.   I think that's what I said, yes, sir.

14  Q.   Now, at the time when you decided to put an

15  investigation, is it your testimony today that you did not

16  have enough evidence to arrest my client?

17  A.   At the time that we opened the case up?

18  Q.   At the time when you had analytical data from law

19  enforcement in Virginia, from law enforcement in Ashe County,

20  at that time did you have enough to arrest my client?

21  A.   Wouldn't have felt comfortable making an arrest at that

22  time.

23  Q.   Is the answer no?

24  A.   Yes, sir.

25  Q.   So is it fair to say that it wasn't until the pole camera

1  or until the cooperating witnesses came into play that an
2  arrest was made?
3  A.    Those were factors involved in the arrest, yes, sir.
4  Q.    All right.  Okay.  So I mean, if there's anything else,
5  I'm sure it's going to be mentioned by the government, right?
6  You would agree.
7  A.    It will be or it has been, yes, sir.
8  Q.    Okay.  Now, you stated that also upon redirect, that
9  these people who are -- basically, you -- bottom line, both
10  the government and yourself are relying or assuming -- I would
11  use relying, hoping that these witnesses are telling the
12  truth; is that correct?
13  A.    Well, again, going through various stages to verify what
14  truths are being told and searching for that corroboration
15  that we spoke of.  And obviously, yes, we're hoping that we
16  can find some truths in witness statements.  But we don't rely
17  on those truths until we can corroborate it with other info or
18  intelligence gathered.
19  Q.    And if there's any intelligence, if there's any evidence,
20  any fingerprints, any video, any recordings of any type, I
21  mean, all those will be brought forward, right?
22  A.    Yes, sir.  We spoke briefly so far about a couple
23  recordings that the jurors will hear, yes, sir.
24  Q.    Okay.  Now, you stated that these witnesses have -- I
25  asked -- your exact words were they have to be anything but

1  untruthful; is that correct?  Those were your words yesterday.

2  A.   I'm not sure I understand the question.

3  Q.   Yesterday when you were -- when you were talking about

4  the motion to reduce a sentence and the government was

5  eliciting testimony from you to establish that it was the

6  judge was the one that decides, right?

7  A.   The judge is the one who decides, yes, sir.

8  Q.   True or not true?  If the government doesn't file a

9  motion to reduce a sentence, there is nothing for the judge to

10  decide at that point, right?

11  A.   The government must file a motion, yes, sir.

12  Q.   So really, without step number one, we don't get step

13  number two, right?

14  A.   Fair to say.

15  Q.   Okay.  And in order to get step number one, we have to

16  get --

17  A.   Truth.

18  Q.   -- the witnesses to come and testify what they have told

19  you.

20  A.   Truth.  Truthfully.  Again, I can't emphasize it enough.

21  It has to be -- we couldn't give it for someone who was not

22  telling the truth.

23  Q.   And the ones who determine whether they're telling the

24  truth or not telling the truth will be the jury; is that

25  correct?

DUSTIN HARMON - RECROSS

1  A.   Obviously, first of all, I must do that.  That's part of
2  my job to be able to utilize them --
3  Q.   Yes, sir.
4  A.   -- throughout the investigation.  We would evolve -- the
5  case would evolve and we have evolved to the point in the case
6  where the jury will be able to tell if the witnesses are
7  telling the truth.
8  Q.   Now, you stated that the protections to guarantee that
9  these people are going to come and tell the truth will be
10 perjury, right?  You mentioned obstruction of justice as some
11 of the guarantees that would say, hey, this person is going to
12 come into court and he's going to tell the truth.  Why?
13 Because perjury is a consequence.  Obstruction of justice is a
14 consequence upon many; is that correct?
15 A.   I acknowledged to Mr. Kaufman that those are consequences
16 that we do mention when we're briefing a witness or
17 cooperating defendant.
18 Q.   But do you acknowledge to me now that when they were out
19 in the street with these people, these honest witnesses,
20 obviously they didn't touch their heart to consume drugs,
21 right?  A lot of them have lengthy drug usage history, right?
22          MR. KAUFMAN:  Objection.  Asked and answered.
23          THE COURT:  Sustained.
24 Q.   And obviously, these people breaking federal drug dealing
25 laws didn't stop them either, right?

DUSTIN HARMON - REDIRECT

1  A.   Didn't stop?

2  Q.   Didn't stop them, right?  You mean to say that people who

3  break federal drug laws are honest people?

4          MR. KAUFMAN:  Objection.  Asked and answered and

5  argumentative.

6          THE COURT:  Sustained.

7  Q.   Officer, yesterday on redirect you stated that my

8  client -- that he was importing drugs.  Do you remember that?

9  A.   Yes, sir.

10  Q.   Do you have personal knowledge that he was importing

11  drugs?  Yes or no, sir?

12  A.   I do not have personal knowledge of his importation of

13  methamphetamine.

14          MR. CANALES:  Thank you, sir.

15          THE COURT:  No further questions?

16          MR. CANALES:  Oh, I'm sorry, Your Honor.  I

17  apologize.  No, Your Honor.  I pass the witness, I'm sorry.

18          MR. KAUFMAN:  Thank you, Your Honor.  I'll be brief.

19                    REDIRECT EXAMINATION

20  BY MR. KAUFMAN:

21  Q.   Special Agent Harmon, you were just asked about personal

22  knowledge and the defense wanted to confine you to yes or no.

23  Do you have any knowledge about defendant's involvement in

24  importation of methamphetamine?

25          MR. CANALES:  Your Honor, I'm going to ask that if

DUSTIN HARMON - REDIRECT

1    he's going to -- that he not be allowed to testify as to any

2    hearsay.  The question should be personal knowledge, Your

3    Honor.  If he's going to be a witness, he's got to have

4    personal knowledge.

5           THE COURT:  Well, I haven't heard the answer yet;

6    but as to the question, the objection is overruled.

7           THE WITNESS:  I would easily -- based on training

8    and experience, those amounts of methamphetamine, everything

9    involved, the testimony, the corroboration that we received

10   from different various confidential sources, that there was

11   importation of Mexican methamphetamine into the Western

12   District of North Carolina in this case.

13   Q.   Agent Harmon, when you have information indicating that a

14   target is guilty of a federal offense and it's -- the

15   information has been corroborated, do you immediately arrest

16   that individual?

17          MR. CANALES:  Your Honor, may I ask that he repeat

18   that question, Your Honor?

19          THE COURT:  Overruled.  Well, excuse me, I'm sorry.

20   You just asked to repeat it?

21          MR. CANALES:  Yes, Your Honor.

22          THE COURT:  Will you please repeat it.

23          MR. KAUFMAN:  Yes, Your Honor.

24   Q.   Special Agent Harmon, when you have evidence that

25   indicates that an individual, a target is guilty of a federal

1  offense, do you immediately arrest that individual?

2  A.   No, sir.

3  Q.   Why not?

4  A.   We generally obviously will take time to corroborate,

5  gather more intelligence and conduct an investigation in the

6  federal system where we try to get more than one person so we

7  can encompass the drug trafficking organization in and of

8  itself if we can during the prosecution as opposed to taking

9  an immediate target off and letting the others flee to Mexico

10 or other parts of the county, other parts of the country.  We

11 will, of course, do our due diligence in exercising a

12 stringent investigation to target the whole -- the whole

13 organization, if you will.

14 Q.   Agent Harmon, you were asked by the defense about the

15 timing of your debriefing or proffer with Ms. Caudell.  Let me

16 ask you, what's the standard -- is there a standard operating

17 procedure after a debriefing in terms of documenting anything

18 about the interview?

19 A.   As far as a report?

20 Q.   Yes.

21 A.   A report is generated in my office within five days

22 generally.

23 Q.   And do you have access to reports from other districts?

24 A.   Yes, sir.

25 Q.   Now, is there anything that would refresh your

DUSTIN HARMON - REDIRECT

1   recollection as to the date that you personally interviewed

2   Ms. Caudell?

3   A.   A report.  I think I answered that yesterday.  Maybe a

4   report.

5        MR. KAUFMAN:  Showing the defense what's been marked

6   as Government's Exhibit 29 for identification.  It's

7   previously been provided to the defense in the discovery

8   process.

9        THE COURT:  You may approach.

10       MR. KAUFMAN:  Thank you, Your Honor.  It's a

11  five-page document.

12  Q.   Do you recognize this?

13  A.   Yes, sir, I do.

14  Q.   What is that?

15  A.   It's a report written by Special Agent Jason Thompson of

16  the Roanoke DEA office in Roanoke, Virginia, in reference to

17  the October 22nd interview of Ms. Clara Jean Caudell in

18  Virginia.

19  Q.   Thank you.  And, Agent Harmon, is this the same interview

20  that you were present at?

21  A.   Yes, sir.

22  Q.   And who else was present in addition to you and Special

23  Agent Thompson?

24  A.   Investigator Williams and Investigator Grier from

25  Virginia.

DUSTIN HARMON - REDIRECT

1    Q.   All right.  So for all of the individuals, not only the

2    witnesses who may or may not testify in this trial, but other

3    witnesses and sources of intelligence in this investigation,

4    are there similar reports generated for all of them?

5    A.   Yes.

6    Q.   You were asked during the recross-examination

7    regarding -- the term that was used was plea deals for

8    witnesses in this case.  Are you aware of whether these plea

9    agreements that the defendants received and signed were

10   standard pleas or if any of them had sweetheart deals, if you

11   will?

12   A.   To my understanding, it's a standard plea process.

13   Nothing out of the ordinary.

14   Q.   And to your understanding, did all of the individuals

15   plead guilty to the full conspiracy according to their

16   liability?

17   A.   Yes, sir.

18   Q.   You were asked some questions about debriefings and

19   proffers and the defense lawyer was asking you questions about

20   a proffer.  Are you familiar with the term "proffer

21   agreement"?

22   A.   Yes, sir.

23   Q.   And have you ever reviewed these documents that are

24   generated by myself or others in my office?

25   A.   Yes, sir.

DUSTIN HARMON - REDIRECT

1   Q.   And what's your understanding as to what's required in

2   that proffer agreement and then what the benefits are to that

3   proffer agreement?

4   A.   The requirement is truth during the proffer agreement

5   that is gauged by not only the investigator but the attorney

6   with the client, and it's an understanding that the client

7   will speak the truth.  And if not, we'll stop the interview

8   and leave, which has happened many times.  And if so, it's an

9   agreement that the information that they give against

10  themselves won't be used against them in court, if I'm not

11  mistaken.

12  Q.   And is the purpose for that so that they can feel

13  comfortable being open about all of their conduct?

14  A.   Yes, sir.

15  Q.   What happens to those individuals if they say anything

16  that's determined to be untruthful?

17  A.   As I mentioned, I've actually walked out of interviews

18  that I've found the defendants or the person providing the

19  interview being untruthful.  I've walked out of those

20  interviews.

21  Q.   Has that ever happened in this investigation?

22          MR. CANALES:  Your Honor, I'm going to object.

23          THE WITNESS:  No, sir.

24          MR. CANALES:  He's going beyond the scope of

25  re-redirect, Judge.  Re-recross.

1      THE COURT:  Overruled.

2      THE WITNESS:  No, sir, it has not.

3   Q.   And how, if at all, can their statements from that

4   debriefing session, that proffer session be used against them,

5   if at all, if they say anything that's untrue?

6   A.   If they say anything that's untrue, as we mentioned

7   before, there is a -- I'm not sure about judicially a charge

8   of perjury or -- is it -- perjury charges, I'm assuming, would

9   take place.  But in a proffer setting it's a little different.

10  Q.   And could the actual content of what they say?

11  A.   Oh, yes.  Yes, the actual content could be used against

12  them.

13  Q.   And is that same proffer language in the -- in every plea

14  agreement in this case and in the standard plea agreements?

15  A.   Yes, sir.  Every one that I've dealt with, yes, sir.

16      MR. KAUFMAN:  Thank you.  Nothing further, Your

17  Honor.

18      THE COURT:  All right.

19      MR. CANALES:  If I may, Judge?

20      THE COURT:  Yes, sir.

21                   RECROSS EXAMINATION

22  BY MR. CANALES:

23  Q.   Officer, on the -- one of the recorded conversations in

24  which you used your knowledge and expertise to decide that my

25  client would be a flight risk --

DUSTIN HARMON - RECROSS

1          MR. KAUFMAN:  Objection, Your Honor.  This is beyond
2   the scope of re-redirect.
3          THE COURT:  Sustained.
4          MR. CANALES:  That's exactly what he said, Judge,
5   about my client returning to Mexico.  He asked --
6          MR. KAUFMAN:  Your Honor, that's not part of the --
7          THE COURT:  That's beyond the scope, sir.
8          MR. CANALES:  Yes, Your Honor.
9   Q.   Right now when you were talking about that each defendant
10  pled guilty according to their liability, right?  Meaning to
11  the amount of drugs in which they are -- let me start again.
12         Right now you were asked that each defendant pled guilty
13  according to their liability, right?
14  A.   I stated that each defendant pled guilty in this case.
15  I'm not sure the second part of your question.
16  Q.   And then the government --
17  A.   Or that I understand it.  I'm not sure I understand it.
18  Q.   Yes, sir.
19  A.   To their liability, is that what you're saying?
20  Q.   Yes, sir.
21  A.   Or reliability?
22  Q.   Liability.
23  A.   No.  All I stated was that each defendant in this case
24  has pled guilty aside from Mr. Saldana.
25  Q.   According to what was decided was their guilt, their

DUSTIN HARMON - RECROSS

1  amount of guilt, right?

2  A.   I'm still missing --

3  Q.   Who decided exactly what type of charge to plead guilty

4  to?  Who decided to charge them?

5  A.   We charged them.  They pled guilty.

6  Q.   And if they pled to something specific, they can only

7  plead to something specific if it's allowed by the government,

8  right?

9  A.   Still missing it.

10 Q.   In this case they pled guilty to a certain amount of

11 drugs, right?

12 A.   Yes.

13 Q.   There were different amounts on different defendants,

14 right?

15 A.   Fair to say, yes.

16 Q.   Okay.  Then who makes the offer like you can plead to

17 this, you can plead to that, you can plead to this amount?

18 Who makes the decision?

19 A.   We listen to their testimony, listen to their

20 information.  Their defendant -- their attorney reaches out

21 and touches base with the United States attorney to form a

22 plea agreement.

23 Q.   Exactly.  And who makes the offer?  Who says you can

24 plead guilty to this?

25 A.   The United States government.

1   Q.   The government, exactly, right?

2   A.   The U.S. Attorney's Office, yes, sir.

3   Q.   And it's given to the defendant and there are

4   different -- different clients pled to different things in

5   this case; is that correct?

6   A.   I think that's correct, yes, sir.

7   Q.   Okay.  Now, when they are -- when witnesses are in a

8   debriefing room, right?

9   A.   Yes, sir.

10  Q.   And reports are made, right?  Like the one you have.

11  A.   Yes, sir.

12  Q.   Right?  There's a difference between Caudell and Eller

13  and the Pinas, right?  The difference being that Eller was

14  already convicted, is that correct, and was already in prison?

15  A.   I'm not sure which report you're referring to, but there

16  was a report generated when he was arrested.

17  Q.   The one about Caudell.  She was already in prison, right?

18  She's in prison today as we speak.

19  A.   The report that we just referred to?

20  Q.   Yes.  When was it prepared?  Where was it done?

21  A.   That was in 2012.

22  Q.   Where?

23  A.   She was not under arrest.  In Virginia.  She was not

24  under arrest.

25  Q.   But she knew she was already a target.  She knew you had

1  found drugs in her home.

2  A.   I'm not sure that they found drugs in her home, but...

3            MR. CANALES:   May I have a copy of the report?

4            THE WITNESS:   She was definitely not in custody.   I

5  actually was present during that interview.

6  Q.   She was taken into custody as soon as this happened,

7  right?

8  A.   I don't think she was in custody, sir.

9  Q.   Was this done in the presence of an attorney or an

10 attorney was not present?

11 A.   Attorney was not present.   It was on her own goodwill and

12 volition.

13 Q.   And at that point, after she spoke to you all, you

14 decided that she was telling the truth and we took it as such;

15 is that correct?

16 A.   We took parts of the interview and dissected it and

17 determined what was truthful and what wasn't.

18 Q.   So, then, not everything that she said is in that report?

19 A.   No.   Whatever is in that report is what she said.   And it

20 clearly states at the top of the report this is what she

21 stated.

22 Q.   So then we took this report -- excuse me.   We took this

23 report, what she told you when she's surrounded by police

24 officers, this drug addict, right, this drug addict?   She's

25 been using meth, I believe, since the age of 15?

1   A.   Possibly.  Several years.

2   Q.   How old is she -- approximately how old is she now?

3   A.   How old is she?

4   Q.   Yeah.

5   A.   In her 40s.

6   Q.   Okay.  So we have a person who's been using drugs for at

7   least 25 years, right?

8            MR. KAUFMAN:  Objection.  Argumentative.

9            THE COURT:  I'll overrule the objection, but we are

10  on --

11           MR. CANALES:  Yes, sir.

12           THE COURT:  -- re-recross.

13           MR. CANALES:  Yes, sir.

14           THE COURT:  And it is not an open field.

15           MR. CANALES:  Yes, Your Honor.

16  Q.   We took this 25 -- this person surrounded by police

17  officers without a lawyer who has been constantly using meth

18  for 25 straight years --

19           MR. KAUFMAN:  Objection.

20  Q.   -- and took her comments as truth and it became a report;

21  is that correct?

22  A.   I'm not sure how many years she was using meth, but she

23  stated who she got the methamphetamine from which corroborated

24  what we knew.

25  Q.   She told you right here, stated that she first

JEREMY WILLIAMS - DIRECT

1  experimented with meth at least 15 years ago.

2          MR. KAUFMAN:  Objection.

3          THE COURT:  Sustained.

4          THE WITNESS:  As opposed to 25 years.

5          MR. KAUFMAN:  Objection.

6          MR. CANALES:  No further questions.

7          MR. KAUFMAN:  Nothing further.  We are asking that

8  Agent Harmon be subject to recall, Your Honor.

9          THE COURT:  All right.  You may step down.

10         (Witness stepped down.)

11         MR. KAUFMAN:  Your Honor, the United States calls

12 Sergeant Detective Jeremy Williams.

13         JEREMY WILLIAMS, GOVERNMENT WITNESS, SWORN,

14              DIRECT EXAMINATION

15 BY MR. KAUFMAN:

16 Q.  Good morning, sir.

17 A.  Good morning.

18 Q.  If you would please state your full name and introduce

19 yourself to the jury.

20 A.  My name is Jeremy Williams.  I work at the Ashe County

21 Sheriff's Office.  I am a sergeant over narcotics at the

22 sheriff's office.

23 Q.  Can you tell the jury just a little bit about your

24 background in law enforcement.

25 A.  Yes.  I was hired as a deputy in 2005.  I worked just

JEREMY WILLIAMS - DIRECT

1  regular patrol and that would be from answering calls to

2  service of civil papers, service of criminal papers, warrants.

3  I worked that for about four years.  Two years of that, at the

4  end of the two years, which would be 2007, I became a K-9

5  handler and I worked the -- my K-9 for two years.  2009 is

6  when I moved to narcotics and I've been in narcotics since

7  2009.

8  Q.   In the time period that you've been in law enforcement,

9  approximately how many drug related investigations and arrests

10 have you taken part in?

11 A.   Since I've been in law enforcement, I've participated in

12 around 500 drug cases.

13 Q.   Now, you mentioned that you're not only a detective, but

14 also a sergeant.  Do you supervise anybody in the sheriff's

15 office?

16 A.   Yes, I am a sergeant.  There's three guys in our unit.

17 We have a lieutenant.  I'm the sergeant.  And then I have one

18 guy under me.  So I supervise one gentleman.

19 Q.   All right.  Are you even certified in instruction in law

20 enforcement?

21 A.   Yes.  I am certified through North Carolina as an

22 instructor.  I teach just basic law enforcement training to

23 guys that are going through basic school.  I teach domestic

24 violence and patrol techniques.

25 Q.   All right.  Sergeant Williams, I'd like to direct your

1  attention to the gentleman in the shirt to my left, the

2  defendant who's wearing headphones right now.  Do you

3  recognize who that is?

4  A.    Yes, sir, I do.

5  Q.    And who is that?

6  A.    That's Martin Saldana.

7  Q.    And did he become a target of your ongoing investigations

8  at some point in time?

9  A.    He did.

10  Q.    When was that and how did he become a target of the

11  investigation?

12  A.    Whenever I was working patrol right around 2008, I was a

13  K-9 handler.  I learned through just basic patrol, people came

14  up to you and they would give you information.  They didn't

15  want to be named.  They didn't want to have any say so in it.

16  But that's how I learned in 2008 that Mr. Saldana was involved

17  in the drug business.

18  Q.    At that point in time, did you have sufficient evidence

19  to arrest Mr. Saldana?

20  A.    No, we had no sufficient evidence at the time.  We didn't

21  have any kind of witness or any kind of buys or anything just

22  other than one person telling me that he was involved in the

23  drug business.

24  Q.    And over time did you develop further information?

25  A.    Yes, sir, we did.

1    Q.    Before I go into that, let me ask you, when he first got

2    on to your radar screen in 2008, approximately how many

3    different narcotics investigations were you running?

4    A.    Probably around 12.  A dozen.  That's about the given

5    that we run at a certain time -- at a given time.  We have 10

6    to 12 investigations open all the time.

7    Q.    At some point did you determine where Mr. Saldana lived?

8    A.    Yes, we did.

9    Q.    And did you ever conduct surveillance of the property

10   personally, physical surveillance?

11   A.    Yes, we conducted surveillance on his property multiple

12   different times.  And that would range from sitting in the

13   woods behind his house or just three or four of us getting in

14   a car and driving down Ervin Houck Road and getting the tags

15   off the vehicle.

16   Q.    And do you remember when you started conducting that kind

17   of surveillance?

18   A.    It would probably have been around 2010 when we started

19   conducting the surveillance.

20   Q.    And at that point I believe you testified that you

21   generally had a dozen different investigations going at a

22   given time.  Is that true at this point in time in 2010?

23   A.    Yes, sir.

24   Q.    What furthered your investigation next?

25   A.    We -- as an investigative team, we learned that there was

1   a vehicle -- or a motor vehicle accident near Mr. Saldana's

2   residence.  The information came from law enforcement in

3   Virginia.  And the person driving the vehicle was also

4   involved in methamphetamine trafficking and they were wanting

5   us to check on who that person was and where the wreck

6   occurred.  And then they were saying or giving us information

7   that the person that had wrecked the motorcycle was involved

8   in narcotics and that he wrecked near his supplier's house.

9   Q.   And did you determine where the wreck took place?

10  A.   The wreck took place on Highway 221 near Westwood

11  Elementary School.

12  Q.   And approximately how far away was that wreck from the

13  intersection of 221 and Ervin Houck Road?

14  A.   It's less than two miles.

15  Q.   All right.  After that what happened next that furthered

16  your investigation?

17  A.   About -- approximately a year later, 2012, early 2012, we

18  received other information from the same investigators in

19  Virginia that there was a gentleman or an Hispanic male who

20  worked at Adams Construction by the name of Martin, they did

21  not know his last name, and their information was --

22            MR. CANALES:  Your Honor, I'm going to object to him

23  testifying as to the findings of another officer.  Obviously

24  he doesn't have any knowledge of the veracity, of the truth of

25  this information, Your Honor, and he's testifying as if it was

JEREMY WILLIAMS - DIRECT

1   true.

2            THE COURT:  Overruled.  Members of the jury, you

3   won't consider the information as to whether it's true or not,

4   but you may consider this witness's testimony as to what he

5   says he heard and what he may have done in response to it.

6            THE WITNESS:  They gave us the information that

7   Mr. Saldana obviously worked at Adams Construction, was

8   involved in the methamphetamine business.

9   Q.   Did you come to learn of another individual by the name

10  of Bobby Shore?

11  A.   Yes, sir, I did.

12  Q.   And was he somehow connected with this same conspiracy?

13  A.   Yes, sir, he was.

14  Q.   As a result of that -- well, let me ask you, before going

15  to Bobby Shore, at this point in your investigation, did you

16  have an ability to, for example, have somebody who knew

17  Mr. Saldana in order to try and get them to purchase narcotics

18  from him?

19  A.   At that time we did not.  We had nobody that knew

20  Mr. Saldana well enough to actually go and purchase

21  methamphetamine from him.

22  Q.   Do you believe that you -- let me go back to Mr. Shore

23  now.  This has already been admitted as Government's 1B.

24       Is this Mr. Shore?

25  A.   Yes, sir, it is.

1    Q.    All right.  Now, did you have the ability to buy from
2    Mr. Shore?
3    A.    Yes, sir, we did.
4    Q.    Okay.  I'd like to turn your attention to the August and
5    September time frame of 2012.  What activities did you take
6    part in at that point?
7    A.    During that time, August, September 2012, we had a
8    confidential source and he knew Bob Shore and was able to
9    purchase methamphetamine from him directly.  During that time
10   we purchased seven -- we purchased seven different times from
11   Bob Shore.
12   Q.    All right.  By the way, can you explain to the jury how
13   you utilize a confidential source to do a controlled buy.
14   A.    Yes.  There's a couple different steps in it.  We meet
15   with the confidential source.  Upon the meeting, the
16   confidential source, his person, is searched for drugs or
17   contraband and money.  If money is located, we take the money,
18   which in a prior agreement they know that we're going to seize
19   that money for a short period of time.  We later return it to
20   them.
21         Once they're searched, the vehicle that is going to
22   transport the confidential source, whether it be his vehicle
23   or whether it be a vehicle that we provide him, is also
24   searched for money and/or drugs or contraband.
25         We -- after that's done, we give the confidential source,

1  depending case by case, an audio recording which is a digital

2  voice recorder and/or money to purchase the drugs and that

3  money comes from an agency and that's why we take their money

4  from them so we don't get money that is theirs and ours mixed

5  up.

6  Q.   With regard to the money, do you record it in advance

7  somehow?

8  A.   Yes, we photocopy the money before we turn it over to the

9  confidential source.  So we have all the serial numbers of the

10 money recorded.

11 Q.   And why do you want those serial numbers?

12 A.   The serial numbers are important because each individual

13 bill has a unique serial number on it.  There's no two that

14 are the same.  So once we photocopy those bills, then we have

15 a record of that in case we run into money later on in that

16 case, we can go back and look to see if -- where the bills

17 were used and who the bills were used by.

18 Q.   And you mentioned that there were certain -- that you, as

19 a routine practice, search the confidential source both before

20 the possible transaction and after.  Why do you do that?

21 A.   We do search them after and that's just to keep

22 everything clean and honest.  We don't want the confidential

23 source who we have deemed reliable, because obviously they're

24 doing controlled buys for us.  If we catch them taking the

25 drug or contraband out of what we had purchased, then their

1   credibility is gone and we charge them with that.

2          Also, with money, sometimes change, there's not -- we

3   don't have the exact change so there's change that comes back

4   to us.  So the reason we search them before and after is to

5   make sure that they're not hiding something from us that we

6   need to know about.

7   Q.   So is this a standard operating procedure to verify even

8   though you found them credible and reliable, you still want to

9   verify at all stages of the process?

10  A.   Yes, sir, we want to verify it throughout the process.

11  Once the process has been contaminated or once they break the

12  rules, then we're -- they are no longer reliable to us.

13  Q.   And if you find that they breached the agreement and the

14  understanding as to what they're required to do, do you use

15  them again in the investigation at all?

16  A.   No, sir.

17  Q.   And is that kind of integrity of the investigation

18  adhered to at all times?

19  A.   Yes, sir, it's something we abide by.

20  Q.   Now, you mentioned that you made several controlled

21  purchases from Mr. Shore.  I'd like to show you what's been

22  marked as Government's Exhibits 2A, B, C, D, E, F, and G.

23  They've been made available to the defense in the discovery

24  process.  Marked at this time for identification purposes.

25         Sergeant Williams, do you recognize 2A through G?

JEREMY WILLIAMS - DIRECT

1  A.    Yes, I do.

2  Q.    And how do you recognize these?

3  A.    It's in my handwriting.  And these are the -- they're the

4  methamphetamine that was bought from Bob Shore.

5            MR. KAUFMAN:  Your Honor, at this time we'd move to

6  admit and publish 2A through G.

7            MR. CANALES:  No objection, Your Honor.

8            THE COURT:  Let them be admitted.

9            MR. KAUFMAN:  Thank you, Your Honor.

10           (Government's Exhibits Nos. 2A, 2B, 2C, 2D, 2E, 2F,

11  and 2G were received into evidence.)

12           MR. KAUFMAN:  And let me -- at this time I think I'd

13  like to read into evidence Government's Exhibit 32 which is a

14  set of factual stipulations between the parties.

15           THE COURT:  All right.

16           Members of the jury, I told you as we did the

17  preliminary jury instructions that if the parties stipulated

18  to some piece of information, that would be information that

19  you may accept as fact even though nothing is said about it

20  one way or another other than the stipulation itself.  In

21  other words, the stipulation is evidence.  You may rely on it.

22  And it's evidence before you and something that you should

23  consider as part of the facts of the case.

24           MR. KAUFMAN:  Your Honor, may I move to admit and

25  publish the stipulation, 32, or would you prefer that I just

1  merely mark it as an exhibit for identification?

2          THE COURT:  That's entirely your call.

3          MR. KAUFMAN:  Your Honor, we would so move to admit

4  and publish Exhibit 32 to the jury.

5          THE COURT:  Let it be admitted.

6          (Government's Exhibit No. 32 was received into

7  evidence.)

8          MR. KAUFMAN:  And at this time I'll be going to page

9  2.  Page 1 relates to firearms and I'll read those to the jury

10 at the appropriate time.

11         With regard to page 2, I'm going to highlight the

12 second paragraph which states that "the substance seized in

13 this case that was suspected to be methamphetamine was tested

14 by an expert forensic chemist and determined to be, in fact,

15 methamphetamine."

16         I'll read the footnote 1 in just a moment.

17         "In making this stipulation, the defendant is not

18 admitting that he conspired to distribute or to possess with

19 intent to distribute methamphetamine or any controlled

20 substance.  In other words, the defendant merely agrees that

21 the laboratory tests prove that the materials seized are

22 methamphetamine.  The defendant specifically denies the other

23 elements of the drug charges in this case."

24         Then with regard to footnote 1, "The

25 methamphetamine, or a portion thereof, and/or the laboratory

JEREMY WILLIAMS - DIRECT

1   reports are admissible at trial if the United States elects to

2   present them."

3   Q.   Now, when you, Sergeant Williams, seize narcotics or

4   other evidence in a case, is there some sort of way that you

5   document it?

6   A.   Yes, we have a property sheet through my agency.  It's

7   just an in-house property sheet.  We write down basically the

8   date and what it is on the property sheet so we can keep a

9   list of what we have as evidence in that case.

10  Q.   I'd like to show you what's been marked for

11  identification purposes as 2H.

12       Do you recognize this document?

13  A.   Yes, sir, I do.

14  Q.   What is it?

15  A.   That is a property sheet from my agency and that's the

16  property that was seized from -- or seized and bought from Bob

17  Shore.

18  Q.   And is this a standard operating procedure that this type

19  of document is generated for any seizure?

20  A.   Yes, sir, it is.

21  Q.   And is it maintained by the sheriff's office in the

22  ordinary course of business?

23  A.   Yes, sir, it is in my sheriff's office.

24       MR. KAUFMAN:  At this time, Your Honor, we'd move to

25  admit and publish 2H.

JEREMY WILLIAMS - DIRECT

1        THE COURT:  Let it be admitted.

2        (Government's Exhibit No. 2H was received into

3   evidence.)

4   Q.    Highlighting the top portion, at the lower right,

5   collecting officer, is that your name?

6   A.    Yes, sir, it is.

7   Q.    And so let me go back.  The OCA file number, can you

8   describe for the jury what that is.

9   A.    The OCA file number is just a number that is -- it shows

10  that at my agency that the 12-0623, if you pull that --

11  basically, it's the year and the case, the number of cases

12  that we've had.  If you pull that in any record, that specific

13  number, it will bring up Bob Shore's case file.

14  Q.    And is that a number that's basically used to track the

15  investigation throughout the life of that investigation?

16  A.    Yes, sir, it's used to track it.  Once it's -- the number

17  is given, it's there forever.

18  Q.    And is that also used when corresponding with the

19  forensic drug laboratory?

20  A.    Yes, sir, it is.

21  Q.    I'd like to go to a lower portion.

22        Now, showing the column on the left, property control

23  number and then items 1, 2, and 3.  Just to give the jury an

24  idea, can you explain what this portion of the property report

25  contains.

1  A.   Yes.  The property control number on the left is just my

2  number that I give a specific item of evidence.  The number 1,

3  which go across the description of the articles, the item

4  number 1 is an audio recording from 8/16/2012.  That's what

5  the evidence is is just an audio recording.

6      The "no deal," that's something that I put in there so I

7  could keep my notes straight that there was no specific

8  transaction between money and drugs from confidential source

9  to Bob Shore on that date.  So the only thing that's there for

10 that date is an audio recording.

11 Q.   Okay.  If you could explain what's on line item 2 now.

12 A.   Item 2, obviously, the number 2 is my control number.

13 The description is 1 CPB, and that's shorthand for clear

14 plastic bag, I write that on most of my stuff, of crystalline

15 substance, in particular methamphetamine.  The bag weighed

16 3.9 grams that I weighed it at at the sheriff's office.  And

17 the positive test, it is a field test that we have --

18 Q.   Can you describe what a field test is.

19 A.   Yes.  There's a couple different ones.  We use -- it's

20 just a tube that the end cap pulls off of it.  You place the

21 substance in question into the tube.  You put the lid back on

22 it.  There's two vials, two glass vials in it.  You bust one

23 vial at the bottom.  You shake it for five to ten seconds and

24 then you break the top vial.  The color of the liquid in those

25 vials will change colors.  And if it turns blue or dark

1 purple, it is a positive test for methamphetamine.

2    There are some other ones. There's a small bag that has

3 three tests in it. Just works the same way. You put the

4 substance in question in it. You seal the top of it. You

5 break the vials from left to right and shaking it five to ten

6 seconds in between each vial. On the last vial, the substance

7 that is in the vials mixed with the substance in question will

8 turn blue or violet purple and that's a positive test for

9 methamphetamine.

10 Q.    Will different substances whether they're controlled

11 substances or not, will they have a different color indicated?

12 A.    Sometimes they will. Most of the time if you test for

13 methamphetamine, every test that I have ever used has turned

14 purple or blue.

15    A different substance of cocaine actually turns a light

16 blue. I think heroin, if I'm thinking on this, actually turns

17 red. But it tells you on the packet that you have on the bag

18 what color it should change -- or the color should change to

19 for a positive test.

20 Q.    So it's a prepackaged test. So you're not combining

21 liquids other than when you're cracking the vials; is that

22 right? You receive a premanufactured set of materials to use

23 from a company that's selling this product to various law

24 enforcement agencies.

25 A.    Yes, it is prepackaged. We don't put anything in it

1    other than the substance in question.  The chemicals are in

2    there and it's all sealed up when we get it.  The only thing

3    that we put into the package before we break the vials is the

4    substance in question.

5    Q.   And going back to the portion that's highlighted on the

6    exhibit, line item 3 where it says, "One audio recording of

7    deal 8/17/12," is that relating to property control number 2,

8    the crystal substance, 3.9 grams?

9    A.   Yes.  The item number 3 and then it goes to the audio

10   recording of the deal and then it transfers up to the audio --

11   or the clear plastic bag of the substance.  So it's just the

12   audio recording -- item number 3 is the audio recording of

13   8/17/2012 which relates to item number 2.

14   Q.   Okay.  So does that continue on down this form so that

15   four and five are related to each other?

16   A.   Yes, four and five are related.

17   Q.   And I'll just do this one more time.

18        Oh, well, there are another couple times where you

19   attempted deals with Mr. Shore and it didn't result in a

20   transaction; is that right?

21   A.   That is correct.  Six and seven there is an audio

22   recording as evidence, but there was no deal on that day.

23   Q.   And then -- so going back to when deals were conducted,

24   do eight and nine correspond to each other?

25   A.   Yes, they do.

JEREMY WILLIAMS - DIRECT

1    Q.    Next I'd like to show you what's been marked and by

2    stipulation admitted -- admissible.

3             MR. KAUFMAN:  Your Honor, may I show the lab report

4    at this time?

5             THE COURT:  Yes.

6             MR. KAUFMAN:  And admit and publish it?

7             Thank you.

8             (Government's Exhibit No. 2I was received into

9    evidence.)

10   Q.    Are you familiar with this report?

11   A.    Yes, sir, I am.

12   Q.    And I believe earlier you talked about the OCA number.

13   I'm looking at the right column where it says "Agency file

14   number."  Is that, in fact, the same OCA number for Mr. Shore?

15   A.    Yes, sir, it is.

16   Q.    All right.  And that's your name on the left side where

17   it says "To Jeremy Williams"?

18   A.    Yes, sir, that's my name.

19   Q.    And then are you familiar -- have you -- how many times

20   have you reviewed a lab report?

21   A.    Quite extensively.  A lot.

22   Q.    All right.  And so in looking at the report where it says

23   item 1, what does that correspond to?

24   A.    The item 1 is -- can be either --

25   Q.    Oh, I'm sorry.  If I can take a step back, it might make

JEREMY WILLIAMS - DIRECT

1  sense for me to highlight kind of one-third of the way down.

2      Can you explain this section?

3  A.   Yes, I can.  The items on the left where it says items

4  number 1, number 2, number 3, that is the State Bureau of

5  Investigation, that is their number.  That's the number that

6  they assign so all their numbers correspond.

7      The middle of it is the description, "Ziplock plastic bag

8  containing white crystalline substance."

9      To the right it says, "Your item number 2."  That would

10 be my item number 2 that's on the property sheet.

11 Q.   Okay.  And maybe I'll just go back to 2H just for a brief

12 moment.

13     So their lab item number 1, is this your item number 2;

14 is that right?

15 A.   Yes, sir, it is.

16 Q.   And so for each of these entries on 2H where there is a

17 crystal substance that field tested positive, that will be

18 corresponding in sequence to the lab items on 2I; is that

19 right?

20 A.   Yes, sir.

21 Q.   Okay.  So going from this, then, using their item number,

22 let's just do the first one.  Can you explain based on your

23 training and experience what this means.

24 A.   Yes.  That would be their item number 1 which would be my

25 first item number whether it be 1, 2 or 3.  In this case it

1    was 2.  They tested it.  It came back as a controlled

2    substance, methamphetamine, which is a Schedule II controlled

3    substance.  The weight of the material was 3.41 grams with a

4    marginal error there of plus or minus .03 grams.  With a

5    qualitative analysis that we did which tested the purity of

6    the meth, the purity came back as 95.7 percent pure.

7         So -- and then the bottom part, the calculated weight of

8    the actual methamphetamine which is going to be the actual

9    pure meth is 3.2 grams.

10   Q.    And is that final number 3.2 merely a mathematical

11   calculation of the net weight 3.41 times 97 -- sorry,

12   95.7 percent purity?

13   A.    Yes, I think it is.

14   Q.    And by the way, you mentioned a margin of error.  I mean,

15   scientific margin of error for the net weight of the material.

16   Is there also a scientific margin of error for the purity

17   level?

18   A.    Yes, I have been told that there is a margin of error on

19   the purity and it is 2 to 3 percent, plus or minus.  So

20   there's a margin of error 2 to 3 percent above or below.

21   Q.    Is that based on a consultant -- consulting with a

22   forensic chemist expert?

23   A.    Yes, that would be the chemist giving me that

24   information.

25   Q.    Okay.  All right.  Now, I'd like to show you what's been

JEREMY WILLIAMS - DIRECT

1  admitted as 1 -- 1A.

2      Do you recognize who this is?

3  A.   Yes, sir, I do.

4  Q.   Who is that?

5  A.   That is Danny Eller.

6  Q.   And did you have an opportunity to interview Mr. Eller?

7  A.   Yes.

8  Q.   Now, prior to that interview, did you, in fact, conduct

9  similar controlled buys from Mr. Eller?

10  A.   Yes, we conducted similar controlled buys from Mr. Eller.

11  Three to be in fact.

12  Q.   Do you remember what month and year those were?

13  A.   It was October 2012.

14  Q.   All right.  I'd like to show you -- I'll show defense

15  what have been marked as 3A, B, and C and made available in

16  the discovery process.

17      Do you recognize these three exhibits?

18  A.   Yes, sir, I do.

19  Q.   And how do you recognize them?

20  A.   It's in my handwriting.

21  Q.   And what are these?

22  A.   It would be the three buys from Danny Eller that were

23  done.

24  Q.   All right.  And these were also documented on a property

25  report; is that correct?

JEREMY WILLIAMS - DIRECT

1   A.   Yes, sir, they were.

2         MR. KAUFMAN:  Your Honor, we'd move to admit

3   Exhibits 3A through C.

4         THE COURT:  Let them be admitted

5         (Government's Exhibits Nos. 3A, 3B, and 3C were

6   received into evidence.)

7         MR. KAUFMAN:  And we'll publish them at the

8   appropriate time.

9   Q.   With regard to the property report, I'd like to show you

10  what's been marked as Government's Exhibit 3D.

11       Do you recognize this?

12  A.   Yes, sir, I do.

13  Q.   What is it?

14  A.   It's a property sheet for Danny Eller.  It would be the

15  controlled buys and all the evidence that was seized on that

16  case.

17  Q.   All right.

18        MR. KAUFMAN:  Your Honor, we'd move to admit and

19  publish 3D.

20        THE COURT:  You may.

21        MR. KAUFMAN:  Thank you, Your Honor.

22        (Government's Exhibit No. 3D was received into

23  evidence.)

24  Q.   Again, similar type of information from Bobby Shore's

25  property sheet?

1  A.    Yes, it is.  It's the item numbers and then the -- take

2  one across.  It's one clear plastic bag of crystalline

3  substance.  My weight would be 4.1 grams and a positive field

4  test.

5       The item number 2 was the -- is one audio recording of

6  the deal that happened on 10/9/2012.  So --

7  Q.    And is it very common for the weight that you have from

8  the field weight being different than the lab weight?

9  A.    Yes, it is.

10 Q.    Why is that?

11 A.    Most of the time it is -- it takes us -- when we work our

12 case, it takes time to work that case.  We usually do not send

13 our items of evidence to the crime lab, the SBI's crime lab

14 until we get through with the case.

15 Q.    If I can actually stop you for a moment.  With regard to

16 your weighing -- first of all, when you weighed the substance,

17 do you include the plastic packaging material that's indicated

18 as CPB?

19 A.    Yes.

20 Q.    And to your knowledge, does the lab weigh the packaging

21 too or just the contents?

22 A.    Just the contents.

23 Q.    So is it almost expected for your weight to be slightly

24 larger than the lab's?

25 A.    Yes, sir.

1  Q.   And during the lab's testing, do they consume a portion

2  of the product as well?

3  A.   They do for qualitative analysis, yes.

4  Q.   I'd like to show what's been marked for identification

5  purposes as 3E.

6       Do you recognize this?

7  A.   Yes, sir.  It's a lab report for Danny Eller.

8            MR. KAUFMAN:  Your Honor, we'd move to admit and

9  publish 3E.

10           THE COURT:  Let it be admitted.

11           (Government's Exhibit No. 3E was received into

12  evidence.)

13  Q.   Again, you mentioned this is from Danny Eller.  And that

14  corresponds to the OCA number on the right column; is that

15  correct?

16  A.   Yes, sir.

17  Q.   And looking at the three items from those three different

18  buys.  You mentioned earlier that there is a 2 to 3 percent

19  scientific margin of error.  Is that why you can actually have

20  more than a hundred percent on a lab report?

21  A.   Yes, sir.

22  Q.   And based on your training and experience, would it even

23  be within scientific norms if there was something as high as,

24  say, 102.9 percent?

25  A.   Yes.  That would be close to -- you would take -- that

1  would be 3 percent over so it will be close to a hundred

2  percent.

3  Q.   And to your understanding, scientifically acceptable?

4  A.   Yes.

5  Q.   Next I'd like to turn your attention to October 26th of

6  2012.  Did you, in fact, go to Mr. Eller's residence on that

7  date?

8  A.   Yes, sir, we did.

9  Q.   If you could tell us what happened.

10 A.   We conducted a search warrant on Mr. Eller's residence

11 because of the selling of the methamphetamine.

12 Q.   What happened?

13 A.   During the search warrant we seized out of Mr. Eller's

14 truck 1 gram -- approximately 1 gram of methamphetamine.  And

15 we seized from his house approximately 10 grams of

16 methamphetamine.  We also found three firearms in the

17 residence.

18 Q.   Did you attempt to interview Mr. Eller?

19 A.   Yes, sir, we did.

20 Q.   Let me get back to that in a second.

21      Showing -- I'd like to show you what's been marked as

22 Government's 4A and 4B for identification purposes.  It's been

23 made available to defense in the discovery process.

24      All right.  Do you recognize 4A and 4B?

25 A.   Yes, sir, I do.

JEREMY WILLIAMS - DIRECT

1  Q.   What are they?

2  A.   This is what was located at Danny Eller's during the

3  search warrant.

4  Q.   And does this contain the methamphetamine you mentioned?

5  A.   Yes, sir, it does.

6  Q.   And it doesn't have everything that was seized, but this

7  is just the drug evidence; is that right?

8  A.   Yes, this is just the drug evidence.

9         MR. KAUFMAN:  Your Honor, we would move to admit and

10 publish 4A and 4B.

11        THE COURT:  Let them be admitted.

12        (Government's Exhibits Nos. 4A and 4B were received

13 into evidence.)

14 Q.   And you also documented these on a property report; is

15 that correct?

16 A.   Yes, sir, I did.

17 Q.   I'd like to show you what's been marked as 4C -- I'm

18 sorry, this was a search warrant.

19     Let me ask you, is there any distinction between a

20 controlled buy and a search warrant --

21 A.   Yes.

22 Q.   -- in terms of how you document it?

23 A.   Whenever we document it on a search warrant, we fill out

24 what items are to be seized.  It's a prefilled form that goes

25 with the search warrant that has to be returned to the clerk's

1   office and also a copy given to the defendant.  So there was

2   no handwritten documentation on our property receipt.

3   Whenever you do a search warrant, we do it on a prefilled form

4   that has to be signed and delivered back to the clerk's

5   office.

6   Q.    Okay.  So property reports are standard business

7   documents; is that right?

8   A.    Yes, sir.

9   Q.    With regard to the report, that contains other things

10  other than the property seized and contains other things that

11  may not be admissible in court, right?

12  A.    Yes.

13  Q.    Okay.  But you did, in fact, based on the October 26,

14  2012, search of Mr. Eller's property, document the items

15  seized and other elements of the search?

16  A.    Yes, everything that we seized was documented.

17  Q.    Okay.  And I'd like to show you 4C.  Based on the

18  seizure, do you recognize this?

19  A.    Yes, sir, I do.

20  Q.    What is it?

21  A.    It is the lab report from the search warrant at Danny

22  Eller's residence.

23  Q.    All right.

24          MR. KAUFMAN:  Your Honor, we'd move to admit and

25  publish 4C.

JEREMY WILLIAMS - DIRECT

1      THE COURT:  Let it be admitted.

2      (Government's Exhibit No. 4C was received into

3  evidence.)

4  Q.   All right.  Now, I started to ask you about interviewing

5  Mr. Eller.  What happened?

6  A.   As we were conducting the search warrant, we sat

7  Mr. Eller aside and attempted to interview him, in which he

8  agreed to interview and cooperate with authorities.

9  Q.   Okay.  And based on your interview with Mr. Eller, the

10  investigation as to whom was furthered?

11  A.   I'm sorry, can you repeat that.

12  Q.   Without going into the details of what he told you, the

13  investigations against which targets or target did he further

14  for you?

15  A.   He furthered Martin Saldana for us.  He gave us

16  information about him.

17  Q.   Okay.  Now, did you attempt to utilize Mr. Eller as a

18  confidential informant, confidential source in any way?

19  A.   Yes, sir, we did.

20  Q.   And tell us about that.

21  A.   Once he was interviewed, he was given an opportunity to

22  basically render assistance or buy drugs from people.  Just,

23  you know, people in general.  He actually went and purchased

24  two different times from an Hispanic male known as Jose for

25  us.

JEREMY WILLIAMS - DIRECT

1  Q.    And during those operations, who was the target for those
2  purchases?
3  A.    The target was Martin Saldana.
4  Q.    Okay.  Now, the purchases were not directly from
5  Mr. Saldana; is that right?
6  A.    No, they were not.
7  Q.    Based on the information that Mr. Eller provided to you,
8  did you expect it to be directly from Mr. Saldana?
9  A.    No, we didn't -- we did not expect Mr. Eller to be able
10 to go and purchase directly from Martin Saldana.  We knew that
11 he would have to purchase the actual methamphetamine from an
12 Hispanic male known as Jose.
13 Q.    And this took place -- these controlled purchases took
14 place, I take it, after the October 26, 2012, stop or search
15 of Mr. Eller's residence; is that right?
16 A.    Yes, sir, that's true.
17 Q.    I'd like to show you what's been marked as Government's
18 Exhibits 5A, 5B, 5C, and 5D for identification.  They have
19 previously been made available to the defense in the discovery
20 process.
21      Do you recognize these four exhibits?
22 A.    Yes, sir, I do.
23 Q.    All right.  What are they?
24 A.    Item number 1 is a clear plastic bag of meth.  Two --
25 these are the buys from Jose, that Eller did from Jose.

JEREMY WILLIAMS - DIRECT

1  Q.    And you mentioned that 5A is the methamphetamine seized

2  on one of the occasions.  And I take it -- do you recall the

3  date?

4  A.    Yes, 10/30/2012.

5  Q.    And that's even indicated on Exhibit 5A?

6  A.    Yes, sir, it is.

7            MR. KAUFMAN:  By the way, Your Honor, we'd move to

8  admit 5A through 5D.

9            THE COURT:  Let them be admitted.

10            (Government's Exhibits Nos. 5A, 5B, 5C, and 5D were

11  received into evidence.)

12            MR. KAUFMAN:  Thank you.  We'll publish during

13  Sergeant Williams' testimony.

14  Q.    Now, 5B, can you describe what the contents of 5B are?

15  A.    Yes.  5B --

16  Q.    And if you could hold it up so the jury can see it as

17  well.

18  A.    Basically, you have a -- it's the outer wrappings of what

19  we got.  So we actually got -- whenever it was transferred

20  back to us from Danny Eller, it was a ball -- it looked like a

21  ball of black electrical tape is what it was, just a ball.  We

22  started unwrapping the ball.  So you have the black electrical

23  tape on the exterior, on the outermost part.

24        As you start unwrapping it, you get into Saran Wrap, a

25  little bit thicker than Saran Wrap.  So it's like a cellophane

JEREMY WILLIAMS - DIRECT

1  Saran Wrap.

2      As you keep taking the Saran Wrap off, you have a dryer

3  sheet.  Just a dryer sheet you throw in your dryer for the

4  smell.

5      Once the dryer sheet comes off, you take some more

6  cellophane off and you have ultimately at the bottom of it a

7  clear plastic bag of meth.

8  Q.   And by the way, how does this wrapping compare to the way

9  that you received the meth from the controlled buys from Danny

10 Eller -- from him when you purchased from the informant with

11 Danny Eller?

12 A.   They were -- they were not the same.  They were actually

13 just in a clear -- or corner bag from Danny Eller.  That's the

14 way we received them from Danny when we bought them.

15 Q.   Is there anything in particular that you do in law

16 enforcement when you're handling these controlled substances

17 and you could potentially come into contact with them?

18 A.   Yeah, I wear rubber gloves.

19 Q.   Why is that?

20 A.   Because you don't want it to get on your fingers because

21 your skin will absorb it; and it wouldn't be as bad as eating

22 it or smoking it or snorting it, but it still will absorb into

23 your fingers and you can be contaminated from it.

24 Q.   And then for 5C, what's that?

25 A.   That would be the clear plastic bag of meth that Eller

JEREMY WILLIAMS - DIRECT

1  purchased from Jose on 11/7/2012.

2  Q.    And what's in 5D?

3  A.    5D are the outer wrappings.  Again, you have the

4  electrical tape, the Saran Wrap type clear plastic, and then

5  the dryer sheet that was all wrapped up.

6  Q.    And so does 5B, the wrapping, belong with 5A; and then

7  5D, the wrapping, belong with 5C?

8  A.    Yes.

9  Q.    Now, by the way, these materials that we've been showing

10 to you have all come back from the lab; is that correct?

11 A.    Yes, sir.

12 Q.    Before you sent them to the lab, what was the appearance

13 of the meth?  What did it look like?  What form was it in?

14 A.    This meth from -- that was purchased from Jose was very

15 large.  It looked like large chunks of quartz crystal, if you

16 will.  They were very, very large.  Some of them would be --

17 would weigh half of an ounce or smaller.  So if you think of

18 an ounce as being 28 grams, and then half of it.  There were

19 rocks in there that were close to 10 grams.  They were very,

20 very big.

21 Q.    And with regard to all the other samples of

22 methamphetamine that have already been admitted, what

23 appearance did they have when you had obtained them before

24 sending them to the lab?

25 A.    They were crystal like also.  They weren't as big.

JEREMY WILLIAMS - DIRECT

1  Personally, this is the largest meth rock that I had ever
2  seen.  But they weren't as big.  Most of the time the shards,
3  we call them shards, look like pieces of glass.  The bigger
4  ones are about the size of your fingernail.
5  Q.   So other than the size difference, did they have similar
6  characteristics in terms of that quartz like look that you
7  mentioned?
8  A.   Yes.
9  Q.   And in terms of clarity, how did the clarity compare
10 among all these different purchases?
11 A.   They were clear.  The clarity was clear.  Like I say, it
12 looked like a piece of broken glass.
13 Q.   Now, if any of the exhibits now after they've been
14 examined and then brought back or sent back and now admitted
15 into court are in a powder form, can you explain that?
16 A.   That is where they go to the lab and then they have to
17 take the weight, which during transport from the sheriff's
18 office to the lab, it gets thrown around in a box.  They get
19 broke.  When it gets to the lab, they actually, when they test
20 it, they have to crush it.  And then -- so basically, what we
21 get is a powder crystal form as it comes back.  It's not in
22 the same rock form it was whenever it went down there.
23 Q.   Okay.  Now, with regard to these purchases that Mr. Eller
24 did from your target's go between, if you will, did you
25 document those seizures?

JEREMY WILLIAMS - DIRECT

1  A.   Yes, sir, I did.

2  Q.   I'd like to show you what's been marked for

3  identification purposes as 5E.

4      Do you recognize this?

5  A.   Yes, sir, I do.

6  Q.   What is it?

7  A.   It is the property sheet from the buys from Jose.

8          MR. KAUFMAN:  Your Honor, we move to admit and

9  publish 5E.

10         THE COURT:  Let it be admitted.

11         (Government's Exhibit No. 5E was received into

12  evidence.)

13  Q.   And similar notations as to your prior reports you've

14  testified about?

15  A.   Yes, sir, it is.

16  Q.   Next I'd like to show you what's been marked as

17  Government's 5F for identification.

18      Do you recognize what this is?

19  A.   Yes.  This is a lab report for the two controlled

20  purchases of methamphetamine from Jose.

21         MR. KAUFMAN:  Your Honor, we'd move to admit and

22  publish 5F.

23         THE COURT:  Let them be admitted.

24         (Government's Exhibit No. 5F was received into

25  evidence.)

JEREMY WILLIAMS - DIRECT

1      THE COURT:  If you'll excuse me a moment.

2      Members of the jury, we'll take our morning recess

3  at this time.  We'll call for you in about 15 minutes.

4      (Brief recess at 11:03 a.m.)

5      THE COURT:  Parties ready?

6      MR. KAUFMAN:  Yes, Your Honor.

7      THE COURT:  May we have the jury, please.

8      (Jury entered the courtroom.)

9      THE COURT:  All right.  The jury is settled.  You

10 may begin.

11     MR. KAUFMAN:  Thank you, Your Honor.

12                  JEREMY WILLIAMS

13            DIRECT EXAMINATION (Cont'd.)

14 BY MR. KAUFMAN:

15 Q.   Sergeant Williams, just before the break you were

16 testifying about the two purchases that you used Mr. Eller to

17 purchase from your target through the courier Jose.  The

18 second date you mentioned was November 7th of 2012.  After

19 that did you continue to try to make purchases from your

20 target?

21 A.   Yes, we continued to try.  Try being the keyword.  They

22 were failed attempts because of -- not because of Eller, but

23 because of Jose.

24 Q.   What happened?

25 A.   We would meet and do just like we had done before.  We

JEREMY WILLIAMS - DIRECT

1   would search Mr. Eller.  We would search his vehicle.  And we

2   would try to place a recorded phone call to Jose to set up the

3   transaction of money for meth.  During -- after the second

4   deal we did, we waited a couple weeks because that was the

5   norm -- or the normal thing to do.  And we tried to place a

6   phone call to Jose and we got no answer and no response.  So

7   we let it go a couple days.  Jose never called Mr. Eller back.

8   We again attempted to try to contact Jose and we were -- we

9   had negative results in trying -- or in contacting him by

10  phone.

11  Q.   Based on those facts, your training and experience, what

12  conclusions did you make and then what did you therefore

13  formulate as your next step?

14  A.   Since he wasn't answering his phone, through my training

15  and experience, means that they, being suspects or drug --

16  people who sell drugs, when they don't answer their phone,

17  they know that something is wrong.  They either don't want to

18  deal with the person anymore or they think that law

19  enforcement is on to them so they basically drop their phone

20  and they don't answer any other calls from that person.

21  Q.   Now, when you say "drop the phone," what does that

22  usually mean?

23  A.   It can mean just what it says, drop it.  Throw away

24  phones.  They just take them and throw them away.  Or they

25  just stop answering the phone call from that person.  So we

JEREMY WILLIAMS - DIRECT

1  can just -- we just use the terminology as drop the call or

2  drop the phone.

3  Q.   Did there come a point when you were able to use

4  Mr. Eller to further your investigation against Mr. Saldana

5  and others?

6  A.   Yes, there was.

7  Q.   Tell us about what happened.

8  A.   It was December 11th, 2012.  We had attempted and

9  attempted to contact Jose by phone with negative results.  So

10 our next step was to send Mr. Eller to Martin Saldana's house

11 and Jose's house and just do it, as we call it, cold.  They

12 don't know we're coming.  We just -- they just show up.

13     We searched Mr. Eller just like we do in all previous.

14 We searched his person and his truck with negative results,

15 meaning we didn't find anything.  We placed an audio recorder

16 on him, a digital voice recorder, which captures the

17 conversation.  And we gave him $2,800 to purchase

18 methamphetamine from either Jose or Martin if that would have

19 allowed itself to happen.

20     Martin -- or I'm sorry, Danny drove to Jose's residence

21 first, which is 178 Ervin Houck Road.  He knocked on the door.

22 Nobody came to the door.  He then got back in his truck, drove

23 a short distance out of the driveway to 148 Ervin Houck Road

24 where he made contact with a white female, and he spoke with

25 her and asked if Martin was around.  From there she let him,

JEREMY WILLIAMS - DIRECT

1  Mr. Eller, into the residence to speak with Martin.

2  Q.   Now, show you what's been marked for identification

3  purposes already as 7A.  Do you recognize this as the audio

4  recording or a clip from the audio recording, a true and

5  accurate clip, that is, from the meeting between Mr. Eller and

6  Mr. Saldana?

7  A.   Yes, sir, I do.

8  Q.   And you've reviewed it?

9  A.   Yes, sir, I have.

10  Q.   And have you initialed it to indicate it is a fair and

11  accurate clip?

12  A.   Yes, sir, I've initialed it.

13  Q.   And do you recognize Mr. Eller's voice?

14  A.   Yes, sir, I do.

15  Q.   And Mr. Saldana's?

16  A.   Yes, sir.

17  Q.   All right.

18      MR. KAUFMAN:  Your Honor, at this time we seek to

19  admit 7A, we're going to publish it through Mr. Eller's

20  testimony, along with 7B which is a transcript which we'll be

21  asking to be used as a demonstrative exhibit to assist the

22  jury's review of the audio.

23      THE COURT:  All right.  Thank you.  You may do that.

24      MR. KAUFMAN:  Thank you, Your Honor.

25      (Government's Exhibit No. 7A was received into

JEREMY WILLIAMS - DIRECT

1  evidence.)

2          THE COURT:  Wait just a minute.

3          MR. KAUFMAN:  Your Honor, I'm not going to play the

4  audio until Mr. Eller --

5          THE COURT:  Oh, you're not going to be playing it

6  right now.

7          MR. KAUFMAN:  Yes, I'm sorry.

8  Q.  Now, after the recording between Mr. Eller and

9  Mr. Saldana, what did you do next?  And if I can specifically

10  turn you to December 12 of 2012.  You already testified about

11  Mr. Shore.

12  A.  Right.

13  Q.  How, if at all, does he come back into the investigation

14  that next day?

15  A.  On December the 12th, 2012, very early in the morning, we

16  conducted a search warrant on Bob Shore's residence.  And in

17  that search warrant we located about 160 grams of

18  methamphetamine.  I would say a pretty large sum of money, it

19  was about 35, 34 hundred dollars, in the same desk drawer that

20  the methamphetamine was located.

21  Q.  All right.  I'd like to show you what's been marked for

22  identification purposes as 6A, 6B, and 6D, delta.  They've

23  previously been made available to the defense.

24          Do you recognize these three exhibits?

25  A.  Yes, sir, I do.

JEREMY WILLIAMS - DIRECT

1  Q.   What are they?

2  A.   These are the meth and the wrappings that were seized on

3  the search warrant of Bob Shore's residence on December 12,

4  2012.

5  Q.   And do these contain your handwriting and your initials?

6  A.   Yes, sir, they do.

7        MR. KAUFMAN:  Your Honor, at this time we move to

8  admit and publish 6A, 6B, and 6D.

9        THE COURT:  Let them be admitted.

10       MR. KAUFMAN:  Thank you, Your Honor.

11       (Government's Exhibits Nos. 6A, 6B, and 6D were

12  received into evidence.)

13 Q.   And were these also sent to the laboratory?

14 A.   Yes, the methamphetamine was.  The wrappings were not.

15 Q.   And I take it this was a search warrant.  So was there a

16 property report done or was it done in one of these narrative

17 reports?

18 A.   It was also done with items of evidence seized which is

19 the prefilled that we fill out.  It was not handwritten.

20 Q.   Okay.  Next I'd like to show you what's been marked for

21 identification purposes as 6C.  Do you recognize what this is?

22 A.   Yes, sir.  That is the methamphetamine that was seized on

23 the search warrant of Bob Shore's residence on December 12th,

24 2012.

25       MR. KAUFMAN:  Your Honor, we'd move to admit and

JEREMY WILLIAMS - DIRECT

1  publish 6C.

2          THE COURT:  Let it be admitted.

3          (Government's Exhibit No. 6C was received into

4  evidence.)

5  Q.   And just briefly under the "Results of examination"

6  section, again, item 1A, what's the purity level?

7  A.   99.2.

8  Q.   And with regard to 1B and 1C and item 2, it doesn't

9  indicate the purity level.  Have you seen that happen before

10  when you have a large bulk in one item and then other items

11  have smaller quantities?

12  A.   Yes.  They usually just test the larger amount and give

13  you the purity level of that.  They won't usually test

14  something that is very small in amount.

15  Q.   And why are there separate item numbers, by the way,

16  these four different bags that you had collected as evidence?

17  What does that indicate?  For example, does it relate somehow

18  to location?

19  A.   Ask me that one more time.

20  Q.   Well, there was items 1A, 1B, 1C, and item 2.  They

21  weren't in just one bag when they were collected; is that

22  right?

23  A.   I think if you will scroll back up.

24      Yes, there were actually two items of evidence.  Item C

25  is my ACSO 1.  That's what I received.  That was my item

JEREMY WILLIAMS - DIRECT

1  number 1 from the search warrant.  And then item number 2 is
2  my ACSO 4.
3      So there were two items of evidence or two different
4  clear plastic bags of methamphetamine.  The lab put the 1A,
5  1B, and 1C.  That would be what they did.
6  Q.   Okay.  Now, what happened immediately upon the execution
7  of the search warrant and the discovery of the narcotics?
8      Let me ask it this way.  Did you, in fact, attempt to
9  interview Mr. Shore?
10  A.   Yes.
11  Q.   What happened?
12  A.   As a result of that interview, Mr. Shore wanted to
13  cooperate with the authorities.  From there, he made a phone
14  call to Mr. Saldana from Mr. Shore -- Mr. Shore made a cell
15  phone call to Mr. Saldana.
16  Q.   Did they have -- did they connect by phone?
17  A.   Yes, they connected and they spoke on the phone.
18  Q.   And did they come to any sort of agreement?
19  A.   They did.  Mr. Shore asked if he could come down and see
20  Martin later that day.  And Martin agreed to speak with him
21  and have him down to his residence.
22  Q.   Did they go into any specifics, for example, talking
23  about drug trafficking on the phone call?
24  A.   I don't recall if they did or not.
25  Q.   Would you expect them to have had that kind of

---

225

JEREMY WILLIAMS - DIRECT

1  Q.   And was there, in fact, a recording that you obtained

2  from the meeting between Mr. Shore and Mr. Saldana?

3  A.   Yes, there was.

4  Q.   And just in case I hadn't asked it already, with regard

5  to the meeting both between Mr. Shore and Mr. Saldana, where

6  did that take place?

7  A.   The meeting between Mr. Shore and Mr. Saldana took place

8  at 148 Ervin Houck Road which was Mr. Saldana's residence.

9  Q.   And going back to the day before, where did the meeting

10 between Mr. Eller and Mr. Saldana take place?

11 A.   It also took place at 148 Ervin Houck Road which was

12 Martin Saldana's residence.

13 Q.   I've got what's already been marked as Government's

14 Exhibit 8A for identification purposes.  Do you recognize this

15 as the disk containing the clip of a true and accurate

16 recording from that conversation between Mr. Shore and

17 Mr. Saldana?

18 A.   Yes, sir, I do.

19 Q.   And have you initialed it to so indicate?

20 A.   Yes, sir, I have.

21      MR. KAUFMAN:  Your Honor, we move to admit

22 Government's 8A.  And as with the other recording, we'll

23 publish it through Mr. Shore along with a demonstrative

24 exhibit to assist the jury with reviewing it which will be 8B.

25      THE COURT:  Let it be admitted.

JEREMY WILLIAMS - DIRECT

1    MR. KAUFMAN:  Thank you, Your Honor.

2    (Government's Exhibit No. 8A was received into

3    evidence.)

4    Q.   After -- on that same date, December 12th, 2012, after

5    the recording between Mr. Shore and Mr. Saldana, did you, in

6    fact, execute a search warrant at Mr. Saldana's residence?

7    A.   Yes, sir, we did.

8    Q.   Can you tell us what happened.

9    A.   The investigative team learned that Mr. Saldana was

10   expected to leave to depart and go back to Mexico that

11   following night so we acted accordingly.  We did a search

12   warrant on Mr. Saldana's residence.

13   Upon conducting a search warrant, we located some

14   firearms and some drug packaging paraphernalia in an

15   outbuilding behind his residence.

16   Q.   All right.

17   MR. KAUFMAN:  I'm showing to defense Exhibit 9 for

18   identification.  It's previously been provided to the defense

19   in the discovery process.

20   Q.   I'd like to show you a package of documents.  They've

21   been -- these are Exhibit 9 for identification.  If you could

22   just leaf through them and confirm whether you recognize them

23   or not.

24   A.   Yes, sir.  They're all from the -- they're photos of the

25   search warrant on 148 Ervin Houck Road which is Martin

JEREMY WILLIAMS - DIRECT

1  Saldana's residence.

2  Q.   On December 12, 2012?

3  A.   On December 12, 2012.

4  Q.   Do you know who took these photographs?

5  A.   I did.

6  Q.   And are they true and accurate copies of the photographs

7  you took?

8  A.   Yes, sir, they are.

9  Q.   All right.

10        MR. KAUFMAN:  Your Honor, we'd move to admit and

11 publish Exhibit 9.

12        MR. CANALES:  Your Honor, I'm going to object.

13 There's only one -- there is one photograph, Judge, that in my

14 opinion is only a partial picture of what it's supposed to

15 depict.  It's not showing everything.

16        MR. KAUFMAN:  Your Honor, these are fair and

17 accurate according to the witness.

18        MR. CANALES:  Fair and accurate piece, not a fair

19 and accurate complete photograph.

20        THE COURT:  Overruled.

21        MR. KAUFMAN:  Thank you, Your Honor.

22        (Government's Exhibit No. 9 was received into

23 evidence.)

24 Q.   All right.  Let's kind of leaf through these.  First of

25 all, can you tell us what we're looking at on page 1.

JEREMY WILLIAMS - DIRECT

1    A.    Yes.  This is the exterior of the residence of 148 Ervin

2    Houck Road.  This would be the back, what I would call the

3    back of the residence.

4    Q.    And is this directly off of the driveway?

5    A.    Yes.  Looking at this photo, the driveway would be to the

6    right-hand side of the screen where the white attachment is.

7    That's where the driveway comes in off the main road.

8    Q.    Going to page 2.

9    A.    It's a photograph of Martin Saldana's vehicle.

10   Q.    And do you see something in the background?

11   A.    Yes.  There's a red building in the background.

12   Q.    Okay.  We'll get back to that.

13       Exhibit 3 -- sorry, page 3 of Exhibit 9.  Is that the

14   same building that was just last seen in the background?

15   A.    Yes, sir, it is.

16   Q.    Page 4.

17   A.    That is just to the left of the back of the residence.

18   We're still in the -- on the exterior.

19   Q.    And is there gravel and pavers in the forefront of the

20   photo?

21   A.    Yes.  At the bottom of the photo, there's a walkway with

22   the gravel and the pavers.  And to the left, the very left

23   side of the screen, that's where a metal outbuilding would be

24   sitting.  Yes, that would be the correct area.

25   Q.    Going to page 5.

JEREMY WILLIAMS - DIRECT

1  A.   That is the metal outbuilding.  Those -- the pavers that

2  you just previously saw lead to that outbuilding.

3  Q.   Page 6.

4  A.   This is the interior of the residence.  This is the

5  bedroom of Martin Saldana.

6  Q.   Page 7.

7  A.   This is the desk drawer.  As soon as you walk in the

8  front -- or his bedroom, the dresser drawer would be on the

9  right and this was located inside the dresser.

10 Q.   Okay.  Now, can you describe what's in this photograph.

11 A.   Yes.  In this photograph you have a pistol which was

12 deemed to be a .22 caliber.  That would be the one that's

13 small with a white grip.

14     Yes, that one.  It's a four-shot .22 pistol.

15     Coming down from that, the thing that looks like a wheel

16 would be a revolver.  It's just a piece of a gun.  It's where

17 the bullets go in a revolver that was taken out.

18     To the -- say to the north of the circular thing, the

19 piece of the revolver, would be a gray cell phone that is --

20 you're looking at the back of it.  And then above that would

21 be a barrel of a shotgun.

22 Q.   And was there another part that matched that barrel?

23 A.   Yes.  The other part that matched the barrel is all the

24 way on the right.  It's the pistol grip.  That's the forearm

25 that matches the barrel of the shotgun.

JEREMY WILLIAMS - DIRECT

1    And in the middle you have a .22 revolver pistol.

2  Q.   Okay.  Is this how it appeared on the search or was it

3  moved in any way?

4  A.   No, this is how it appeared whenever we found it.  And

5  also, there was one other item that was not photographed on

6  top of this.  There was actually an ID card underneath the bed

7  sheets in this same drawer and it was the ID of Martin

8  Saldana.

9  Q.   Okay.  Going to the next page.  What room are we in now?

10  A.   We're still in Mr. Saldana's bedroom.  His bed would have

11  been to the right-hand side of the picture.  And you can see

12  the nightstand.  And then there was a filing cabinet to the

13  left in the corner near the closet.

14  Q.   Next page.  What's this showing?

15  A.   Showing a -- this is inside the filing cabinet.  It's a

16  12 gauge shotgun round.

17  Q.   And how does that shotgun shell compare with the shotgun

18  that was recovered from Mr. Saldana's dresser drawer?

19  A.   It is the same caliber so the 12 gauge shotgun that was

20  in the drawer would fire a 12 gauge shell.

21  Q.   And I'm increasing the size of something from the middle

22  of the image.

23    What's that?

24  A.   That is a .22 round.

25  Q.   And would that fit into any of the two pistols that were

JEREMY WILLIAMS - DIRECT

1  found in the dresser drawer?

2  A.   Yes, it would.

3  Q.   Next page.  What's this?

4  A.   This is of a different bedroom.  This is -- I would guess

5  that it would be a daughter's bedroom.  It was an overnight

6  bag that had blue jeans, socks, underwear, and some -- down in

7  the bag and then it had a smaller brown bag on top that had a

8  lot of bank statements and personal items belonging to Martin

9  Saldana.

10          MR. KAUFMAN:  Showing defense what have been marked

11  as Government's Exhibits 14A and 14B.  They've been previously

12  made available to defense and 14B was actually handled earlier

13  by Agent Harmon during his testimony.

14  Q.   You earlier mentioned an identification card that was

15  also found in the desk -- the drawer I'm showing you in 14A.

16  Do you recognize the contents?

17  A.   Yes, I do.

18  Q.   What are they?

19  A.   It is the gray cell phone and the identification of

20  Martin Saldana that was found in the desk drawer with the

21  guns.

22  Q.   And by the way, on the -- what's the address indicated

23  on --

24          MR. KAUFMAN:  Oh, Your Honor, at this time we seek

25  to admit and publish 14A and 14B.

JEREMY WILLIAMS - DIRECT

1       THE COURT:  Let them be admitted.

2           (Government's Exhibits Nos. 14A and 14B were

3  received into evidence.)

4  Q.   What's the address indicated for his identification on

5  14A?

6  A.   The address is 178 Ervin Houck Road.

7  Q.   Okay.  Now, this search took place at what address?

8  A.   148 Ervin Houck Road.

9  Q.   Okay.  And with regard to 14B, if you could tell us where

10 you found the items.

11 A.   These items were located in the brown zip bag.  It's kind

12 of like a bank bag without a lock.  That's what the bag is

13 that you're seeing and that's where these items came from.

14 Q.   So on the screen now, that image of the bag on the bed.

15 Where -- it appears from the image on the screen that there

16 was more than just this.  Did you select these particular

17 items in 14B for this bag to describe the contents that you

18 testified to as Santa Muerte?

19 A.   Yes.

20 Q.   So there were additional items.  What other items were

21 found in that Ziplock bag?

22 A.   The other items that were found in there were some

23 pictures -- or I'm sorry, thumb drives with music.  Just a lot

24 of MP3, if you're familiar with that, just a lot of downloaded

25 music.

JEREMY WILLIAMS - DIRECT

1    There was an SD card that had some photos of Martin
2  Saldana and his children, and I'm not really sure where those
3  were taken.  I don't think they were taken in my county.  It
4  kind of looked deserty, taken in a desert place.
5    There were some medical records from Martin Saldana in
6  that same brown bag.
7    And there were some handwritten notes talking about --
8  they were in Spanish and I really couldn't interpret them.
9  Had to have somebody interpret them for me.  And it was
10  talking about sheep or lambs and -- but they were handwritten
11  notes.
12  Q.  Were there other documents also with Mr. Saldana's name
13  in that zipper bag?
14  A.  Yes, there was.
15  Q.  Were there any kind of tax documents?
16  A.  I don't recall if the tax documents were in that bag or
17  in the filing cabinet.
18  Q.  Do you recall any of the details from those tax
19  documents; and if so, can you tell us what you remember of
20  them.
21  A.  The tax documents that I remember were from Adams
22  Construction, but I don't remember the amounts that he made or
23  that he was taxed on.
24  Q.  Next page on Exhibit 9.  Can you tell us what this is.
25  A.  This is another .22 caliber revolver pistol.  It was also

1   located in Martin Saldana's bedroom in between the box spring

2   and the mattress.

3   Q.   And by the way, just to confirm, all four of these

4   firearms you testified about, they didn't -- at the moment

5   that you conducted the search, did they have any ammunition in

6   them?

7   A.   No, they did not.

8   Q.   Going to the next page.  Can you tell us what this is

9   showing and where it is.

10  A.   This is in the outbuilding, the metal building that we

11  spoke about earlier that had the gravel and paver walkway from

12  the back door.  This is inside that metal building.  What

13  you're looking at is -- the blue box is a box of dryer sheets.

14  Q.   And then the next image, what's that showing?

15  A.   That is a roll of black electrical tape.

16  Q.   And the next image?

17  A.   That is blue nitrile or latex gloves.  And to the right

18  of that -- yeah, that's the latex gloves.

19       To the right of that is cellophane or plastic wrap.

20  Q.   So when you go into this outbuilding, was this behind any

21  sort of cabinet or was it out in the open?

22  A.   It was out in the open.

23  Q.   And did you, in fact, seize these items from the

24  outbuilding?

25  A.   Yes, sir, we did.

JEREMY WILLIAMS - DIRECT

1   Q.   I would like to show you what's been marked as

2   Government's Exhibit 14C made available to defense during the

3   discovery process.

4        Do you recognize the contents of 14C and how you got

5   them?

6   A.   Yes, sir, I do.

7   Q.   What are those?

8   A.   Those are the latex or blue latex gloves, a box of dryer

9   sheets, a roll of black electrical tape, and the clear Saran

10  Wrap.

11  Q.   And based on your training and experience, what are these

12  consistent with?

13  A.   Those are the items that are consistent with packaging

14  methamphetamine.  And I know that because it was the same

15  packaging material that was used when we were buying

16  methamphetamine from Jose.

17  Q.   Okay.  Now, was this material found -- whose residence

18  was this found from?  Which -- the outbuilding belonged to

19  which residence?

20  A.   The outbuilding belonged to 148 Ervin Houck Road, the

21  residence of Martin Saldana.

22  Q.   Going to the next photograph -- I'm sorry, next image.

23       MR. KAUFMAN:  Ms. Johnson, I'm afraid that the

24  screen has gone black.  Is that on my side or...

25       Oh, I think it looks like my laptop went to sleep or

JEREMY WILLIAMS - DIRECT

1  something.  Got to keep it more exciting, I guess.

2            THE CLERK:  Do you want me to get an IT person?

3            MR. KAUFMAN:  Looks like my computer has rebooted.

4            THE CLERK:  Do you want me to show it?

5            MR. KAUFMAN:  Yes, ma'am.  Thank you.

6            THE CLERK:  Which photo?

7            MR. KAUFMAN:  Ms. Johnson, if you could go down -- I

8  think that's one of the last photos.  I think we need to go up

9  a little bit.

10           Okay.  Going back to the next one, page 16.  Thank

11 you.

12 Q.   Sergeant Williams, what's that depicting, page 16 of

13 Exhibit 9?

14 A.   That would be located inside the same metal outbuilding

15 belonging to 148 Ervin Houck Road.  And it is a photo of the

16 floor inside that outbuilding and there are multiple, multiple

17 rounds of ammunition laying down there.

18 Q.   And is that how it was when you entered the outbuilding

19 or were those dropped by somebody on the law enforcement team?

20 A.   No, that's how it appeared when we first went in there.

21 Q.   All right.

22           MR. KAUFMAN:  Ms. Johnson, next page, please.

23 Q.   And what does this depict, Sergeant Williams?

24 A.   This is the walkway leading to the metal outbuilding.

25 You saw the pavers earlier.  This also belongs to 148 Ervin

JEREMY WILLIAMS - DIRECT

1  Houck Road.  And it is ammunition that has been fired that

2  are -- they're laying on the pavers leading to the

3  outbuilding.

4          MR. KAUFMAN:  Next page, please.

5  Q.  Is this a close-up, basically, of the prior photo?

6  A.  Yes, it's just a close-up.  Just shows ammunition that

7  has been fired on the same walkway.

8  Q.  And again, this is how it was found upon the search?

9  A.  Yes, sir, this is how it was found.

10         MR. KAUFMAN:  And the last page, please.

11 Q.  What's that depicting?

12 A.  That is also just another picture of ammunition that had

13 been fired in the same walkway.

14         MR. KAUFMAN:  And, Ms. Johnson, it looks like my

15 computer is working again.  Thank you so much for the help.

16 Q.  Now, going back, if I may.  You testified about some

17 photographs from Exhibit 9 as well as 14C, which I believe you

18 said was consistent with methamphetamine trafficking

19 paraphernalia --

20         MR. CANALES:  Repetitive.  Been asked and answered

21 by the prosecutor what the plastic is for, what the gloves are

22 for, Your Honor.  I'm going to object on the basis of

23 repetitive.

24         THE COURT:  Overruled.

25 Q.  Going back to what's already been admitted as 30A.  This

1  is the hard copy I'm showing on the ELMO, the document camera.

2  Depicted in 30A, page 1, what is the interior shown?  What

3  building is that?

4  A.   That is the inside of the metal outbuilding of 148 Ervin

5  Houck Road.

6  Q.   And near the bottom right on the table there, what does

7  that appear to be to you?

8         MR. CANALES:  Your Honor, I'm going to object on the

9  basis of repetitive.  This is repetitious testimony just

10  through another witness, Judge.  The jury has already heard

11  this.  I'm sure they know what this is already, Judge.  This

12  is repetitive.

13         THE COURT:  Overruled.  There's been intervening

14  testimony.

15         THE WITNESS:  In the bottom right-hand corner of

16  that photo there is a box and that is a box of latex gloves.

17  Q.   Now, Sergeant Williams, you were present on

18  February 12th, 2013, during the debrief with Jose Pina, Sr.;

19  is that correct?

20  A.   Yes, sir, I was.

21  Q.   And based on his information, did you conduct a search

22  back at the Ervin Houck Drive location?

23  A.   Yes, sir, we did.

24  Q.   What happened?

25  A.   On February 12, 2013, we debriefed or spoke to Jose Sr.,

JEREMY WILLIAMS - DIRECT

1    and he gave us information that there were still narcotics,

2    particularly methamphetamine, and money at the residence --

3    residences on Ervin Houck Road.

4    Q.   And based on that information, did you, in fact, conduct

5    a search and find anything?

6    A.   Yes.  We conducted a search on both properties, if not

7    multiple properties, and we ended up locating 3 ounces that

8    were packaged separately, another 7 grams of methamphetamine,

9    and $49,980 on the properties.

10   Q.   Okay.  I'd like to show you what's been marked for

11   identification purposes as 16A through E, echo.  Previously

12   been made available to the defense in the discovery process.

13          MR. CANALES:  Your Honor, I'm going to object on the

14   basis of cumulative testimony.  If what the government is

15   trying to prove is the fact that these items were found at

16   that property, I'll agree they were found there.  If that's

17   what he's trying to prove they were found on the property,

18   it's obvious they were found, Judge.  If that's what he's

19   trying to prove, we agree.  Meaning that they were found,

20   that's it.

21          MR. KAUFMAN:  Your Honor, we appreciate the

22   stipulation --

23          THE COURT:  Overruled.

24          MR. KAUFMAN:  -- but we think -- thank you.

25   Q.   Sergeant Williams, do you recognize what's in 16A through

JEREMY WILLIAMS - DIRECT

1  E?

2  A.   Yes.   These are the narcotics that were located on the

3  search of February 12, 2013.

4  Q.   And that's 16A through D.

5       And then what's in 16E?

6  A.   This would be the wrappings from all the clear plastic

7  bags of meth.   They're just all put in one bag.

8  Q.   Is this consistent with other methamphetamine you seized

9  during the investigation and the wrappings?

10  A.   Yes, sir.   It was wrapped with electrical tape and there

11  was Saran Wrap and then a dryer sheet all in those as well.

12       MR. KAUFMAN:   Your Honor, we'd move to admit and

13  publish 16A through 16E.

14       THE COURT:   Let them be admitted.

15       (Government's Exhibits Nos. 16A, 16B, 16C, 16D, and

16  16E were received into evidence.)

17  Q.   Now, were there also photographs taken during the search

18  that would help identify the locations of the seizures?

19  A.   Yes, sir, there was.

20  Q.   I'd like to show you what has been marked for

21  identification purposes as 16G.

22       MR. KAUFMAN:   Showing defense what's already been

23  provided to them in the discovery process, that packet of

24  photographs.

25       And, Your Honor, we are nearing the end of Sergeant

JEREMY WILLIAMS - DIRECT

1  Williams' testimony.

2  Q.   If you could, Sergeant Williams, look through 16G and let

3  me know if you recognize those.

4  A.   Yes, I recognize these.  These are from photos taken from

5  February 12, 2013.

6  Q.   And are they fair and accurate depictions of what you saw

7  on that day?

8  A.   Yes, sir.

9           MR. KAUFMAN:  Your Honor, we move to publish and

10  admit -- sorry, admit and publish 16G.

11           THE COURT:  Let them be admitted.

12           MR. CANALES:  No objection.

13           MR. KAUFMAN:  Thank you, Your Honor.

14           (Government's Exhibit No. 16G was received into

15  evidence.)

16  Q.   Okay.  Page 1, can you tell the jury what this is

17  showing.

18  A.   Yes.  This is the outbuilding to 178 Ervin Houck.  What

19  you're looking at is -- the interest to it is to your right,

20  but right in the center of the photo there is a smooshed drink

21  can.

22  Q.   Page 2.  Is that the --

23  A.   That's a close-up of the same drink can.

24       You take the drink can and you untwist it, pull it apart,

25  and the methamphetamine is inside the drink can.

JEREMY WILLIAMS - DIRECT

1    This is another -- if I can go back to the first one.
2  That was 20 -- or 1 ounce of meth.
3  Q.   Oh, sorry.
4  A.   That drink can contained 1 ounce of meth.
5  Q.   Is that 28 grams?
6  A.   Yes, 28 grams.
7  Q.   This is behind the outbuilding.  There is another kind of
8  abandoned property.
9  Q.   And, Sergeant Williams, when you say "the outbuilding,"
10  the outbuilding on which property?
11  A.   That was the outbuilding on 178 Ervin Houck Road.
12  Q.   The one that we're currently looking at?
13  A.   This would be -- the current one would be actually on the
14  property of 212, I think it's listed.
15  Q.   And that's the property that belongs to Mr. Saldana as
16  well?
17  A.   That property also belongs to Martin Saldana.
18  Q.   Okay.
19  A.   This is to the back of it.  You have another drink can.
20  You can open it up.  This drink can contained 7 -- around
21  7 grams of methamphetamine.
22    This photo is -- keep going to the right.  This is on the
23  property of 212.  This is a -- just a big bush, very thorny.
24  On the inside there's another drink can in the back of it.  We
25  dug it out.  There was an ounce of meth in that.  And that was

1  also located on the property of 212 Ervin Houck Road.

2       Another drink can.  This -- this was behind the property

3  of 148.  Right behind the property of 148 there were a couple

4  outbuildings and there was a garage that you saw earlier.

5  There was a small storage building that had a shed.  It kind

6  of looked like a kid's playhouse.  Had a deck on the front of

7  it and white fencing around the sides of it.  In that fencing

8  or on the front porch of that playhouse, there were two drink

9  cans.  This is one of them.  Both drink cans contained 1 ounce

10  of methamphetamine each.

11  Q.   And the next photograph?

12  A.   This is to the side of the playhouse.

13  Q.   And the playhouse is on what property?

14  A.   The playhouse is actually on the property -- it's a PIN

15  number.  It doesn't have an address, but it's called PIN 131,

16  and there's a bunch of other numbers.  I refer to it as PIN

17  131.  But it's also owned by Martin Saldana.  And it's

18  directly behind the 148 property.  Basically, the thing that

19  splits the two properties is the driveway.

20  Q.   And is PIN short for property identification number?

21  A.   Yes, it is.

22  Q.   And so what is this showing inside the picture?

23  A.   This is to the right of the playhouse.  You dig down

24  about six inches, take six inches of dirt off, you have a six

25  inch PVC pipe that is secured and placed down in it.  It has

1  the end cap to the left.  Inside that six inch piece of PVC is

2  a four inch PVC.  You can see the four inch PVC to the left of

3  that.

4       Yes, in that area.

5       The six inch PVC is stationary in the ground.  The -- my

6  apology.

7       Yeah, the four inch piece of PVC also has an end cap on

8  it and you can turn it off as well.

9  Q.   And by the way, was there anything found in this

10 particular piping?

11 A.   No, there was nothing found in that piping.  That pipe

12 was empty.

13 Q.   What's the next photo showing?

14 A.   The next photo is located on the PIN -- or I'm sorry, the

15 212 property.  The building is to the right of the two feet

16 you see.

17      In front of the feet you see a trash pile.

18      Yes, in that area.

19      We peeled back some of the plastic and there was another

20 six inch pipe.  We dug it out.  That's where it came out of

21 where it just shows the impression.  That's what it looked

22 like when it come out.  It's a six inch piece of PVC with a

23 trash bag around it.  We screwed off the top.  This is looking

24 down in it.  You saw the bag.  We pulled the bag out.  To the

25 left what he's holding is there's a four inch piece of PVC,

JEREMY WILLIAMS - DIRECT

1  the same as the other one in the other location.  Took the lid
2  off the four inch piece of PVC and you could see down in it
3  when we dumped it out.  That's what came out of it.  It was
4  $49,980.  It was $20 short of being $50,000.
5      The wrappings on that, it was also wrapped in the clear
6  cellophane.
7  Q.  And based on your training and experience, have you seen
8  money wrapped in cellophane?
9  A.  Yes, I have seen money wrapped in cellophane.  It
10  compresses it.  It's easier to conceal because it's not as
11  large.
12  Q.  And as a prior K-9 officer, is there any relevance to the
13  cellophane around money?
14  A.  If it's wrapped in cellophane and there's money around
15  it, through my training and experience it's getting
16  transported somewhere.  The whole reason behind it is to
17  conceal it, make it smaller so they can package it in smaller
18  places.
19  Q.  And the next photo?
20  A.  This is a photo.  It wasn't on any of the properties
21  owned by Martin Saldana.  It actually was, I would say, four
22  to five hundred yards up in the mountain behind the property
23  of 148 Ervin Houck.  There was a trail leading up to it.  It
24  was just a green, to me it looked like a military -- something
25  that the military would use.  The top screwed off of it.  It

JEREMY WILLIAMS - DIRECT

1  was camouflaged.  Took the top off of it.  And obviously,

2  inside of it there was a bag that all the stuff was wrapped

3  up.  Inside of that there were a box of .357 ammunition.

4  There was a box of .22 .250 ammunition, a pistol grip, and two

5  magazines that were taped together from a gun that in my

6  opinion would have been a sub machine gun.  That's the only

7  thing that it could have fit.  But they were taped together so

8  you could put one of them in, shoot that round, take it out,

9  flip it over and put the other end of it in.  That's what was

10  located in the metal tube.

11  Q.   And this next photograph?

12  A.   The next photograph is of the front of the playhouse.  To

13  the left of the steps of it there was another tube found, six

14  inch tube on the outside, four inch tube on the inside.

15  Q.   And again, which property was this playhouse on?

16  A.   This property was on the PIN property, ID number 131,

17  owned by Martin Saldana.

18  A.   Like I say, it was a six inch tube on the outside, a four

19  inch piece of PVC on the inside of it.  There was nothing in

20  it.  It was empty.

21  Q.   And then this next image, where was it taken?

22  A.   This image was taken back at the sheriff's office in Ashe

23  County.

24  Q.   And what is it showing?

25  A.   It is showing a ball, black ball, basically, of black

1  electrical tape.  And this was one of the balls or ounces of

2  methamphetamine that was located in one of the drink cans.

3  Q.   And based on your training and experience -- by the way,

4  have you ever heard in the drug trafficking world the term "an

5  egg"?

6  A.   An egg?

7  Q.   Yes, in terms of measurements.

8  A.   No, sir, I have not.

9  Q.   Okay.  Next page.

10 A.   Another picture of an ounce.  The only difference

11 between -- or the only thing that was added was the trash bag

12 from what we were purchasing with Danny Eller through Jose.

13 That's exactly the way it looked.  It was unrolled from the

14 black tape to -- this is the end result.  You have a clear

15 plastic bag of meth.

16 Q.   And is this the quartz appearing -- the quartz appearance

17 that you had testified about earlier?

18 A.   Yes.  The way it looks like a quartz rock.

19       MR. KAUFMAN:  Nothing further, Your Honor.

20       THE COURT:  Okay.  Members of the jury, we'll take

21 our lunch break at this time.  Ask you to be back with us at

22 ten minutes till 2:00, so 1:50.  Thank you.

23       (Jury exited the courtroom.)

24       THE COURT:  All the jurors have departed.

25       MR. CANALES:  Yes, Your Honor, if I may just for the

JEREMY WILLIAMS - DIRECT

1   record, Judge.  I want the record to reflect that

2   approximately this witness took the stand about 10:30 and it's

3   now 12:20.  Just for the record, Judge.  He's been on the

4   stand for almost 3 hours, Judge.

5            THE COURT:  Yes, sir.

6            MR. CANALES:  At least two.

7            MR. KAUFMAN:  I believe that's less than two.

8            MR. CANALES:  No -- I mean two hours.  It was 10:30.

9   12:30.  I'm sorry, I was looking at my watch Texas time.  Two

10  hours, Judge, approximately.

11           THE COURT:  Let me see.  He started at 10:13.

12           MR. CANALES:  And it's now --

13           THE COURT:  So approximately two hours.

14           MR. CANALES:  Yes, Your Honor.

15           (Lunch recess at 12:22 p.m.)

16  WEDNESDAY AFTERNOON, MARCH 5, 2014

17           (Court called to order at 1:58 p.m.  Jury not

18  present.)

19           THE COURT:  Mr. Canales, for the record, and

20  although it's irrelevant, we did take a 20-some minute break

21  earlier during this witness so his time on direct was more

22  like an hour and a half.

23           MR. CANALES:  Yes, Your Honor.

24           THE COURT:  Maybe a little over that.  It's not like

25  we keep score on those things.  If you have relevant questions

JEREMY WILLIAMS - CROSS

1  you need to ask in your redirect, you're free to ask those.

2          MR. CANALES:  Yes, Your Honor.

3          THE COURT:  Are the parties ready to begin?

4          MR. KAUFMAN:  Yes, Your Honor.

5          MR. CANALES:  Yes, Your Honor.

6          THE COURT:  May we have the jury, please.

7          (Jury entered the courtroom.)

8          THE COURT:  I believe the government had concluded

9  its direct examination.

10         MR. KAUFMAN:  Yes, Your Honor.

11         THE COURT:  Mr. Canales.

12         MR. CANALES:  Yes, Your Honor.

13                    JEREMY WILLIAMS

14                  CROSS EXAMINATION

15 BY MR. CANALES:

16 Q.  Officer, my name is Rick Canales.  I'll be asking you

17 some questions.  If I speak too fast, let me know and I'll be

18 more than happy to repeat those questions.

19 A.  Yes, sir.

20 Q.  Officer, who buried the money on those pipes, those

21 plastic pipes?  Who buried the money?

22 A.  I don't know.

23 Q.  Who put the drugs in those cans?

24 A.  I do not know that.

25 Q.  You don't know that.  Okay.  Let me ask it this way.

JEREMY WILLIAMS - CROSS

1    MR. CANALES:  May I approach, Your Honor?

2    THE COURT:  Yes, sir.

3    MR. CANALES:  Okay.  Let me show you what I have

4  marked as Defendant's Exhibits Number 1 and Number 2 which I

5  believe have been already introduced to you by the government.

6  I'm old fashioned so I like to use paper copies.

7    MR. KAUFMAN:  May I see that?

8    MR. CANALES:  Oh, I'm sorry.

9    (Counsel conferred.)

10 Q.  Let me show you what is going to come on the screen --

11 may I approach, Your Honor?

12    THE COURT:  Yes, sir.

13 Q.  As Defendant's Exhibit -- what I've marked as Defendant's

14 Exhibit Number 1.  You're familiar, right?

15 A.  Yes, sir.

16 Q.  Okay.

17    MR. KAUFMAN:  And, Your Honor, for the record, I

18 have called up on the screen Government's Exhibit 2I.  That is

19 the correct exhibit according to the defense.

20    THE COURT:  All right.

21 Q.  Also, let me show you Defendant's Exhibit Number 2.  I'll

22 be asking you about it, but same thing.  It says "Lab report,"

23 except one is for Bobby Shore and Number 2 is for Mr. Eller.

24 Can we agree?

25 A.  Yes, sir.

JEREMY WILLIAMS - CROSS

1   Q.   Okay.  You say you don't know who put the money in the

2   pipes.  You said you don't know who put the drugs in the cans.

3   Then let me ask you this one then.  On this -- Defendant's

4   Exhibit Number 2, I mean, you're able to remember which is the

5   lab report, right, the one we saw on the screen, right?

6   A.   Yes, from which defendant?

7   Q.   Okay.  The one from --

8   A.   Eller or Shore?

9   Q.   Mr. Eller.  The one from Mr. Eller.

10  A.   Okay.

11  Q.   You said there were how many buys, how many purchases?

12  A.   Three.

13  Q.   Three.  One was for -- and I'm going to use what's -- the

14  information that's there on the exhibit.  The first one, item

15  number 1, the 3.5 -- I believe 3.52 grams?

16  A.   Yes, sir.

17  Q.   That was the first purchase, right?

18  A.   Yes, sir.

19  Q.   Did you see my client Martin -- yeah, my client Saldana

20  handle those drugs?

21  A.   No, sir.

22  Q.   Okay.  Then let me use the second one now.  The one for

23  3.43 grams, right?  Did you see my client handle those drugs?

24  A.   No, sir, I did not.

25  Q.   Okay.  How about the third one for 3.51 grams, did you

1  see my client, the gentleman right here, handle those drugs?

2  A.   No, sir, I did not.

3  Q.   Okay.  Now, this is -- those are the only three

4  controlled buys for Mr. Eller; is that correct?

5  A.   Yes, sir.

6  Q.   I mean, you got them for this, right?  He had this,

7  right?  He went and got them for you guys.  He was working for

8  you guys when this was going on, right?

9  A.   No, sir, he was not.

10  Q.   This is what he was arrested with.

11  A.   Yes.

12  Q.   Okay.

13  A.   This is what he sold to a cooperating witness or a

14  confidential source.

15  Q.   So you had another source, right?

16  A.   Yes, sir.

17  Q.   Okay.  And this source was working for you?

18  A.   Yes, sir.

19  Q.   Okay.  And I believe your testimony earlier was that

20  this -- in order to have a source, integrity and reliability

21  is very important; is that correct?

22  A.   Yes, sir.

23  Q.   Was that your exact words?

24  A.   I don't know that I used integrity.  But reliability is

25  very important.

1    Q.    I mean, meaning -- and how do you establish reliability

2    on a confidential informant?

3    A.    Reliability is established in a couple different ways.

4          Number one, responsibility for the action that they are

5    accused of, basically accepting what has happened.

6          Number two, it goes into an interview which we speak with

7    them and the information they give us, if we can corroborate

8    that with other facts that we know are true, whether it be in

9    the case or out of the case, there's just factors that you

10   know that are true.

11         And then it goes beyond that.  Whenever they are -- or

12   they take it upon themself or we ask them to go and purchase a

13   drug or make a recorded phone call, then that -- all those

14   factors end up making them -- or establish their reliability.

15   Q.    In very simple terms, it's like anything else in life:

16   Common sense.  When you get a wife or a girlfriend or a

17   husband or a friend, I mean, you establish reliability by

18   using this person, this confidential informant, right?

19   Repeatedly using them, right?

20   A.    Yes.  It doesn't have to be repeated, but yes.

21   Q.    At least --

22   A.    We use them.

23   Q.    -- try them out, right?

24   A.    Yes.

25   Q.    Try them out, make sure they're trustworthy, right?

JEREMY WILLIAMS - CROSS

1  A.    Sure.

2  Q.    Make sure that they don't mess up the drug deal, right?

3  A.    Okay.

4  Q.    Make sure they don't keep money for themselves, right?

5  A.    Uh-huh.

6  Q.    That's what you testified earlier, right?

7  A.    Yes, sir.

8  Q.    Make sure they don't bring extra drugs or take extra

9  drugs, right?

10 A.    Yes, sir.

11 Q.    Make sure they're not breaking the law, right?

12 A.    Yes, sir.

13 Q.    Are they allowed to break the law when they're being

14 confidential informants?  Do they get a free ticket to break

15 the law?

16 A.    No, they do not.

17 Q.    Okay.  So you have to -- you have to follow the steps,

18 right?

19 A.    Yes, sir.

20 Q.    I mean, you just don't get a stranger from the street and

21 tell them, okay, you're working for me now, go ahead and do

22 this, do you?

23 A.    It has happened.

24 Q.    Is that the way it's supposed to happen according to

25 protocol?

JEREMY WILLIAMS - CROSS

1   A.   Well --

2   Q.   Is that what they teach you in the police academy?

3   A.   Actually, no, they don't teach handling confidential

4   informants in basic law enforcement.  It is advanced and

5   something that changes every single day.  No informant or

6   confidential source is handled the same way.

7   Q.   All right.  Reliability, trustworthiness is very

8   important, right?

9   A.   Yes, sir.

10  Q.   Okay.  And isn't it true that a lot of these informants

11  have -- build relationships with the officers, meaning they do

12  arrest after arrest after arrest?  Several informants.  I

13  mean, that's not uncommon, right?  Yes or no, sir?

14  A.   Yes, they -- yes.

15  Q.   Okay.

16  A.   We use them again -- over and over.

17  Q.   Some of these informants get paid cash.

18  A.   Yes.

19  Q.   And other informants, you know, get other benefits of

20  different types, right?

21  A.   Yes.

22  Q.   Okay.  And again, this is relationships that can go on

23  through months, sometimes years; am I mistaken?

24  A.   No, you're correct.

25  Q.   Okay.  As a matter of fact, it's not uncommon for

1  officers to have your people that not only to do drug buys,

2  but also information as well, intelligence of what's going on

3  out there, right?

4  A.    Correct.

5  Q.    Okay.  Now, you said that you used -- the first person

6  that you used, I believe it was Mr. Eller; is that correct?

7  A.    First person we used for what?

8  Q.    Yeah, you talked to Eller, right?  Remember when you

9  arrested Eller?

10 A.    Yes.

11 Q.    Okay.  And when did you arrest Eller?

12 A.    Eller was actually arrested on December the 13th, 2012.

13 Q.    Okay.  When did you first approach him?

14 A.    He was first approached during the search warrant on

15 October, I believe it was 26, 2012.

16 Q.    Okay.  And now, let me -- let me ask you, Mr. Eller, how

17 many arrests did he give you?

18 A.    How many?

19 Q.    Yeah, how many arrests did he provide for you?

20 A.    One.

21 Q.    One, right?  Name them.  Who?

22 A.    Actually, there were two.

23 Q.    Who?

24 A.    Martin Saldana and Jose Pina, Sr.

25 Q.    Same case that we're talking about here today, right?

1   A.    Yes, sir.

2   Q.    In other words, did he tell you, yeah, I know more

3   people?  Did he tell you that?  Did he prove his credibility

4   to you?

5   A.    Yes.

6   Q.    He did?

7   A.    He proved his credibility to me.

8   Q.    I mean, to your satisfaction, right?

9   A.    Yes.

10  Q.    Right?  I mean, when he mentioned -- did you ask him

11  about Saldana?

12  A.    Yes, I did.

13  Q.    Okay.  And this is the same Saldana that in 2008 you had

14  been hearing things, right?

15  A.    Yes, sir.

16  Q.    He was already in your mind, right?

17  A.    Yes, sir.

18  Q.    As a matter of fact, did you inform -- did you give this

19  information to Mr. Harmon or Mr. Harmon give this information

20  to you?

21  A.    From 2008?

22  Q.    Yes.

23  A.    I gave it to him.

24  Q.    You gave it to him, right?  So Mr. Harmon is relying on

25  your intelligence -- and intelligence, I mean information,

1  right?

2  A.   Yes, sir.  As law enforcement we share information --

3  Q.   Yes.

4  A.   -- in the community.

5          MR. KAUFMAN:  Objection, Your Honor.  May the

6  defense counsel let the witness finish his answer, please.

7          THE COURT:  I would ask counsel to do that.

8          MR. CANALES:  Yes, Your Honor.

9  Q.   And it's fair to say that from 2008 all the way to 2012,

10  you had a preconceived idea that Martin Saldana was dealing

11  drugs; isn't that true?

12  A.   Through our investigation and through corroboration of

13  different individuals that we were interviewing, we drew that

14  conclusion from everybody that we had talked to, the

15  interviews that we had conducted, and the buys that were going

16  on.

17  Q.   Officer, I asked you a question and my question --

18          MR. KAUFMAN:  Objection.  Argumentative with the

19  witness.

20          THE COURT:  I'm waiting for a question.

21          MR. CANALES:  Yes, Your Honor.

22  Q.   My question was very simple.  From 2008 up until 2012,

23  you already had a preconceived idea about Saldana; isn't it

24  true?  Yes or no?

25  A.   It was an idea, yes.

JEREMY WILLIAMS - CROSS

1  Q.   Idea?

2  A.   We had an idea.

3  Q.   Right?  Because you're in front of the jury.  If you

4  wanted to arrest him in early December, could you have

5  arrested him on anything?

6  A.   Of what year?

7  Q.   2012.  Yes or no?

8  A.   If it was early, if it was December 12 --

9  Q.   Excuse me, I'm sorry.

10 A.   Yeah, early -- I don't understand early.  Give me a day.

11 Q.   January.

12 A.   January?

13 Q.   Uh-huh.

14 A.   Of 2012?  He was already arrested by then.

15 Q.   Okay.  When was --

16 A.   Or, no.

17 Q.   No, he was arrested in December.  12/12 of '12.

18 A.   So you're saying 1/12 of '12 could I have arrested him?

19 Q.   Yeah.

20 A.   No, sir, I could not have arrested him.

21 Q.   Right?  As a matter of fact, 2008, '09, '10, '11 goes by

22 and you have this idea of Saldana, but then -- but then you

23 come across Mr. Eller, right?

24 A.   Yes, sir.

25 Q.   Was he desperate?

JEREMY WILLIAMS - CROSS

1    A.    He accepted his responsibility and wanted to render
2    assistance and help police.
3    Q.    Was he desperate?
4    A.    I don't know.
5    Q.    I mean, you had contact with him.  You talked to him,
6    right?  You saw his demeanor, right?
7    A.    Yes, but I can't tell you if he was desperate or not.
8    That's an inner feeling that I can't express.
9    Q.    But sometimes we can see nervousness on a person, right,
10   with the shaking?
11   A.    Yes.
12   Q.    They're scared.  You don't go inside their heart, but you
13   can see their physical reaction to know whether somebody is
14   scared or not, right?
15   A.    Yes.  I mean, there is a sense of nervousness.
16   Q.    Okay.
17   A.    As with all of us when we come in contact with any kind
18   of law enforcement.
19   Q.    Okay.  And obviously, you told him we got 4.1 grams on
20   you.  We also have you with 3.9 grams.  And we also have you
21   on 4.0 grams, right, of meth?  You told him that, right?
22   A.    Yes.
23   Q.    You told him, We got you.  We, police officers, sent a
24   control -- we established a controlled delivery and you're
25   busted.  You told him that, right?

JEREMY WILLIAMS - CROSS

1   A.   Actually, it wasn't a controlled delivery.  We didn't

2   take the drugs to him.

3   Q.   Purchase.

4   A.   It was a controlled purchase --

5   Q.   Purchase.

6   A.   -- which we bought from him.

7        And yes, he was made aware of that.

8   Q.   Right.  Was he freaking out at the very least?

9   A.   No, he wasn't running around freaking out that I would

10  say.

11  Q.   Okay.  And I mean, you also got him with a gun, right?

12  A.   Yes, three guns to be in fact.

13  Q.   Mr. Eller?

14  A.   Yes, sir.

15  Q.   Okay.  He's a convicted felon, right?

16            MR. KAUFMAN:  Objection.  May we have a sidebar on

17  that?

18            THE COURT:  Excuse us, please, members of the jury.

19  You may be at ease.

20            (Sidebar conference as follows:)

21            THE COURT:  You have an objection?

22            MR. KAUFMAN:  Yes, Your Honor.

23        My concern is that counsel is asking many questions

24  with factual predicates that are not correct.  This is the

25  latest one.  He asked if -- first of all, you cannot impeach a

1   witness who has not testified with a prior conviction.  It is

2   only a matter of cross examination for a witness who has

3   testified to impeach their credibility only upon testimony.

4   Not if they haven't even testified yet.  If Mr. Eller, as we

5   expect to testify, does so, then counsel can do so.

6           But the real concern I have is that he has stated

7   something which is not accurate.  Mr. Eller has no prior

8   felony convictions.  And the question was couched that at the

9   time of this stop, that he did.  He does not have any felony

10  convictions.  The only convictions that Mr. Eller has are a

11  couple of -- I believe they were traffic offenses from 1983

12  and 1985.  And now he has put out a factually incorrect

13  assertion in his question, again, this time about one of the

14  witnesses in this case.

15          And, Your Honor, I would ask the court to admonish

16  counsel to be careful about his factual representations in his

17  questions and I would ask for some sort of cleansing

18  instruction to the jury that, in fact, he does not have a

19  prior felony conviction.

20          MR. CANALES:  That's incorrect, Judge, because I'm

21  talking about now.  Right now he's a convicted felon.

22          THE COURT:  As I understood your question, the only

23  relevance could have been that in talking to Mr. Eller, the

24  law enforcement witness might have held up the fact that he

25  had a prior conviction as a reason why that particular

1  witness, Mr. Eller, would have been facing more time than

2  otherwise if he had that prior felony conviction.  To me

3  that's the only possible relevance --

4           MR. CANALES:  Okay.

5           THE COURT:  -- that your question could have

6  carried.  If it's factually incorrect, of course, it's an

7  inappropriate question from the beginning.

8           MR. CANALES:  Yes, Your Honor.

9           THE COURT:  And you should be much more careful --

10          MR. CANALES:  Yes, sir.

11          THE COURT:  -- about your factual predicate.

12          MR. CANALES:  I -- we do know that Mr. Bobby Shore

13  does have a conviction.  I just don't -- and we know that --

14          MR. KAUFMAN:  Well --

15          MR. CANALES:  -- he had a conviction at the time as

16  well.

17          THE COURT:  Even there I think it's appropriate --

18  an appropriate point to raise by the government that what

19  you're apparently seeking here is questions related to

20  possible sentencing of these cooperating and testifying

21  co-defendants or co-conspirators.  That's a very thin ice on

22  which to tread.  It's not appropriate.  And you have already

23  done some of this by speaking to the defendant and then coming

24  back and asking a question of a witness saying would it

25  surprise you that, for example, my client made 40 or 50

1  thousand dollars in his business?  That is a way of having

2  your client testify without having to testify.

3          So I'm going to make the point that I want you to be

4  careful about how you go and talk to your defendant and then

5  bring up factual issues that, in effect, the jury obviously

6  understands are coming directly from the defendant.  That's

7  inappropriate.

8          Now, getting back to the point.  I just wanted to

9  make that general observation.

10          MR. CANALES:  Yes, Your Honor.

11          THE COURT:  That it's not appropriate for you to be

12  attempting to elicit from a law enforcement witness who has

13  testified about his investigation about the state of mind of

14  people to whom he is talking because he obviously doesn't know

15  that state of mind.

16          MR. CANALES:  Your Honor, obviously -- excuse me.  I

17  corrected the record in saying that I was looking for physical

18  symptoms.  I did say that, Judge.  Not state of mind.  Did he

19  look nervous?  Was he shaking?  I mean, that's what -- I mean,

20  I made it clear to the jury, Judge.

21          THE COURT:  Well, I thought you did all right in

22  that respect.

23          MR. CANALES:  Yes, Your Honor.  I will be --

24          THE COURT:  There wasn't any objection to that

25  either.  But I -- you know, so we're talking about the factual

JEREMY WILLIAMS - CROSS

1    predicate.

2              MR. CANALES:  Yes, Your Honor.

3              THE COURT:  Be careful about matters that really go

4    into the sentencing process, drug quantities as related to

5    sentences that a defendant might face.  These are things you

6    can explore in a general sense in terms of the interest of a

7    witness.  And I'm sure you'll explore them when you talk to

8    that witness.  But I think it's really beside the point with a

9    witness like this who obviously can't testify to the state of

10   mind of a given witness.

11             MR. CANALES:  Yes, Your Honor.

12             MR. KAUFMAN:  And, Your Honor, I can provide the

13   presentence report for Mr. Eller for the court's review to

14   confirm in fact that he does not have a prior felony

15   conviction.  The defense's question -- and I should note that

16   I made very specific *Giglio/Brady* disclosures to defense

17   counsel in e-mails that included criminal history.  So there

18   should be no question as to what his criminal status was at

19   the time of October 26, 2012.  I think right now the jury is

20   assuming based on the question posed which had a false factual

21   predicate, well, Danny Eller had a felony conviction and

22   should not have had firearms on October 26th.

23             MR. CANALES:  He wasn't even --

24             MR. KAUFMAN:  I'm --

25             THE COURT:  Well --

JEREMY WILLIAMS - CROSS

1          MR. KAUFMAN:  -- still --

2          THE COURT:  I understand your point.

3          MR. KAUFMAN:  So I would ask, Your Honor, if I show

4   Your Honor the PSR, if you would be able to take judicial

5   notice of the fact so the jury knows he does not have a

6   criminal record.

7          THE COURT:  Well, evidently you're not contesting

8   that; is that right?

9          MR. CANALES:  I can withdraw my question, Your

10  Honor.  It wasn't even answered.  A response wasn't even

11  given.

12         MR. KAUFMAN:  The bell was rung, Your Honor.  He's

13  put it out there.  There's so many questions where they're put

14  out there.  I would ask that the jury --

15         THE COURT:  Well, all I'm asking you now is do you

16  accept the fact, assuming it's a fact, that Mr. Eller at that

17  time of the interview did not have a prior felony conviction?

18         MR. CANALES:  May I ask this question?

19         THE COURT:  Yeah.

20         MR. CANALES:  Is Danny Shore the one that had the

21  felony conviction at the time?

22         MR. KAUFMAN:  Mr. Shore did.  But you cannot

23  impeach --

24         MR. CANALES:  No.

25         MR. KAUFMAN:  -- a non-testifying witness.

JEREMY WILLIAMS - CROSS

1          I sent you the e-mail.  I sent counsel the e-mail in

2     a *Giglio* disclosure and I can show the page on the PSR that

3     showed those two 1983 and 1985 traffic convictions.

4          And if that satisfies counsel, I would ask that

5     either the court instruct the jury or that the defense

6     stipulate that he did not have a prior felony conviction as

7     he's posited just now.

8          THE COURT:  As of that time.

9          MR. KAUFMAN:  And in fact --

10          THE COURT:  Wait a minute, that's a simple question.

11     Do you all agree that there is not a factual predicate for

12     asking this witness about a prior conviction -- felony

13     conviction of Mr. Eller at the time of the interview?

14          MR. CANALES:  I can withdraw my question, Your

15     Honor --

16          THE COURT:  All right.

17          MR. CANALES:  -- in front of the jury.  I'll

18     withdraw my question in front of the jury and proceed to

19     another matter.

20          THE COURT:  All right.

21          MR. KAUFMAN:  Your Honor, I submit the bell has been

22     rung.  You can not unring it.  It has to be clarified for the

23     jury because if he just withdraws the question --

24          THE COURT:  I think it will be.  It would be

25     appropriately -- it's something for you to take up on cross.

JEREMY WILLIAMS - CROSS

1  I'd also ask you to withdraw the question.

2           MR. CANALES:  Yes, Your Honor, I will.

3           MR. KAUFMAN:  Your Honor --

4           THE COURT:  Redirect, rather.

5           MR. KAUFMAN:  I don't believe that Mr. -- that

6  Sergeant Williams necessarily knows what his criminal history

7  is and it shouldn't be the burden on Sergeant Williams to know

8  it when the defense has been the proponent of the question.

9           THE COURT:  Right.  Well, perhaps you could ask the

10 witness what -- whether he, in fact, knows --

11          MR. CANALES:  Yes.

12          THE COURT:  -- if Mr. Eller had a felony at that

13 time or not.

14          MR. CANALES:  Yes, Your Honor.

15          MR. KAUFMAN:  Well --

16          THE COURT:  And then you can slam the defense with

17 that on redirect.

18          MR. KAUFMAN:  Well, but --

19          THE COURT:  That's how you do it.

20          MR. KAUFMAN:  Your Honor, Sergeant Williams may not

21 even know what his criminal history is.

22          THE COURT:  I'm assuming he would answer that.

23          MR. KAUFMAN:  So if he says I don't know, then the

24 jury still -- now it shows, if anything -- if the burden is on

25 the government to ask the question of its witness, not only

1  does the defense now have the question out there where he's

2  posited as an officer of the court that he does have a prior

3  felony conviction, but now I'm in the position of not knowing

4  what Sergeant Williams' answer is going to be and it makes it

5  even worse because if he says he doesn't know, now I'm --

6  because of the defense's improper question, Sergeant Williams

7  looks like he's not prepared by knowing what his criminal

8  history is.  And this is ultimately based on the defense's not

9  only factually incorrect question, but under Rule 404, you

10  cannot ask one witness if another one has a conviction.  And

11  that would apply for Shore who, in fact, does have a

12  conviction.  And when he testifies we will actually, like we

13  would for any other witness, bring that out on direct.

14          THE COURT:  Yeah.

15          MR. CANALES:  I can withdraw it, Judge.  Withdraw

16  the question and just ask at the time did he have a criminal

17  record, yes or no.  I mean, I can make it more general.

18          THE COURT:  All right.  I'll handle it.

19          MR. KAUFMAN:  Thank you, Your Honor.

20          (End of side-bar conference.)

21          MR. CANALES:  Proceed?

22          THE COURT:  All right.

23                    JEREMY WILLIAMS

24              CROSS EXAMINATION (Cont'd.)

25  BY MR. CANALES:

JEREMY WILLIAMS - CROSS

1  Q.   Officer, I'm going to withdraw the last question that I

2  asked you, okay?  And let me proceed to another matter.

3  A.   Yes, sir.

4       THE COURT:  Excuse me, counselor, I did want to

5  advise the jury that the prior question about a -- whether at

6  the time of this witness's interview with Mr. Eller, Mr. Eller

7  had a prior felony conviction, that was not an appropriate

8  question because there is no indication that he had a prior

9  conviction at that time.  Just wanted to advise you of that.

10      You may continue.

11      MR. CANALES:  Okay.

12 Q.   Now, I did ask you earlier that as far as the -- as far

13 as the 3.52 grams, the 3.43 grams, and the 3.5 grams from the

14 lab report, that you did not see my client touch those drugs,

15 right?

16 A.   No, sir.

17 Q.   You didn't hear my client give anybody instructions on

18 what to do with those drugs.

19 A.   No, sir.

20 Q.   Okay.  Now, talking about the drugs from the lab report

21 entitled Bobby Shore, the other lab report.

22 A.   Yes.

23 Q.   That was shown on the screen, right?

24 A.   Yes, sir.

25 Q.   That 3.41 grams, was Bobby Shore arrested with those

1  drugs?

2  A.   Yes, he was arrested.

3  Q.   Okay.  Did you see my client handle those drugs?

4  A.   No, sir, I did not see him.

5  Q.   Did you hear my client give anybody instructions?

6  A.   No, sir, I did not hear.

7  Q.   Okay.  How about the 3.38 grams, the second, did you?

8  Did you see my client handle those drugs?

9  A.   No, sir, I did not see your client handle those drugs.

10  Q.   Give anybody instructions?

11  A.   No, sir, I did not hear him give anybody instructions.

12  Q.   And there were more -- there was 7.04 grams as well,

13  right?  That was another transaction.  As a matter of fact,

14  your testimony was that it was seven transactions; am I

15  mistaken?

16  A.   No, sir, there were seven transactions.

17  Q.   There were seven, right?  And they're all listed in the

18  report, right?

19  A.   Yes, sir.

20  Q.   And they would be as follows:  The next one would be

21  7.04 grams, right?  And the report states 0.91 grams and

22  13.58 grams, 13.49 grams and 14.92 grams, right?  All those

23  seven transactions listed in the report, do you have any

24  personal knowledge, did you see my client handle any of those?

25  A.   Which -- do I have personal knowledge --

JEREMY WILLIAMS - CROSS

1  Q.   Yes, sir.

2  A.   -- that he handled those drugs?

3  Q.   You saw him --

4  A.   Through interviews and corroboration of those interviews,

5  yes, I have personal knowledge that he handled those drugs.

6  Q.   And those interviews and corroboration are based on

7  somebody else's eyes, somebody else's mouth, somebody else's

8  doing or not doing, right?

9  A.   Yes, those -- that inference -- or that conclusion is

10 drawn and my personal knowledge is coming from the interviews

11 and the corroboration of those interviews on the facts that

12 they gave us that we can corroborate that statement as being

13 true.

14 Q.   But it also comes since 2008.

15 A.   No, those drugs --

16 Q.   Right?

17 A.   -- that you're referring to --

18 Q.   Right?

19 A.   -- are from August through September of 2012.

20 Q.   No.   I'm talking about your beliefs -- you said that your

21 knowledge is coming from what somebody else has told you, what

22 somebody else's debrief or didn't debrief or what somebody

23 else told the investigators or didn't tell the investigators.

24 But we're talking about these drugs.   But your -- your

25 beliefs, the ones you're using to form an opinion today in

JEREMY WILLIAMS - CROSS

1  front of this jury is coming from a preconceived idea that

2  you've had since 2008 --

3          MR. KAUFMAN:  Objection.

4  Q.    -- about my client.

5          MR. KAUFMAN:  Objection.  This lengthy narrative is

6  just argument and it's already been asked and answered.

7          THE COURT:  Overruled (sic).  Asked and answered.

8  Q.    True or not true?

9          THE COURT:  Asked and answered.  New question.

10          MR. CANALES:  Yes, Your Honor.

11  Q.    Okay.  Let's talk about your surveillance.  Your

12  testimony was that you had surveillance on my client's

13  property -- you surveilled his property many times; is that

14  correct?

15  A.    Yes.

16  Q.    How many times?

17  A.    I'm unable to answer that.  It was quite a few.

18  Q.    Would you give us an average of what quite a few is.

19  A.    Between five and ten times.

20  Q.    Between five and ten times.  And the first time, did you

21  see my client touch any drugs?

22  A.    No, sir.

23  Q.    Did you see my client handle money?

24  A.    No, sir.

25  Q.    How about the second time, did you witness anything?

JEREMY WILLIAMS - CROSS

1   A.   No, sir, I did not see your client handle drugs or handle

2   any money the second time.

3   Q.   How about the third time?

4   A.   No, sir, I did not see your client handle any drugs or

5   money the third time.

6   Q.   I mean, this would be a perfect opportunity, right, for

7   you to have personal knowledge of witnessing, right?  That's

8   what surveillance means.  Surveillance means trying to catch

9   someone in the act, watching them.  Isn't that what it means?

10  A.   No, surveillance can mean many different things.

11  Surveillance is seeing who comes and goes from that residence.

12  Seeing what vehicles come and go from that residence.  Seeing

13  what time the vehicles come and go from that residence.  It's

14  not all a matter of seeing two people exchange drugs or money.

15  Two people can exchange something right in front -- three feet

16  from myself or anybody else and we can't really tell what that

17  exchange is.  It could be drugs.  It could be money.  It could

18  be a cell phone.  We really don't have any knowledge of what

19  they exchanged unless we have that actual object in our hand

20  to see what that is.

21  Q.   Officer, there's ways of a police officer knowing when

22  two people are meeting and there's obviously a drug

23  transaction going on or what the officer thinks is a drug

24  transaction, right?

25  A.   It's not -- it's never obvious.

JEREMY WILLIAMS - CROSS

1    Q.   Okay.

2    A.   Now, can we draw an inference --

3    Q.   Yes.

4    A.   -- that we think something might be happening?  Yes.  Has

5    that always been the case that, yes, we think but maybe as a

6    road officer we stop and check it out and it's totally not it?

7    Yes, that has also happened.

8    Q.   Okay.  Then let me ask you this.  During those five or

9    ten times that you were there, did you make an inference that

10   a drug transaction or a crime was happening enough to arrest

11   my client, yes or no?

12   A.   No.

13   Q.   Okay.  How many times did you drive by his property --

14            THE COURT:  Well, wait just one minute.

15            I do advise you that, of course, if you have a

16   question that appears to ask for a yes or no, you may

17   nevertheless explain your answer if you need to do that --

18            THE WITNESS:  Okay.

19            THE COURT:  -- to make it a complete answer.

20            THE WITNESS:  Yes, sir.

21   Q.   (By Mr. Canales) How many times did you drive by his

22   property?

23   A.   Between three, four that we actually drove down Ervin

24   Houck Road.

25   Q.   Okay.  Now, during the first time that you were driving

1  by, you were making observations, right?

2  A.   No, we were gathering information on what cars were

3  there, what vehicles -- or what color the vehicles were, what

4  make, what model, what tag numbers were at that residence.

5  Q.   Okay.  And based on your -- what happened first, the

6  surveillance or the driving by the property?

7  A.   Kind of both goes hand in hand.  If I'm going to drive

8  down Ervin Houck Road which is a dead end road, the road from

9  start to finish is probably no longer than a quarter to a half

10 a mile.  Then if I'm going to drive down that road, I'm going

11 to do surveillance and retrieve my tags because it would be

12 pointless for me to drive down the road and not get something

13 from it.

14 Q.   Okay.  Let me ask you this.  At the conclusion of driving

15 by five or ten times, at the conclusion of doing surveillance

16 five to ten times and observations and taking plates and doing

17 whatever you had to do when you did and whoever was with you,

18 whatever intelligence you gathered, is it -- isn't it true

19 that you made an inference, right, based on what you saw?

20 A.   No, I made notes on tag numbers.  But as far as an

21 inference, it really didn't -- I didn't make an inference

22 other than these are the vehicles that are there.

23 Q.   Did anything amount to a crime to arrest my client?

24 A.   No, sir.

25 Q.   Okay.

JEREMY WILLIAMS - CROSS

1   A.    There was no -- there was nothing --

2   Q.    Okay.

3   A.    -- that we saw in the middle of the daytime while we

4   drove down there.  We didn't see a transaction happen with

5   Martin or anybody else.

6   Q.    So in essence, we can say that you are a witness, at

7   least for those times that you were driving by and the times

8   that you were sitting there in the woods, you were a witness

9   that my client was not committing a crime, at least the times

10  you passed by and the times you were watching him, right?

11  It's fair to say that?  You were a witness that he didn't

12  commit a crime?

13  A.    Yeah, I did not observe him commit a crime; but yet, I

14  wasn't on that road for more than two minutes and that would

15  include my time from turning on to 221, going to the end of

16  the road and turning around and coming back.

17  Q.    Okay.  So the time you were in the woods, how long were

18  you sitting there?

19  A.    Sometimes -- most of the time while we were in the woods,

20  it was during a transaction of Danny Eller and Jose while they

21  were -- the transaction of methamphetamine for money where

22  Danny was buying meth from Jose, we were in the woods watching

23  that.

24  Q.    Whatever time it took, you were there watching and you

25  saw Pina committing a crime.  That's -- that's clear, right,

JEREMY WILLIAMS - CROSS

1   to the jury when you were there?

2           MR. KAUFMAN:  Objection.

3   Q.   Did you see him?

4   A.   Did I -- did I see --

5           THE COURT:  Overruled.

6   A.   -- what?

7   Q.   Let me ask you this.  Let me withdraw my question.  Let

8   me ask you this.

9       These were your physical observations.  Let's talk about

10  the pole camera.

11  A.   Okay.

12  Q.   Was there a pole camera?

13  A.   Yes, sir, there was.

14  Q.   Who decided -- who decided -- whose idea was it to

15  install a pole camera on the property?

16  A.   It was the investigative team.

17  Q.   Okay.

18  A.   I don't recall one person stepping up and saying let's do

19  this.  It was a team effort to install the pole camera.

20  Q.   Okay.  A decision was made to install a camera.  A

21  decision was made where to place the camera.  A decision also

22  must have been made, right, based on the terrain and the area.

23  I mean, you just don't put a camera wherever you feel like it,

24  right?

25  A.   Correct.

JEREMY WILLIAMS - CROSS

1    Q.   I mean, officers are going to study the area.  If it's

2    got hills, if it's flat or if it's got obstructions, right?

3    A.   Correct.

4    Q.   So am I correct in saying that this property was observed

5    and a determination was made where to place the camera, right?

6    A.   Yes.  The camera was not placed on the property of Martin

7    Saldana, though.

8    Q.   It was placed on -- in an area close to the property?

9    A.   Yes, sir, it was placed in an area close to the property.

10   Q.   Was it properly installed?

11   A.   Yes, it was properly installed --

12   Q.   Properly.

13   A.   -- in a working manner, yes.

14   Q.   Okay.  Now, for how long did this camera run?

15   A.   I really don't -- can't -- I can't recall when the camera

16   was actually put up and I can't recall when it was actually

17   taken down.

18   Q.   Would --

19   A.   But the camera probably ran between three weeks to six

20   weeks.

21   Q.   Okay.  So there we have another possible, I can't say

22   witness, but another possible way for -- to determine or

23   detect criminal activity on behalf of my client, right?

24   A.   Correct.

25   Q.   Did this camera show my client handling drugs in any form

JEREMY WILLIAMS - CROSS

1    or fashion?  Yes or no?

2    A.   No.

3         MR. KAUFMAN:  Objection.

4         THE COURT:  We've been over that, counselor.

5         MR. CANALES:  Yes, sir.  I'm only asking for a yes

6    or no and if he wants to explain, Your Honor.

7         THE COURT:  No, the line of questioning appears to

8    be aimed at hypotheticals and speculativeness.  I think you

9    can ask the question you want answered in a very simple

10   question.

11        MR. CANALES:  Yes, Your Honor.

12   Q.   Was there evidence of drug dealing by my client on that

13   footage, that video?

14   A.   I will say no to the extent of the camera that is

15   installed is obviously not like a CSI camera.  It's a camera.

16   It's blurry.  When it snows on it, you can't see.  When it

17   rains, you also can't see.  You can't zoom in and count the

18   buttons on somebody's shirt.  It doesn't work like that.  So

19   however, if there had been criminal activity that Martin had

20   been involved in --

21        MR. CANALES:  Your Honor.

22   A.   -- I wouldn't know that because you can't see what is

23   going on.  It wouldn't do me any good -- or I couldn't see it

24   on the TV screen or my computer screen if they even switched

25   money for drugs.  I would not be able to see that.

JEREMY WILLIAMS - CROSS

1  Q.   Okay.  Who's -- is it my client's responsibility or law
2  enforcement's responsibility as to the type of camera that is
3  used?
4         MR. KAUFMAN:  Objection.
5         THE COURT:  Sustained.  Move on, please, counselor.
6  Q.   Okay.  Then other methods of investigation.
7  Fingerprints, was that employed in this case, sir?
8  A.   No, sir.
9  Q.   How about wiretaps, were those employed?
10 A.   No, sir, a wiretap was not employed.
11 Q.   Even if it's a painstaking process, does it take a lot of
12 work to get a wiretap?  There's a lot of hoops to cross,
13 right?
14 A.   Yes, sir, it is.
15 Q.   Okay.  So even if it's a painstaking process, this would
16 have been a good avenue to approach in this case, would you
17 agree?
18 A.   I don't have the means to initiate a wiretap.  A state
19 wire would have to go through the State Bureau of
20 Investigation.  A federal wire would have to go through a
21 federal agency such as the DEA, Homeland Security, FBI.
22 Q.   So then how about Mr. Harmon, could Mr. Harmon have done
23 it?
24        MR. KAUFMAN:  Objection.
25        THE COURT:  Overruled.

JEREMY WILLIAMS - CROSS

1    Q.    Could Mr. Harmon have applied for a permit or a request

2   from a federal judge or whatever the process is to do a

3   wiretap?

4   A.    I think, yes, he could have applied.  But due to money

5   restrictions, they have basically cut off all Title III

6   wiretaps.

7   Q.    Is it the same for the camera?  Were there money

8   restrictions on the camera that was employed as well?

9   A.    No, there was no money issues on the camera that was

10  deployed.

11  Q.    Okay.  You said there was a car accident, right?

12  A.    There was a what?

13  Q.    A car accident about a driver involved in meth.

14  A.    Yes, sir.

15  Q.    When was this car accident?

16  A.    It was in -- the initial report came to me from Virginia

17  and that was in 2010.

18  Q.    2010.  Who was the driver?

19  A.    I am unable to recall that.

20  Q.    So correct me if I'm wrong, you stated on the record that

21  it's early 2012, right?  You stated that as early as 2012,

22  they, meaning you all, they didn't have anyone -- or you

23  didn't have anyone that knew the defendant well enough to do a

24  purchase; is that correct?

25  A.    That is correct.

JEREMY WILLIAMS - CROSS

1  Q.  So here we are in 2012, right?  And you have information

2  of a person who's dealing, I mean, hundreds -- hundreds of

3  grams, right?

4  A.  Maybe.

5  Q.  Maybe or no or yes?

6  A.  It's just information.  I can't go arrest Mr. Saldana or

7  anybody without physical or probable cause to make that

8  arrest.  I can't just go knock on somebody's door because his

9  best friend or his wife has told on him and arrest him for a

10  crime that I don't really know has been committed.

11  Q.  Because you would be relying on hearsay, gossip or just

12  street information, right?

13  A.  In 2012, yes, we didn't have anybody to corroborate

14  anything that had been said throughout the case.

15  Q.  Okay.

16  A.  And we didn't have anybody in early 2012 that could go

17  directly to Mr. Saldana and purchase methamphetamine directly.

18  Q.  But that's not what -- that's not what I'm -- okay.  But

19  here in early 2012 -- listen to my question.  I'm not asking

20  you whether you had enough to arrest, okay?

21         MR. KAUFMAN:  Objection.  That's exactly what his

22  question was, Your Honor.

23         THE COURT:  Well, start your question over.  I think

24  it may be at a point of confusion.

25         MR. CANALES:  Your Honor, I ask him a question.  He

1  goes it into a lengthy explanation of --

2              THE COURT:  He answered the question.

3              MR. CANALES:  Yes, Your Honor.

4  Q.   To recall my recollection correct, you did state, right,

5  that as early as 2012 you didn't have anyone until -- until

6  you found Eller and Shore; is that correct?

7  A.   We didn't have anyone to what?

8  Q.   To do a controlled purchase.

9  A.   We didn't have anybody that could do a controlled

10 purchase --

11 Q.   Okay.

12 A.   -- directly from Martin Saldana.

13 Q.   Okay.  Well, then -- but this is a person that based on

14 your information -- because by December 12 he's already

15 arrested, right?  Mr. Saldana, right?

16 A.   Yes, sir, he was arrested on December 12, 2012.

17 Q.   This is a person that based on your information is

18 dealing with hundreds and hundreds and hundreds of grams of

19 meth, right?

20 A.   To a certain extent, yes.

21 Q.   Is he being accused of that today, as he stands here

22 today?

23 A.   Yes, sir, he is.

24 Q.   Do you know why he's being charged?

25 A.   Yes, sir.

JEREMY WILLIAMS - CROSS

1    Q.   What, sir?

2    A.   He's being charged with gun charges and possession of

3    methamphetamine over a certain amount.

4    Q.   Over what amount?

5    A.   I don't know if it's 500 grams or 1500 grams.

6    Q.   Okay.  You have a person, I mean, who's got hundreds and

7    hundreds -- based on your information, moving hundreds of

8    grams of meth, yet you can't find anybody else?

9              MR. KAUFMAN:  Objection.  Asked and answered.

10             THE COURT:  Sustained.  Argumentative.

11             MR. CANALES:  Okay.

12             THE COURT:  Sustained.

13             MR. CANALES:  Yes, Your Honor.

14   Q.   Now, when it came to Mr. Shore, right, how -- did Eller

15   used to work with my client?  I'm asking you.  I'm not -- I'm

16   asking.

17   A.   Not that I'm aware of.  I'm not aware of that.

18   Q.   Did Shore used to work with my client?

19   A.   Not that I'm aware of.

20   Q.   Okay.  But Eller was from the same town, right?

21   A.   Yes, sir.

22   Q.   Mr. Shore was from the same town, right?

23   A.   Yes, sir.

24   Q.   Let me see.  Those are your two -- the only two people

25   you were able to find, right?

JEREMY WILLIAMS - CROSS

1  A.   Find to do what?

2  Q.   I mean, this is a person, sir, who's --

3           MR. KAUFMAN:  Objection.  Ambiguous.

4           THE COURT:  Rephrase your question, please.

5  Q.   I mean, this is a person who's moving hundreds and

6  hundreds of grams.  Yet you're only able to find two.  It

7  seems kind of -- isn't that illogical?

8  A.   Not really.

9  Q.   Okay.  Then let me ask you this.  There were recordings,

10 right?  Were there recordings made?

11 A.   Of what?

12 Q.   Of when you sent Mr. Eller to talk to my -- into

13 Mr. Saldana's house.

14 A.   Yes, sir, there was an audio recording made of that.

15 Q.   Right.  I mean, obviously -- obviously on the recording

16 they were talking about drugs, right?

17 A.   Yes, sir.

18 Q.   Really?  So when they hear that recording, they're going

19 to hear how much drugs for so much money?

20 A.   No, they're going to hear Martin Saldana asking Danny

21 Eller if he had been caught with drugs.

22 Q.   But they know each other, right?  They're from the same

23 town.

24 A.   But they don't work together.

25           THE COURT:  Wait just a minute.  I would ask you to

1   phrase your presentation in the form of a question instead of

2   an ejaculation and then sort of make it sound like a question.

3   I want you to completely form a question so the witness is

4   able to answer a definite question.

5           MR. CANALES:  Yes, Your Honor.

6   Q.   Were they from the same town?

7   A.   Yes.

8   Q.   Were they prior acquaintances?  Had they known each other

9   for a long time?

10  A.   Who?

11  Q.   Eller and Saldana.  Yes or no, do you know?

12  A.   From Eller's statement, yes, they had known each other

13  for a sufficient amount of time through the drug business.

14  Q.   How about Mr. Shore, had they known each other for a long

15  time?

16  A.   Again, from Shore's statement, they had known each other

17  for a sufficient amount of time through the drug trafficking

18  business.

19  Q.   Okay.  And my client knew the Pinas, right?  They were

20  renting from him, right?

21  A.   Who do you mean he knew?

22  Q.   The Pinas.  Pinas, I'm sorry.  The Pinas.  I misspoke.

23  The Pinas.  Where did they live?  What was their address?

24  A.   178 Ervin Houck Road.

25  Q.   Were they renting?

1  A.   Yes.

2  Q.   Okay.  They were renting from whom?

3  A.   From the Pinas' statements they were renting that

4  residence.

5  Q.   Now, when he came down -- let me -- before I -- yes.

6      On Mr. Shore, when it came down -- when it came down to

7  get in evidence against Mr. Shore, I mean, you were able with

8  no problems to get a buyer to go buy and come back, right?

9  A.   Yes, but that took time.

10  Q.   Okay.  Whatever time it took, whatever amount it

11  reasonably takes, you were able to do it, right?

12  A.   Yes.  The first time it actually happened with Bob Shore

13  was in 2010 and it took until 2000 -- or August of 2012 to

14  re-establish a connection.  It took two years to re-establish

15  that connection.

16  Q.   Okay.  And when it came to Danny Eller, you were also

17  able to do it, right?

18  A.   Yes, sir.

19  Q.   Okay.  Matter of fact, three times with one, seven times

20  with the other, right?

21  A.   Yes, sir.

22  Q.   Yet, when it came down to sending someone, right, two

23  known acquaintances of my client, when it came down to sending

24  Eller to talk to my client, you were not able to come back

25  with any drugs, were you?

JEREMY WILLIAMS - CROSS

1    A.    No.

2    Q.    Okay.

3    A.    And that -- the reason that was was from prior interviews

4    we had learned -- as the investigative team we learned --

5                MR. CANALES:  Your Honor --

6                THE COURT:  Please don't interrupt the witness.

7                THE WITNESS:  We learned that Martin Saldana had

8    moved to Mexico and placed -- or introduced a gentleman by the

9    name of Jose Pina to sell drugs in his place while Martin was

10   in Mexico.

11   Q.    And you got that from whose mouth?

12   A.    (No response.)

13   Q.    You say you heard.

14   A.    Yes, through interviews.

15   Q.    Whose mouth?

16   A.    Whose what?

17   Q.    From whose mouth did it come out from?

18   A.    It came from Bob Shore's.  It came from Danny Eller's.

19   And it came from Clara Caudell's.

20   Q.    The same people who have been arrested and pled guilty?

21               MR. KAUFMAN:  Objection again.  We're going down

22   the --

23               THE COURT:  Make it a complete question, please.

24   Q.    The same -- it came from them, right?

25   A.    Yes.

1    Q.    Okay.  I asked you that -- about Bobby Shore, about

2    Mr. Eller, right?  And when it came down to sending Mr. Bobby

3    Shore, right, again, same result?  You sent him over there.

4    Were you able -- was Bobby Shore able to come out with some

5    drugs?

6    A.    No, sir.

7    Q.    Remember all the ammunition?  They showed us a picture of

8    all the ammunition on the floor by one of the sheds.  Remember

9    there was like multiple rounds on the floor?  Do you remember

10   a picture of that?

11   A.    Yes, sir, I remember.

12   Q.    What caliber were they?

13   A.    I do not recall what caliber it was.  It was turned over

14   and seized by the ATF agent.

15   Q.    You stated that in the brown bag that was found in my

16   client's bedroom, in the brown bag there were some bank

17   accounts, right?

18   A.    It wasn't found in your client's bedroom.  It was found

19   in the -- another bedroom.  It wasn't the same bedroom that --

20   the bedroom of Martin Saldana.

21   Q.    Okay.  But those records are being attributed to my

22   client, right?

23   A.    Yes.  Those records were bank records, medical records,

24   and clothing that would fit a male person and he was the only

25   male living at that residence.

JEREMY WILLIAMS - CROSS

1   Q.   Now, sir, based on all the information that you've had on

2   this case, based on your experience as an officer, of drug

3   dealers that you have dealt with in the past, there's

4   financial -- money to be made, right?

5   A.   There can be, yes.

6   Q.   I mean, isn't that -- I mean, if we were to stereotype, I

7   mean, we would say that that would be like the number one

8   incentive.  Why else do it?

9   A.   I've heard a lot of people do it for different reasons.

10  They do it for money.  They do it to gain power.  They also do

11  it for sexual pleasure.

12  Q.   Okay.  Then let me ask you.  Based on your findings in

13  this case, what sexual pleasure did this man get?

14  A.   I don't know.  I didn't go to his house and hang out with

15  him.  I don't know what he got.  I didn't ask him.

16  Q.   Does that mean you were hanging out with the other ones

17  that told you about the sexual pleasure?

18  A.   No, sir.  That's just through training and experience.

19  Q.   Okay.  So through training and experience, what power did

20  this man have in the community?  What power did he have in

21  Ashe County?

22  A.   That I'm not aware of.

23  Q.   Through your investigation, through your findings, did he

24  have any power that is evident to you, that was so obvious to

25  you?

JEREMY WILLIAMS - CROSS

1    A.    Through my investigation, the only power that I saw

2    was -- again, it was through an interview, that he was more --

3    powerful enough to turn over his business to Jose Pina and

4    basically make him run it.

5    Q.    And who's the one saying this?  Whose mouth did it come

6    out from?

7    A.    That would be Jose Pina.

8    Q.    So Pina is the one saying, Hey, he's very powerful.

9    Look, he's so powerful that he's the one putting me in charge,

10   right?  That's the evidence that we're bringing to the jury

11   today, right?

12   A.    Yes, that's what Jose Pina said.

13   Q.    Right.  You say -- I mean, isn't that -- isn't that a

14   normal tactic?  I mean, it wasn't me; it was him.  Even kids

15   do that.

16   A.    To a certain extent.  But when Mr. Pina gave a statement,

17   we were able to corroborate through his statement some facts

18   that would lead us to believe the things that he was saying.

19   Q.    Okay.  Those facts that you corroborated, did he have any

20   expensive jewelry in his house when you -- when you searched

21   his house?

22   A.    No, sir.

23   Q.    Did he have any expensive cars, sports car, expensive

24   trucks with $3,000 tires and stuff, did he have that at his

25   property?

1    A.   No, he did not, but where we live in Ashe County, if you

2    have a fancy car that is shiny or cost a lot of money, it

3    draws attention to yourself.  So more and more we see now that

4    people with money that are in an illegal business hide that

5    money elsewhere.  They don't put it in their cars.  They don't

6    put it in the clothes they wear.  They don't put it in their

7    jewelry because that attracts attention to them.

8    Q.   Can you give us some examples of some money stashed away

9    somewhere or put it somewhere?  Give me some examples.

10   A.   They put it in their house which --

11   Q.   Okay.  Where else?

12   A.   I'm talking about inside.

13   Q.   Okay.  Inside the house.  Where else?

14   A.   As in buying -- I've seen them buy tractors, backhoes.

15   Q.   Tractors, backhoes?

16   A.   Equipment, farm equipment, TVs.  Stuff that is concealed

17   in something that the general public doesn't have access to to

18   walk in and see because if they do see it, it sets them up for

19   potential robberies and things like that.

20   Q.   Okay.  Then these are the type of ways that -- in Ashe

21   County that's the way it would happen in Ashe County.  So then

22   let me ask you, how many expensive tractors did he have on his

23   property?

24   A.   None that I saw.

25   Q.   Okay.  Then let me ask you this.  How many expensive or

1  regular, or whatever, new backhoes did he have on his
2  property?
3  A.  None that I saw.
4  Q.  Okay.  How about farm equipment, how much expensive farm
5  equipment did he have?
6  A.  None that I saw.
7  Q.  Okay.  Let me ask you this one.  How about expensive TVs,
8  how many expensive plasma TVs, or whatever, did he have at his
9  house?
10  A.  He only had one flat screen.  However, with that being
11  said, he only had the one TV but he also had been in Mexico
12  for some time and he had just returned.
13  Q.  Sir, he had gone to Mexico numerous terms; isn't it true?
14  Numerous times.
15  A.  Yes, he had and especially at the end of the case.
16  That's why we had to wrap up the case when we did because he
17  was leaving to return to Mexico the following morning.
18  Q.  But he also said on the recording, "I'm going to return";
19  isn't it true?
20         MR. KAUFMAN:  Objection.
21         THE COURT:  Well, sustained.  The recording will
22  speak for itself.
23         MR. KAUFMAN:  And, Your Honor, facts not in
24  evidence.
25  Q.  You said that he said that he was going to go to Mexico,

JEREMY WILLIAMS - CROSS

1   right?

2   A.   Yes.

3   Q.   Okay.  And this is based on what?

4   A.   On the meeting between Bob Shore and Martin Saldana.

5   Q.   Bob Shore.  All right.

6        Okay.  Do you remember that conversation?

7   A.   Briefly.

8   Q.   Okay.  Do you remember in what part of the conversation

9   they talk about Mexico?

10  A.   No, I don't.

11  Q.   If I was to show you Defendant's Exhibit Number 3, would

12  that refresh your recollection, the transcript?

13         MR. KAUFMAN:  Your Honor, we object.  The recording

14  is going to be admitted in this trial and we submit -- and

15  actually, that already has been admitted into evidence.  It

16  will speak for itself.

17         MR. CANALES:  Judge, that's something --

18         THE COURT:  If you want to show him a part of the

19  transcript, you may do that.

20         MR. CANALES:  Yes, Your Honor.

21  Q.   Now, just to be correct, we're saying Bobby Shore on

22  December 12th, sir?

23  A.   Yes, sir, of 2012.

24  Q.   Sir, didn't he also say, "Yes, I'm going to Mexico.  I'm

25  going to return."  Isn't that the complete context that he

JEREMY WILLIAMS - CROSS

1   said it, sir?

2   A.    I don't recall --

3   Q.    You just remember the leaving but --

4           MR. KAUFMAN:  Objection.  Can the witness please

5   answer the question.

6           THE COURT:  Well, were you finished?

7           THE WITNESS:  No.  I don't recall where -- or when

8   because the audio recording is something that I don't just sit

9   around and listen to.  I actually heard it over a kel unit

10  which is a body wire and that's where I got it, off of that.

11  Q.    I mean, it would be important if he's saying I'm

12  returning.  That's something important for the jury to

13  consider, right?  Would you agree with me?

14  A.    I don't recall if he said I'm returning.

15  Q.    But if he did, if the conversation said, Hey, yes, but

16  I'm coming back, that would be important.

17  A.    Yes, that would be.  But I would think that he would

18  return anyway because his family members are there.  He would

19  return sometime; we just didn't know when.

20          MR. CANALES:  Your Honor, if I may have the -- if I

21  may address the court -- if I can see the drugs that were

22  seized, the actual drugs that were seized from Mr. Shore and

23  Mr. Eller, Judge.  They're not in my possession.  I believe

24  they might be in the government's possession.  If I could see

25  them.  The actual drugs.  I believe all of them that were from

1   the lab report.

2           MR. KAUFMAN:  All the drugs?

3           MR. CANALES:  If I may see them, please.

4           MR. KAUFMAN:  Sure.

5           MR. CANALES:  Just the drugs.

6           MR. FORRESTER:  Exhibit 5.

7           MR. CANALES:  Exhibit 5?

8           MR. FORRESTER:  5A, B, C, I believe.

9           MR. CANALES:  5A, B, C.

10  Q.   For reasons of custody --

11          MR. CANALES:  May I approach, Your Honor?

12          THE COURT:  Yes, sir.

13  Q.   Let's look at the -- this exhibit.  It's got different

14  baggies of drugs, right?  Right?

15  A.   It has one bag of drugs and it's contained in another

16  plastic bag.

17  Q.   To save some time and effort, they're all the same,

18  right?  Different bags, right?  Different wrappings, but they

19  all have one thing in common.  They all come in little Ziplock

20  bags, right?

21  A.   Yes.

22  Q.   Okay.

23  A.   And this is from Bob Shore.

24  Q.   Bob Shore.  Okay.  Let me show you -- and they're unique

25  because they're bags -- it's not just plastic.  These are

1  obviously a couple little bags you would purchase, right?

2  Nobody makes these bags, right?

3  A.   Correct, nobody makes them.

4  Q.   Right.  These are not -- because they have a little

5  Ziplock thing, right?

6  A.   Right.

7  Q.   Like sandwich bags.

8  A.   Correct.

9  Q.   Okay.  And let me show you the next exhibit of drugs that

10 were also confiscated.

11      I don't know if I'm nearsighted or farsighted.

12      Can the same observation be made?  Right?

13 A.   Actually, if you look at these bags --

14 Q.   Uh-huh.

15 A.   -- this bag --

16          MR. KAUFMAN:  And for the record, if I may note that

17 Sergeant Williams is reviewing Exhibits 3A and 3C.

18          THE WITNESS:  These bags, they're actually -- this

19 one has two different ones in it.

20 Q.   Okay.

21 A.   And I don't recall, I would have to go back and look at

22 my notes of how that was packaged.  But these bags that

23 they're in, these big Ziplock bags are from the lab --

24 Q.   Okay.

25 A.   -- from where they did the analysis.

JEREMY WILLIAMS - CROSS

1  Q.   Okay.  But it's fair to say that the big Ziplock bags are
2  from the lab, but they're within a smaller Ziplock bag, right?
3  And those are purchased, right?
4  A.   The bag that's inside, the Ziplock bag, is for the lab.
5  Q.   Okay.  This one has a Ziplock bag within a Ziplock bag.
6  A.   Yes.
7  Q.   And that's original.
8  A.   It could be.  Like I say, I would have to go back and
9  look at my notes to see whether it was a corner bag or it was
10  actually put in a Ziplock bag.
11  Q.   Do you want to go through your notes?  I will give you a
12  chance if you need to refresh your recollection.
13  A.   Yes.  If that's something you need, I'd be more than
14  happy to.
15  Q.   Could you, please.
16       MR. CANALES:  May I be allowed, Judge, to refresh
17  his recollection?
18       THE COURT:  You may.
19       (Witness stepped down from the witness stand.)
20  Q.   What is it, Officer?
21  A.   Yes, those were placed in Ziplock bags.
22  Q.   Okay.
23  A.   Whenever they were given to us by Danny Eller and Bob
24  Shore, they were in small Ziplock bags.
25  Q.   Okay.  So --

JEREMY WILLIAMS - CROSS

1    THE COURT:  Wait just one second.  Would you explain

2  what a corner bag is for the jury.

3    THE WITNESS:  Yes.  A corner bag is if you have a

4  regular Ziplock bag, it would be like a sandwich bag.  It's

5  square.  The bottom of it that doesn't zip -- if you're

6  familiar with the top part being zipped.  They just -- they

7  cut a half circle out of the corners and it makes -- it's

8  circular on top.  It's kind of like a cone.  And that's used

9  to put the drugs in and then they twist it down and usually

10  put a small zip tie on it or tie it in a knot.  It's just what

11  we refer to as a corner bag.

12  Q.    But nonetheless, all the drugs that Eller and Bobby Shore

13  had had one thing in common.  They were all in parts of a

14  Ziplock bag, the ones that you buy, right?

15  A.    Yes.

16  Q.    Meaning -- let me see if I understand correctly.  This

17  would be my regular Ziplock sandwich bag, right?  You open it,

18  right, with a sandwich, or whatever, close it and zip it,

19  right?

20  A.    Correct.

21  Q.    That's what we're talking about?

22  A.    Yes.

23  Q.    And you're saying that somehow a part would be cut.  I

24  guess you leave the lock, I guess, and the other part will be

25  cut, right?  I guess throwing away part of the bag.

JEREMY WILLIAMS - CROSS

1   A.   Yes.  It would be -- the only two parts that you could

2   use on what we call a corner bag would be the two corners.

3   That's the only parts you could use would be the two corners

4   and you'd throw the rest of the bag away.

5   Q.   How many empty cut plastic Ziplock bags did you find in

6   my client's house?

7   A.   None.

8   Q.   This is a person dealing with hundreds and hundreds of

9   grams, yet not a single Ziplock bag in that house?

10  A.   He had just returned from Mexico and he had, from my

11  investigation, put Jose in charge of his drug business.

12  Q.   So you mean before going to Mexico, he made sure he threw

13  away all the Ziplock bags, made sure there was not one in the

14  house?

15  A.   He could have.

16  Q.   He could have, but then we're guessing, right?

17  A.   Yes, we are.

18  Q.   And another thing that we had in common is you would get

19  what you call the -- what the government was referring to as

20  eggs that you see -- or the balls of heroin, they were wrapped

21  in several layers of --

22              MR. KAUFMAN:  Objection.

23              THE COURT:  Sustained.

24              THE WITNESS:  The --

25              THE COURT:  Wait just a minute.  I sustained that.

JEREMY WILLIAMS - CROSS

1    MR. CANALES:  Okay, Judge.

2    THE COURT:  Ask a new question.

3  Q.   How many rolls of black tape did you find in my client's

4  house?

5  A.   Inside the residence?

6  Q.   Uh-huh.

7  A.   None.

8  Q.   And even when you looked in the shed, how many rolls of

9  black tape did you find?

10 A.   One.

11 Q.   One tape, right?

12 A.   Yes, sir.

13 Q.   One tape.

14    MR. KAUFMAN:  Objection.

15    THE COURT:  That's argumentative, counselor.  Let

16 him answer the question and then move to the next question.

17    MR. CANALES:  Yes, Your Honor.

18 Q.   It took Pina from the date that Pina -- I'm sorry, the

19 Pinas were arrested, right?

20 A.   Yes, sir, they were arrested.

21 Q.   It took -- it took him two months before he came -- he

22 came clean, right?

23    MR. KAUFMAN:  Objection.

24    THE COURT:  If he knows.

25    THE WITNESS:  To come clean, I don't understand.

1  Q.   Cooperate.

2  A.   He was interviewed on February the 2nd, 2013, the same

3  day that we went back to Ashe County and located additional

4  drugs and money.

5  Q.   Okay.  So -- so it took him two months to find honesty?

6           MR. KAUFMAN:  Objection.

7           THE WITNESS:  No, it was --

8           THE COURT:  Wait just a minute.

9           THE WITNESS:  -- one year --

10          THE COURT:  Wait just a minute.  Sustained.

11 Q.   It took him two months for him to cooperate with the

12 authorities, right?

13 A.   It was February the 12th, 2013, whenever he cooperated.

14 Q.   He got arrested in December of 2012.

15 A.   December 12, 2012.

16 Q.   Yes, 12/12/12.  He got arrested December 12, right, 2012?

17 A.   Right.

18 Q.   But it took him to February 2013 for him to cooperate,

19 correct?

20 A.   Correct.

21 Q.   Two months had passed by, right?

22 A.   Sure.

23 Q.   But before cooperating he had told his girlfriend where

24 the money was at, right?

25 A.   And I'm not -- I'm not real sure of that.  He later

JEREMY WILLIAMS - REDIRECT

1  claims that he had told his girlfriend where a part of the

2  money was.

3  Q.   Okay.  But based on your information, based on your

4  intelligence, based on everything that you gathered, was it

5  ever brought to your attention that that girlfriend indeed

6  went and withdrew money -- I mean, went and got money from

7  the -- Pina told her where the money was at and she used that

8  money to buy a truck?

9  A.   No, I did not know that.

10  Q.   You didn't know that?

11  A.   No, sir.

12  Q.   Today do you know that?

13  A.   Yes, sir, I do today.

14  Q.   When did you find out?

15  A.   About -- I would say approximately three weeks ago.

16  Three or four weeks ago.

17  Q.   And at the local level, you're the one in charge in this

18  case.

19  A.   Yes, sir.

20          MR. CANALES:  No further questions.

21                    REDIRECT EXAMINATION

22  BY MR. KAUFMAN:

23  Q.   Sergeant Williams, where did you find out the other

24  amount of money went?

25  A.   We -- there was supposed to be -- when we interviewed

1    Mr. Pina, there was supposed to be different places where the

2    money was.  One, being buried.  Two, there was supposed to be

3    some money in the ceiling of Mr. Pina's trailer.  We were not

4    able to locate that money.  It was a substantial amount of

5    money that he said was supposed to be there.  We did not find

6    it.  There was -- I later found out three to four weeks ago

7    that there was some more money somewhere hidden that we did

8    not know about and he did not tell us about that he had told

9    his girlfriend where it was and supposedly she went and

10    retrieved it and purchased --

11   Q.   Sergeant Williams, my question is --

12          THE COURT:  Wait just a minute.  He hadn't finished

13   his answer.

14          THE WITNESS:  Yes, she went and retrieved it and

15   either purchased a truck with it or kept it.  We're really not

16   sure what she did with it.

17   Q.   And in addition to the girlfriend, your information was

18   who else had collected money from the residence?

19   A.   My information was --

20          MR. CANALES:  Your Honor, objection, Your Honor.  I

21   ask that he clarify when he got this information.  At the time

22   when the crime was committed or alleged crime was committed or

23   in the present?

24          THE COURT:  Do you want to state the time.

25          THE WITNESS:  The time for...

JEREMY WILLIAMS - REDIRECT

1          THE COURT:  Let me ask counsel for the government to
2   rephrase its question.
3          MR. KAUFMAN:  Yes, Your Honor.
4   Q.   When did you come to learn that somebody other than or in
5   addition to Mr. Pina's girlfriend having taken money from the
6   residence did you learn that other people had?
7          MR. CANALES:  Your Honor, I'm going to object on the
8   basis of hearsay.
9          THE COURT:  Overruled.
10          THE WITNESS:  It would have been the time of the
11   interview with Jose Pina on February the 12th, 2013.
12   Q.   And you came to learn that who -- well, please tell us,
13   who were those other individuals?
14   A.   Those other individuals were there on the night of the
15   search warrant which was 12/12/12.  The -- there were two
16   ladies from Brownsville, Texas, Eva Ramirez and Perla Ramirez.
17   Q.   And who are they associated with and how?
18   A.   They are associated with Martin Saldana.  They -- from
19   the information we had through the interviews, that they would
20   come to the residence every two to three weeks and pick up
21   money from Jose and take it back to Mexico to Martin.
22   Q.   Let me go back to the early part of your cross
23   examination by the defense lawyer.  You're -- well, first of
24   all, you were asked about people knowing each other in Ashe
25   County.  Is it a small county or are you aware of whether it

1   encompasses more than 400 square miles?

2   A.   It's 430 square miles.

3   Q.   You were asked about the concept of based on the

4   cooperating confidential sources and other people you had been

5   interviewing since as early as 2008, that you had an idea

6   about Mr. Saldana.  Is that a term that you would have used?

7   A.   It was something -- I wouldn't use the word idea.  It's

8   just something that somebody tells you and you put it in the

9   back of your mind in basically a filing cabinet and you can

10  dig through it whenever you need it.  It's just something you

11  remember, but it's nothing that you can act on at that time.

12  It's just something that's stored away and it's basically...

13  Q.   Is that what you would call intelligence in law

14  enforcement?

15  A.   It is intelligence.

16  Q.   Okay.

17  A.   It's just something you gather over time.  It could be

18  useful at the time or it could be unuseful.  But at some time

19  you will more than likely go back and need it.

20  Q.   The defense lawyer asked you -- or posed to you that

21  Mr. Eller and Mr. Shore were the first two individuals to

22  provide information to you about Mr. Saldana.  Is that, in

23  fact, true?

24           MR. CANALES:  Your Honor, objection.  Misleading.

25  That's not what I said, Your Honor.

1    THE COURT:  Overruled.  The jury will have to

2  remember the questions.

3    THE WITNESS:  No.  The first person to -- they were

4  not the first persons to tell me about Mr. Saldana.  They did

5  tell me about Mr. Saldana, but that was in the year 2012.  We

6  learned through interviews from 2008, 2010, and 2011 with the

7  other people that we were interviewing, we also learned about

8  Mr. Saldana.

9  Q.    Based on your training and experience, is it common for

10  leaders of a drug trafficking organization to do hand-to-hand

11  transactions of drugs and money when they have couriers that

12  they use?

13  A.    That -- that is a fair statement.  They do not -- the

14  leaders of the group usually do not touch any drugs or any

15  money because they have people that do it for them.  The only

16  thing that they have to do is set up the deal between another

17  courier to their courier.  They don't have to touch anything.

18  Q.    You were asked if you found fingerprints in this case.

19  Based on your training and experience, would you have expected

20  to find any fingerprints?

21  A.    No, sir, I would not have expected to find any

22  fingerprints for the simple fact of the latex gloves that were

23  found.  The latex gloves -- obviously we wear them as in law

24  enforcement not to contract anything from the methamphetamine,

25  not let it absorb into our body.  Same as nurses.  Anybody

JEREMY WILLIAMS - REDIRECT

1  that works around dangerous things wear rubber gloves.  The

2  rubber gloves were also found on the search -- or the night of

3  the search warrant.

4  Q.    And even if an individual is not wearing latex gloves,

5  based on your training and really, more importantly, your

6  experience in law enforcement, can you quantify how many times

7  or what percentage of times there are actually usable prints

8  that you could obtain, from, for example, a plastic bag?

9  A.    In my training and experience, I have lifted fingerprints

10  probably a dozen or more times and I have never got a recall

11  or a statement back from the SBI saying that this print

12  belongs to this person.

13  Q.    In fact, will the lab at this point even bother to try

14  and conduct an analysis of fingerprints off of a plastic bag?

15  A.    Not unless -- they won't even work fingerprints now

16  unless it is a high profile case, being one of murder or

17  something in that nature.

18  Q.    And is that based on the rare circumstance where usable

19  prints can be even found?

20  A.    Yes, usable prints are usually not found anywhere.

21  Q.    With regard to the questions about wiretaps, you

22  indicated that that was not something that a sheriff's deputy

23  or sergeant or detective would do.  You mentioned SBI, DEA.

24  Are you even familiar with what are legally required in order

25  to get a wiretap?

JEREMY WILLIAMS - REDIRECT

1   A.   No, not right off the top of my head.  I have been

2   involved in one before, but my involvement was limited.  I was

3   not in the administrative part.  I didn't have to do the

4   paperwork.  I was a ground runner and a surveillance guy.

5   Q.   Are you familiar with the term "dirty calls"?

6   A.   Yes, I am.

7   Q.   And did you have any dirty calls on Mr. Saldana based on

8   the way the organization was arranged?

9   A.   No, we did not have any dirty calls.  And I'll explain

10  dirty calls.  It is a phone call to a person and there has to

11  be drug talk between the two people.  Drug talk, money talk,

12  something that would lead to drugs.  And if I'm not mistaken,

13  there has to be two of those.

14  Q.   Sergeant Williams, you were asked about whether

15  informants in general, confidential informants who have been

16  signed up and prepared for that activity, whether they

17  sometimes receive cash.  Have any of the witnesses in this

18  trial received any sort of cash or other compensation for

19  testifying?

20  A.   No, sir.

21  Q.   You were asked some questions about Danny Eller on

22  October 26, 2012, and you were asked whether he was "nervous"

23  and as to your beliefs about what he was exhibiting physically

24  in terms of his demeanor.  Based on your training and

25  experience, when somebody has methamphetamine and firearms

1  found in their home or just really methamphetamine, do you

2  find that they are often nervous?

3  A.   Yes, they are nervous.

4  Q.   You were asked some questions by the defense lawyer about

5  your conducting surveillance, and you testified about going

6  even on to Ervin Houck Road or Drive.  Is it drive?

7  A.   I think it is drive.

8  Q.   Are there calculated risks involved in conducting that

9  type of close-on surveillance?

10  A.   Yes, there are.

11  Q.   Can you explain what those are.

12  A.   You can, we call it get burnt.  If somebody sees you in

13  that vehicle, they know that that vehicle obviously does not

14  belong there.  They know that it is a vehicle associated with

15  the sheriff's office.  And then also, you can be approached

16  and stopped by anybody going in there that wants to talk to

17  you and ask you what you're doing on the property or on the

18  road.  So there are calculated risks in just driving down a

19  road to get tags.

20  Q.   Is Ervin Houck Drive a major thoroughfare?

21  A.   Is it a major...

22  Q.   Thoroughfare.  Lots of homes and residences off of the

23  street.

24  A.   No.  It is a single lane, paved drive that houses -- that

25  there are two residences and a single-wide trailer and an

1  abandoned trailer.

2  Q.   We asked about calculated risk of surveillance in your

3  vehicle.  Are there any sorts of risks in terms of trying to

4  place a pole camera?

5  A.   Yes, there is.  If they -- if someone sees the pole

6  camera being put up, they're obviously going to question

7  why -- or is somebody putting a box or some kind of device on

8  a pole and what is that for.  It's not so much us.  We do not

9  install those.  Blue Ridge Electric who is the service

10  provider for electricity actually installs those for us.  So

11  not only is it us in danger doing surveillance, it's also them

12  being in danger.

13  Q.   Based on your training and experience, do Mexican drug

14  dealers often send their proceeds to Mexico?

15  A.   Yes, in almost all -- almost all of my cases with

16  Hispanics, the proceeds return to Mexico.

17  Q.   In terms of characterizing somebody as a drug trafficker

18  or dealer or a drug user, based on your training and

19  experience, is it uncommon to find that people are both, both

20  traffickers and users?

21  A.   Yes, that is not uncommon.

22  Q.   Are you familiar with the term "subsistence dealing"?

23  A.   Try that one more time.

24  Q.   Maybe not.  Have you encountered during your numerous

25  debriefs with various -- during various investigations with

JEREMY WILLIAMS - REDIRECT

1    people who are selling in order to support their habit?

2    A.    Yes, that happens.  People do sell in order to support

3    their habit, their using habit.  And it's just basically they

4    sell enough to -- that they don't have to go out and buy it.

5    They make a profit on half of what they have.  They make

6    enough profit that they can use the rest of it.  So they're

7    not really out any money out of their pocket.

8    Q.    Would you expect to see corner -- plastic bag corners at

9    the residence of a wholesaler, a bulk seller?

10   A.    No, sir.  Most of the corner bags that you see is

11   usually -- will only hold 3.5 grams which we call an eight

12   ball in the drug business.  Mostly when you have a large

13   wholesaler who is packaging large amounts of methamphetamine,

14   it is put into a bigger Ziplock bag and it just -- it contains

15   it more.  It won't spill out.  And you don't have to worry

16   about the thin bag breaking open.

17   Q.    Is it fair to say that much like many businesses, there

18   are different levels of distribution and it goes down kind of

19   in a chain of distribution?

20   A.    Yes, sir.

21   Q.    If an individual is buying methamphetamine that's been

22   packaged to avoid detection with cellophane, dryer sheets,

23   black electrical tape, if that's sold to a redistributor and

24   that -- the distributor then sells smaller amounts, would you

25   then expect to see them using a different type of packaging to

1  the consumer such as small Ziplock bags?

2  A.   Yes, you would see that.  You wouldn't see a

3  redistributor packaging a gram of meth which is the most

4  commonly bought for a user, you wouldn't see them packaging it

5  in a quart-size bag or a sandwich-size Ziplock bag.

6  Q.   In fact, is it consistent or inconsistent with the

7  Ziplock baggies that you obtained from Mr. Eller and Mr. Shore

8  when you bought from them using another informant?

9  A.   Yes, we -- whenever we did the search warrants, we

10  located different Ziplock baggies in Mr. Shore's residence and

11  also Danny Eller's residence for the repackaging of the

12  methamphetamine.

13  Q.   The defense lawyer confronted you with the notion that

14  Jose told you that Mr. Saldana had left him, that is, Jose to

15  run Mr. Saldana's business while he was in Mexico.  Was that

16  the only person you heard that from?

17  A.   No, sir.

18  Q.   Who else did you hear that from?

19  A.   We heard that from Ms. Clara Caudell from Virginia.  We

20  heard it from Bob Shore.  We heard it from Danny Eller.

21  Q.   With regard to the transcript, if Mr. Saldana says that

22  he is leaving and is planning to return, is that necessarily

23  true?

24  A.   No, sir, that is just him saying words.

25  Q.   And in fact, if he said he wasn't coming back, based on

1  your training and experience, how would that impact his

2  ability to keep an ongoing methamphetamine trafficking

3  relationship with his customers if they knew that their source

4  was not going to be coming back?

5  A.   Right.  If he were to leave and tell his people that he

6  was not -- he was leaving and not coming back, then most of

7  his customers would have went from him and found another

8  source of supply.  But instead, he placed someone in his

9  position who was a -- residing in the same residence and

10  residing in the same county and turned the business over to

11  him and then he would introduce -- Martin would introduce Jose

12  to his customers so they wouldn't feel uncomfortable whenever

13  they called and Jose showed up and it wasn't Martin.

14  Q.   You were asked about the two months from the time that

15  Mr. Pina, Sr., was arrested until the date that he debriefed

16  with you.  After his arrest did he have to have an appearance

17  in federal court?

18  A.   Yes, he does.

19  Q.   After that is there also the grand jury process and they

20  have to be charged, indicted?

21  A.   Yes, sir.

22  Q.   And then do they have to be -- have another court date on

23  which they're arraigned in federal court?

24  A.   Yes, sir.

25  Q.   And then do they have to be appointed a lawyer if they're

1   eligible for appointed counsel?

2   A.   Yes, sir.

3   Q.   And then after that does there have to be negotiations

4   between the prosecutor and the defense counsel as to whether

5   the defendant even wants to go to trial?

6   A.   Yes, sir, that's true.

7   Q.   And is that decision based on the defense lawyer

8   receiving voluminous amounts in some cases of discovery to

9   include audio recordings and photographs and documents?

10  A.   Yes, sir, that's true.

11  Q.   And did Mr. Pina, in fact, plead guilty having yet

12  another court date prior to his debriefing with you?

13  A.   Yes, sir, he did.

14  Q.   By the way, you had established informants who not only

15  provided information about Mr. Saldana but who were even

16  having face-to-faces, for example, Mr. Eller and Mr. Shore.

17  After December 12 those individuals were going to be in

18  federal custody, right?

19  A.   Yes, sir, they were.

20  Q.   Would you have been left after December 12 with anybody

21  with whom you could have a direct connect back to Mr. Saldana?

22  A.   No, because they were -- they were going to be arrested

23  on December 12 because we had to wrap up our case.  Those two

24  were the only ones that had a direct connection to Martin

25  Saldana and he was supposedly leaving the country.  That's why

JEREMY WILLIAMS - REDIRECT

1  we had to wrap up our investigation.

2  Q.   And when you say the only ones with a direct connection,

3  a then still existing one?

4  A.   Yes.  A current one at the time that could actually go

5  and talk to him.

6  Q.   Did Mr. -- did Jimmy Hawkins still have an ability to

7  have a meeting with Mr. Saldana if he's in federal custody?

8  A.   No, he was in federal custody when all that happened.

9  Q.   Did Ms. Caudell still have the ability to have a

10 face-to-face or a phone call with Mr. Saldana?

11 A.   No, she was also in federal custody.

12         MR. KAUFMAN:  Thank you.  Nothing further, Your

13 Honor.

14         THE COURT:  Okay.  Members of the jury, we'll take

15 our afternoon break at this time.  Please keep an open mind

16 about the case.  Don't discuss it.  Remember the other

17 instructions.  We'll call for you in about 15 minutes.  Thank

18 you.

19         (Jury exited the courtroom.)

20         THE COURT:  You may step down.  Do you propose to

21 have any redirect -- recross, rather?

22         MR. CANALES:  Yes, Your Honor.

23         THE COURT:  I would expect you to be -- since you're

24 a very capable lawyer and knowledgeable in these matters, to

25 be very concise because we've been over at great length on

1   direct, on cross, and then, in my view, Mr. Kaufman was

2   responsive to your cross in his redirect.  So if you -- as you

3   undertake recross, which I'm going to allow, I would ask you

4   to be concise and attempt to direct your questions in a manner

5   that -- that are likely to elicit facts and not opinions,

6   suppositions, hypotheticals, speculation.

7           In other words, I think we've been thoroughly

8   over -- it just so happens that rather than going with

9   cooperating witnesses first, the government has chosen to put

10  on two investigators first.  So that naturally colors your

11  approach as a cross examiner.  And as a result, you've quite

12  appropriately delved into matters of the witness's motivation,

13  the criteria under which the witness proceeded through the

14  investigation, what the witness as an investigator had or

15  didn't have in support of the testimony.  I think we've been

16  over that quite thoroughly.  And I wouldn't at this point see

17  a need for rehashing that area since we've really had it with

18  now two investigators over a matter such as what the charges

19  are, what goes on in terms of the cooperating witnesses and

20  all that.

21          Do you think I'm on point sufficiently that you

22  understand what I'm saying?

23          MR. CANALES:  Yes, Your Honor, I do understand.

24  However, there are some issues that were asked during redirect

25  such as -- let me give you an example, Your Honor.  Let me sit

1  down here for a minute.  Such as there was no cash received by

2  witnesses to testify.  Well, obviously he's going to answer

3  no.  We all know that.  But there's other incentives that

4  these people are going to receive.

5          THE COURT:  Well, now, that's a matter of a factual

6  inquiry and you're certainly entitled to go into that.  But my

7  point is, I'm quite accustomed to seeing recross that is maybe

8  five, maybe ten questions, simple interrogatory questions.

9  The witness answers and you go to the next matter.  So I'm

10  hoping you can keep as close to that kind of pattern as

11  possible.  I don't want the jury to think this trial is about

12  the relationship between the court and counsel as opposed to

13  the facts of the case.

14          MR. CANALES:  Yes, Your Honor.

15          THE COURT:  All right.

16          (Brief recess at 3:45 p.m.)

17          THE COURT:  Okay.  Are the parties ready to resume?

18          MR. KAUFMAN:  Yes, Your Honor.

19          THE COURT:  All right.  May we have the jury.

20          (Jury entered the courtroom.)

21          THE COURT:  All right, sir.  The jury is with us.  I

22  believe you have some other questions on recross.

23          MR. CANALES:  Yes, Your Honor.

24                    JEREMY WILLIAMS

25                  RECROSS EXAMINATION

1    BY MR. CANALES:

2    Q.   The last statement you made, Officer, was that before --

3    that after -- that before 12/12/2012, December the 12th of

4    2012, that before December the 12th, you did -- I'm quoting

5    you, you didn't have any -- the only ones with a direct

6    connection who were testifying were the cooperating witnesses.

7    A.   Yes, sir.

8    Q.   So after 2012 -- before you didn't have anybody.  It

9    wasn't until 2012 that you had the cooperating witnesses; is

10   that correct?

11   A.   It was around -- before 12/12/2012 before we had anybody

12   that could buy -- that could go directly to Martin Saldana and

13   purchase methamphetamine.

14   Q.   True.  And it wasn't until after 2012 that you were able

15   to get Eller, Pina, and the other people who are going to --

16   who are scheduled to come and testify today -- I mean, in this

17   proceeding; is that correct?

18   A.   Yes, sir.

19   Q.   Okay.  Now, you were also asked -- let me ask you this

20   question before I -- how many gallon-size bags did you find in

21   my client's house?

22   A.   None.

23   Q.   Okay.  So he was a wholesaler.  We're in agreement he's

24   not using the little bags.  So no big bags either?

25   A.   No, sir.  And --

1   Q.   Okay.

2   A.   -- the reason --

3   Q.   Do you know the reason?  Personal knowledge?

4   A.   Through corroboration and interviews, yes.

5   Q.   All right.  Do you have personal knowledge that does not

6   involve interviews and other people's comments?

7           MR. KAUFMAN:  Objection.

8           THE COURT:  Overruled.

9           MR. KAUFMAN:  That is his personal knowledge, Your

10  Honor.

11          THE COURT:  Overruled.

12  Q.   Do you have, not including those corroborations and those

13  witness -- do you have personal knowledge?

14  A.   Personal knowledge to me is through interviews and

15  cooperators and stuff that we can put -- stuff that we can

16  corroborate.  That is personal knowledge for me because I

17  can't personally go and sit down with somebody to gain their

18  personal knowledge and then be able to purchase from them.

19  It's almost impossible.  So the way that I get my personal

20  knowledge is through interviews and through corroboration of

21  facts that we get, that we can corroborate.

22  Q.   As to those things, do you have personal knowledge?

23  A.   I just explained what personal knowledge was, so yes.

24  Q.   All right.  You were asked by the government if the

25  witnesses -- and when I mean the witnesses, I'm talking about

1  the same, Eller, Shore, Pinas, right?  They weren't getting
2  paid any money -- any cash.  You said no cash is going to be
3  received by the witnesses who testified; is that correct?
4  A.  Yes, they did not receive any cash.
5  Q.  When you're -- but -- but they are going to get a reward,
6  right, sir?
7  A.  Not a cash reward.
8  Q.  Okay.  Then tell the jury what reward they're going --
9  what reward is Shore going to receive?  Please tell the jury.
10  Explain.
11  A.  The reward is not up to me.  Whenever they give
12  substantial assistance, the substantial assistance that they
13  give on behalf of themself and the government is then relayed
14  through the prosecutor to the judge and then the judge has a
15  say so in the sentencing part of their case.
16  Q.  Okay.  Now please answer my question.  What --
17            MR. KAUFMAN:  Objection.
18  Q.  -- reward do they get?
19            THE COURT:  Well --
20            MR. CANALES:  He didn't answer --
21            THE COURT:  He's answered that question.
22  Q.  Do they get -- are they expecting a reduction in
23  sentence, sir?
24            MR. KAUFMAN:  Objection.  Scope.  Scope of --
25            THE COURT:  Sustained.

1   Q.   Okay.  Let me ask you case specific.  Eller, is he -- to

2   your knowledge, is he expecting a sentence reduction based on

3   his testimony?

4            MR. KAUFMAN:  Objection.

5            THE COURT:  Sustained.

6   Q.   Do you know what they're expecting?

7            MR. KAUFMAN:  Objection.

8            THE COURT:  Sustained.

9   Q.   You testified earlier that it was brought to you through

10  intelligence that when you were talking about Eva and Perla,

11  you were talking about the money -- they would take money from

12  Jose and take it to Mexico; is that correct?

13  A.   Yes, that is correct.  That is the interview -- or the

14  intelligence that we gathered from Jose, that these two

15  ladies, Perla and Eva Ramirez, would come to Ashe County, pick

16  up money from Jose and take it to Mexico to Martin Saldana.

17  Q.   Oh, so you -- so then it's -- your intelligence is very

18  specific.  It came from Jose's mouth.  He himself is saying

19  it's them taking the money to Mexico.

20  A.   Yes, that was through intelligence -- or through

21  intelligence and interviews that we learned that.

22  Q.   But you just testified that it was through Jose's

23  interview that you learned this.

24  A.   Yes, it was through Jose's interview.

25  Q.   And he's the same one -- and is he blaming that also on

1   my client?

2   A.   Blaming what on your client?

3   Q.   Whose money was it?

4   A.   He is saying that it was Martin's money.

5   Q.   Okay.  And again, he's blaming my client.

6   A.   Yes.

7   Q.   Officer, let me give you some things, then I'll stop.  Is

8   it fair to say -- to summarize your testimony in the following

9   manner?

10          MR. KAUFMAN:  Objection to characterization.  He's

11  been testifying for hours, Your Honor.

12          THE COURT:  I'll wait for the question.

13  Q.   Is it fair to say that based on everything you testified

14  today, based on the intelligence, based on the information, if

15  you could please agree with me or disagree with me, whatever

16  has been presented in the courtroom today, am I correct or

17  incorrect by saying Shore tried, right, Mr. Shore tried, but

18  he couldn't get a controlled purchase from my client, correct?

19  A.   No, he did not purchase methamphetamine from your client.

20  Q.   Okay.  Then let me ask you also, Eller tried, right?

21  Eller tried and still couldn't purchase any drugs from my

22  client; is that correct?

23  A.   Eller went there to have a conversation.  Eller actually

24  never tried to purchase from -- purchase methamphetamine from

25  Martin Saldana.

JEREMY WILLIAMS - RECROSS

1    Q.    And whether we have a good camera or a bad pole camera or

2    a cheap camera, or whatever type of camera that the law

3    enforcement decided to install, there is no video, no -- that

4    would incriminate my client with any drug dealing; is that

5    correct?

6    A.    No.  The video surveillance was used basically for

7    surveillance so we didn't have to tie up two guys sitting in

8    the woods throughout the day.  We could -- if we had something

9    else going on and we had a free minute, we could pop it up on

10   our computer and view that camera and surveillance through the

11   camera and we didn't have to tie two guys up out in the woods.

12   It just saved time, man hours and money.

13   Q.    So when it comes to investigating, because I keep hearing

14   budget, I've been hearing money cuts, I've been hearing this.

15   So when it comes to a person's liberty --

16              MR. KAUFMAN:  Objection.

17   Q.    -- it is fair to assume that even the police department

18   are taking cuts and shortcuts on things that could have been

19   done in a case, but they're not conducted because of money?

20              MR. KAUFMAN:  Objection.

21              THE COURT:  Well, sustained.

22              MR. KAUFMAN:  Argumentative.

23   Q.    Isn't it true that whatever dirty calls are required

24   on -- dirty calls are a prerequisite for a wiretap, we don't

25   have any dirty calls in this case; is that correct?

CLARA CAUDELL - DIRECT

1   A.   No.

2   Q.   Nor a wiretap.

3   A.   No, sir, we have no dirty calls nor a wiretap.

4           MR. CANALES:  No further questions, Your Honor.

5           MR. KAUFMAN:  Nothing further, Your Honor.

6           THE COURT:  You may step down.

7           (Witness stepped down.)

8           MR. KAUFMAN:  Your Honor, the United States calls

9   Clara Caudell.

10          CLARA JEAN CAUDELL, GOVERNMENT WITNESS, SWORN,

11                       DIRECT EXAMINATION

12  BY MR. KAUFMAN:

13  Q.   Good afternoon.

14  A.   Good afternoon.

15  Q.   Ma'am, in a loud and clear voice, would you please tell

16  us your full name, and spell it for the record.

17  A.   Clara Jean Caudell.  C-l-a-r-a, J-e-a-n, C-a-u-d-e-l-l.

18  Q.   Ma'am, are you here having pled guilty and been convicted

19  and, in fact, sentenced to a methamphetamine trafficking

20  conspiracy that involved well in excess of 500 grams of

21  methamphetamine?

22  A.   Yes.

23  Q.   Are you currently here having been brought here from the

24  Bureau of Prisons?

25  A.   Yes.

1  Q.    Where are you currently being housed at the Bureau of

2  Prisons?

3  A.    Alderson, West Virginia.

4  Q.    What is your projected release date?

5  A.    9/18.

6  Q.    Of what year?

7  A.    2018.

8  Q.    Oh, so September of 2018?

9  A.    Yes.

10 Q.    And do you know whether you're anticipated to receive any

11 sort of minor adjustment for good time served?

12 A.    Maybe.  If I go to RDAP.

13 *Q.*   And what's RDAP for the jury?

14 A.    Drug program.

15 Q.    And have you been cleared -- like, are you qualified to

16 enter into that program?

17 A.    Yes, sir.

18 Q.    And if you successfully complete the RDAP program, how

19 much time off would you receive?

20 A.    Eighteen months.

21 Q.    And does that have anything to do with your testifying

22 here today?

23 A.    No.

24 Q.    And what percentage of time in addition to RDAP, what

25 percentage of your time can also be reduced for good time,

CLARA CAUDELL - DIRECT

1   that is, no major infractions in the BOP?

2   A.   Fifty-four days per year.

3   Q.   And as of this point in time, do you have a record in the

4   BOP that would qualify you for that additional 54 days per

5   year?

6   A.   Yes, I think so.  I think so.

7   Q.   Well, are you aware of any major infractions that you

8   have incurred?

9   A.   No, I haven't done anything wrong.

10  Q.   So would it be fair to say -- would it be accurate to say

11  that your projected release date is actually -- the one that's

12  on record now, it will probably be much earlier than that that

13  you will get out of the BOP?

14  A.   Yes, sir.

15  Q.   Now, you weren't prosecuted in the Western District of

16  North Carolina, were you?

17  A.   No, sir.

18  Q.   You were prosecuted out of what state or if you even know

19  which district within that state?

20  A.   Roanoke, Virginia.

21  Q.   Now, if I could draw your attention to my left, your

22  right.  Do you see a gentleman who's wearing a shirt?  He's

23  sitting down at the table to my left and he's wearing

24  headphones.

25  A.   Yes.

CLARA CAUDELL - DIRECT

1  Q.   Do you know who that person is?

2  A.   Yes.

3  Q.   What's his name?

4  A.   Martin.

5  Q.   Do you know what his full name is?

6  A.   Martinez.

7  Q.   And does he have yet a third name?

8  A.   I didn't know that one.

9  Q.   So you only know Martin Martinez?

10  A.   Uh-huh.

11  Q.   Is that a yes?

12  A.   Yes, sir.

13  Q.   Thank you, ma'am.

14       Have you ever heard the name Saldana with reference to

15  him?

16  A.   Not that I recall.

17  Q.   Okay.  Can you tell us, when did you first meet

18  Mr. Martinez?

19  A.   About seven years ago working at Adams Construction.

20  Q.   When you say seven years ago, let me ask you this.  Was

21  it seven years ago from now or was it seven years ago from

22  when you were arrested in your case?

23  A.   Seven years ago from when I was arrested.

24  Q.   Okay.  And when were you arrested?

25  A.   December 23rd, 2012.

CLARA CAUDELL - DIRECT

1  Q.   Now, was that the first day that you had met with law

2  enforcement?

3  A.   No, I had seen federal marshals.

4  Q.   And in fact, to my right is DEA Special Agent Dustin

5  Harmon.  Had you met with him prior to the date that you were,

6  in fact, arrested?

7  A.   Yes, sir.

8  Q.   About how much earlier before your arrest did you meet

9  Special Agent Harmon?

10  A.   Oh, Lord.

11  Q.   If you recall.  And if there's something that might help

12  remind you of when it was.

13  A.   It was summertime.  It was warm.  I don't know.

14  Q.   Well, let me ask you this.  So seven years -- you say

15  2012 is when you were arrested.  So seven years earlier.  So

16  it was approximately 2005 that you met Mr. Martinez at Adams

17  Construction; is that right?

18  A.   Yes, sir.  Probably.  Okay.  I'm not good on dates.

19  Q.   What type of relationship did you have with him, if any?

20  A.   He's my friend.

21  Q.   Did you -- how soon after you met did you start to

22  consider him a friend?

23  A.   A couple years.

24  Q.   So you were merely coworkers for the first couple of

25  years?

CLARA CAUDELL - DIRECT

1    A.   Yes, sir.

2    Q.   And then after you became friends -- so would it be

3    accurate to say it's roughly 2007 you now had formed a

4    friendship?

5            MR. CANALES:  Your Honor, I'm going to object to

6    leading, Your Honor.

7            THE COURT:  Overruled.

8            THE WITNESS:  Yes.

9    Q.   When you said that you were friends with him, can you

10   describe the friendship and what you may have done with each

11   other, where, things like that.

12   A.   We were just friends.  We laughed and goofed off at work

13   and --

14   Q.   Have you gone to each other's homes?

15   A.   Yes.

16   Q.   How often?

17   A.   I'm not for sure.  I went to Martin's once.

18   Q.   And so after you became friends, did at some point your

19   relationship -- well, first of all, let me just clear the air

20   on this.  Have you ever had an intimate relationship with

21   Mr. Martinez?

22   A.   No.

23   Q.   In your friendship, at some point did the two of you get

24   involved in methamphetamine transactions together?

25   A.   Yes, sir.

1    Q.    When was that?

2    A.    When was that?  2000 -- I don't...

3    Q.    Can you tell me -- maybe it might help if I ask it this

4    way.  How many years before or months or days, whatever, what

5    period of time before your arrest had you been transacting

6    methamphetamine business with Mr. Martinez?

7    A.    Maybe about five years.

8    Q.    Five years.

9    A.    Yes, sir.

10   Q.    Do you remember when the first transaction was?

11   A.    No, sir, I don't remember when the first one was, no.

12   Q.    And who was selling to whom?

13   A.    Martin was selling to me.

14   Q.    How much were you buying from him?

15   A.    Half ounce or more a week.

16   Q.    Just so I make sure -- maybe I'm not hearing very well,

17   but did you say a half ounce or more per week?

18   A.    Yes, sir.

19   Q.    And was that for the entire five years or so?

20   A.    Mostly.

21   Q.    When you say "mostly," can you explain what you mean by

22   that?

23   A.    There was a few dry spots during the year, you know,

24   where you couldn't get anything.  So it was like two or three

25   months, three or four times, I don't know.  Something like

CLARA CAUDELL - DIRECT

1  that.

2  Q.    And other than those dry spells, was it relatively

3  consistent that you were receiving a half ounce per week?

4  A.    Yes, sir.

5  Q.    Were there ever occasions when you received more?

6  A.    Yes, sir.

7  Q.    Can you tell us about those times.

8  A.    I would get more, an ounce or 2 ounces when he was going

9  out of town so that I wouldn't run out.

10  Q.    And when you say "run out," the methamphetamine that you

11  were buying from him, what were you doing with it?

12  A.    Selling it to my cousin and smoking it.

13  Q.    Okay.  So you were using some.

14  A.    Yes.  A lot.

15  Q.    Can you tell us, were you a heavy user?

16  A.    Yes, sir.

17  Q.    Roughly how much were you using per day?

18  A.    Per day?  An eight ball a week.

19  Q.    An eight ball a week.

20  A.    Uh-huh.

21  Q.    3.5 grams or so?

22  A.    Uh-huh.  Yes, sir.

23  Q.    You mentioned that you had been to Mr. Martinez's

24  residence one time.  Do you recall where it was or can you

25  describe it.

CLARA CAUDELL - DIRECT

1    A.   It's in West Jefferson somewhere way out there.  It's

2    just a nice white house.  He has a garage and a pool.

3    Q.   Do you remember any of the roads nearby?

4    A.   No, sir, I don't remember their names or nothing.  I

5    don't remember their names or nothing.  I'm not good at that.

6    Q.   Can you describe what it was like as you approached.

7    What kind of road were you on?  What kind of road was his

8    residence on?

9    A.   I'm not for sure about that.  I mean, I don't know.  It

10   was a curvy road, I mean.  Go over a little bridge or

11   something.  It's been so long since I been out there, I'm not

12   for sure.

13   Q.   Were there -- in addition to the house, do you recall if

14   there were any other buildings on the property?

15   A.   A trailer maybe.

16   Q.   What were you doing at Mr. Martinez's house that one

17   time?

18   A.   Picking up dope.

19   Q.   How much did you pick up?

20   A.   Half an ounce.

21   Q.   How much, by the way, did you pay for the half ounce?

22   A.   Nine hundred.

23   Q.   And over the five years that you were buying from

24   Mr. Martinez, did that amount change?

25   A.   No, sir.

CLARA CAUDELL - DIRECT

1   Q.   Or was it always 900?

2   A.   Always 900.

3   Q.   I'd like to show you -- and it will show up on the screen

4   in front of you.  You may have to pull it upright so you can

5   see it.  There's a screen right in front of you, ma'am.  It's

6   been marked as Government's Exhibit 33 for identification

7   purposes.

8        Do you recognize what this is?

9   A.   My notebook.

10  Q.   How do you recognize it as yours?

11  A.   That's my writing.  It's my notebook.

12  Q.   And do you recall making the notations on this particular

13  page of the notebook?

14  A.   Yes, sir.

15  Q.   How do you remember that?

16  A.   Because -- it's the numbers he gave me when I met Jose, I

17  believe.

18  Q.   And who is Jose?

19  A.   A courier.

20  Q.   A courier for whom?

21  A.   Martin.

22  Q.   Did Martin only have one courier?

23  A.   No, he had a few.

24  Q.   Can you describe -- do you know the names of the other

25  couriers?

CLARA CAUDELL - DIRECT

1  A.   I know one of them is Jimmy.

2  Q.   And how about any others, do you know any of their other

3  names?

4  A.   No, sir, I don't know their names.

5        MR. KAUFMAN:  Your Honor, by the way, at this time

6  we'd move to admit and publish Exhibit 33.

7        THE COURT:  Let it be admitted.

8        (Government's Exhibit No. 33 was received into

9  evidence.)

10 Q.   And when you say "Jose," is that the H-o-s-a that's

11 indicated in the middle of the page?

12 A.   Yes, sir.

13 Q.   Is that because that's the phonetic way of saying Jose?

14 A.   Yes, sir.

15 Q.   Now, do you remember what your phone numbers were that

16 you were using when you spoke with Mr. Saldana?

17 A.   235-5562 or 65.  5565.  And 237-3306.

18 Q.   I'd like to show you one page from what's been admitted

19 already as Exhibit 30.  Can you see this page?  I'm going to

20 increase the size of a certain portion of it.

21      You just mentioned two phone numbers.  These two phone

22 numbers that are appearing there, are those your phone

23 numbers?

24 A.   Yes, sir.

25 Q.   And the second entry, it says "Clara Loca."  Does that

CLARA CAUDELL - CROSS

1   have any significance to you?

2   A.   He's called me loco before because I'm crazy.  That's

3   all.

4            MR. KAUFMAN:  Okay.  Thank you.

5            Your Honor, we have nothing further.

6                      CROSS EXAMINATION

7   BY MR. CANALES:

8   Q.   Are you, ma'am?

9   A.   Sir?

10  Q.   Are you?

11  A.   (No response.)

12  Q.   Crazy.

13  A.   No.  It's just -- I'm just a goof off, that's all.

14  Q.   Reckless?

15  A.   No, sir.

16  Q.   Obviously you got the name for a reason, right?

17           MR. KAUFMAN:  Objection.  Argumentative.

18           THE COURT:  Sustained.

19  Q.   Did you get the name for a reason?

20           MR. KAUFMAN:  Asked and answered, Your Honor.

21           THE COURT:  Overruled.

22  A.   Because I act silly or something.  I mean, I'm not crazy.

23  Q.   I mean -- I couldn't hear your response.  What was your

24  response?

25  A.   I'm not crazy.

CLARA CAUDELL - CROSS

1    Q.   Prior to that you got it because?

2    A.   Well, I act silly sometimes, you know.

3    Q.   All right.  Are you an honest person, ma'am?

4    A.   Yes, sir.

5    Q.   Okay.  Are you a truthful person?

6    A.   Yes, sir.

7    Q.   Are you a reliable person?

8    A.   Yes, sir.

9    Q.   Do you lie?

10   A.   No, sir.

11   Q.   When did you become honest?

12   A.   Sir?

13   Q.   Do you remember when you became honest?

14              MR. KAUFMAN:  Objection, Your Honor.

15              THE COURT:  Sustained.

16   Q.   Let me ask you, have you always been a trustful person?

17   A.   Yes, sir.

18   Q.   Have you always been a reliable person?

19              MR. KAUFMAN:  Objection.  Asked and answered.

20              THE COURT:  Sustained.

21              MR. CANALES:  Judge, I asked trustful and now I'm

22   asking for reliable, Judge.  Different question.  Trustful and

23   reliable in my opinion are two different things, Judge, two

24   different words.

25              THE COURT:  Sustained.

CLARA CAUDELL - CROSS

1   Q.   Have you always not lied?

2        MR. KAUFMAN:  Objection.

3        THE COURT:  Sustained.

4   Q.   When did you -- when were you sentenced, ma'am?  Do you

5   remember when you were sentenced?

6   A.   December of -- wait a minute.  Yeah, December 23rd.

7   Q.   Of what year?

8   A.   2012.

9   Q.   2012.  You were sentenced or arrested on December 23rd.

10  A.   Well, I was arrested.  I guess I was sentenced in -- when

11  was I sentenced?  I don't know when I was sentenced.

12  Q.   You don't know when you were sentenced?

13  A.   No.  I know I went to prison in August.  I

14  self-surrendered.

15  Q.   August of what year?

16  A.   2013.  I don't know.

17  Q.   You think?  Okay.  You're not sure.  If you're not sure,

18  you're not sure.  I'm only asking.  If you're not, you're not.

19  A.   It was 2013.  I been there for six months.

20  Q.   Okay.  And that's when you went to prison.  Now, did you

21  have a plea bargain agreement when you pled guilty, ma'am?

22  A.   Yes, sir.

23  Q.   Was it in writing?

24  A.   Yes, sir.

25  Q.   What did you plead guilty to?

1  A.    Conspiracy to distribute 500 grams or more.  Distribute

2  500 grams or more.

3  Q.    Was it less than 1500 grams?

4  A.    Sir?

5  Q.    Was it less than 1500 grams?

6  A.    Yes, sir.

7  Q.    I mean, that -- in your opinion or your knowledge, you

8  have been in jail for this time.  I mean, is that -- well,

9  it's a different crime.  I would think 1500 would be a

10  different type of crime versus --

11            MR. KAUFMAN:  Objection.

12            MR. CANALES:  If she knows.

13            THE WITNESS:  How would I know?  I don't know.

14            THE COURT:  Overruled.

15  Q.    Somebody pleading guilty to more than 500 grams, would

16  that person receive -- expect to receive more punishment or

17  less punishment than a person that gets 1500 grams?

18            MR. KAUFMAN:  Objection.  Asked and answered.

19            THE WITNESS:  Sir, I don't know.

20            THE COURT:  Well, over -- sustained as to the

21  general nature of the question.

22            MR. CANALES:  Your Honor, I'm going to object to the

23  objections of the government, Judge.  I ask that he state a

24  basis of the objection for the record other than just an

25  objection, Your Honor, if I may, please, for the record.

CLARA CAUDELL - CROSS

1          THE COURT:  You may ask her a question about her
2   situation.
3   Q.   Did you plead to less than 1500 grams?
4   A.   Yes, sir.
5   Q.   Okay.  You were sentenced to how much?
6   A.   Seventy months.
7   Q.   Seventy months.  Okay.  And you said -- you met the
8   gentleman to my right, the investigator.
9   A.   Yes, sir.
10  Q.   Okay.  When did you first talk to him?
11  A.   I'm not for sure on the date.  It's when he come to my
12  house.
13  Q.   When was that?
14  A.   Sir, I'm not for sure.
15  Q.   But you remember -- you do remember half a gram -- or
16  what was your testimony?  You were very specific about the
17  language you're using.
18          MR. KAUFMAN:  Objection.  Argumentative.
19          THE COURT:  Avoid commentary, please.  Stick to
20  questions.
21  Q.   You do remember buying half an ounce or more a week,
22  mostly for five years.  You remember that.  I mean, no doubt
23  in your mind, right?
24  A.   Yes, sir.
25  Q.   Okay.  And -- but you don't remember when you were

1    sentenced?

2    A.    No.

3    Q.    Okay.

4    A.    I tried to forget it.

5    Q.    You used to work with my client, right?

6    A.    Yes, sir.

7    Q.    He trusted you, right?

8    A.    Yes, sir.

9    Q.    He was your friend?

10   A.    Yes, sir.

11   Q.    He confided in you?

12   A.    Yes, sir.

13   Q.    He knew you and you knew him.

14   A.    Yes, sir.

15   Q.    Right?

16         And through that you developed a friendship with him,

17   right?

18   A.    Yes, sir.

19   Q.    Was he a user?

20   A.    Who?  Yes, sir.

21   Q.    Right?  You had that in common, the fact that he was a

22   user, right?

23   A.    Right.

24   Q.    Okay.  Do you remember when you -- did you ever give a

25   statement to the police?

1    A.    What police?  I did the marshals.

2    Q.    Okay.  Was that -- let me refresh your recollection to

3    October 22 of 2012.  Was that when Mr. Harmon spoke to you?

4    A.    I guess, sir.

5    Q.    Okay.  And had you already been sentenced on

6    October 22 -- when he spoke to you, had you already been

7    sentenced?

8    A.    I don't know.  You're confusing me.  No, sir.

9    Q.    No?

10   A.    No.

11   Q.    Okay.  I thought you said you had been sentenced in

12   August.

13   A.    Of 2013.

14   Q.    Okay.  So you hadn't been sentenced, right?  Okay.  And

15   were you asked if you wanted to cooperate in this case?

16   A.    I didn't at first.

17   Q.    But now you are, right?

18   A.    Well, I want to go home too.

19   Q.    Ma'am -- and I don't blame you, ma'am.  I do not blame

20   you.

21   A.    I mean, I took full credit for my part.

22   Q.    I am asking you are you expecting a reduction in

23   sentence, yes or no?

24   A.    If the judge approves.

25   Q.    And who do you think is going to ask the judge to reduce

CLARA CAUDELL - REDIRECT

1  your sentence, me or the prosecutor?

2  A.   The prosecutor.

3        MR. CANALES:   Thank you.   No further questions.

4               REDIRECT EXAMINATION

5  BY MR. KAUFMAN:

6  Q.   Ms. Caudell, with regard to this nickname of crazy, did

7  the probation office and the Bureau of Prisons do a mental

8  evaluation of you as they would with any other inmate?

9  A.   Yes, sir.

10 Q.   And did they, in fact, confirm that you have no mental

11 health issues?  Or if they -- or what was their determination?

12 A.   I'm just bi-polar.

13 Q.   Okay.

14 A.   I'm not crazy.

15 Q.   Okay.  And are you currently suffering from -- well, let

16 me ask you this.  Are you -- when was the first time that you

17 were diagnosed?

18 A.   About three years ago.

19 Q.   And so at that point -- from that point did you

20 immediately receive medication?

21 A.   Yes sir.

22 Q.   Okay.  Now, with regard to -- you mentioned that you self

23 surrendered.

24 A.   Yes, sir.

25 Q.   What does that mean?  Can you explain that to the jury.

CLARA CAUDELL - REDIRECT

1  A.   I took myself to prison and got out and told them I was

2  there and let them come pick me up.  Said good-bye to my

3  sister.

4  Q.   Now, you were asked about your -- your meeting with

5  Special Agent Harmon in October of 2012.  I believe your

6  testimony was that you were arrested two months later in -- on

7  December 23rd, 2012; is that right?

8  A.   Yes, sir.

9  Q.   And after that I believe you testified that you had a

10  written plea agreement; is that correct?

11  A.   Yes, sir.

12  Q.   I'd like to show you -- this will be on your screen as

13  well -- what's been marked as Government's Exhibit 24 for

14  identification.  And it appears to be a 12-page document.  I'm

15  showing you the first page.

16       Do you recognize your name on the document?

17  A.   Yes, sir.

18  Q.   I'm going to go to the end of it.

19       Do you recognize your name and signature on the last

20  page?

21  A.   Yes, sir.

22            MR. KAUFMAN:  Your Honor, we'd move to admit and

23  publish Government's Exhibit 24.

24            THE COURT:  Let it be admitted.

25            (Government's Exhibit No. 24 was received into

CLARA CAUDELL - RECROSS

1  evidence.)

2  Q.  Now, I'm going to page 2 and then to page 3 -- sorry, let

3  me go up to the first page and have everyone -- okay.

4      So this is your plea agreement now that's on the screen,

5  yes?

6  A.  Yes, sir.

7  Q.  Going to page 3, is this a correct indication of how much

8  methamphetamine you pled guilty to, 500 grams to

9  1.5 kilograms?

10 A.  Yes, sir.

11 Q.  And with regard to substantial assistance, there's even

12 bolded language.  Have you throughout been aware that you have

13 been promised nothing in exchange for substantial assistance?

14 A.  Yes, sir.

15 Q.  Let me ask you this.  Ms. Caudell, you said that you had

16 started a friendship with Mr. Martinez several years ago.

17 A.  Yes, sir.

18 Q.  How do you feel about him now?

19 A.  He's still my friend.  I'm sorry.

20 Q.  How do you feel about testifying against him today?

21 A.  It bothers me.

22          MR. KAUFMAN:  Nothing further, Your Honor.

23                  RECROSS EXAMINATION

24 BY MR. CANALES:

25 Q.  Does it bother you to get your sentence reduced?

CLARA CAUDELL - RECROSS

1   A.    No, sir.

2   Q.    I mean, that's the golden ticket when you're in prison,

3   right?  Trying to get your sentence reduced, right?

4   A.    No, sir.

5   Q.    No?  All those inmates in jail don't dream of their

6   sentence being reduced?

7   A.    I don't know what they dream of, but this was real hard.

8   Q.    What do you dream of?  Do you dream of going home early?

9   A.    I dream of going home after I finish my program.

10  Q.    All right.  And I thought you said your release date is

11  not until 2018?

12  A.    Yes, but with RDAP and good time, I can go home earlier.

13  Q.    And with a reduction, with a motion to reduce your

14  sentence after your testimony, right, that's even more

15  substantial than your drug program, won't you agree?

16  A.    No, I have to take the drug program.

17  Q.    To get a credit.  But to get your -- you can get --

18  another way of getting your sentence reduced would be with the

19  prosecutor, right, filing a motion?

20  A.    Right.

21  Q.    Okay.  Now, let me ask you this.  You started using meth

22  at what age?

23  A.    I'm not for sure what age.

24  Q.    Would you please give me an estimate if you can recall

25  when you started using meth.  At what age?

CLARA CAUDELL - RECROSS

1     MR. KAUFMAN:  Your Honor, objection to scope.

2     THE COURT:  Overruled.

3     THE WITNESS:  Ten or 15 years ago.

4   Q.   Ten to 15 years ago.

5   A.   Maybe.

6   Q.   All right.

7   A.   Maybe more, I don't know.

8   Q.   Okay.  You said that you were allowed to take yourself to

9   prison, right?

10  A.   Yes, sir.

11  Q.   Do you think that was a privilege?

12  A.   Yes, sir.

13  Q.   Most people are not allowed to take themselves to prison,

14  right?

15  A.   There's a lot of us that self-surrender.

16  Q.   Okay.  And do you remember when you self-surrendered,

17  what year?

18  A.   August 2013.

19  Q.   Okay.  Of course, that was -- that privilege was after

20  you had given your statement and after they had spoken to you,

21  right?  You had already given your statement because it says

22  here October 22nd of 2012.  That's when you gave your

23  statement, right?

24  A.   I talked on me, sir.

25  Q.   All right.

CLARA CAUDELL - REDIRECT

1   A.   I told the truth about me.

2   Q.   All right.  And am I correct that privilege was given to

3   you after you cooperated, right?

4   A.   I'm not for sure.  My probation officer asked for it.

5   Q.   Was that agreed to by the government?

6   A.   Yes.

7   Q.   Or did the government oppose it?

8   A.   Yes, sir.

9   Q.   They were in agreement?

10  A.   Yes, sir.

11           MR. CANALES:  Okay.  No further questions.

12           MR. KAUFMAN:  Just briefly, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MR. KAUFMAN:

15  Q.   Ms. Caudell, your self-surrender, was that, in fact, a

16  determination by the judge because they trusted you to, in

17  fact, appear at the Bureau of Prisons when you were told you

18  had to?

19  A.   Yes, sir.

20           MR. KAUFMAN:  Nothing further, Your Honor.

21           THE COURT:  You may step down.

22           (Witness stepped down.)

23           THE COURT:  Call your next witness.

24           MR. KAUFMAN:  Thank you, Your Honor.

25           The United States calls ATF Special Agent David

DAVID SCHAUBLE - DIRECT

1    Schauble.

2              DAVID SCHAUBLE, GOVERNMENT WITNESS, SWORN,

3                      DIRECT EXAMINATION

4    BY MR. KAUFMAN:

5    Q.    Good afternoon.

6    A.    Good afternoon.

7    Q.    If you would, please state your full name, spelling your

8    last name, and generally introduce yourself and your career to

9    this point to the jury.

10   A.    My name is David Schauble, S-c-h-a-u-b, as in boy, l-e.

11   I'm a special agent with ATF.  Have been so employed for

12   approximately the last 12 years.  Prior to that I was a deputy

13   sheriff in both Watauga County and in Avery County.

14   Q.    Now, Agent Schauble, were you involved in a supporting

15   role in the investigation of Martin Martinez Saldana and

16   others in a methamphetamine trafficking conspiracy?

17   A.    Yes, sir.

18   Q.    And do you see that individual in the courtroom today?

19   A.    Yes, sir.

20   Q.    Can you identify him by where he is and what he's wearing

21   or any other distinguishing factors?

22   A.    Be the gentleman on the very end of the table there with

23   the plaid shirt on and headphones.

24   Q.    Agent Schauble, did you have an opportunity to interview

25   him?

DAVID SCHAUBLE - DIRECT

1  A.   I did.

2  Q.   Can you tell us if you recall the date and the

3  circumstances.

4  A.   Yes.  On December 12th, 2012, I assisted the Ashe County

5  Sheriff's Office, SBI, and DEA in the execution of search

6  warrants at both 148 and 178 Ervin Houck Road in West

7  Jefferson.  Once the residents were secured, I witnessed

8  Special Agent Harmon with DEA verbally *Mirandize* or verbally

9  advise Mr. Saldana of his constitutional rights.  Mr. Saldana

10 said he understood those rights and was willing to talk with

11 officers.

12      I spoke with Mr. Saldana, asked if there were any

13 firearms in the residence.  He said there were some in his

14 room in his dresser.  And he indicated that his room was the

15 back room on the right.

16      I went back to his room and I found a -- I opened up the

17 dresser drawer and found a Tanfoglio pistol, a Harrington and

18 Richardson 12 gauge shotgun, a Hermann Weihrauch .22 caliber

19 revolver.

20      I then went back and myself and Mr. -- Agent Harmon

21 interviewed Mr. Saldana.  At that time Mr. Saldana said that

22 he had been given both the H and R 12 gauge shotgun and the

23 small Tanfoglio .22 caliber pistol by Betty Houck, and he said

24 that the Hermann Weihrauch 12 -- .22 caliber revolver he had

25 won in a punch game.

1        During the search, other officers ended up finding

2   another Tanfoglio .22 caliber rifle -- sorry, revolver in

3   between the mattress and the box spring and he said that he

4   had won that as well in a punch board game.

5   Q.    Agent Schauble, did you, in fact, document that

6   interview?

7   A.    Yes, sir.

8   Q.    I'd like to show you what's been marked for

9   identification purposes only as Government's Exhibit 18.

10        Do you recognize the two-page report on document 18 --

11  Government's Exhibit 18?

12  A.    Yes.

13  Q.    Is that, in fact, your report?

14  A.    That is.

15  Q.    I'd like to show you -- and I'll note that all of the

16  firearms that I'll be presenting have already been cleared

17  with the United States Marshals as safe for presentation in

18  the courtroom.  They are not loaded and the -- they're unable

19  to be fired because of being rendered unable to do so by a

20  plastic strap.

21        I'd like to show you what's been marked as Government's

22  Exhibit 10 for identification.

23        Do you recognize that firearm?

24  A.    Yes, sir.

25  Q.    And how do you recognize it?

DAVID SCHAUBLE - DIRECT

1  A.   Both by a tag I affixed to it and the serial number on

2  the firearm, as well as the make and the model.

3  Q.   And is that one of the firearms you just described as

4  having been seized from Mr. Saldana's residence?

5  A.   Yes, sir.  This is a Hermann Weihrauch .22 caliber

6  revolver.

7  Q.   And where was that one located?

8  A.   It was located in the dresser drawer on top.

9  Q.   If you can put that down for a moment.

10     I'm showing you what's been marked as Government's

11  Exhibit 11 for identification.

12     Do you recognize that?

13  A.   Yes.

14  Q.   What is that?

15  A.   A Tanfoglio pistol, .22 caliber.

16  Q.   And do you recognize that particular one?

17  A.   I do.

18  Q.   How so?

19  A.   Again, from the serial number and my tag affixed to it.

20  Q.   And where was that recovered?

21  A.   This too was located in the dresser.

22  Q.   All right.  Put that down.

23     Government's Exhibit 12.

24     Do you recognize this one?

25  A.   Yes, sir, I do.

DAVID SCHAUBLE - DIRECT

1  Q.  How do you recognize that?

2  A.  Serial number and my tag is affixed to it.

3  Q.  Where was that recovered?

4  A.  This was in between the mattress and the box spring.

5  Q.  And lastly, Government's Exhibit 13 for identification.

6  A.  Yes, sir.

7  Q.  And do you recognize that?

8  A.  I do.

9  Q.  How do you recognize that?

10  A.  Again, from the serial number and my tag affixed to it.

11  Q.  And where did you recover that?

12  A.  This Harrington and Richardson shotgun was found in the

13  dresser drawer.

14  Q.  Okay.

15      MR. KAUFMAN:  Your Honor, at this time we would move

16  to admit and publish Government's Exhibits 10, 11, 12, and 13.

17      THE COURT:  Let them be admitted.

18      MR. KAUFMAN:  Thank you, Your Honor.

19      (Government's Exhibits Nos. 10, 11, 12, and 13 were

20  received into evidence.)

21  Q.  First I'll publish Government's 10.

22      11.

23      13.

24      And with regard to 14, Agent Schauble, can you describe

25  the condition of the two parts that are connected right now by

DAVID SCHAUBLE - DIRECT

1   a plastic tie, what it was like when you recovered it.

2   A.    They were sitting in the dresser on top of the -- it was

3   a bed -- or a sheet and some clothing.  They were on top of

4   that taken apart.

5   Q.    And when you say "taken apart," is it intended by design

6   the way it is to be taken apart into two pieces?

7   A.    Yes, sir.

8           MR. KAUFMAN:  Your Honor, I think this might be a

9   good time for me to read in the first page of the stipulations

10  in Exhibit 32.

11          THE COURT:  You may.

12          MR. KAUFMAN:  Thank you, Your Honor.

13          The first substantive paragraph, "The four firearms

14  that law enforcement officials recovered in this case from

15  defendant Saldana's residence located at 148 Ervin Houck

16  Drive, West Jefferson, North Carolina, on December 12th, 2012,

17  are each a 'firearm' for purposes of the charges in this case.

18  In addition, they were manufactured outside the State of North

19  Carolina and were, therefore, in and affecting interstate and

20  foreign commerce for purposes of this trial."

21          The second substantive paragraph states by

22  stipulation between the parties "that the Harrington and

23  Richardson Arms 12 gauge shotgun, serial number A62823, which

24  was one of the firearms seized from 148 Ervin Houck Drive,

25  West Jefferson, North Carolina, on December 12, 2012, is a

1  short-barreled shotgun of less than 12 inches in barrel length

2  and, therefore, was made in violation of the provisions of the

3  National Firearms Act.  Furthermore, the Harrington and

4  Richardson Arms 12 gauge shotgun was not registered to the

5  defendant in the National Firearms Registration and Transfer

6  Record, as would be required by law."

7        On page 2, the parties have also stipulated that "in

8  making these stipulations, however, the defendant specifically

9  denies the other elements of the firearms charges, to include

10 the allegation that he knowingly received and/or possessed

11 it."

12       THE COURT:  Now, members of the jury, you'll recall

13 my instruction earlier that when the parties stipulate that

14 something is a fact, the jury must accept the stipulation as

15 establishing the facts set forth in the stipulation.  The

16 parties enter into stipulations to save the court and the jury

17 the time it would take to prove facts that are not in dispute.

18 Thank you.

19       MR. KAUFMAN:  Thank you, Your Honor.

20 Q.  Next I'm showing you what's been marked as Government's

21 Exhibit 15 for identification.  Do you recognize what that is?

22 A.  Yes.

23 Q.  And by the way, Agent Schauble, just to confirm, the

24 stipulations that were just read about the short-barreled

25 shotgun, is that, in fact -- when it talks about the serial

DAVID SCHAUBLE - DIRECT

1  number and the make, model, is that, in fact, this

2  Government's Exhibit 13?

3  A.    Yes, sir.

4  Q.    Do you recognize what's in 15 for identification?

5  A.    Yes.

6  Q.    What is that?

7  A.    This is a certificate under seal from the National

8  Firearms Registration and Transfer Record stating that that

9  firearm is not registered to Mr. Saldana.

10  Q.    Thank you.

11        MR. KAUFMAN:  We'd move to admit and publish at a

12  later time Government's Exhibit -- or publish to the jury

13  Government's Exhibit 15.

14        THE COURT:  Let it be admitted.

15        MR. KAUFMAN:  Thank you, Your Honor.

16        (Government's Exhibit No. 15 was received into

17  evidence.)

18  Q.    And I'd like to show you what has been marked as

19  Government's Exhibit 34 for identification and 35 for

20  identification.  If you could tell me if you recognize them,

21  how so, and what they are.

22  A.    These envelopes -- this envelope in 34 contains three

23  rounds of .22 caliber ammunition and I recognize it from the

24  tag I affixed to it as well as my initials and date that I

25  sealed it.

DAVID SCHAUBLE - DIRECT

1    Q.    And where were they seized from?

2    A.    These were sitting on top of the dresser.  The firearms

3    were found in a drawer underneath the dresser.

4    Q.    And with regard to Exhibit 35 for ID?

5    A.    This is a round of 12 gauge ammunition which was found in

6    a file cabinet in the same room as -- in the same bedroom.

7            MR. KAUFMAN:  Your Honor, at this time we seek to

8    admit and publish Exhibits 34 and 35.

9            THE COURT:  Let them be admitted.

10           (Government's Exhibits Nos. 34 and 35 were received

11   into evidence.)

12   Q.    Agent Schauble, can you tell us with regard to Exhibit

13   13, the sawed-off -- the short-barreled shotgun, first of all,

14   what is the required minimum barrel length for a shotgun that

15   is illegal under the National Firearms Act?

16   A.    Has to be at least 18 inches.

17   Q.    And this one is under 12; is that correct?

18   A.    Yes, sir.  11 and 15/16.

19   Q.    Based on your training and experience, what is such a

20   weapon as this short-barreled shotgun in Exhibit 13 for?  Or

21   what is it not for and what is it for?

22   A.    It's not for any real sporting use.  You can't go hunting

23   with it.  It's not good for target practice.  It's not good

24   for shooting competitions.  And it's not a collector's item.

25   I mean, it's illegal to possess it anyway if it's not

DAVID SCHAUBLE - CROSS

1  registered through the National Firearms Registration and

2  Transfer Record.

3      By shortening the barrel and the stock on the firearm and

4  making a weapon made from a shotgun, it becomes easy to

5  conceal and it gives you a readily available firearm with a

6  devastating fire power.

7  Q.   Lastly, Agent Schauble, have you test fired all four of

8  those firearms to determine whether they were, in fact,

9  operable?

10  A.   I have.

11  Q.   And what was the result of your test firing?

12  A.   They all test fired.

13          MR. KAUFMAN:   Thank you.

14          MR. CANALES:   Thank you.

15                  CROSS EXAMINATION

16  BY MR. CANALES:

17  Q.   Sir, you stated that my client gave a statement.

18  A.   Yes, sir.

19          MR. CANALES:   May I see it, please?

20          MR. KAUFMAN:   I can put it on the screen for you.

21  Q.   You had a chance to -- on December the 12th of 2012, was

22  my client arrested on that day?

23  A.   Yes, sir.

24  Q.   My client, meaning the gentleman over here.

25  A.   Yes, sir.

1  Q.   Okay.  Now, would I be correct in saying that your --

2  your participation in this case had to do with the guns

3  primarily?

4  A.   Primarily, yes, sir.

5  Q.   You're an ATF agent, right?  Alcohol, Tobacco and

6  Firearms, right?

7  A.   And explosives, but...

8  Q.   And explosives.  But you didn't find any explosives here,

9  right?

10  A.   No, sir.

11  Q.   Nor tobacco, right?

12  A.   (Negative nod.)

13  Q.   All right.  Let me ask you this, Officer.  You -- you had

14  a chance to talk to my client.  Did you have to get it out of

15  him or did he tell you on that day where the firearms were at?

16  A.   He told us where the firearms were at.

17  Q.   He was cooperative, right?

18  A.   Yes, sir.

19  Q.   He wasn't hiding the fact that they were there, right?

20  A.   He told us where three of them were.

21  Q.   Okay.  I mean, but the other one was in the same area?

22  A.   It was under the mattress, in between the mattress and

23  the box spring.

24  Q.   Okay.  But he was -- now, you say you found ammo in the

25  bedroom -- ammunition?

DAVID SCHAUBLE - CROSS

1  A.   Yes, sir.

2  Q.   How many -- what -- you said you found 12 gauge and .22

3  caliber, right?

4  A.   Yes.

5  Q.   Okay.  How many shells for a shotgun did you find?

6  A.   One round of shotgun ammunition.

7  Q.   One round.  How many -- how many -- they were bullets

8  so -- but how many bullets were there found for a .22?

9  A.   We seized three rounds.

10 Q.   Where were they found?

11 A.   On top of the dresser.

12 Q.   Was there any more .22 bullets in the house?

13 A.   In one of the pictures I saw after the search, there

14 was -- there was a round of ammunition in the file cabinet.

15 Q.   One round?

16 A.   That was not seized.  Yes, sir.

17 Q.   At most there were four bullets of .22, right?

18      How about the shotgun?

19 A.   There's only one we found in the house.

20 Q.   I mean, he also told -- may I approach, Your Honor?

21      THE COURT:  Yes, sir.

22 Q.   Showing you Exhibit 10.  May I see number 10?

23      What caliber is this?

24 A.   .22.

25 Q.   .22.  Okay.  Let me show you -- as far as fire power, is

DAVID SCHAUBLE - CROSS

1  that like -- is that considered low caliber?

2  A.  It's low caliber.

3  Q.  All right.

4  A.  Small caliber.

5  Q.  Small caliber, right?  Target -- it's used for target

6  practice?  Commonly in the high schools like in the ROTC or

7  the shooting competitions, they use .22 caliber, right?

8  A.  Some competitions they use a .22.

9  Q.  It's common for high school kids to use a .22 caliber in

10  the high school competitions like the army, navy.  Do they

11  have any in Carolina?

12  A.  I wasn't in ROTC.  I would imagine they would use -- I

13  don't know what they would use.

14  Q.  But it's commonly used for target practice, right?

15  A.  Yes, sir.

16  Q.  Okay.  Now, let me show you Exhibit Number 11 if I may.

17     What caliber is this?

18  A.  .22.

19  Q.  Again, same caliber, right?

20     Let me show you number 12.

21     What caliber is this?

22  A.  .22.

23  Q.  All right.  So now, let me show you Exhibit Number -- I

24  mean Government's Exhibit Number 14.  Number 14.

25     Are we missing any parts here?

DAVID SCHAUBLE - CROSS

1  A.   It will be put together -- if you pull that strap out,

2  you can get it together.

3  Q.   Okay.  I mean, you've seen weapons before, right?

4  A.   A lot of them.

5  Q.   To become an expert, right?

6        MR. CANALES:  May I approach, Your Honor?

7  Q.   How old is this thing?

8  A.   I don't know the date of manufacture.

9  Q.   If you had to guess, how old is this thing?

10  A.   Probably 50 years old.

11  Q.   At least?

12        THE COURT:  Please stand so all the jurors can see

13  the witness.

14        THE WITNESS:  I'm guessing.

15  Q.   You're guessing, right?

16        How many shells did you find for this weapon?

17  A.   One.

18  Q.   One.  So you found four weapons, four bullets, right?

19  A.   Yes, sir.

20  Q.   I mean, if you're --

21        MR. KAUFMAN:  Objection.  Asked and answered.

22  Q.   If you're preparing to defend yourself, I mean, it's not

23  very smart, right, to have one bullet per gun, right?  I mean,

24  if you're going to use them to shoot someone or defend

25  yourself, it's not very smart, right?  Fair to say?

1    A.   One round of 12 gauge ammunition in that gun from here

2    would hit probably all three of you.

3    Q.   Yeah, but one shot only, right?  I mean, you're preparing

4    to defend yourself or to attack.

5    A.   Takes one shot to kill.

6    Q.   Yes, sir.  Yes, sir.  But usually when you are going to

7    prepare to use it against somebody, whatever, you don't just

8    carry one bullet?  Do you carry one -- do you have a weapon?

9            MR. KAUFMAN:  Objection.  Argumentative.

10           THE COURT:  Sustained.

11   Q.   To your knowledge, do most officers when they carry a

12   weapon, do they carry only one bullet?

13   A.   I only know one officer who carries one bullet.

14   Q.   All right, sir.  Now, let me ask you -- I have an idea

15   who that one is.

16       Now, did you -- there was testimony of some bullets found

17   on the floor in the shed.  Are you aware of that?

18   A.   I've been sequestered all day so I don't know what was

19   testified to.

20   Q.   Okay.  Do you know if there were some bullets found in

21   the shed?

22   A.   Yes, sir.

23   Q.   What caliber were those?

24   A.   I believe there was some .223, some .45.

25   Q.   .45.

DAVID SCHAUBLE - CROSS

1  A.    And I believe some 9 millimeter.

2  Q.    Different caliber, right?

3  A.    That's correct.

4  Q.    Okay.  Did you see an old lady residing within the

5  property when you were there?

6  A.    I don't understand your question.

7  Q.    Let me ask it this way.  On December the 12th, was it

8  brought to your attention there was a lady by the name of

9  Betty there, an old lady residing in the vicinity of the home?

10  A.    Living in the home?

11  Q.    Yeah.

12  A.    Yes, sir.

13  Q.    Can you please describe her to the jury.

14  A.    White female, short hair.

15  Q.    Okay.  How old?

16  A.    I really -- 50, 60 maybe.  I'm totally guessing.

17  Q.    Okay.

18  A.    She didn't stick out.

19  Q.    But it was an old lady, right?

20  A.    Yes, sir.

21  Q.    Did you ask her who this weapon belonged to?  Did she

22  ever tell you it belonged to her husband?

23  A.    I did not speak with her.  From the report I read, she

24  told Investigator Williams that she gave the guns to

25  Mr. Saldana.

DAVID SCHAUBLE - CROSS

1   Q.   So this old lady told investigators that she gave what to

2   Mr. Saldana?  The shotguns, the guns?

3   A.   She gave him the shotgun and then the small Tanfoglio

4   pistol.

5   Q.   And isn't it true that to your knowledge that she said

6   those used to belong to her husband who passed away?

7   A.   That was not in the report.

8   Q.   Okay.  Now, let me ask you this.  Where does she live?

9   A.   She lives in the same house.

10  Q.   In the same house, right?

11       Was that the same thing that my client told you?

12  A.   Yes.

13  Q.   That those weapons were given to him by the old lady who

14  lives there?

15  A.   Yeah, he said two -- the same two she said she gave him,

16  he said that he got from her.

17  Q.   And you also had -- you also interviewed my client about

18  who was the owner of the property, right?

19  A.   Yes, sir.

20  Q.   He told you that first he used to live in the trailer,

21  right?

22  A.   Yes, sir.

23  Q.   So if he had a driver's license with that address, that

24  wouldn't surprise you, right, because he used to live there

25  years ago.  That was his address, I guess, at one point.

1   A.   If he lived there and that was the address on his

2   driver's license, that would not surprise me.

3   Q.   Okay.  And he said that was between 14 and 18 years ago?

4   A.   Yes.

5   Q.   Okay.  And did he tell you that he first purchased that

6   truck -- I mean, that trailer from the old couple, for lack of

7   a better term.  The Houcks, I think is the name.  Houcks,

8   right?

9   A.   Houck, right.

10  Q.   Houck, sorry.  He said he purchased this trailer from

11  this old couple, right?

12  A.   Yes, sir.

13  Q.   Then eventually he bought the house from the old couple

14  as well, right?

15  A.   Yes, sir.

16  Q.   And the lady -- the lady stayed there because -- for

17  whatever reason she stayed there, right, allowing him

18  basically to live side to side, right?

19  A.   Yes.

20  Q.   Okay.  And did he tell you that he had -- that he had

21  continued to rent the trailer to other people as well?

22  A.   I know that he was renting that trailer according to the

23  other people that were living in there.

24  Q.   Okay.  Fair enough.

25       And was it brought to your attention that he had been

1  giving payments on this house for at least ten years, my

2  client?

3  A.  He said he started buying it ten years ago.  I don't know

4  what his arrangement was or if he paid -- I don't know any of

5  that.

6  Q.  Okay.  And he also advised you that since 1988 he had

7  been working at Vannoy Construction, V-a-n-n-o-y Construction?

8  A.  That's what he said, yes, sir.

9  Q.  All right.  And also that he had worked at Adams

10  Construction?

11       MR. KAUFMAN:  Objection, Your Honor, to this line of

12  questioning regarding what his own client said.  We object to

13  that.

14       MR. CANALES:  He was a witness to it, Judge.

15       THE COURT:  Overruled.

16       MR. CANALES:  He has knowledge.

17       THE COURT:  Overruled.

18  Q.  He also told you he worked there for five years and then

19  he worked -- he continued working after that at Adams

20  Construction until November 2011, right?

21  A.  That's what he said, yes, sir.

22       MR. KAUFMAN:  Your Honor, may we have a brief

23  sidebar on this line of questioning?  There's a particular

24  component to it that I think we do need to address outside the

25  presence of the jury?

DAVID SCHAUBLE - CROSS

1    THE COURT:  All right.  We'll take a recess
2  overnight, members of the jury.  We'll ask you to be with us
3  at 9:30 in the morning.  Thanks for your attention to the
4  case.  Ask you to remember the usual instructions.  Thank you.
5    (Jury exited the courtroom.)
6    THE COURT:  All right.  All the jurors have left.
7    MR. KAUFMAN:  Thank you, Your Honor.
8    First I should apologize to Agent Schauble.  It
9  appears he may have -- he's going to be coming back tomorrow
10  at this point.
11    But on a serious note, with regard to this line of
12  questioning, the Federal Rules of Evidence state that the
13  statement of a party opponent is not hearsay; however, the
14  defense's elicitation of what their own client's statement is
15  is, in fact, hearsay under the rule.  And while, you know, the
16  questioning about these minor details about relationships and
17  things of that nature are not overly prejudicial to the United
18  States' position, my concern is that the most rank sort of
19  hearsay is what the defense is eventually going to get to.
20    And what I'm talking about is during the interview,
21  Mr. Saldana was confronted with drug trafficking and there's
22  self-serving hearsay in the interview in that he made a
23  general denial of ever being involved in the trafficking of
24  methamphetamine, having others sell methamphetamine.
25    In fact, for the court, we've already marked it as

DAVID SCHAUBLE - CROSS

1   Government's Exhibit 18 for identification.  We never moved

2   for its admission.  If I may, I'll put it up on screen.

3        And on page 2, it's paragraph 7 that I believe the

4   defense is trying to get to.

5        Mr. Saldana can take the stand and testify in his

6   own defense, but this sort of hearsay that the rules very

7   clearly, based on case law, do not permit for denials,

8   self-serving denials by the defense through somebody other

9   than the defendant himself.

10       MR. CANALES:  First of all, Judge, I haven't even

11  asked that question; and so therefore, I mean, I don't know

12  what --

13       THE COURT:  If you have no objection to not asking

14  it, then that solves the matter.

15       MR. CANALES:  Well, Your Honor, I hadn't thought

16  about asking that question, Judge; but how can I be precluded

17  from asking that question, Your Honor, if it was a question

18  that was asked, it was a statement that was given, and this

19  gentleman was present?  Why would it not be admissible?  It's

20  not hearsay.  And he's -- everything else that he was asked

21  comes into play.

22       THE COURT:  The government says it's inadmissible.

23  We'll ask the government to give us the authority overnight

24  and we'll consider it.

25       MR. CANALES:  Yes, sir.  Thank you.

372

DAVID SCHAUBLE - CROSS

1          THE COURT:  All right.

2          (Evening recess at 5:18 p.m.)

3                         *****

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16          Dated this 10th day of August 2015.

17

18

19                    s/Cheryl A. Nuccio

20                    _____
                      Cheryl A. Nuccio, RMR-CRR
                      Official Court Reporter

21

22

23

24

25