UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA )    DOCKET NO. 5:12-CR-49-1
                         )
        vs.              )    VOLUME III
                         )
MARTIN MARTINEZ SALDANA, )
                         )
        Defendant.       )
_____)


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
MARCH 6, 2014


<u>APPEARANCES</u>:

On Behalf of the Government:

        STEVEN KAUFMAN, ESQ.
        United States Attorney's Office
        227 West Trade Street, Suite 1700
        Charlotte, North Carolina

On Behalf of the Defendant:

        DENZIL H. FORRESTER, ESQ.
        Law Office of Denzil Forrester
        P.O. Box 32511
        Charlotte, North Carolina

        JESUS RICARDO CANALES, ESQ.
        Law Office of Rick Canales
        845 East Harrison Street
        Brownsville, Texas




                Cheryl A. Nuccio, RPR, RMR, CRR
                   Official Court Reporter
                United States District Court
                  Charlotte, North Carolina

1                          I N D E X

2  GOVERNMENT'S WITNESSES                          PAGE

3  DAVID SCHAUBLE
     Voir Dire Examination By Mr. Canales          379
4    Cross Examination By Mr. Canales              381
     Redirect Examination By Mr. Kaufman           388
5    Recross Examination By Mr. Canales            390
     Redirect Examination By Mr. Kaufman           391
6    Recross Examination By Mr. Canales            391
     Redirect Examination By Mr. Kaufman           393
7    Recross Examination By Mr. Canales            393

8  DANNY CHARLES ELLER
     Direct Examination By Mr. Kaufman             394
9    Cross Examination By Mr. Canales              418
     Redirect Examination By Mr. Kaufman           444
10   Recross Examination By Mr. Canales            449

11 BOBBY SHORE
     Direct Examination By Mr. Kaufman             455
12   Cross Examination By Mr. Canales              466
     Redirect Examination By Mr. Kaufman           475
13   Recross Examination By Mr. Canales            479

14 JOSE FRANCISCO PINA
     Direct Examination By Mr. Kaufman             479
15   Cross Examination By Mr. Forrester            482

16 JAMES THOMAS HAWKINS
     Direct Examination By Mr. Kaufman             490
17   Cross Examination By Mr. Canales              498
     Redirect Examination By Mr. Kaufman           509

18

19

20

21

22

23

24

25

E X H I B I T S

GOVERNMENT'S EXHIBITS

NUMBER                                              ADMITTED

16F ............................................515
20 .............................................447

```
 1              P R O C E E D I N G S
 2   THURSDAY MORNING, MARCH 6, 2014
 3            (Court called to order at 9:42 a.m.  Jury not
 4   present.)
 5            THE COURT:  The defendant -- excuse me, the
 6   government has made a motion in limine as it did yesterday
 7   orally.  This one is in writing.  I wondered if the defendant
 8   would like to -- or had anything to say in response to the
 9   government's motion?  This has to do with the possible
10   admission of defendant's disclaimer of involvement in drug
11   activity.
12            MR. CANALES:  Your Honor, I didn't check my email
13   yesterday, Your Honor, so I did not receive any --
14            THE COURT:  You had not seen it?
15            MR. CANALES:  I didn't check my email yesterday.  I
16   wasn't able to get a copy from my office and I don't have
17   access to a computer where I'm staying.
18            THE COURT:  Okay.  Go ahead and look at it, then.
19            (Defense counsel peruses document.)
20            MR. CANALES:  I'm ready, Judge.
21            THE COURT:  All right.  Do you have anything you'd
22   like to say in response?
23            MR. CANALES:  The only thing -- I think there is a
24   distinction here in that the question that was asked here was
25   asked as an interrogation by an interrogator, Judge.
```

1    In this case the officer was asking my client for --
2 literally interrogating him, asking him to make a -- about
3 what happened in this case.  I don't think that would be
4 hearsay, Judge.  I don't understand how --
5    THE COURT:  If you would sit down and speak into the
6 microphone, it would be a little more easier to pick up on
7 things.
8    MR. CANALES:  I'm sorry.
9    I think that it's different in this case in the fact
10 that this question was elicited, was made in the form of an
11 interrogation.  It's a police officer -- it's not the same --
12 the distinction in the case law that the government is making
13 is about a statement made by a defendant to his wife.  I
14 understand that.  That definitely would be hearsay.
15    But in this case it's different because he was asked
16 by a police officer in the pursuit of his duties in trying to
17 obtain a confession.  And had my client given a confession,
18 that would be admissible.  But in this case the fact that he's
19 denying it is the only issue why the government is trying to
20 exclude it, Judge.
21    THE COURT:  I think that's a distinction without a
22 difference.  It's still a hearsay statement.  Therefore, it
23 would be excluded.
24    MR. CANALES:  Yes, Your Honor.
25    THE COURT:  Since there is no exception that would

1    apply to allow its admission.

2              May we have the jury, please.

3              MR. FORRESTER:  Could we be heard on the record

4    before the jury comes out?

5              THE COURT:  About what?

6              MR. FORRESTER:  Are we allowed to proffer what we

7    would ask?  I understand your ruling, Your Honor, but just for

8    the record, are we allowed to ask what we would have liked

9    just for the record to --

10             THE COURT:  If you want to.  Let's have the witness

11   on the stand, please.

12             (Witness resumed the witness stand.)

13             THE COURT:  You're already sworn, sir.

14             THE WITNESS:  Yes, sir.

15      DAVID SCHAUBLE, GOVERNMENT WITNESS, PREVIOUSLY SWORN,

16                    VOIR DIRE EXAMINATION

17   BY MR. CANALES:

18   Q.   Officer, will you please state your name for the record.

19   A.   Special Agent David Schauble.

20   Q.   Agent, on December the 12th of 2012, that was the date

21   that my client got arrested; is that correct?

22   A.   That's correct.

23   Q.   And that day you asked him a question whether or not he

24   had anything to do with drug dealing or the meth trade; is

25   that correct?

1    A.    Yes.

2    Q.    What was his response?

3    A.    He said that he had nothing to do with distribution of

4    controlled substances and he never directed anyone else to

5    distribute controlled substances.

6              MR. CANALES:  Thank you, sir.

7              THE COURT:  All right.

8    Q.    Were you satisfied with the response?  Sorry, Judge.

9    A.    Are you asking if I believed him?

10             MR. KAUFMAN:  Objection, Your Honor.

11             THE COURT:  That's beyond the question.

12             MR. CANALES:  Yeah, that's beyond...

13             THE COURT:  Let's have the jury, please.

14             (Jury entered the courtroom.)

15             THE COURT:  Good morning, members of the jury.

16             THE JURY:  Good morning.

17             THE COURT:  Thank you for being here on time.  We

18   had a few minutes that we had to take to clear up something

19   that will help expedite the trial.  So we did indulge that and

20   we're ready now to move forward as soon as the clerk comes

21   back.  She is engaged in seeing that the construction going on

22   down below doesn't distract the court.  If you can hear sort

23   of a whining noise.

24             THE CLERK:  They're going to take care of it.

25             THE COURT:  All right.  Thank you.

DAVID SCHAUBLE - CROSS

1        I believe you had the floor for questions as to
2    Mr. Schauble.
3            MR. CANALES:  Yes, Your Honor.
4                    CROSS EXAMINATION (Cont'd.)
5    BY MR. CANALES:
6    Q.   Based on your information, based on intelligence reports,
7    based on your participation on December the 12th of 2012, my
8    client's arrest, did you -- were you able -- were you able to
9    learn why my client had stopped working?
10           MR. KAUFMAN:  Objection.
11           THE COURT:  Overruled.
12           THE WITNESS:  I'm sorry, I'm having a hard time
13   hearing you.
14   Q.   I'm sorry.
15       Based on -- based on intelligence -- based on your
16   participation, your investigation on December the 12th of
17   2012, and your conversations with everybody, were you able to
18   determine why my client had quit working?
19   A.   Just what he told me.
20   Q.   Which is?
21           MR. KAUFMAN:  Objection.  Same basis that was just
22   discussed, Your Honor.
23           THE COURT:  Sustained.
24   Q.   Okay.  I don't want you to tell me what he told you, but
25   I'm asking you a question, that based on your reports, based

DAVID SCHAUBLE - CROSS

1   on your -- based on your investigation, based on, you know,

2   your -- on everything, right, were you able to determine why

3   he quit working in 2011?  Because he had always worked.  I'm

4   asking you based on that, were you able to make a conclusion

5   as to why he had quit working?

6           MR. KAUFMAN:  Objection, Your Honor.  Same basis.

7   Self-serving hearsay.

8           THE COURT:  Well, if he knows outside of a statement

9   of the defendant.

10          MR. CANALES:  Yes, Your Honor, that's what I'm

11  asking.  Based on his conversations, based on his

12  intelligence.  I mean, I'm going as wide as I can, Judge.

13          MR. KAUFMAN:  Your Honor, there has not been a

14  proper foundation for Agent Schauble to be able to testify

15  about knowledge of the defendant's unemployment other than

16  through hearsay.  It would be hearsay.

17          THE COURT:  Well, your question was whether he

18  learned anything about it.  I'll let him answer that question.

19          MR. CANALES:  Yes, sir.

20  Q.  Did you?

21  A.  It's my understanding that he was --

22          THE COURT:  Wait a minute.  Just answer whether or

23  not you did or did not have such information?

24          THE WITNESS:  I had some information.

25          THE COURT:  All right.  Now you can ask him the

1  basis on which he discovered that information.

2  Q.   What's the basis of that information?

3         MR. KAUFMAN:  And, Your Honor, may I ask because I

4  know this is a legal matter that we're discussing and Agent

5  Schauble is not a lawyer, but I would ask the foundational

6  question being the source of the information as opposed to the

7  content.  The content being the hearsay.

8         THE COURT:  Well taken.

9         THE WITNESS:  Other officers.

10 Q.   Through your experience, through your investigation of

11 this case, through, I don't know, border crossings, I don't

12 know, whatever you used to investigate my client, would he

13 often -- strike that question.

14     Let me ask you this question.  Let me ask you this.  You

15 did a check on those guns, right?

16 A.   Yes.

17 Q.   Okay.  Were they reported stolen?

18 A.   (No response.)

19 Q.   Had they been reported stolen?

20 A.   No, sir.

21 Q.   Were the serial numbers intact?

22 A.   Yes, sir.

23 Q.   Okay.  Were there any reports of those specific

24 weapons -- not the type, obviously.  There's millions and

25 millions of .22s and shotguns in the U.S. and everywhere.  But

DAVID SCHAUBLE - CROSS

1  were there any reports that those specific guns had been used

2  in any type of crime?

3  A.   (No response.)

4  Q.   Those specifically.

5  A.   Other than the crime he's been charged with?

6  Q.   Of course.

7  A.   I have no reason to believe that.

8  Q.   Okay.  And that's a common tactic that drug dealers do,

9  right, when it comes to trying to -- when they get weapons,

10  meaning either get stolen weapons so you can't trace it to

11  them, right?

12  A.   Sometimes.

13  Q.   And isn't it also true that another common tactic that

14  drug dealers --

15          MR. KAUFMAN:  Objection to the term "other" since

16  the witness's last answer was to contradict the factual

17  predicate of the defense lawyer's.

18          THE COURT:  Overruled.

19  Q.   Isn't it true that, you know, it's common practice among

20  drug dealers that when they use weapons or have weapons for

21  purposes of using them in the trade of drugs, that they will

22  scratch off the serial number?  That's a common practice,

23  right, to your knowledge?

24  A.   In my experience, they'll have one that they can get rid

25  of easily.  But the guns they keep in their house are usually

1  legal.

2  Q.   Do you mean to tell me that all -- most drug dealers keep

3  guns in their house with serial numbers intact and not stolen

4  guns, Officer?

5  A.   In my experience, quite often if they are not prohibited

6  from possessing those firearms, the firearms they keep in

7  their residence are going to be legal firearms.

8  Q.   But they also keep other weapons, right?  You said -- you

9  make a distinction the ones they keep in the house and I guess

10 the ones they use on the street?

11 A.   Yes, sir.  Sometimes they'll have other weapons that they

12 can get rid of --

13 Q.   Right.

14 A.   -- and can't be traced back to them.

15 Q.   Right.  Well, did you find any other weapons in this

16 case?

17 A.   In this case, yes, sir.

18 Q.   Okay.  What weapons, sir?

19 A.   They were on co-defendants.

20 Q.   Okay.  So you didn't find them on my client.  They were

21 in the co-defendant's house?

22 A.   Yes, sir.

23 Q.   Okay.  Which co-defendant?

24 A.   Jose, I believe his name is Mancilla, Jose Humberto,

25 Danny Eller.

1  Q.   Are you talking about Jose Pina?

2  A.   Yes, sir.  We had some problems figuring out what his

3  legal name was.

4  Q.   Let's talk about that.  Why were you having a problem

5  trying to identify the actual Jose Pina?

6  A.   Because I'm not real familiar with the way the Hispanics

7  take the name of their mother and then exchange it with the

8  last name.

9  Q.   Isn't it true that during this investigation, it was --

10 it was brought to the surface that he had different names?

11 A.   Yes, sir.

12 Q.   Okay.  So it wasn't just different Hispanic names, right?

13 A.   They were Hispanic names.

14 Q.   Yeah.  In other words, he had aliases, another identity.

15 A.   Yes, sir.

16 Q.   Right?  I mean, I know that most Hispanics have two first

17 names and two last names.  I'm not trying to stereotype, but

18 that's the way it happens.  But this gentleman had different

19 identities, meaning different first names, different last

20 names, Mr. Pina, right?

21 A.   I believe all his first names were the same.  I think he

22 had some discrepancies in his last names and his middle names.

23 Q.   So he was changing the middle names and the last names,

24 right?

25 A.   Yes, sir.

1  Q.   Now, on this -- just in the State of North Carolina or in

2  other states?

3  A.   I don't recall.

4  Q.   Was he -- was Pina legal based on your investigation?

5  Were you able to determine whether Pina was legal or illegal

6  in this country?

7  A.   Illegal.

8  Q.   Okay.  Based on your investigation, were you able to

9  determine if Pina Jr. was here legal or illegal?

10  A.   Illegally.

11  Q.   How old is Pina Jr.?

12  A.   Excuse me?

13  Q.   How old is Pina Jr.?

14  A.   How is he?

15  Q.   Uh-huh.  How old approximately?

16  A.   Approximately early 20s.

17  Q.   Was he a clean-cut kid?  Tattooed?  All gangster style?

18  What?

19        MR. KAUFMAN:  Objection.  Characterization.

20        THE COURT:  Overruled.

21        THE WITNESS:  He was pretty clean-cut.

22  Q.   He didn't have tattoos on his neck, sir?  He didn't have

23  a tattoo here?

24  A.   I don't remember.

25        MR. CANALES:  All right.  Fine.  Thank you, sir.  No

DAVID SCHAUBLE - REDIRECT

1  further questions.

2                    REDIRECT EXAMINATION

3  BY MR. KAUFMAN:

4  Q.   Agent Schauble, you were talking about Hispanic names.

5  Is there often confusion because of the space or a dash

6  between the maternal last name and paternal last name?

7  A.   Yes.

8  Q.   And also because sometimes there's confusion as to

9  whether the given name, which is the first -- which is

10  properly the first given name and the second given name?

11  A.   Yes.

12  Q.   Now, you were asked some questions by the defense lawyer

13  about whether the firearms had been stolen.  Did you expect

14  them to have been stolen?

15  A.   They weren't entered into NCIC as stolen.

16  Q.   And in fact, the information you learned, where did he

17  get those weapons from?

18  A.   He received two from Betty Houck and then he said he won

19  two in a punch board game.

20  Q.   And in fact, had he received two of the guns from

21  Ms. Houck?

22  A.   Yes.

23  Q.   So based on that, did you expect them to be stolen?

24  A.   I did not.

25  Q.   You were asked by the defense lawyer whether any of the

DAVID SCHAUBLE - REDIRECT

1  serial numbers were obliterated.  And did you expect the
2  serial numbers to be obliterated?
3  A.   No.
4  Q.   With regard to the shotgun, you were asked whether these
5  firearms were legal.  Was the shotgun legal?
6  A.   No, sir.
7  Q.   Why not?
8  A.   Because it wasn't registered.
9  Q.   The defense lawyer yesterday during your cross
10 examination had asked you if the defendant was cooperative by
11 telling you where the firearms were.  Was he fully
12 cooperative?
13 A.   No, sir.
14 Q.   Why do you say that?
15 A.   He told us where three of the firearms were.  He did not
16 tell us where the fourth revolver was.
17 Q.   And that's the fourth one that was between the box spring
18 and mattress?
19 A.   Yes, sir.
20 Q.   With regard to the other three that he did disclose, when
21 he disclosed that, was he aware that you already had a search
22 warrant for the residence?
23 A.   Yes.
24 Q.   You were asked questions about the .22 caliber
25 ammunition.  Are you -- are you aware of the -- statistically

1  what type of caliber ammunition kills the most people in this

2  country?

3        MR. CANALES:  Your Honor, we're going to object.

4  Relevance.

5        THE COURT:  Sustained.

6  Q.   What impact does a .22 caliber round have when it enters

7  a human body?

8  A.   It can cause quite a bit of damage.  Lot of times it will

9  go in, hit a bone, ricochet and go to other places.

10  Q.   As opposed to a larger caliber round which would go

11  through?

12  A.   That happens quite often.

13  Q.   And lastly, with regard to that shotgun where I believe

14  you testified there was one shell that matched it, how many

15  rounds does that shotgun hold at any given time?  What's the

16  maximum capacity?

17  A.   One round.

18        MR. KAUFMAN:  Thank you.  Nothing further, Your

19  Honor.

20                    RECROSS EXAMINATION

21  BY MR. CANALES:

22  Q.   Cartel members, as a comparison, based on your

23  investigation, they use high caliber weapons, right?

24        MR. KAUFMAN:  Objection.  Scope.

25        THE COURT:  Sustained.

DAVID SCHAUBLE - REDIRECT

1  Q.  Had Betty Houck registered the shotgun herself?

2  A.  She had not.

3  Q.  Okay.  You had a chance to speak to her?

4  A.  I have not.

5  Q.  The officers have had a chance to speak to her, right?

6  A.  Yes, sir.

7  Q.  Did she get arrested for having a shotgun at one point

8  not registered to her name?

9  A.  No, sir.

10         MR. CANALES:  No further questions.

11         MR. KAUFMAN:  Briefly, Your Honor.

12               REDIRECT EXAMINATION

13  BY MR. KAUFMAN:

14  Q.  Was Ms. Houck implicated in any way in any kind of

15  methamphetamine or other controlled substances trafficking?

16  A.  No, sir.

17  Q.  And could Ms. Houck, if she wanted to, if she had owned

18  the shotgun, registered that firearm?

19  A.  If she'd have registered it prior to it being made into a

20  weapon made from a shotgun.

21  Q.  And is that a simple process?

22  A.  Yes, sir.

23         MR. KAUFMAN:  Nothing further, Your Honor.

24               RECROSS EXAMINATION

25  BY MR. CANALES:

DAVID SCHAUBLE - RECROSS

1  Q.   But having a shotgun -- he's asking you having a shotgun

2  in relation to meth trafficking, but in this case it's

3  different because if I had a shotgun --

4           MR. KAUFMAN:  Objection.  Argument.

5           THE COURT:  Well, let me hear the question.

6  Q.   The crime -- you testified earlier that the crime was the

7  fact that it was under 18 inches; is that correct?

8  A.   Yes, sir.

9  Q.   So Ms. Houck doesn't have to be involved in the drug

10 trade.  Ms. Houck can, if she was in possession of a weapon,

11 she could be arrested by the mere fact that it was less than

12 18 inches, right?

13 A.   If she was in possession of it, yes.

14 Q.   Thank you.  It was the possession of that type of weapon

15 that makes it a crime period.

16 A.   If it is not registered, yes, sir.

17 Q.   And in this case not registered and that it was less than

18 18 inches, right?

19 A.   Yes, sir.

20 Q.   You don't have to be with drugs or nothing.  Just the

21 weapon itself period, it's a crime.

22 A.   Again, if she possessed it when it was a short-barreled

23 shotgun, then it would be illegal.

24 Q.   Okay.  When was it made into a short-barreled shotgun?

25 A.   I have no idea.

DAVID SCHAUBLE - REDIRECT

1    MR. CANALES:  No further questions.
2                   REDIRECT EXAMINATION
3    BY MR. KAUFMAN:
4    Q.   Do you have any evidence that it was Ms. Houck who
5    created or possessed the shotgun when it was less than
6    18 inches?
7    A.   I do not.
8    Q.   Who is the only person who you have by their own
9    admission who possessed that firearm on December 12th, 2012,
10   when it was in a status of less than 18 inches?
11   A.   Mr. Saldana.
12                   MR. KAUFMAN:  Nothing further.
13                   RECROSS EXAMINATION
14   BY MR. CANALES:
15   Q.   Do you have any evidence to contradict --
16                   MR. CANALES:  I'm sorry, Judge, may I?
17                   THE COURT:  One question.
18                   MR. CANALES:  Yes.
19   Q.   Do you have any evidence for the jury to prove that it
20   was my client who made it like that?  Any evidence?
21   A.   That he made it like that?
22   Q.   Yes.
23   A.   No, sir.
24                   MR. CANALES:  No further questions.
25                   THE COURT:  You may step down.

DANNY ELLER - DIRECT

1        (Witness stepped down.)

2            MR. KAUFMAN:  Your Honor, the United States called

3   Danny Eller.

4            DANNY CHARLES ELLER, GOVERNMENT WITNESS, SWORN,

5                      DIRECT EXAMINATION

6   BY MR. KAUFMAN:

7   Q.   Good morning.

8   A.   Good morning, sir.

9   Q.   If you would, please state your full name for the record

10  and spell your last name.

11  A.   Danny Charles Eller, and it's spelled E-l-l-e-r.

12  Q.   Mr. Eller, are you here having pled guilty to a

13  methamphetamine trafficking conspiracy involving in excess of

14  500 grams of methamphetamine?

15  A.   Yes, sir, I am.

16  Q.   As part of your plea, did you also stipulate and agree to

17  an enhancement for weapons possession?

18  A.   That I did.

19  Q.   Do you see any of the co-conspirators from your

20  conspiracy in the courtroom today?

21  A.   Yes, sir.

22  Q.   Who do you see?

23  A.   Martin.

24  Q.   Do you know Martin's full name?

25  A.   I do now.  It's Martin Saldana.

DANNY ELLER - DIRECT

1  Q.   And during the course of the conspiracy prior to your

2  arrest, did you know any more than his first name, Martin?

3  A.   No, sir, I didn't.

4  Q.   Can you identify him by where he is and what he's

5  wearing.

6  A.   It's him sitting over there with the plaid shirt with the

7  earphones.

8           MR. KAUFMAN:  Your Honor, may the record reflect an

9  in-court identification of the defendant?

10          THE COURT:  It will so reflect.

11          MR. KAUFMAN:  Thank you.

12 Q.   I'd like to -- I asked you about your arrest.

13 October 26, 2012, that was the date of your arrest?

14 A.   Yes, sir.

15 Q.   On that date had you previously been convicted of any

16 felony convictions?

17 A.   No, sir, I hadn't.

18 Q.   Ever?

19 A.   Ever.

20 Q.   And --

21 A.   Just a DWI at one time.

22 Q.   Okay.  And was that a felony?

23 A.   No, sir.

24 Q.   And by the way, when was that that you got the DWI?

25 A.   That was several years ago.  Maybe 20.

DANNY ELLER - DIRECT

1   Q.   Was it, in fact, in the mid '80s?

2   A.   Yes.  Yes, it was.  I think I was around 21.  So it was

3   actually 30 years ago.

4   Q.   And so if somebody said that you had a felony conviction

5   prior to October 26 of 2012, would that be true or untrue?

6   A.   That's untrue.

7   Q.   I would like to run through some photographs with you if

8   I may.  They've already been admitted into evidence in the 1

9   series.  The first one is 1A.  There's a screen in front of

10  you.  You may -- is it working?

11  A.   Yes, sir.

12  Q.   Okay.  And if it's hard to see, if you will change the

13  angle by pulling the top towards you, it might be easier to

14  see.

15  A.   Oh.

16  Q.   So who's in Exhibit 1A?

17  A.   That is me, sir.

18  Q.   Going to 1B.

19       Do you know who that is?

20  A.   Bob Shore.

21  Q.   1C?

22  A.   That's Jose.

23  Q.   During -- and I should have asked maybe even further and

24  maybe going back to 1B.  Was Mr. Shore a part of the

25  conspiracy?

1  A.   I just knew of Bob.  That's all I...

2  Q.   And how did you know of Bob?

3  A.   By different people.  He was a neighbor of my sister at

4  one time.

5  Q.   Okay.  And 1C?

6  A.   Yes, that's Jose.  I think his last name is Pina.

7  Q.   All right.  Did you know during the course of the

8  conspiracy, did you know his last name?

9  A.   No.

10  Q.   Okay.  So are you familiar with the term "discovery" in

11  the legal process?

12  A.   Yes.

13  Q.   And you were appointed a lawyer in this case; is that

14  right?

15  A.   That's correct.

16  Q.   And he went through the discovery materials with you,

17  yes?

18  A.   That's right.

19  Q.   Are you able to distinguish and recall what you knew

20  before the conspiracy as opposed to what you learned after the

21  fact in discovery?

22  A.   Excuse me, I'm sorry?

23  Q.   So for example, with Mr. Pina's last name, you learned

24  that from the discovery but didn't know it before?

25  A.   That's correct.

DANNY ELLER - DIRECT

1  Q.   If we could limit your responses to things that you knew

2  just during the course of the conspiracy, not things that you

3  learned through the legal process.

4  A.   Okay.

5  Q.   Going to 1D.

6       Do you recognize this person?

7  A.   Yes, I do.

8  Q.   And what's his name?

9  A.   I'm not sure of his name.  I just knew it was Jose's son.

10 Q.   Okay.  Did you have any methamphetamine trafficking

11 conspiracy -- methamphetamine activities with him?

12 A.   Just one time.

13 Q.   And just briefly, what did that involve?

14 A.   Just a -- just an exchange.

15 Q.   Of how much?

16 A.   I don't remember if it was a half ounce or an ounce.

17 Q.   1E?

18 A.   I didn't know him.

19 Q.   Okay.  1F?

20 A.   Yes.

21 Q.   And who is that?

22 A.   It's Martin.

23 Q.   1G?

24 A.   No, didn't know her.

25 Q.   All right.  Now, let's first start with Mr. Saldana, with

DANNY ELLER - DIRECT

1  Martin as you knew him.  When did you first meet him?

2  A.  I don't know exactly.  It's probably -- it might even

3  been a year and a half to two years ago.

4  Q.  And when you say "a year and a half to two years ago," do

5  you mean a year and a half or two years ago from this point in

6  time --

7  A.  Yes.

8  Q.  -- or from the -- hold on, let me finish my question.

9  A.  I'm sorry.

10  Q.  From today's date or a year and a half or two years ago

11  from the date that you were arrested in October of 2012?

12  A.  That's from today's date.

13  Q.  Okay.  So how long had you known him until -- until you

14  were arrested in October 2012?  What was that period of time?

15  A.  Six months to a year, I'm guessing.

16  Q.  All right.

17  A.  I don't really know for sure.

18  Q.  And how did you meet Martin?

19  A.  I was introduced to him by a fella named Jody.

20  Q.  And was Jody involved in methamphetamine trafficking?

21  A.  No.

22  Q.  What was the context of your meeting with Mr. -- with

23  Martin?

24  A.  Just went to buy -- to purchase.

25  Q.  How did you know to purchase from him?

DANNY ELLER - DIRECT

1  A.    Through Jody.

2  Q.    So Jody wasn't involved in the conspiracy?

3  A.    No, sir, but he just -- he knew him.

4  Q.    He knew that Martin was a seller?

5  A.    Yes.

6  Q.    Okay.  And was Jody there to vouch for you during that

7  meeting with Martin?

8  A.    Yes.

9  Q.    Do you recall, if you do, do you recall either the month

10 or the season of 2012?

11 A.    No, I don't.

12 Q.    Where was the meeting?

13 A.    It was outside a place.  I believe it was a -- a paving

14 construction site.

15 Q.    Are you familiar with the business Adams Construction?

16 A.    Yes.

17 Q.    How are you familiar with that business?

18 A.    That's where I went to meet him.  That's a place in our

19 hometown.

20 Q.    Sir, how long had you been using methamphetamine prior to

21 meeting with Martin?

22 A.    Several years.  It's been a long time.

23 Q.    Has it, in fact, been a couple of decades?

24 A.    No -- yes, I've used it for quite a while.

25 Q.    Have you even learned during that process how to cook

DANNY ELLER - DIRECT

1   your own methamphetamine?

2   A.   Yes, I had.

3   Q.   Are you familiar with evaluating purity levels of

4   methamphetamine?

5   A.   No, I'm not.  I haven't --

6   Q.   I don't mean to a scientific level.

7   A.   Oh, okay.

8   Q.   But based on your usage, can you tell --

9   A.   I can tell when it's good.

10  Q.   Okay.  In general, what type of sources, like what were

11  the origins of the methamphetamine that you were obtaining?

12  A.   They were decent.

13  Q.   I'm sorry?

14  A.   They were decent.

15  Q.   Are you familiar with domestic versus, say, Mexican

16  methamphetamine?

17          MR. CANALES:  Objection, Your Honor.

18          THE WITNESS:  No.

19          MR. CANALES:  Knowledge.

20          THE COURT:  Well, overruled.

21  Q.   I'm sorry, what was your answer?

22  A.   I don't have any idea.

23  Q.   Okay.  The first time you had a methamphetamine

24  trafficking -- methamphetamine transaction with Martin, was

25  that during that initial meeting where Jody was present at

DANNY ELLER - DIRECT

1    Adams Construction?

2    A.   Yes, sir.

3    Q.   How much was that for?

4    A.   That was for a half ounce.

5    Q.   And how much did you pay for it?

6    A.   Fifteen hundred.

7    Q.   And I believe you said that the course of your

8    transactions with Martin was anywhere from six months to a

9    year; is that right?

10   A.   Yes.

11   Q.   How frequently did you do business with him?

12   A.   I never really kept tabs.  Maybe it might be every two

13   weeks.  It might be every three weeks.

14   Q.   And were you getting a half ounce each time or did it

15   vary?

16   A.   Yes, to begin with and then I later on went to an ounce.

17   Q.   Approximately how many times do you think you received a

18   half ounce of meth from him?

19   A.   It was several months and I just don't know exactly for

20   sure, but it was several times.  And then I went to the ounce.

21   I couldn't tell you for sure how many times I bought.

22   Q.   But --

23   A.   I just know it was several.

24   Q.   And it was -- did you say -- how frequently was it?

25   A.   Every couple of weeks.

DANNY ELLER - DIRECT

1  Q.   So every two to three weeks; is that right?

2  A.   Yes.

3  Q.   And did that also apply, that same frequency apply when

4  you were then getting 1 ounce at a time?

5  A.   It might have, but it was actually probably closer to

6  three to four weeks then.

7  Q.   Do you remember at what point that transition took place

8  from a half ounce to an ounce?

9  A.   It wasn't too long a period of time.  It happened pretty

10  quick.

11  Q.   So most of the time that you were dealing with him, it

12  was for an ounce?

13  A.   Yes.

14  Q.   After that first deal at Adams Construction, where did

15  your transactions take place?

16  A.   We would just meet most of the time on the road

17  somewhere.  I could give him a call and we would meet and make

18  the transaction.

19  Q.   Are you familiar with where Martin lived?

20  A.   Yes, sir, I am.

21  Q.   Where is that?

22  A.   It's in Ashe County.  West Jefferson.

23  Q.   Do you know what street it was?

24  A.   No, sir, I don't.

25  Q.   So did you ever transact business inside of his house?

DANNY ELLER - DIRECT

1   A.   Not inside of his house, but I have been to his house.

2   Q.   Did you transact business on his property?

3   A.   Yes, sir.

4   Q.   Can you describe where you were doing that.

5   A.   It was in a building outside of his house.

6   Q.   Can you describe what that building looked like.

7   A.   It's just a small, something like a 12 by 12 building.

8   Like a workshop.

9   Q.   By the way, what kind of vehicle did you drive to the

10  meetings with him at his residence?

11  A.   I had a '97 Chevrolet Silvarado.

12  Q.   What color?

13  A.   It was blue.

14  Q.   Did you -- how did you make the arrangements to meet with

15  Martin?

16  A.   I called him on my cell phone.

17  Q.   Actually, I'd like to show you what has already been

18  admitted as 30 -- sorry.  Oh, well, this has been admitted as

19  30A.

20       Do you recognize this location by any chance?

21  A.   That is the building.

22  Q.   The building that what?

23  A.   That we made transactions in.

24  Q.   Okay.  I'd like to show you Exhibit 30.  It's already

25  been admitted.  Going to page 2, 3, 4.  Yeah, 4.  At the very

DANNY ELLER - DIRECT

1  bottom.  I'm going to increase this.

2      Do you recognize that phone number at the bottom right?

3  A.    Yes, sir.  That is my cell phone number.

4  Q.    Now, you mentioned Jose who's in Exhibit 1C.

5  A.    That's it.

6  Q.    How did you meet Jose?

7  A.    Through Martin.

8  Q.    Can you describe the way you were introduced to Jose.

9  A.    He was just with us there one day and he, of course,

10 introduced me.

11 Q.    When you say, of course, introduced you, just as a social

12 matter?

13 A.    No.

14 Q.    If you can, tell the jury about the meeting and what was

15 discussed.

16 A.    Well, it was just a short meeting and when I arrived he

17 said that he was going to be gone a couple of weeks back to

18 Mexico and I can be able to call him and do what I needed to

19 do.

20 Q.    And when you say "call him" to do --

21 A.    Call Jose.

22 Q.    And do what?

23 A.    For transactions.

24 Q.    Of methamphetamine?

25 A.    Yes, sir.

DANNY ELLER - DIRECT

1  Q.   Was Jose an independent drug dealer?

2  A.   No, not as I know of.

3  Q.   Is that based on your conversations with Jose himself or

4  with Mr. Saldana, with Martin?

5  A.   Yes.

6  Q.   What did Mr. Saldana say specifically?

7  A.   He just said, "He'll be taking care of you while I'm

8  gone."

9  Q.   Okay.  And what was your understanding as to the

10 relationship, if they had one, between the two of them in

11 terms of the business?

12 A.   That he was working for him, I guess.

13 Q.   Do you know where Jose was living at that point in time?

14 A.   There was a trailer beside of Martin's place where he was

15 living.

16 Q.   Jose was?

17 A.   Yes, sir.

18 Q.   Do you know when Jose began living there?

19 A.   No, sir, I couldn't recall.

20 Q.   Was he living there when you first had met Martin?

21 A.   Not that I know of.

22 Q.   When you were receiving the methamphetamine from Martin,

23 how was it packaged?

24 A.   It was wrapped in cellophane and then electrical tape

25 wrapped around it.

1   Q.   Was there ever anything else in the packaging material?

2   A.   Yes, there was.  A fabric softener sheet.

3   Q.   Now, you say that you've been using methamphetamine for a

4   long time.  I take it that you therefore used some of the

5   methamphetamine?

6   A.   Well, yeah, I did.

7   Q.   And in fact, I guess --

8   A.   That was my main purpose.

9   Q.   Okay.  And is that all you did with it?  Did you use all

10  of the methamphetamine?

11  A.   No, not all of it.  I just sold enough to take care of my

12  habits so I wouldn't have so much to -- because it was

13  expensive.  But I was a user.

14  Q.   Did you repackage the methamphetamine you received from

15  him or did you just use the same packaging material?

16  A.   No, I repackaged.

17  Q.   How did you repackage it?

18  A.   I just put it into little small baggies or just whatever

19  the amount that they wanted, that's the way I done it.  I'd

20  just weigh it.

21  Q.   What kinds of baggies did you use?

22  A.   Used sandwich bags and cut the corners.

23  Q.   Were there other types of bags you used?

24  A.   No, that was it.  But there -- I have seen people use

25  other types of bags like little small jewelry bags or

DANNY ELLER - DIRECT

1    something.

2    Q.   So like Ziplock bags?

3    A.   Yes.  Yes, sir.

4         Well, yes, now that you mentioned it.  I -- like if they

5    wanted a bigger quantity, there was these other size Ziplocks,

6    like little, small Ziplocks that we could use.

7    Q.   Sir, because we have to have everything recorded by

8    voice, we can't record your hand gestures.

9    A.   Oh.

10   Q.   No, no, I don't mean to be a pain, but if you could

11   describe either by inches or something like that.

12   A.   Something about maybe like a 3 by 5 maybe.  Maybe not

13   hardly that large.

14   Q.   Okay.  I'd like to show you what's been previously

15   admitted as 3C.  Does any of the contents of this bag look

16   familiar to you?

17   A.   Yes, it does.

18   Q.   What does?

19   A.   All of it.

20   Q.   Okay.  So when you say "all of it," you were just

21   touching the white substance.

22   A.   Yes, that looks like methamphetamines.

23   Q.   And what I'm now -- I'll put this up on the ELMO as well

24   and ask you a second time.  But while I'm up here with you, do

25   you recognize this bag?

1  A.    Yes, that's the 3 by 5 bag that I was talking about.

2  Q.    Okay.  I'm going to put that up on the screen now.

3        Okay.  And so inside of this bag, this is what you were

4  just testifying about, that that's what you had used on

5  occasion; is that correct?

6  A.    Yes, sir.  Yes, sir.

7  Q.    So the interior smallest bag, to give it another

8  description; is that right?

9  A.    Yes.

10 Q.    Now, you had sold actually this baggie, for example, to

11 an individual who you later learned was working for law

12 enforcement; is that right?

13 A.    That's correct.

14 Q.    Now, law enforcement confronted you at your home with a

15 search warrant on October 26, 2012; is that correct?

16 A.    That is correct.

17 Q.    And then what happened?  Did they interview you?

18 A.    Yes, they did.

19 Q.    And what did you do when they tried to interview you?

20 A.    I give them a statement.

21 Q.    And did you give them a full statement about your

22 involvement in methamphetamine trafficking?

23 A.    Yes, sir.

24 Q.    And did you discuss the full extent to include Martin and

25 Jose?

DANNY ELLER - DIRECT

1  A.    That's correct.

2  Q.    Did they ask you to do anything during the interview?

3  A.    Yes, they did.

4  Q.    What?

5  A.    They just wanted me to give them information.

6  Q.    Did they ask you to actually do any purchases?

7  A.    Yes, they did.

8  Q.    And what did you indicate you would be able to do for

9  them?

10  A.    I told them I could get -- give them the one that I was

11  purchasing from.

12  Q.    And at that point in time, who were you actually directly

13  buying from?

14  A.    Jose.

15  Q.    And was that on anybody else's behalf?  Like, were you

16  buying from him?  Was he acting on anybody else's behalf?

17  A.    As I had told -- had said before, the -- that was my

18  understanding, that he was doing it for Martin.

19  Q.    Okay.  And you, in fact -- did you, in fact, accomplish

20  that and purchase methamphetamine from Jose?

21  A.    Yes.

22  Q.    Where did those purchases take place?

23  A.    At the trailer.  And sometimes out on the road.  Most of

24  the time I just met him.

25  Q.    Okay.  But you said "the trailer."  Do you mean the

DANNY ELLER - DIRECT

1  trailer that was on Martin's property?

2  A.   That's correct.

3  Q.   At some point in time, did you try calling Jose or Martin

4  and your calls were not being answered?

5  A.   Yes, sir.

6  Q.   Then what did law enforcement ask you to do?

7  A.   They asked me to go see if anyone was at home.

8  Q.   And tell us about that.  By the way, just so we can

9  understand timing, was this December 11th of 2012?

10  A.   I don't recall if that's what the date was or not.

11  Q.   Okay.  Well, was it approximately --

12  A.   Yeah, it was close.  It was close, yes, sir.

13  Q.   So what happened?

14  A.   They asked me to go and just knock on his door to see if

15  Martin was there.

16  Q.   Was he?

17  A.   Yes, he was.

18  Q.   And had you been searched, your body searched and then

19  had you been given a recording device to wear?

20  A.   Yes, sir, I had.

21  Q.   Have, you in, fact reviewed a copy of the recording?

22  A.   Yes, sir.

23  Q.   And did you initial the disk to indicate that it was a

24  fair and accurate recording of your conversation with Martin?

25  A.   Yes, I did.

DANNY ELLER - DIRECT

1   Q.   I'd like to show you what's been marked for ID purposes
2   only as Government's Exhibit 7.
3        There are several initials on here, but do you recognize
4   your initials?
5   A.   Yes, I do.  That's mine right there.  Says "DCE."
6   Q.   Okay.  And that's -- that was your indication that this
7   was an accurate recording?
8   A.   That's correct.
9   Q.   All right.
10       MR. KAUFMAN:  Your Honor, at this time we'd like to
11  play what's already been admitted as Exhibit 7A, and we'll be
12  asking that -- we'll be playing that with a transcript as a
13  demonstrative aid for the jury for their review.
14       MR. CANALES:  Judge, if I may, that was prior to the
15  computer not working.  If the computers are working, we can
16  follow it.
17       MR. KAUFMAN:  Your Honor, we're here.  We're ready.
18  Everything is good to go.
19       THE COURT:  All right.  You have the -- you propose
20  to play an audiotape, a digital recording, and present a
21  transcript simultaneously; is that right?
22       MR. KAUFMAN:  That's correct, Your Honor.
23       THE COURT:  All right.
24       Now, members of the jury, concerning, first of all,
25  the audio recording about which you have heard evidence, these

1   conversations, as you heard described, were legally recorded

2   by the government and therefore they are a proper form of

3   evidence for this trial and may be considered by you just as

4   any other evidence.

5           Now, when you hear an audio recording, keep in mind

6   that the transcript which you will see along with it is not

7   evidence.  The transcript also undertakes to identify the

8   speakers engaged in the conversation.  You are permitted to

9   have the transcript for the limited purpose of helping you

10   follow the conversation as you listen to the tape recording

11   and also to help you keep track of the speakers.  The

12   transcript, however, is not evidence.  The tape recording

13   itself is the primary evidence of its own contents.

14           So you are instructed that whether the transcript

15   correctly or incorrectly reflects the conversation or the

16   identity of a speaker is entirely up to you to determine based

17   on what you've heard here about the preparation of the

18   transcript and upon your own examination of it in relation to

19   what you hear on the tape recording.  What you hear is the

20   evidence, not what you may see on the transcript.  If you

21   decide that the transcript is in any respect incorrect or

22   unreliable, you should disregard it to that extent.

23           Differences in meaning between what you hear in the

24   recording and read in the transcript may be caused by such

25   things as the inflection in a speaker's voice.  You should

DANNY ELLER - DIRECT

1  therefore rely on what you hear rather than what you read when
2  there is a difference.
3       In considering a tape recording or digital
4  recording, you must consider whether the words are audible and
5  intelligible; whether what you're hearing is trustworthy under
6  the circumstances you heard described in the evidence; whether
7  the operator of the equipment was competent to operate it;
8  whether the equipment is being faithful to what is said as to
9  what is recorded; whether there have been any alterations;
10 whether the identity of the speakers has been established.
11      With those considerations I would allow the
12 government to go ahead and play the recording.
13      MR. KAUFMAN:  Thank you, Your Honor.
14      (Government's Exhibit Number 7 was played to the
15 jury.)
16 Q.  (By Mr. Kaufman) So, Mr. Eller, that's the recording from
17 October 26, 2012, with the defendant here in court that took
18 place at the defendant's residence.
19 A.  Yes.
20 Q.  Now, near the beginning there's a pause and then -- and
21 you say, "My goodness."  What caused you to say "my goodness"?
22 A.  When I seen what kind of shape he was in where he showed
23 me where he was cut all the way down where he had been shot --
24      MR. CANALES:  Your Honor --
25 A.  -- several times.

1        THE COURT:  Overruled.

2   Q.   And when he later talked about two gangs, what was he

3   talking about?

4   A.   I suppose that was gangs in Mexico, I don't know.

5   Q.   And where had he said he had just -- where had he told

6   you before that meeting that he was going to?

7        MR. CANALES:  Objection.  One second, Your Honor.

8        (Defense counsel conferred.)

9        MR. CANALES:  Your Honor, we're asking you to strike

10  the answer about the gangs because he doesn't know, Judge, and

11  I ask the jury to be instructed as such.

12       THE COURT:  Overruled.  That will be for cross.

13  Q.   So before this meeting with Mr. Saldana, had he told you

14  where he was going?

15  A.   He said he was going back to visit his parents.

16  Q.   Where?

17  A.   In Mexico.

18  Q.   At one point in the conversation, the defendant talked

19  about it being too hot.  What's that mean?

20  A.   That from when we make a statement of things being too

21  hot, it's where the law is on our tails, so to speak.

22  Q.   And then at a point about a minute and a half later, the

23  conversation talks about how it's quiet.  What does that mean?

24  A.   Talks about how it's quiet?

25  Q.   Yeah, at 18:01.  Maybe what I can do is play that

DANNY ELLER - DIRECT

1   portion.

2               MR. CANALES:  Your Honor --

3   Q.   Going to --

4               MR. CANALES:  -- I'm going to object, Your Honor.

5   This is repetition.  I ask that he be asked to answer to the

6   best of his recollection, Your Honor.

7               THE COURT:  Hold up just a minute.

8               MR. KAUFMAN:  Yes, Your Honor.

9               THE COURT:  What's the objection?

10              MR. CANALES:  Your Honor, I'm going to object.  This

11  is cumulative.  This has already been played.  If he wants to

12  ask him questions for him to answer to the best of his

13  recollection, to his knowledge, not what's being presented

14  today.  He's testifying --

15              THE COURT:  All right.  The question appeared to ask

16  the witness legitimately what his recollection was and I think

17  he wants to refresh the witness's memory about what was said

18  in the conversation.  So overruled.

19              (Government's Exhibit Number 7 resumed.)

20  Q.   (By Mr. Kaufman) During the conversation when Mr. Saldana

21  says, "I'm telling you so, I mean, things around here are

22  pretty, pretty quiet or how."

23       And then you respond, "I didn't know.  I couldn't get

24  ahold of nobody and didn't know for sure."

25  A.   Oh, that right there would mean when he's saying it's

DANNY ELLER - DIRECT

1   pretty quiet around here, there was no activities.

2   Q.   And your understanding as to what -- what was the reason

3   for that?

4   A.   No buying or selling or anything of that sort.  Nothing

5   going on.

6   Q.   At one point Mr. Saldana tells you to lay low.  What does

7   that mean?

8   A.   Try to stay out of trouble.

9   Q.   At another point he talks to you about the number two

10  guy.

11  A.   Yes.

12  Q.   Is this number two guy involved in methamphetamine

13  trafficking?

14  A.   Yes, he is.

15  Q.   Why does he refer to him as the number two guy?

16  A.   I don't know.  That's just what they called him was the

17  number two guy.

18          MR. KAUFMAN:  Nothing further, Your Honor.

19          THE COURT:  Members of the jury, we'll take our

20  morning break at this time.  We'll call for you shortly.

21          (Brief recess at 10:55 a.m.)

22          THE COURT:  May we have the jury, please.

23          (Jury entered the courtroom.)

24          THE COURT:  All right.  The jury is with us.  I

25  believe the government had concluded its direct examination.

1        MR. KAUFMAN:  That's correct, Your Honor.  Thank

2   you.

3        THE COURT:  Thank you.

4        Mr. Canales.

5                        DANNY ELLER

6                     CROSS EXAMINATION

7   BY MR. CANALES:

8   Q.   Good morning, sir.

9   A.   Good morning, sir.

10  Q.   I'm going to be asking you some questions.

11  A.   Certainly.

12  Q.   If you don't understand them or I'm speaking too fast,

13  I'd be more than happy to repeat those questions.

14  A.   Thank you.

15  Q.   Do we have an agreement?

16  A.   Pardon me?

17  Q.   Do we have an agreement?

18  A.   Yes.

19  Q.   Let me see if this helps.

20       All right.  Who is Bob?

21  A.   He is just another person that dealt in drugs in the

22  county.

23  Q.   Okay.  In Ashe County?

24  A.   Yes, sir.

25  Q.   Was he a neighbor of your sister?

1   A.   Pardon me?

2   Q.   Was he a neighbor of your sister?

3   A.   He lived just over the hill from my sister, yes.

4   Q.   I mean over the hill.

5   A.   Maybe a mile or a half mile.  Something like that.

6   Q.   Mile, half a mile for Ashe County, that's considered a

7   neighbor --

8   A.   Well, okay.

9   Q.   -- right?

10  A.   Yeah, correct.

11  Q.   That's fair.  That's fair.

12       Now, did you used to live with your sister?

13  A.   Yes, I did.

14  Q.   How long did you live with your sister?

15  A.   It wasn't too long.  Three, four months maybe.

16  Q.   Okay.  During that time you got to know Mr. Saldana,

17  right?

18  A.   Not while I was with my sister, no.

19  Q.   No?

20  A.   No.

21  Q.   You knew him before or after?

22  A.   Saldana?

23  Q.   Yes.

24  A.   It's after.

25  Q.   After not before?

DANNY ELLER - CROSS

1  A.    No.

2  Q.    Isn't it true you knew him while you were living with

3  your sister?

4  A.    Are we talking about Bob Shore or Saldana?

5  Q.    You tell me.  Who are you talking about?  Who did you

6  know -- did you know Saldana?

7  A.    No, not while I was living with my sister.  I met him

8  later.  We were talking about Bob Shore.

9  Q.    Okay.  You knew Bob Shore as a neighbor of your -- he was

10 also a neighbor of your sister?

11 A.    I met him once, maybe twice.

12 Q.    Was he also from Ashe County?

13 A.    Yes.

14 Q.    Okay.  So it's fair to say that you knew about Bob and

15 you all got to become friends while you were a neighbor of

16 your sister, right?

17 A.    No.  I just said I had made his acquaintance, met him

18 maybe once or twice.

19 Q.    Okay.

20 A.    That was -- that was it.

21 Q.    You know of him, right?

22 A.    Well, I know of him from other people talking.

23 Q.    What do you know of him?

24 A.    I just know he had been known for dealing drugs.

25 Q.    I mean, that's something that -- that's fine.  And I'm

1  sorry for asking this question, but is gossip pretty strong in

2  Ashe County?

3  A.    Pardon me?

4  Q.    Is gossip pretty strong in Ashe County?

5            MR. KAUFMAN:  Objection.

6            THE WITNESS:  Well --

7            MR. KAUFMAN:  Objection.

8            THE WITNESS:  -- I don't --

9            THE COURT:  Overruled.

10            THE WITNESS:  I don't know if you can call it

11  gossip, but we do know things.

12  Q.    People talk.

13  A.    Yes.

14  Q.    And after a while it just becomes the truth.

15  A.    Well, some of it's true and some of it isn't.

16  Q.    Okay.  Was there gossip about your drug usage?

17  A.    Mine?

18  Q.    Yes.

19  A.    I don't know for sure, but I imagine, yes, that there

20  was.

21  Q.    You were a heavy drug user, right?

22  A.    Yes, I was.

23  Q.    You started at what age?

24  A.    I started drinking when I was 16.

25  Q.    Okay.  Heavy?

1    A.    No, not heavy, just...

2    Q.    Then?  Tell us about your drug usage.  Then what

3    happened?  You graduated to something stronger?

4    A.    Oh, yes.  Yes.

5    Q.    What was the next step you took after drinking?

6    A.    I think it was marijuana.

7    Q.    How long did you smoke marijuana?

8    A.    Yes.

9    Q.    For how long?

10   A.    Several years.  I believe it's all in my statement that I

11   give.

12   Q.    Yes, sir.  That's why I'm asking you.

13   A.    Well, I -- that's been a while since I made my statement.

14   Q.    Okay.  But you know -- I'm asking about your life, not

15   about your statement.  I'm asking about your life.  Your

16   statement -- I'm not concerned about your statement.  I'm

17   concerned about your life.

18        When did you start smoking marijuana?

19   A.    Probably around 18.  Eighteen to 21.

20   Q.    Eighteen to 21.  And were you combining marijuana with

21   alcohol as well?

22   A.    Yes, sir.

23   Q.    Okay.  And then what did you do then?  What other drugs

24   did you try?

25   A.    I tried cocaine.

1  Q.   Okay.  And then what about -- did you ever combine

2  alcohol with cocaine?

3  A.   Yes.

4  Q.   How about cocaine, marijuana, and alcohol?

5  A.   Yes.

6  Q.   Okay.  What was the next drug?

7  A.   Methamphetamine.

8  Q.   When did you start using meth?

9  A.   Late 20s.

10  Q.   Late 20s.  How old are you now?

11  A.   I am 53.

12  Q.   Late 20s.  You're 53.  Two, three decades of drug usage,

13  right?

14  A.   Yes.

15  Q.   The day you were arrested on October -- were you arrested

16  in October?

17  A.   Yes, sir.

18  Q.   Okay.  When you were arrested in October, were you taken

19  to jail immediately?

20  A.   No, sir.

21  Q.   No?

22  A.   No.

23  Q.   You didn't have to get a bond like everybody else, post

24  bond?

25  A.   Yes.

1  Q.   Were you taken to jail then?

2  A.   Oh -- I'm sorry, rephrase your question.

3  Q.   When were you arrested?  When were you handcuffed for the

4  first time?

5  A.   December 12th.

6  Q.   December 12th.  Okay.

7  A.   Of 2012.

8  Q.   Wait a minute.  Wait a minute.  On October -- correct me

9  if I'm wrong, in October you had already been confronted by

10 the authorities.

11 A.   That's right.

12 Q.   I mean, they told you that -- they confiscated drugs from

13 you, right?

14 A.   Correct.

15 Q.   You were told -- I'm sure you were told, correct me if

16 I'm wrong, "We got you.  There's been at least seven purchases

17 of drugs."

18        MR. KAUFMAN:  Objection.  Facts not in evidence.

19 Q.   Did they ask you?

20        THE COURT:  Overruled.

21 Q.   They told you, right?

22 A.   They told me...

23 Q.   For how many grams did they have you?

24 A.   For how many grams?

25 Q.   Yes.

1  A.   That they had me?

2  Q.   Do you know the charges?

3  A.   Yes.

4  Q.   Okay.  Did they tell you that they had a controlled buy

5  for 3.5 grams approximately?

6  A.   Yes.  Yes, that was in that statement.

7  Q.   Did they tell you they had you for 3.43 grams,

8  approximately?

9  A.   Yes, approximately.

10 Q.   And did they tell you there was another buy where they

11 sent a confidential informant?  Did they tell you they set you

12 up?

13 A.   Yes.

14 Q.   I mean, right?  And did they tell you that the other buy

15 was for 3.5 grams?

16 A.   Right.

17 Q.   Right?

18 A.   Uh-huh.

19 Q.   And did they tell you there's another day that you sold

20 drugs to another person and that time it was for 7.4 grams,

21 approximately?  Did they tell you that?

22 A.   No.

23 Q.   No?

24 A.   For another buy of 7.4 grams?

25 Q.   Excuse me, 6.4 grams, approximately.  I'm using

426

DANNY ELLER - CROSS

1  approximate weights, right?

2  A.   I'm not getting what you're talking about.

3  Q.   Okay.

4  A.   It should be in my statement there.

5  Q.   Sir, I'm not interested in your statement.  I'm

6  interested in what you recall and don't recall.

7        MR. KAUFMAN:  Objection, Your Honor.  Counsel is

8  misstating the fact and he's arguing with the witness because

9  of his misunderstanding.

10       MR. CANALES:  I'll be more than happy --

11       THE COURT:  Counselor, I would ask you to ask a

12 question and not enclose it in a lot of interjections and

13 exclamations.  If he gets one question at a time, I think

14 he'll understand it better.

15       MR. CANALES:  Yes, Your Honor, but that's very --

16 I'm going to object to the government's comments about me

17 misrepresenting the facts.  I am using the lab report.

18       THE COURT:  I overruled his objection.

19 Q.   (By Mr. Canales) Okay.  Was there a time in which you

20 sold -- I'm giving you estimate weights of 6.4 grams.

21 A.   I never sold that much at -- in one certain time.

22 Q.   Okay.  So if --

23 A.   I've sold in like 3-1/2 grams.  That's what they consider

24 an eight ball.  And that's what I was set up with.

25 Q.   Of how many grams?

1    A.    Three and a half grams.

2    Q.    Okay.

3    A.    Is what they consider an eight ball.

4    Q.    So they have here different quantities.

5    A.    Yes.  I can sell it in different quantities.  I can sell

6    it in halves.  I can sell it in grams.  I can sell it in

7    whatever I want.

8    Q.    You were told -- were you told that they had you selling

9    at least on seven different occasions?

10    A.    Seven different occasions?

11    Q.    Seven.  Number seven.  Were you told that?

12    A.    No.

13    Q.    Were you not informed of that?

14    A.    No.

15    Q.    Okay.

16    A.    Not that I know of.

17    Q.    Okay.  But you knew -- you didn't know -- the cops -- you

18    didn't know how much -- how much you were being confronted

19    with, how many -- how many -- how many times you had sold.

20    They never told you that?

21    A.    No, well --

22          MR. KAUFMAN:  Objection, Your Honor.  Asked and

23    answered.

24          THE COURT:  Overruled.

25    Q.    Did they ever tell you, "We have you"?

1    A.    Well, yes.

2    Q.    You understood that, right?

3    A.    Yes.

4    Q.    Okay.

5    A.    When they had three buys of controlled substance.

6    Q.    Exactly.  Three buys.  And that equals to how many grams

7    in total?

8    A.    Well, three times three and a half is what?

9    Q.    You tell me, sir.

10   A.    Ten and a half.  Is that right?  Ten and a half grams.

11   Q.    Okay.  And did they tell you that we have you with this,

12   right?

13   A.    Yes.

14   Q.    Were you arrested immediately that day?

15   A.    No.

16   Q.    You were not put in handcuffs?

17   A.    That's because I was -- what's the word?  I'm -- I can't

18   think of the word.

19   Q.    What is the word?  What do we call that?

20   A.    I'm agreeing to help them, in other words.

21   Q.    What would be a good term to call it?

22   A.    That's what I -- I'm lost for words.  I can't think of

23   what you would call it.

24   Q.    Okay.  So --

25   A.    Um...

DANNY ELLER - CROSS

1    Q.    Okay.  So --

2    A.    I'm committing to help them, in other words.

3    Q.    You agreed to become a snitch.

4                MR. KAUFMAN:  Objection.

5                THE WITNESS:  Yes.

6    Q.    Is that correct?  It's commonly known as that, right?

7                MR. KAUFMAN:  Objection.  Defense counsel is

8    characterizing.

9                THE COURT:  Sustained.

10   Q.    A person in jail who cooperates, what is that person

11   known as?

12               MR. KAUFMAN:  Objection.

13               THE COURT:  Overruled.

14   Q.    What is a nickname they use in jail for a person that

15   cooperates?

16               MR. KAUFMAN:  Objection to relevance, Judge.

17               THE COURT:  Overruled.

18               THE WITNESS:  They call them a snitch.

19   Q.    All right.  Are you one?

20   A.    Not basically, no.

21   Q.    No?  Okay.  You're not a snitch.

22         Are you honest?

23   A.    Well, I'd hope so.

24   Q.    Are you truthful?

25   A.    Yes.

DANNY ELLER - CROSS

1    Q.    Do you believe in helping yourself?

2    A.    Yes, I do.

3    Q.    Are you helping yourself today?

4    A.    The way I look at it is when I took -- put my hand on the

5    Bible there, it said tell the whole truth and nothing but the

6    truth so help you God.  That's what I'm doing.  And I'm

7    thinking that these drugs that I have been doing all my life

8    is the wrong thing to be doing.  So now I'm trying to correct

9    myself.

10   Q.    Wait a minute.  Why didn't you try to correct yourself

11   before October of 2012?

12   A.    Because I was on the wrong -- I was on drugs.

13   Q.    So were you not an honest man because of drugs?

14   A.    Yes, I was an honest man.

15   Q.    So you were an honest drug dealer?

16          MR. KAUFMAN:  Objection.  Argumentative.

17          THE COURT:  Sustained.

18   Q.    Would you consider a drug dealer being an honest person?

19          MR. KAUFMAN:  Objection.

20          THE COURT:  Sustained.

21   Q.    Trustworthiness.  Is a drug dealer trustworthy?

22          MR. KAUFMAN:  Objection.

23          THE COURT:  Sustained.

24   Q.    Okay.  So you were not -- have you pled guilty to

25   conspiracy?

1    A.    Yes, sir.

2    Q.    Okay.  When did you plead guilty?

3    A.    I don't remember when it was, but you have my plea

4    agreement.

5    Q.    Do you have an idea around when?

6    A.    I think it was in April.

7    Q.    In April.  Were you --

8    A.    That's when I signed my plea agreement was in April.

9    Q.    In April of last year?

10   A.    April 6 -- April 16 of 2013.

11   Q.    2013.  We're almost going on a year.  You know that,

12   right?

13   A.    Pardon me?

14   Q.    We're almost going on a year --

15   A.    Yes.

16   Q.    -- since you pled guilty?

17   A.    Yes.

18   Q.    Does it usually take a year from pleading guilty to being

19   sentenced in North Carolina?

20   A.    Yes.

21          MR. KAUFMAN:  Objection.  Relevance.

22          THE COURT:  Sustained.

23   Q.    Are you done with your cooperation as of today, as of

24   right now?

25   A.    I don't have no idea.  If they come back and ask me to do

1  something else, I may do it, I don't know.

2  Q.   If it benefits you, right?  If it helps you?

3  A.   I've never been promised anything.

4  Q.   No, sir.  You're not expecting -- there's a difference

5  between expecting and a promise.  Are you expecting a

6  reduction in sentence today?

7  A.   (No response.)

8  Q.   Remember, you're an honest man.

9  A.   I've not been told I was promised anything or told that

10  it would help me whatsoever.

11  Q.   So as far as you know, you're testifying today out of the

12  kindness of your heart?

13  A.   I'm trying to do the right thing.

14  Q.   So you told them, you know what -- you're the one --

15  you're the one that called the government first, told them I

16  want to help?

17  A.   No.

18  Q.   Did you call -- who --

19  A.   I didn't do anything until I was caught.

20  Q.   Exactly.  And now it becomes self-serving, right?  Now it

21  becomes something that is going to help you, right?

22  A.   Pardon me?

23  Q.   You didn't do anything until you got caught.  Those were

24  your exact words.

25  A.   Yes.  I didn't do anything until I got caught, yeah.

1   Q.   But now that you're caught, now that you're here before

2   this jury, you're asking the jury to believe you, right?

3   A.   Yes, I am.

4   Q.   And so I'm asking you.  I didn't use the word promise,

5   not in writing, not orally.  Expectation.  I'm expecting that

6   it's going to get hot in the summer.  I'm not -- nobody is

7   promising me it's going to be hot in the summer.

8        So I'm asking you, do you expect for your sentence to be

9   reduced?

10  A.   Well, put yourself in my place.  If you was doing

11  something like this, wouldn't you be hoping for some kind

12  of...

13  Q.   Some kind?

14  A.   Some kind of help.

15  Q.   I mean, it's commonly known in jail how much a sentence

16  is going to be reduced --

17            MR. KAUFMAN:  Objection.

18            THE COURT:  Sustained.

19  Q.   Do you have a percentage?

20  A.   No, sir.

21            THE COURT:  Sustained.

22  Q.   Did you plead guilty to -- did you plead guilty to

23  1500 grams or more?

24  A.   It was 500 to 1500.

25  Q.   Oh, so you pled to between 5 to 1500, right?

DANNY ELLER - CROSS

1   A.   That's correct.

2            MR. KAUFMAN:  Objection to counsel echoing the

3   response of the witness.

4            THE COURT:  Just ask questions.

5   Q.   Is there another -- to your knowledge, is more than 1500

6   another category of a crime?

7            MR. KAUFMAN:  Objection.

8            THE WITNESS:  I have no idea.

9            THE COURT:  Sustained.  Don't consider the last

10  answer, members of the jury.

11  Q.   Where did you meet my client?

12  A.   At Adams Construction.

13  Q.   Adams Construction.  Were you working there?

14  A.   No, sir.

15  Q.   Okay.  How did you -- that was the first time you met him

16  at Adams Construction.  You just happened to be walking by?

17  A.   No, sir.

18  Q.   You didn't?

19  A.   I had a friend of mine that had an acquaintance.  He said

20  he had someone he would like for me to meet.

21  Q.   And you met him there at Adams Construction.

22  A.   Yes, sir.

23  Q.   Okay.  And how long were you dealing -- how long were you

24  dealing with my client?  You and my client only.

25  A.   Maybe -- I don't know how long it was.  Six months to a

1  year.

2  Q.   Six months to a year.

3  A.   Yes.  I don't -- I have no idea.

4  Q.   You just know like general numbers?

5  A.   Yes, sir.

6  Q.   Okay.  Do you have any idea how many times you actually

7  met him, meaning exchange of drugs for money?  Personally with

8  him.

9  A.   No, not personally.  I just know it was a lot.

10  Q.   How many times?

11  A.   Do you -- I have no idea.  I mean...

12  Q.   Was it more than five?

13  A.   Well, yes, it's more than five.

14  Q.   Was it more than 20 times that you -- I'm talking about

15  dealing with him directly.  I'm not talking about dealing with

16  anybody else.  Was it 20 times at least?

17  A.   Maybe.

18  Q.   And there was talk, right?

19  A.   Oh, yeah.

20  Q.   And there was, Hey, did you -- what was the common

21  conversation?

22  A.   We always had a little conversation.

23  Q.   I know, but, you know, how would he know how -- but at

24  one point you would buy different amounts, right?

25  A.   No, most of the time it was one set amount and that was

DANNY ELLER - CROSS

1  it.

2  Q.   And one set of money, right?  Here's the money.

3  A.   Yes.

4  Q.   Here's the drugs.

5  A.   Yes.

6  Q.   But then you changed the quantity, right?

7  A.   One time.

8  Q.   Well, one time only?  I thought you said that -- I

9  thought you testified earlier that after that it became 1

10 ounce.

11 A.   That's what I said.  1500 to begin with --

12 Q.   And so --

13 A.   -- and then --

14 Q.   Would it --

15 A.   -- to 1 ounce --

16      MR. KAUFMAN:  Objection.  May the witness --

17      THE COURT:  Yeah, let him finish his answer.

18 Q.   Okay.  So would it be fair to say that you knew my client

19 well?

20 A.   No, not well, but enough to do transactions with him.

21 Q.   Enough to deal with the subject of drugs.

22 A.   That's correct.

23 Q.   Right?

24 A.   Right.

25 Q.   Okay.  If something -- if the drugs were bad or

1 something, you would have had the drugs -- well, not the

2 drugs, but you would have the ability to talk to him and

3 complain about it, right?

4 A.   Correct.

5 Q.   If the price was too high, you had the ability to talk to

6 him and deal with him about the price, right?  I mean, after

7 all --

8 A.   No.

9 Q.   -- this is business.  This is not friendship, right?

10 A.   Well, we never did bicker about the price.

11 Q.   I'm asking you but you had the ability.  You could have

12 done it.

13 A.   Oh, yes.

14 Q.   Right?

15 A.   Correct.

16 Q.   All right.  Now, this day -- this day you said -- are you

17 able to look at people in the eye and lie to them, sir?

18          MR. KAUFMAN:  Objection.

19          THE COURT:  Sustained.

20 Q.   Do you get nervous when you lie?

21          THE COURT:  Sustained.

22          MR. CANALES:  Judge -- yes, Your Honor.

23 Q.   That day that you talked -- the day that you were wearing

24 a wire, were you nervous?

25 A.   Of course.

1    Q.   On the video, you sound --

2            MR. KAUFMAN:  Objection.  Counsel said video.

3            MR. CANALES:  Sorry, Judge.  Audio.

4            THE COURT:  Slip of the tongue.

5    Q.   On the audio you sound cool, calm, and collected, right?

6    A.   When you're wearing a wire and want them not to know

7    anything about it, you're going to have to try to cover it up

8    somehow.

9    Q.   So it's fair for me to say you were cool, calm, and

10   collected.

11   A.   To some extent, yes.

12   Q.   Right?  You're able to -- you were able to hide whatever

13   fears you had, right?

14   A.   Right.

15   Q.   Fair?

16   A.   Yes.

17   Q.   I mean, you don't want to be caught being an informant,

18   right?

19   A.   That's correct.

20   Q.   You don't want to be caught.  You didn't want my client

21   to find out, right?

22   A.   Right.

23   Q.   So you're able to -- you were able to be in a strenuous,

24   difficult situation and wing it, right?  Right?  You can do

25   it.

DANNY ELLER - CROSS

1   A.   I can try.

2   Q.   But you can do it.  Trying and doing are two different

3   things.

4            MR. KAUFMAN:  Objection.

5            THE COURT:  He answered that question, counsel.

6   Q.   Okay.  Are you nervous today?

7   A.   Of course.

8   Q.   Okay.  But you can try today too, right?

9   A.   Try?

10  Q.   To not be nervous today.

11  A.   Yeah, I can try.

12  Q.   Are you trying right now?

13  A.   Of course.

14  Q.   Okay.  Now, where's Jody?

15  A.   I have no idea.

16  Q.   Did the government know about Jody?  Did you tell them

17  about Jody?

18  A.   Yes.

19  Q.   Okay.  They were able to find -- they were able to find

20  him if they want to, do you think?  Do you know?

21  A.   I guess.

22  Q.   All right.  Now, Jody would be a good witness today,

23  would you agree, to the fact he was the one that introduced

24  you to my client?

25            MR. KAUFMAN:  Objection.

1    THE COURT:  Sustained.

2  Q.   The government asked you whether Jose was -- whether Jose

3  Pina was independent or not and your response was "working for

4  him, I guess."  Is that your answer?

5  A.   Yes.

6  Q.   You don't know for a fact?

7  A.   That was just my understanding.

8  Q.   Did you know for a fact?

9  A.   No, I said that was only my understanding.  That was my

10 opinion.

11 Q.   Your opinion, right?

12    Okay.  Now, when were you given discovery on this case?

13 Like your lawyer, right, your lawyer was given copies of all

14 the reports, everything going on in this case, right?

15 A.   Yes.  It was while I was in Mecklenburg County jail.

16 Q.   Okay.  And were you able -- that's where you learned last

17 names and you learned dates and all that; is that correct?

18 A.   That's right.

19 Q.   That's where you learned about what was found in my

20 client's home, right?

21 A.   Pardon me?

22 Q.   That's where you learned, like, on the date of the arrest

23 what happened to my client, right?

24 A.   I was just showed what happened to me.

25 Q.   I mean, but your lawyer had access to full discovery,

DANNY ELLER - CROSS

1  right?

2           MR. KAUFMAN:  Objection.  Foundation.

3           THE COURT:  Overruled.

4  Q.   Are you -- did your lawyer have access to full discovery

5  in this case over a year -- over a year ago?

6  A.   Yes, he showed me the -- he give me the stuff where they

7  had wore a wire in on me.  I got to see all that.

8  Q.   But you also got to see the arrest reports of what

9  happened in the whole case, who got arrested and who didn't

10 get arrested, right?

11 A.   I knew who got arrested, but I didn't see exactly who got

12 arrested.

13 Q.   Okay.  But -- I'm talking about discovery.  Copies of

14 reports, police reports.  At least your lawyer knew to your

15 knowledge?

16 A.   He give me a copy of my report.

17 Q.   Okay.  Let me ask you this question.  Did your lawyer --

18 in your opinion was your lawyer informed about this case?

19           MR. KAUFMAN:  Objection.

20           THE COURT:  Sustained.

21 Q.   Are you satisfied with your lawyer?

22           MR. KAUFMAN:  Objection.

23           THE COURT:  Sustained.

24 Q.   I mean, you could have -- this recorded conversation, I

25 mean, you could have complained.  I mean, after all -- how

1  come you didn't complain to my client on that recorded

2  conversation?

3         THE COURT:  Sustained.  I think you'll need to

4  rephrase the question.

5  Q.  Okay.  You weren't happy with the fact that you were not

6  able to get in contact with Pina, is that correct, on the date

7  that you wore a wire?

8  A.  I just told him I couldn't get in touch with him.

9  Q.  Did the police tell you to say that or you were unable to

10  get in touch with him?

11  A.  I just wasn't able -- no, that's when I was calling to

12  make a buy and I couldn't get...

13  Q.  Couldn't get what?

14  A.  Couldn't get in touch with him.

15  Q.  Okay.  So here is a person that you've dealt drugs in the

16  past.  You've bought from him numerous times.  You've given

17  money in exchange for drugs.  Why not?  I mean, you all didn't

18  complain, talk about drugs, talk about money.  You didn't do

19  that.

20  A.  That's because my understanding was that Martin wasn't

21  around.

22  Q.  But you realized that he was around.  You saw him.  You

23  were talking to him.

24      Let's talk about deals.  Let's talk about, hey, this guy

25  who I -- my understanding is he's working for you, doesn't

1  return my calls.  Why not complain?  Why not talk about money?

2  Why not talk about drugs?  I mean, that was the purpose you

3  were there.

4  A.   That's the reason I stopped by to see him.

5  Q.   Wasn't that your purpose?

6  A.   When I stopped by to see Saldana?

7  Q.   Why not talk about drugs?  Why not talk about cash?  Why

8  not sweeten up the pie?

9  A.   (No response.)

10 Q.   Why not?

11 A.   Because I was dealing with Jose at the time.

12 Q.   But I said -- you said your understanding was that Jose

13 was working for him.  He's the boss.  Complain to the boss,

14 the manager.

15       THE COURT:  I'll need to hear a question, counselor.

16 Q.   Did you --

17       THE COURT:  Other than argumentation.

18 Q.   Do you feel -- isn't it true you feel you got set up by

19 the police?

20 A.   Repeat that, please.  I didn't understand.

21 Q.   When you were arrested, when you were first confronted,

22 isn't it true that you feel you were set up by the police?

23 A.   Yes.

24       MR. CANALES:  No further questions.

25                 REDIRECT EXAMINATION

DANNY ELLER - REDIRECT

1   BY MR. KAUFMAN:

2   Q.    Mr. Eller, in the beginning of the recording, did the

3   boss ask you about your arrest with suspicion about you?

4   A.    Yes.

5   Q.    And so at that point in time, if you did try to talk with

6   him after he asked you about your arrest, do you think that

7   would have helped you get him talking?

8   A.    He probably wouldn't have talked to me.

9   Q.    The defense lawyer asked you about your understanding,

10  and pounding on the word "understanding," about Jose working

11  for Martin Saldana.  What was the basis for your

12  understanding?  What did you hear from either of them or see

13  from them that gave you the understanding that Jose was

14  working for Martin?

15  A.    Well, just when Martin would take off and go to Mexico or

16  wherever he was going, let me put it that way, wherever he was

17  going, Jose was the one that I would call.  So that was just

18  my assumption.

19  Q.    Who told you to call Jose?

20  A.    Martin.

21  Q.    Counsel asked you about Jody.  First, as a background

22  question, are you familiar with all the different

23  investigations that law enforcement may or may not be

24  conducting?

25  A.    No, sir, I'm not.

DANNY ELLER - REDIRECT

1   Q.   Did Jody, to your knowledge, ever sell drugs?

2   A.   No, sir.

3   Q.   The defense lawyer was asking you about changes in your

4   arrangement with Mr. Saldana and he confronted you with the

5   notion that there was only one change.  Can you explain what

6   that one change was.

7   A.   The only change was from buying a half ounce to an ounce.

8   Q.   And then once that one change happened, did you remain

9   consistent with that 1 ounce for the rest of your buying

10  relationship with the defendant?

11  A.   Yes, sir, I did.

12  Q.   Now, in the very beginning of your testimony, the defense

13  lawyer was asking you about Bobby and the relationship with

14  your sister, right?

15  A.   Yes.

16  Q.   Now, in the recording, however, you reference --

17  Mr. Saldana states, "Yeah, that damn Bobby, Bobby Nichols.

18  Bobby.  You know, Bobby and Mikey."

19       Is Bobby Nichols the same person depicted in 1B who

20  you've talked about that you know from living near your

21  sister?

22  A.   No, that's not Bobby Nichols as I know of.

23  Q.   So there are two different Bobbys that are being

24  discussed.

25  A.   Evidently, yes.

DANNY ELLER - REDIRECT

1  Q.   So you were discussing a different person in the -- Bobby
2  Nichols that you discussed with Martin is different than Bobby
3  who is showing up in 1B.
4  A.   That is correct.
5  Q.   The defense lawyer confronted you with the idea that you
6  were stopped by law enforcement on October 26, 2012, and
7  weren't actually taken into custody until December 12th of
8  2012.  Do you remember that?
9  A.   Yes, sir.
10 Q.   And was the reason for that because you immediately
11 confessed and agreed to cooperate proactively with the
12 investigation?
13 A.   That's correct.
14 Q.   The defense lawyer repeatedly asked you about seven buys
15 from you.  Were there seven buys that law enforcement made
16 from you?
17 A.   No, sir.
18 Q.   He asked you many times about the seven buys.  Are you
19 sure?
20 A.   As far as my -- as far as I know.
21 Q.   And you said that you had seen the reports about you.
22 I'm showing you what's been marked as Exhibit 3D, and I'm
23 highlighting a portion.
24      Were those -- based on your recollection of the timing,
25 were those three and only three buys made from you on

DANNY ELLER - REDIRECT

1  October 9th, October 10th, and October 23rd?

2  A.    That's it.

3  Q.    And then was there only one other time that drugs were

4  taken from you, that is, from your house on October 26th?

5  A.    Yes, sir.

6  Q.    So there weren't actually seven buys from you?

7  A.    No, sir.

8  Q.    With regard to your plea agreement, going to what's been

9  marked for identification as Government's 20.

10      Do you see the first page?

11  A.    Yes, sir.

12  Q.    And the last page, 7 of 7?

13  A.    Yes, sir.

14  Q.    Do you recognize what this document is?

15  A.    Yeah, that's my plea agreement.

16      MR. KAUFMAN:   Your Honor, we'd move to admit and

17  publish Exhibit 20.

18      THE COURT:   Let it be admitted.

19      MR. KAUFMAN:   Thank you, Your Honor.

20      (Government's Exhibit No. 20 was received into

21  evidence.)

22  Q.    Okay.   Page 1, and then -- now, you testified that you

23  entered your guilty plea in magistrate's court on April 16th

24  of 2012, right?   I'm sorry, April 16th of 2013; is that right?

25  A.    That's right.

1  Q.   Okay.  Now, going to the last page, when -- what was the
2  date that you actually signed your plea?
3  A.   That was February 21st, 2013.
4  Q.   Okay.  So you had to weight for the court's calendar to
5  open up for your plea to actually be entered.
6  A.   That's correct.
7  Q.   All right.  And there is a portion in your plea agreement
8  called "Assistance to the United States."  Are you familiar
9  with that?
10  A.   Yes.
11  Q.   And I'm showing you page 5 of 7.  Just, you know, it's a
12  seven-page document and there's a lot of terms in there.  But
13  the bottom line, what's your understanding as to the rules
14  regarding assistance to the United States?  What is your job?
15  A.   To cooperate.
16  Q.   And how?
17  A.   In any way that I can.
18  Q.   Okay.  And what must you do at all times?
19  A.   Tell the truth.
20  Q.   And what happens if you don't?
21  A.   You can get more, more time.
22  Q.   How so?
23  A.   It's -- excuse me.  It's contempt of court; is that
24  correct?
25  Q.   So is that an additional crime?

DANNY ELLER - RECROSS

1    A.    Yes, it is.

2    Q.    And what would happen to your potential desire to get a

3    reduced sentence from Judge Voorhees?

4    A.    Be out the door.

5    Q.    And who will ultimately decide what your sentence is?

6    A.    The judge.

7            MR. KAUFMAN:   Nothing further.

8                      RECROSS EXAMINATION

9    BY MR. CANALES:

10   Q.    But wait, let me -- you said that -- you were right, it

11   wasn't seven.  The government -- I'm sorry if I misspoke.  It

12   was -- they only had you on three -- three buys, right?

13   A.    Yes.

14   Q.    And that's a total of how many grams?

15   A.    Let's see.  Well, three and a half -- well, when they

16   showed that, they were weighing the bag which showed four.  So

17   that's 12 grams.

18   Q.    12 grams.  All right.  So they only have you for a

19   total -- a total of 12 grams when this happened, right?

20   A.    Uh-huh.

21   Q.    And this happened when?

22   A.    Whatever the dates were.

23   Q.    October.  October 2012.  But today, according to the

24   government based on what they showed you, on February of 2013

25   you have a greater danger, a greater need to cooperate, right?

DANNY ELLER - RECROSS

1  Because you pled guilty to between 500 but less than

2  1500 grams; is that correct?

3  A.   Yes, sir.

4  Q.   As a matter of fact, now you're looking -- now you're

5  looking at a minimum of ten years, right?

6  A.   Uh-huh.

7  Q.   Is that a real possibility of you getting ten years?

8  A.   Yes, sir.

9  Q.   Okay.  But there's one way out, right?  There's one way

10  out and you want it, right?

11  A.   Yes.

12  Q.   And what's that -- what way -- what's that way?  Tell us,

13  what's that way for you to help yourself?  What's the way out?

14  A.   Is to cooperate.

15             THE COURT:  Wait just a minute.

16             MR. CANALES:  Okay.

17             THE COURT:  Counselor --

18             MR. CANALES:  That's fine, Your Honor.  I apologize.

19             THE COURT:  I want to hear the questions and I want

20  the witness to be able to answer them.  But you actually, if

21  I'm not incorrect, asked three separate questions serially

22  before you allowed the witness to answer.

23             MR. CANALES:  You're correct, Judge.

24             THE COURT:  I would like you to try to just ask one

25  at a time.

451

DANNY ELLER - RECROSS

1    MR. CANALES:  Yes, sir.
2  Q.   Now you have a greater danger than back then, right?
3    MR. KAUFMAN:  Objection.  Asked and answered.
4    THE COURT:  Sustained.
5  Q.   Okay.  And let me tell you, you have to convince -- you
6  have to convince someone about Martin, right?
7    MR. KAUFMAN:  Objection.
8    THE COURT:  Sustained.
9  Q.   You were interviewed by the police, right?  This
10 morning --
11    THE COURT:  Wait a minute, counselor.  I will repeat
12 myself.  When you ask a question, it's your obligation to wait
13 for the answer.
14    MR. CANALES:  Yes, Your Honor.
15    THE COURT:  Now, if you're not happy with that
16 question, I'd ask you to strike it and then ask another
17 question.
18    MR. CANALES:  Yes, Your Honor.
19 Q.   This morning did you talk to anybody from the
20 government's office?
21 A.   No, sir.
22 Q.   When was -- when was the last time you talked to anybody
23 from the government's office?
24 A.   It's been several weeks now.
25 Q.   Were you prepped for trial?

DANNY ELLER - RECROSS

1    A.    Yes.

2    Q.    Were you told what to expect?

3    A.    Yes.

4    Q.    Were you told you're going to have a defense attorney

5    asking you questions?

6    A.    Yes, sir.

7    Q.    Okay.  And did they ask you -- did they basically tell

8    you this is what we -- this is what the subject matter of your

9    testimony?  I mean, you knew what this whole thing was going

10   to be about today, right?

11   A.    Yes, sir.

12   Q.    And how many meetings did you have?

13   A.    Pardon me?

14   Q.    How many meetings did you have with the government?

15   A.    Just one.

16   Q.    Really?

17   A.    Yes, sir.

18         MR. KAUFMAN:  Objection, Your Honor.  Ambiguous as

19   to government.

20         THE COURT:  Well, overruled.  Redirect.

21   Q.    When I say "government," I mean the police as well.

22   Mr. Harmon.  How many times have you met with Mr. Harmon, the

23   gentleman right there?  Have you met with him?

24   A.    Yes, I met with him one time.

25   Q.    Okay.  What about the state officers in the back, have

DANNY ELLER - RECROSS

1  you talked to them too?

2  A.  They were the arresting officers.

3  Q.  Okay.  So you spoke to them another time.

4  A.  No, no.  You asked me if I talked to Mr. Kaufman.

5  Q.  You know him by name?

6  A.  Yes, sir.

7  Q.  How is that?

8  A.  Because he's on my plea.

9  Q.  Okay.  Have you talked to him before?

10 A.  One time.

11 Q.  Okay.  And did you talk about what was going to happen

12 today in the courtroom?

13 A.  He prepped me, yes, he had.

14 Q.  He prepped you.  All right.

15     Now, when you realized what this testimony was going to

16 be about, they told you you needed to tell the truth, right?

17 A.  Mr. Kaufman give me two rules to go by.  The first rule

18 was to tell the truth, the whole truth and nothing but the

19 truth.

20 Q.  Uh-huh.

21 A.  The second rule was don't forget rule number 1.

22 Q.  Sir, I'm not concerned about Mr. Hoffman -- Kaufman,

23 excuse me.  I'm talking about you.

24 A.  That's right.

25 Q.  You were told to tell the truth, right?

DANNY ELLER - RECROSS

1  A.    That's right.

2  Q.    Right?

3       And you knew that the truth that they wanted was about

4  Mr. Saldana, right?

5  A.    Right.

6  Q.    Okay.  And you knew that if the truth was that Saldana

7  was selling you drugs or charged with selling drugs, that that

8  would be -- that would be a way to get your sentence reduced,

9  right?  You knew that before coming to the courtroom today.

10 A.    I wasn't told anything.  I was just hoping it would help.

11 Q.    I'm not asking what you were told.  This is not about the

12 government.  I'm asking you.  Did you know -- did you know

13 testifying against Saldana was your way out today?  Yes or no?

14 A.    It's not my way out, but I knew that there was a chance

15 it could help.

16 Q.    Okay.  Let's assume -- let's pretend you didn't testify

17 today.  Give me another way of reducing your sentence.

18            MR. KAUFMAN:  Objection.  Speculation.

19            THE COURT:  We've been over this.

20            MR. CANALES:  If he knows.

21            THE COURT:  Counselor, you have been over this.

22 Q.    Okay.  One question.  Have you been told by your lawyer

23 there is another way other than this to reduce your sentence?

24            THE COURT:  Objection.

25            THE COURT:  Sustained.

BOBBY SHORE - DIRECT

1    Q.    Okay.  Do you hope for another way of reducing your

2    sentence other than this testimony?

3            MR. KAUFMAN:  Objection.  Asked and answered.

4            MR. CANALES:  Judge, he hasn't answered that one.

5            THE COURT:  Overruled.

6    Q.    Is there another real hope in your heart of another way

7    of reducing the sentence other than this one?

8    A.    I wasn't aware of one, no.

9            MR. CANALES:  Okay.  No further questions.

10           THE COURT:  No questions?

11           MR. KAUFMAN:  No, Your Honor.

12           MR. CANALES:  Pass the witness.

13           THE COURT:  You may step down.

14           (Witness stepped down.)

15           MR. KAUFMAN:  United States calls Bobby Shore.

16      BOBBY GILES SHORE, GOVERNMENT WITNESS, SWORN,

17                    DIRECT EXAMINATION

18   BY MR. KAUFMAN:

19   Q.    Good morning.

20   A.    Good morning.

21   Q.    If you would, please state your full name and spell your

22   last name for the record.

23   A.    Bobby Giles Shore.  B-o-b-b-y, G-i-l-e-s, S-h-o-r-e.

24   Q.    Mr. Shore, are you here having pled guilty to a

25   methamphetamine conspiracy involving over 500 grams of

1  methamphetamine?

2  A.   Repeat that, please.

3  Q.   Are you here having pled guilty to a methamphetamine

4  trafficking conspiracy that involved well in excess of

5  500 grams of methamphetamine?

6  A.   Yes, sir.

7  Q.   Do you see anybody in the courtroom today who is part of

8  your methamphetamine activities?

9  A.   Yes.

10  Q.   Who do you see?

11  A.   Martin.

12  Q.   Do you know Martin's last name?  And by the way, this

13  would be from anything you knew leading up till your arrest.

14  Did you know his name prior to your arrest, his last name that

15  is?

16  A.   I can't pronounce his last name.  I know it's -- I know

17  it.  I know it.  I can't pronounce it.

18  Q.   Okay.  Can you tell us where Martin is sitting and what

19  he's wearing.

20  A.   To the right of me.  Right over here (indicating).

21  Q.   What's he wearing?  What's he look like?

22  A.   The plaid shirt.

23       MR. KAUFMAN:  Your Honor, may the record reflect the

24  correct in-court identification of the defendant.

25       THE COURT:  It will so reflect.

BOBBY SHORE - DIRECT

1        MR. KAUFMAN:  Thank you, Your Honor.

2   Q.   When did you first meet Martin?

3   A.   It was -- I think it was 2009.

4   Q.   How did you meet him?

5   A.   Friend of mine named James introduced me to him.

6   Q.   And for what purpose?

7   A.   To buy methamphetamine.

8   Q.   Did you -- when you met him that first time, that is

9   Martin, did you buy methamphetamine from him?

10  A.   Yes, I did.

11  Q.   How much did you buy?

12  A.   It was a gram.

13  Q.   And was that for your personal use or for resale?

14  A.   For personal use.

15  Q.   So when did you first start using methamphetamine?

16  A.   It was -- it was about that time.

17  Q.   And by the way, sir, have you been previously convicted

18  for a drug felony?

19  A.   Yes, I have.

20  Q.   When did you get out of prison?

21  A.   In '96.

22  Q.   Okay.  So where did you meet Martin?  Where were you

23  located?  Like, were you at a business, a residence?  Do you

24  remember?

25  A.   I'm sorry, I didn't hear you.

BOBBY SHORE - DIRECT

1   Q.   Where did you meet Martin?  What was the location?

2   A.   Where I met Mr. Martin?

3   Q.   Yes.

4   A.   At his house.

5   Q.   And where was his house, sir?

6   A.   In Deep -- in Deep Gap.

7   Q.   I'm sorry, where?

8   A.   In Deep Gap.

9        MR. CANALES:  Your Honor, can I ask him to repeat

10  that.  I didn't get it.  I couldn't hear.

11       THE COURT:  Does the court reporter have it?

12       THE COURT REPORTER:  Deep Gap.

13       MR. CANALES:  Deep Gap.

14  Q.   Is there any route that's near that?

15  A.   What?  Excuse me.

16  Q.   A numbered route that goes through Deep Gap?

17  A.   On Highway 221.

18  Q.   After that 1 gram purchase from Martin, did you then buy

19  more?

20  A.   Yes, I did.

21  Q.   How soon after?

22  A.   It was probably within a month.

23  Q.   How much did you buy?

24  A.   I think it was about -- let's see.  A half ounce.

25  Q.   And after that purchase, did you have an ongoing

BOBBY SHORE - DIRECT

1    relationship where you continued to buy from him?

2    A.    Yes, I did.

3    Q.    Did the amounts change over time?

4    A.    Yes, they did.

5    Q.    How so?  If you can describe that for the jury.

6    A.    It started off with half ounces.  I mean, it was -- it

7    was -- from -- after I bought the gram, then it was half

8    ounces for over about probably a period of a year.  About

9    maybe a half ounce a month each month.  Then it changed to

10   ounces.

11   Q.    When you say "ounces," do you mean 1 ounce or --

12   A.    One ounce -- 1 ounce at a time per month.

13   Q.    Okay.  Did it ever increase to even greater numbers?

14   A.    Then later on it was like 4 ounces, 4 to 6 ounces a

15   month.

16   Q.    How long did that last?

17   A.    I mean, it was -- that lasted up until 2012.

18   Q.    And was that per month, 4 to 6 ounces?

19   A.    Yeah.

20   Q.    For how many months were you at that rate?

21   A.    I'd say that was -- that was about five months.

22   Q.    To your knowledge, was there ever anybody else who worked

23   with Martin?

24   A.    Yes.

25   Q.    And was it one person or more?

BOBBY SHORE - DIRECT

1   A.   One person.

2   Q.   And did you have interactions with that one person?

3   A.   Yes, I did.

4   Q.   What was his name?

5   A.   Jose.

6   Q.   I'd like to show you what has been admitted as 1C.

7   A.   Yes.

8   Q.   Do you recognize who that person is?

9   A.   Yes, that's him.

10  Q.   All right.  And how did you meet Jose?

11  A.   Through Martin.

12  Q.   What did Martin say about Jose?

13  A.   He told me that he would be -- I can -- he'll be calling

14  me or I can call him.  When he went to Mexico, I could -- I

15  could get the meth from Jose.

16  Q.   And based on your conversations with Martin and with

17  Jose, was there -- what was their business relationship, Jose

18  and Martin?

19  A.   All I know is just -- just what -- the methamphetamine,

20  that's all I know.

21  Q.   Well, what about the methamphetamine?  What was the

22  relationship -- did one of them work for the other or did they

23  work independently?

24          MR. CANALES:  Your Honor, asked and answered.

25  Objection.

1    THE COURT:  Overruled.

2  A.   Just independently.  No, they weren't together.

3  Q.   How so?

4  A.   It was -- it was Martin's drugs and it was his drugs and

5  it was Jose's -- it was -- he was giving him orders what to

6  do.

7  Q.   Is that based on what Martin told you?

8  A.   Pardon me?

9  Q.   Is that what you could tell from what Martin told you?

10  A.   Yes.

11  Q.   Did you have Martin's phone number in your phone?

12  A.   Yes, sir.

13  Q.   Like to show you what's been admitted already as Exhibit

14  30.  Going to -- sorry.  Going to page 2.  And 3.

15    Can you -- oh, good, you've got your glasses.  Can you

16  see the bottom right?

17  A.   Yes.

18  Q.   That number?  Do you recognize that phone number?

19  A.   Yes.

20  Q.   Whose number is that?

21  A.   That's my number.

22  Q.   Was that -- did law enforcement execute a search warrant

23  of your house on December 12 of 2012?

24  A.   Did -- my house?

25  Q.   Yes.

BOBBY SHORE - DIRECT

1    A.    Yes, uh-huh.

2    Q.    And did they find any methamphetamine there?

3    A.    Yes, they did.

4    Q.    Where did you get that meth from?

5    A.    I got it from Jose.

6    Q.    And upon your arrest, did you immediately agree to

7    provide a statement after being read your rights and agree to

8    cooperate?

9    A.    Yes.

10   Q.    And did you tell law enforcement what you've been

11   testifying to today in court?

12   A.    I'm sorry, I didn't hear you.

13   Q.    What you're testifying about today in court, is that also

14   what you told law enforcement upon your arrest?

15   A.    I didn't --

16   Q.    When you were arrested --

17   A.    Yes, it was, yeah.

18   Q.    -- you spoke to -- and what you told them then, is that

19   what you're testifying about today?

20   A.    Yes, it is.

21   Q.    Now, five days before you were arrested, had you met with

22   Martin?

23   A.    Yes, I did.

24   Q.    What did he tell you?

25   A.    No, I didn't -- I didn't meet Martin five days before.

BOBBY SHORE - DIRECT

1    Q.   And I don't mean meet for the first time, but did you

2    speak --

3    A.   I'm sorry?

4    Q.   Did you speak with Martin before your arrest within days

5    of your arrest?

6    A.   Yes, I did.

7    Q.   What did the two of you talk about before your arrest?

8    A.   Before the arrest?

9            MR. CANALES:  In what period, Judge, of the arrest?

10   Before the arrest in 2010, 2011?  I ask that he be more

11   specific, Judge.

12           THE COURT:  That will be for cross.  Wait for a new

13   question.

14   Q.   So maybe to assist, Mr. Shore, did you receive a phone

15   call from Martin?

16   A.   Yes, I did.

17   Q.   Okay.  Do you remember that conversation?

18   A.   Yes, I do.

19   Q.   Okay.  Not every detail, but do you remember what the

20   general idea of the conversation was?

21   A.   Yes, I did -- do.

22   Q.   What was it about?

23   A.   It was about me riding over and talking to him about --

24   about everything that was going on about -- if there was

25   anybody getting in any trouble or anything, you know.

1  Q.   And did he tell you that any -- did he tell you that

2  anything had happened to him?

3  A.   Yes.

4  Q.   What did he say?

5  A.   He told me he got shot in Mexico.

6  Q.   Okay.  Now, let's go to the day of your arrest.  You said

7  that you spoke with law enforcement and agreed to cooperate.

8  What did they ask you to do that very same day?

9  A.   To cooperate.

10 Q.   And what specifically did they ask you to do?

11 A.   To wear a wire.

12 Q.   And did they tell you to go anywhere?

13 A.   To go to Martin's and wear a wire.

14 Q.   And you did that, right?

15 A.   Yes, I did.

16 Q.   Have I met with you a few weeks ago to prepare you for

17 trial?

18 A.   Yes, you did.

19 Q.   And during that meeting I asked you questions much like

20 law enforcement had; is that right?

21 A.   Yes.

22 Q.   And Agent Harmon to my right was with me; is that

23 correct?

24 A.   Yes.

25 Q.   And we played a recording from a disk for you; is that

BOBBY SHORE - DIRECT

1   right?

2   A.   Yes.

3   Q.   I'd like to show you what's already been -- I'm sorry,

4   what's been marked for identification purposes only as 8.

5        There are people's initials on that disk.  Do you

6   recognize any of them?

7   A.   That's my initials, "BS."

8   Q.   Okay.  And did I ask you to initial this disk if it was a

9   true and accurate copy of the recording that you had on

10  December 12th, 2012?

11  A.   Yes, you asked me to.

12  Q.   Thank you, sir.

13       MR. KAUFMAN:  Your Honor, at this time we'd like to

14  publish and play for the jury Exhibit 8A which has already

15  been admitted, and with that as a demonstrative aid for the

16  jury the transcript which is 8B.

17       THE COURT:  All right.  Thank you.

18       Members of the jury, the same instruction applies

19  here as applied to the other wire recording.

20       (Government's Exhibit Number 8A was played to the

21  jury.)

22       MR. KAUFMAN:  Nothing further, Your Honor.

23       THE COURT:  Well, we'll take our break, members of

24  the jury, and ask you to be with us -- it will be a little

25  shorter this time.  About an hour and ten minute, so make it

BOBBY SHORE - DIRECT

1    12:30.  It's almost 12:30.  Make it 1:30.  Thank you.

2              (Lunch recess at 12:25 p.m.)

3    THURSDAY AFTERNOON, MARCH 6, 2014

4              (Court called to order at 1:36 p.m.)

5              THE COURT:  May we have the jury, please.

6              (Jury entered the courtroom.)

7              THE COURT:  Welcome back, members of the jury.

8    We're ready to resume.

9              Did the government conclude its direct examination?

10             MR. KAUFMAN:  We did, Your Honor.  Thank you.

11             THE COURT:  Okay.  Mr. Canales.

12                       BOBBY GILES SHORE

13                       CROSS EXAMINATION

14   BY MR. CANALES:

15   Q.   Good afternoon.  Can you hear me?

16   A.   No, I couldn't.

17   Q.   Good afternoon.  You say you got out of prison in 1996?

18   A.   Sir?

19   Q.   You testified earlier that you got out of prison in 1996?

20   A.   Yes.

21   Q.   Okay.  Exactly for what?

22   A.   That was for conspiracy for cocaine.

23   Q.   Okay.  Almost the same as this but a different drug?

24   A.   Pardon me?

25   Q.   Almost the same as this but a different drug?  Different?

BOBBY SHORE - CROSS

1    A.    A different drug, yes.

2    Q.    Okay.  You testified earlier that you have been dealing

3    with Mr. Saldana for about five years.

4    A.    It's about three years.

5    Q.    Three years?

6    A.    Yeah.

7    Q.    Are you sure it wasn't two?

8    A.    I'm sure -- no.  No.  Three years.

9    Q.    Okay.  Because when you gave -- do you remember when they

10   spoke to you on December the 12th of 2012?

11   A.    When?

12   Q.    Do you remember December the 12th of the year 2012?

13   A.    The 12th?

14   Q.    December the 12th.

15   A.    I'm not understanding you.  I mean, I can't hear.

16   Q.    That's fine, sir.  That's fine.  I understand.

17         I'm asking do you remember the day -- the date of

18   December the 12th of 2012?

19   A.    Oh, yes.  Yes, sir.

20   Q.    What happened on that date, do you remember?

21   A.    Yes, sir, I remember.

22   Q.    What happened?

23   A.    That's the day that the law came and arrested me.

24   Q.    Do you remember talking to them?

25   A.    Yes, I do.

1 Q.   Do you remember telling them that you were dealing with
2 them for at least a two year time frame?
3 A.   Do I remember the time frame?
4 Q.   Do you remember telling them that you had been dealing
5 with my client for two years -- at least two years?  Do you
6 remember saying that?
7 A.   Yes, uh-huh.
8 Q.   Okay.  Do you remember telling what quantities you told
9 them back then?
10 A.   Yes, I do.
11 Q.   Which were, sir?  What were they?
12 A.   That it was like a half ounce -- half ounce quantities
13 and then ounce quantities and then it was some 4 ounce
14 quantities.
15 Q.   Four ounce?
16 A.   And then a 6 ounce.  Some quantities.
17 Q.   Do you remember -- do you remember the specific --
18 really, you remember telling them 4 ounces and 6 ounces?
19      MR. KAUFMAN:  Objection, Your Honor.  It's been
20 asked and he's answered it.
21 Q.   Isn't it true that you did not --
22      THE COURT:  I'm going to overrule that, but it was a
23 repetitive question.
24      MR. CANALES:  Yes, Your Honor.
25 Q.   Isn't it true you didn't tell them that?

1        MR. KAUFMAN:  Objection, Your Honor.  May we have a

2   sidebar on this?

3        THE COURT:  Yes, sir.

4        Excuse us, members of the jury.

5        (Sidebar conference as follows:)

6        THE COURT:  Okay.  Your objection?

7        MR. KAUFMAN:  Your Honor, I didn't want to do a

8   speaking objection in front of the jury.  But again, counsel

9   is implying with his tone and his repeated questions of the

10  witness in this case to suggest that he's saying something

11  that's contrary to what's in the report.  The report very

12  clearly states that Mr. Shore did, in fact, say that he had

13  received 4 ounces from Martin and it says it in a couple of

14  places.  And so I don't know how to have counsel stick with

15  the facts that have been disclosed to him in discovery.

16       MR. CANALES:  I made an honest mistake, Judge.

17  Okay.  Honest mistake.  Just because I don't recall the facts

18  like he does doesn't make me a monster.  I apologize, but,

19  yes, he's right.  But I was asking a question in good faith

20  thinking he was -- thinking he was lying, Judge, because here

21  first he said 1 ounce, half ounce, and then that's where I

22  stopped.  And then after the report what he pointed out, he's

23  talking about the 4 to 6, Judge.

24       MR. KAUFMAN:  Your Honor, if I may, it talks about 4

25  ounces in paragraph 9, 4 ounces in paragraph 10, in paragraph

1    12.  "In the last year's time frame Shore purchased at least 4

2    to 6 ounces of methamphetamine every three weeks to one

3    month."  I mean, this is all exactly consistent with his prior

4    testimony, and not only on direct but also on cross.  I mean,

5    it's in multiple places.

6             THE COURT:  Well, all I can do is ask counsel to be

7    careful about the facts.

8             MR. CANALES:  I made a mistake, Judge.  I really

9    did.

10            THE COURT:  We have counsel, we have co-counsel.

11   You have had -- obviously had these statements available to

12   you a long time.  And I'd want you to use as predicates for

13   your question real matters that you may wish to ask about of

14   the witness.

15            MR. CANALES:  Yes, Your Honor.

16            THE COURT:  All right.

17            MR. KAUFMAN:  Your Honor, may I ask as a possible

18   remedy, may we -- I know ordinarily this wouldn't be the case,

19   but based on what's just transpired, I think that this may be

20   one of those rare circumstances where the actual debrief

21   report can be admitted as evidence in this case.

22            THE COURT:  No, you can handle it on redirect.  But

23   you can also redirect your questions.

24            MR. CANALES:  Yes, Your Honor, I will.

25            THE COURT:  All right.

1          (End of sidebar conference.)

2               CROSS EXAMINATION (Cont'd.)

3   BY MR. CANALES:

4   Q.   On the date of your --

5          THE COURT:  Wait just one second, please.

6          (The court and the deputy clerk conferred.)

7          THE COURT:  You may continue.  And if you wouldn't

8   mind, evidently there's some difficulty in communication here

9   so you'll need to be well paced with your questions.

10         MR. CANALES:  Yes, sir.

11         THE COURT:  It wouldn't do to have rapid fire

12  questions with this witness.

13         MR. CANALES:  Yes, Your Honor.

14  Q.   (By Mr. Canales) You were arrested on December 12th of

15  the year 2012, right?

16  A.   Yes, sir.

17  Q.   Were you confronted with the accusations against you?

18  Were you told?

19  A.   I didn't understand that, the last part.

20  Q.   Did the police tell you what charges you were facing?

21  A.   Yes.

22  Q.   What were they?

23  A.   Said at least 20 years.

24  Q.   Okay.  And what else -- were you told about the drugs?

25  About -- that you were being charged with meth?

1    A.    For the meth?

2    Q.    What type of drugs were you being charged?

3    A.    Methamphetamine.

4    Q.    Okay.  And what else that is not a drug?  Were you?

5    A.    Just --

6          MR. CANALES:  One second, please.

7          (Defense counsel conferred.)

8    Q.    Let me ask you this, and I'm asking you.  Were you found

9    with guns in your house or a gun or a weapon in your house or

10   on your person?

11   A.    No gun, no.

12   Q.    Now, let me ask you this.  Was my client a user?

13   A.    I didn't understand.

14   Q.    Mr. Saldana, was he a user, an addict like you?

15   A.    I didn't understand.

16   Q.    Was my client addicted to drugs?

17         MR. KAUFMAN:  Objection to addicted.

18         THE COURT:  That's what he said.

19         MR. KAUFMAN:  And we object.  That's a medical

20   conclusion, I believe.

21         THE COURT:  Overruled.

22         THE WITNESS:  I can't say -- I don't -- not that I

23   know of.

24   Q.    You seen him do meth?

25   A.    I seen him use drugs, you know.

BOBBY SHORE - CROSS

1  Q.   Well, then, was my client also a drug user, right?

2  A.   Yes, I seen him, you know, use drugs.

3  Q.   And what about the Pinas, did you ever see Pina do drugs?

4  Jose.

5  A.   No, huh-uh.

6  Q.   You -- okay.  Isn't it true, sir, on that day that -- do

7  you remember the day when you wore a wire?  Remember?

8  A.   Yes.

9  Q.   Okay.  You couldn't -- you couldn't get my client to sell

10 you drugs; isn't that true?  You wanted to buy drugs, right?

11 A.   I didn't understand.

12          THE COURT:  That was another compound question.  I

13 want one question at a time and then wait until he answers.

14 Okay.  Am I clear about that?

15          MR. CANALES:  Yes, Your Honor.

16          THE COURT:  Okay.  Thank you.

17 Q.   Were you trying to buy drugs from my client?

18 A.   No, I wasn't trying to buy drugs.

19 Q.   You were giving him money.  Did he take -- you were

20 giving him money, right?

21 A.   I was owing money.

22 Q.   No, to him or did you owe the money to Pina?

23 A.   To -- on the -- to Mr. Martinez.  Martin, I meant.

24 Q.   I thought you said that you had stopped dealing with

25 Martin.

1    MR. KAUFMAN:  Objection.  Not his testimony.

2    THE COURT:  Rephrase your question, please.

3    MR. CANALES:  I think we're not understanding each

4  other, Judge.  I apologize.

5  Q.  Okay.  You tried to give him money that day.

6  A.  Yes.

7  Q.  Okay.  Your testimony earlier was that you were dealing

8  with Pina, right?

9  A.  For the -- I was -- the money I was offering him was

10  for -- because I owed him money.

11  Q.  But isn't it true that the one you were dealing with was

12  with Pina, Jose?

13  A.  Yes.

14  Q.  Right?

15    You couldn't get my client to sell you drugs that day.

16    THE COURT:  That wasn't in the form of a question.

17  Q.  Were you trying to get -- were you trying to get him to

18  sell you drugs?

19  A.  To buy drugs?

20  Q.  Yes.

21  A.  No.

22  Q.  No?  Didn't he tell you, "No, go with Pina?"

23    MR. KAUFMAN:  Objection.  The recording speaks for

24  itself, Your Honor.

25    THE COURT:  Sustained.

1    MR. CANALES:  No further questions, Your Honor.

2    MR. KAUFMAN:  Briefly, Your Honor, if I may.

3                    REDIRECT EXAMINATION

4  BY MR. KAUFMAN:

5  Q.   Mr. Shore, have you reviewed the report that was

6  generated after you spoke with law enforcement on

7  December 12th, 2012, the day you were arrested?

8  A.   I'm sorry, I didn't understand you.

9  Q.   Have you seen a written report before today that has the

10 information that you provided to law enforcement after you met

11 with them on December 12th, 2012?

12 A.   Yes, I have.

13 Q.   Do you remember every word from it?

14 A.   Do I remember what?

15 Q.   Every word that's in the report.

16 A.   No, I don't remember --

17 Q.   Now --

18 A.   -- everything in it.

19 Q.   Now, when you were being cross examined by the defense

20 lawyer, he was challenging you as to your earlier testimony

21 today about buying 4 ounces at a time from Martin Martinez

22 Saldana, right?  Do you remember that?

23 A.   Yes, sir.

24 Q.   Would it -- and they were challenging that.  Would it

25 help refresh your recollection as to what you told law

BOBBY SHORE - REDIRECT

1  enforcement back then if I showed you the report?

2  A.    Yes, it would help.

3  Q.    If I can show you what has been provided to defense in

4  discovery and marked as Government's Exhibit 26 for

5  identification.  I'm going to direct your attention to page 3

6  of 5, paragraphs 9 through 12.  Basically, the entire page,

7  sir.  If you could review that and let me know when you're

8  done reviewing it.

9  A.    This first one here?

10 Q.    Actually, Mr. Shore, if you could read the entire page on

11 page 3 of 5, please.

12 A.    Okay.

13          MR. CANALES:  Your Honor, I'm going to -- withdraw

14 my objection.

15 Q.    All right, sir.  I'm retrieving Exhibit 26 for

16 identification.

17     So do you remember the defense lawyer challenging your

18 testimony about 4 ounces of methamphetamine -- 4 to 6 ounces

19 of methamphetamine from the defendant?  Do you remember that?

20 A.    Yes, sir.

21 Q.    Now, in paragraph 9 did you, in fact, discuss 4 ounces?

22          THE COURT:  Wait just a minute.  Your question was

23 whether it refreshed his recollection.  Now you'll have to ask

24 him about his recollection.

25          MR. KAUFMAN:  Yes, Your Honor.

1  Q.   Mr. Shore, what did you tell law enforcement on

2  December 12th about the amount you had received from

3  Mr. Saldana?

4  A.   It was 4 ounces.

5  Q.   And was it just 4 ounces or was there a range?

6  A.   Was it just 4 ounces?

7  Q.   Yes, was it just 4 ounces?

8          MR. CANALES:  Your Honor, I'm going to object.

9  Leading.

10          THE COURT:  Overruled.

11  Q.   Was it just 4 ounces or was it 4 to 6 ounces or was it

12  some other number?

13          MR. CANALES:  Your Honor, I'm going to object.  He's

14  suggesting the answer already.

15          THE COURT:  Overruled.

16          THE WITNESS:  It was 6 ounces.

17  Q.   So 4 to 6 ounces?

18  A.   Yes.

19  Q.   And in the report, what frequency did you say that you

20  had gotten that amount from Mr. Saldana?

21          THE COURT:  Counsel, I'm not going to let you use

22  that document in that fashion.  If it refreshed his

23  recollection, it did, and he can testify from his

24  recollection.

25          MR. KAUFMAN:  Your Honor, at this time we are going

BOBBY SHORE - REDIRECT

1  under the Federal Rules of Evidence regarding prior consistent

2  statements since there's been an allegation by the defense

3  about inconsistencies between the prior statement and his

4  current testimony.

5          MR. CANALES:  There have been no allegations on my

6  part, Judge.

7          THE COURT:  I overruled the objection -- I mean, I

8  sustained his objection and you'll need to move to another

9  area.

10 Q.  And, Mr. Shore, what is the one count that you were --

11 that you pled guilty to in this case?

12 A.  What was the one count?

13 Q.  What is the one crime that you've pled guilty to in this

14 case?

15 A.  Conspiracy.

16 Q.  And you were never charged with any gun charges, were

17 you?

18 A.  No.

19 Q.  Law enforcement didn't find any in your residence, did

20 they?

21 A.  Guns?  No.

22          THE COURT:  Sustained to the leading form of the

23 question.

24 Q.  How many firearms did law enforcement seize from your

25 residence upon your arrest in 2012?

1    A.   I don't know anything about any firearms.

2         MR. KAUFMAN:  Thank you.  Nothing further.

3                   RECROSS EXAMINATION

4    BY MR. CANALES:

5    Q.   Sir, for how long did you -- did you -- did you abuse

6    meth?

7    A.   How long?

8         MR. KAUFMAN:  Objection.  Scope.

9         THE COURT:  Beyond the scope.  Sustained.

10   Q.   Do you remember much of anything, sir?

11        MR. KAUFMAN:  Objection, Your Honor.

12        THE COURT:  Sustained.

13        MR. CANALES:  No questions, Your Honor.

14        THE COURT:  You may step down.

15        MR. CANALES:  Thank you, sir.

16        (Witness stepped down.)

17        MR. KAUFMAN:  Your Honor, at this time the United

18   States calls Jose Pina, Sr.

19        (Witness spoke through an interpreter.)

20        JOSE FRANCISCO PINA, GOVERNMENT WITNESS, SWORN,

21                   DIRECT EXAMINATION

22   BY MR. KAUFMAN:

23   Q.   Good afternoon.

24   A.   Good afternoon.

25   Q.   Could you please tell us your full name.

BOBBY SHORE - RECROSS

1   A.   Jose Francisco Pina.

2   Q.   And is your last name spelled P-i-n-a?

3   A.   Yes.

4   Q.   And is your son also Jose Pina?

5   A.   Yes.

6   Q.   By the way, do you speak some English?

7   A.   A little bit.

8   Q.   But will it assist you in having a Spanish/English

9   interpreter today?

10  A.   Yes, it helps me.

11  Q.   Have you pled guilty to two charges, one being a

12  methamphetamine trafficking conspiracy and two being a

13  firearms charge?

14  A.   Yes.

15  Q.   With regard to the methamphetamine, who did you sell the

16  drugs to?

17  A.   The two gringos that are over there.

18  Q.   And when you say "over there," were you transported

19  from -- transported to the courthouse with those two people?

20  A.   Just with one of them.

21  Q.   Do you remember what their name was?

22  A.   No, I don't know their names.

23  Q.   I'm showing you what's been marked -- sorry, what's been

24  admitted as Government's 1A.  It will be on the screen in

25  front of you.

1    Do you recognize this photo, this person in this photo?
2  A.   Yes.
3  Q.   Who is that?
4  A.   That's the one that traveled with me.
5  Q.   And is this one of the people that you sold
6  methamphetamine to?
7  A.   Yes, that person.
8  Q.   Do you recognize the person in 1B which is on the screen
9  now?
10 A.   That's the other one, yes.
11 Q.   Who did you sell the drugs for?
12 A.   To these people.
13 Q.   And were you working on behalf of somebody else?
14       MR. FORRESTER:  Objection.  Asked and answered, Your
15 Honor.
16       THE COURT:  Overruled.
17       THE WITNESS:  Yeah, I worked for other people.
18 Q.   I'm sorry, can you say that again.
19       MR. FORRESTER:  Excuse me, Your Honor.  I would
20 object to that.  I think if he wants the reporter -- the court
21 reporter can play back the answer as opposed to asking the
22 witness a second time the same question.
23       THE COURT:  Overruled.
24       THE WITNESS:  I worked for someone.
25 Q.   Who was that person?

1    MR. FORRESTER:  Again, asked and answered, Your
2  Honor.
3        THE COURT:  Overruled.
4        THE WITNESS:  For Martin.
5  Q.   What's Martin's last name, if you know it?
6  A.   Martinez.
7  Q.   Sir, if you could look around the courtroom and see if
8  you see him here today.
9  A.   Yes.  He's over there in front of me.
10 Q.   Can you describe what he's wearing, what he looks like.
11 A.   He's got on a shirt that's kind of green and brown.
12    MR. KAUFMAN:  Your Honor, may the record reflect a
13 correct in-court identification of the defendant.
14    THE COURT:  It will so reflect.
15    MR. KAUFMAN:  We have no further questions.
16                CROSS EXAMINATION
17 BY MR. FORRESTER:
18 Q.   You took an oath to tell the whole truth, right, sir?
19 A.   I'm telling the truth.
20 Q.   Okay.  But you weren't telling the truth when you said
21 your name was Jose Francisco Pina, were you?
22 A.   Yes, I was telling the truth.
23 Q.   You actually go by Mancilla, don't you, sir?  Isn't that
24 correct?
25 A.   Yes, that's the second last name.

1   Q.   And you weren't telling the truth when you say you work

2   for other people, right, sir?

3   A.   Yes, it is the truth.

4   Q.   Isn't it true that you worked with your son, sir?

5   A.   No, no.  My son has nothing to do with this and you know

6   that.

7   Q.   I didn't quite here that.  If he can repeat his answer.

8   I didn't truly...

9           THE COURT:  Does the court reporter have the answer?

10          THE COURT REPORTER:  No, no.  My son has nothing to

11  do with this and you know that.

12  Q.   Sir, how long has your son had nothing to do with this?

13          MR. KAUFMAN:  Objection.

14          THE COURT:  Overruled.

15          THE WITNESS:  Well, at the time that I was with him

16  was -- with this guy was 2012.  And the people who know us can

17  tell you that my son had two jobs.  That he was working as a

18  painter and in the restaurant.  My son has nothing to do with

19  this business.

20  Q.   Did his two jobs stop him from being indicted in a meth

21  conspiracy, sir?

22  A.   That's why -- that's why I don't know why they're

23  accusing him of that.  The detectives and the gentleman here

24  know that my son didn't have anything to do with this.

25  Q.   Did his two jobs stop him from signing a guilty plea

JOSE PINA - CROSS

1  on -- on February -- I'm sorry, February 11th of last year,

2  sir?

3  A.   Yeah, we signed because we were afraid because they were

4  saying 20 to life, and 7 years is better than 20 to life.

5  Q.   Let me ask you this, sir.  You mentioned two detectives.

6  Do you remember their names?

7  A.   I don't remember their names, but I do remember their

8  faces.

9  Q.   Do you see them in court here today?

10  A.   One of them.

11  Q.   Okay.  And you said the two, so at least -- you said two

12  detectives -- you don't know why because the two detectives

13  know he has nothing to do with that.  Isn't that your prior

14  testimony?

15  A.   Yes.

16  Q.   Can you point out that detective who you say you know.

17  Can you point him or her out.

18  A.   He's in front of me.

19  Q.   Okay.  We've got at least two gentlemen, well, in the

20  gallery.  We actually --

21  A.   The one on the left side.

22  Q.   Okay.  Would it help if -- okay.

23          MR. FORRESTER:  Let the record reflect that it's

24  Detective Jeremy Williams that he pointed out.

25          THE COURT:  I don't think it's clear.  You're going

1   to have to ask your question.

2   Q.   Okay.  Sir, if you're talking in reference to the lady,

3   there are two detectives to the left of her.  Is it the one at

4   the end of the bench, sir?

5   A.   No, no, no, it's the one that's at the table here.

6   Q.   Oh, I'm sorry.  Okay.  So it's actually Special Agent

7   Dustin Harmon, right, sir?

8   A.   Yes.  I mean, I don't know his name.

9   Q.   Okay.  But he's sitting to the -- to your left and to the

10  right of the prosecutor, right?

11  A.   Yes, uh-huh.

12  Q.   Okay.  And he's at the head table, right, sir?

13  A.   Yes.

14  Q.   And you're aware that he's the lead detective, right,

15  sir?

16  A.   Well, I didn't know that.  I don't know if he's the lead

17  detective or not.  I just know he was a detective.

18  Q.   Okay.  And you also know that he didn't believe you,

19  right, sir?

20            MR. KAUFMAN:  Objection.

21            THE COURT:  That's sustained because it's not clear

22  what the predicate of the question is.

23            MR. FORRESTER:  The predicate for the question is

24  this, Your Honor.

25            THE COURT:  You'll have to explain that to the

JOSE PINA - CROSS

1  witness.

2  Q.   Sir, this is one of the two detectives who did not

3  believe you that your son has nothing to do with that; isn't

4  that correct, sir?

5  A.   That's right.

6  Q.   Okay.  So they don't trust some of your words; is that

7  correct?

8           MR. KAUFMAN:  Objection.

9           THE COURT:  Sustained.

10 Q.   Sir, it's established that at least one of them don't

11 believe you, right, sir?

12          MR. KAUFMAN:  Objection.

13          THE COURT:  Sustained.

14 Q.   Sir, are you -- strike that.

15      You made reference to the word "gringos," right, sir?

16 A.   Yes, the ones that are in front of me.

17 Q.   Okay.  But the word "gente" in Spanish means people,

18 right, sir?

19 A.   Yes.

20 Q.   And the word "hombres" or "hombres" means men, right,

21 sir?

22 A.   Yes.

23 Q.   But you didn't choose to refer to them in a respectful

24 way; isn't that correct?

25          MR. KAUFMAN:  Objection.

1        THE COURT:  Sustained.

2        Sustained.  That means he doesn't have to answer.

3        THE INTERPRETER:  He does not have to answer?

4        THE COURT:  That's right.

5   Q.   Gringos is a negative term to refer to people, right,

6   sir?

7        MR. KAUFMAN:  Objection.

8        THE COURT:  Sustained.  Sustained.  Next question.

9   Q.   Sir, you lived on Ervin Houck Drive; isn't that correct,

10  sir?

11  A.   For six months.

12  Q.   Okay.  And for six months you had the ability to dig into

13  the ground at that property, right, sir?

14  A.   Not of my free will.

15  Q.   Okay.  Sir, isn't it correct -- okay.  Are you saying

16  basically your son forced you to do something?  Is that your

17  testimony here today, sir?

18  A.   Never.  Never.

19  Q.   Are you saying a man who it's been testified got shot up

20  and it's on audio that --

21       MR. KAUFMAN:  Objection.

22  Q.   -- people were concerned about his health, that he forced

23  you to do something, sir?  Is that your testimony?

24       MR. KAUFMAN:  Objection.

25       THE COURT:  Sustained.

1    Q.   Did Mr. Saldana force you to do anything, sir?

2    A.   Well, he didn't force me, but he told me where to dig to

3    put his money.

4    Q.   Sir, it's your testimony that his money was in the

5    ground, sir?  Is that your testimony?

6    A.   Yes, it was in holes and also in the trailer there was

7    part of it.

8    Q.   Okay.  And it's your testimony that it was his money,

9    right, sir?

10   A.   Yes.

11   Q.   Okay.  And let me ask you this.  Are you an honest man,

12   sir?

13   A.   100 percent.

14   Q.   Were you a hundred percent honest after you were

15   arrested, sir?

16   A.   I've always been, yes, all my life.

17   Q.   Isn't it true that you didn't tell the police about the

18   money until recently, sir?

19   A.   I turned in part of the money to the detectives and they

20   told me that Mr. Saldana was saying that it was mine, and then

21   I turned it all over.

22   Q.   You turned it all over to your girlfriend, right, sir?

23   A.   Part of it I told her where it was and she did find it.

24   Q.   And she didn't turn it into the police; isn't that

25   correct, sir?

1        THE INTERPRETER:  Interpreter needs a repetition of

2   the question for clarity.

3        THE COURT:  Would ask the court reporter to repeat

4   the question, please.

5        THE COURT REPORTER:  And she didn't turn it into the

6   police; isn't that correct, sir?

7        THE WITNESS:  That I don't know.

8   Q.   You know she bought a truck with it, right, sir?

9   A.   Yes.

10  Q.   Sir, isn't it the truth that you told her to get the

11  money and take it and use it?  Isn't that correct, sir?

12  A.   No, I never said that.  I told her the money wasn't mine.

13  It was that guy's.

14  Q.   So -- and before we go on, let's clarify for the jury.

15  Who is April Blevins, sir?

16  A.   That's my girlfriend.

17  Q.   Okay.  And you would only be with a woman if she was

18  honest, right, sir?

19  A.   Yes.

20  Q.   And she took money who she believed was his money and she

21  stole it, right, and bought a truck, right, sir?

22  A.   Yes, I'm in agreement.

23  Q.   And these gentlemen still have you on the stand

24  testifying for them, right, sir?

25  A.   Yes.  Yes.

JOSE PINA - CROSS

1    MR. FORRESTER:  No further questions.

2    MR. KAUFMAN:  No redirect, Your Honor.

3    THE COURT:  You may step down.

4    (Witness stepped down.)

5    MR. KAUFMAN:  The United States, Your Honor, calls

6  James Hawkins, Jimmy Hawkins.

7    JAMES THOMAS HAWKINS, GOVERNMENT WITNESS, SWORN,

8                    DIRECT EXAMINATION

9  BY MR. KAUFMAN:

10 Q.  Good afternoon.

11 A.  Afternoon.

12 Q.  If you would, please state your full name and spell your

13 last name for the record.

14 A.  James Thomas Hawkins.  Last name is H-a-w-k-i-n-s.

15 Q.  Sir, are you here having pled guilty to a methamphetamine

16 trafficking conspiracy that involved over 500 grams of meth?

17 A.  Yes.

18 Q.  Do you see anybody in the courtroom with whom you either

19 bought or sold methamphetamine?

20 A.  Yes.

21 Q.  Who do you see?

22 A.  Martin.

23 Q.  And prior to your arrest, did you know what Martin's last

24 name was?

25 A.  I can't really pronounce it.  It's Sendana or Sendona.  I

JAMES HAWKINS - DIRECT

1  can't really pronounce it.

2  Q.   And you say you see him in the courtroom.  Can you

3  describe where he is and what he's wearing.

4  A.   He's over on the right-hand side.  He's wearing, it looks

5  like a whitish, bluish long sleeve maybe.  I can't really

6  tell.  It's a button-up shirt.  It's a flannel maybe.

7          THE COURT:   Anything else distinctive about his

8  appearance?

9          THE WITNESS:   He's got headphones on.

10          MR. KAUFMAN:   Your Honor, may the record reflect a

11  correct in-court identification of the defendant.

12          THE COURT:   It will so reflect.

13  Q.   Before I ask you some questions about Martin, let me go

14  back a step.  When were you first stopped by law enforcement?

15  A.   When?

16  Q.   Yes.

17  A.   It was back in September of -- not last September but the

18  September before last.

19  Q.   So it was in the later portion of 2012?

20  A.   Yes.

21  Q.   And on November 9th of 2012, did you have a lengthy

22  interview with the State Bureau of Investigation Special Agent

23  Gene Parsons?

24  A.   Yes.

25  Q.   Subsequently, did you plead guilty in -- or sign your

JAMES HAWKINS - DIRECT

1  plea agreement in June of 2013?

2  A.   Yes.

3  Q.   After you were first stopped by law enforcement, did you

4  agree to cooperate with their ongoing investigation?

5  A.   Yes, I did.

6  Q.   Are you familiar with the term "proactive cooperation"?

7  A.   Kind of.  Not really.  I mean, I understand it's whatever

8  I can give them, yeah.

9  Q.   Did you actually act as, like, an informant and do

10  anything with co-conspirators to help law enforcement arrest

11  those people?

12  A.   Yes, I did.

13  Q.   Can you tell us examples of some of the things that you

14  had done.

15  A.   I helped -- I set somebody up to bring me a bunch of

16  stuff, a bunch of meth, and the law arrested them.

17      And then I had somebody try to buy some off of me and the

18  law got them.

19      And I told them -- I mean, I had a bunch of information

20  on a bunch of people I just let them know about.

21  Q.   Did you assist law enforcement with regard to any kind of

22  currency, any money?

23  A.   Yes.

24  Q.   Can you tell us how that happened.

25  A.   Yeah.  I got somebody to give me a bunch of cash for some

JAMES HAWKINS - DIRECT

1  and I was supposed to pick up for, but it was the law.  I

2  mean, I was doing it for the law.

3  Q.   Now, you mentioned Martin.  When did you first meet him

4  and how?

5  A.   I worked at Adams with him.  I met him probably about in

6  '06 or '07 and we worked together for about six years.

7  Q.   And when you say "Adams," what's -- what type of business

8  is that?

9  A.   Oh, it's Adams Construction.  It's a paving outfit.

10  Q.   All right.  And when you first met him, were you just

11  colleagues?

12  A.   Yeah, we were just work colleagues.  He drove a truck and

13  I -- I worked -- actually, I laid the asphalt down.  So we

14  talked briefly every once in a while.  Then we finally got to

15  know each other.

16  Q.   Did you become friendly?

17  A.   Yeah.

18  Q.   How did it transition into the methamphetamine

19  activities?

20  A.   He started asking questions about it and I was like, you

21  know, I started telling him what I knew about it.  And he told

22  me, you know, that -- you know, that he might be able to, you

23  know, help me out or whatever.  And I agreed with him, you

24  know, we'd try it and see what happens.  And then I started

25  buying off of him.

JAMES HAWKINS - DIRECT

1  Q.   Do you remember when that started?

2  A.   It was probably, I'd say, in '09.  '07, '09, something.

3  It was -- it was in there.  But I just started buying a little

4  quantity off of him at first.

5       And then -- and then after a while I lost my job at Adams

6  and we -- that summer he come up to me and asked me if I

7  wanted to start selling quite a bit for him and I said, yeah,

8  I'd try it.  And we started moving a little bit more then.  It

9  was probably, I'd say that was in a '010 then.

10 Q.   When you say "a little bit more," how much were you

11 moving for Martin?

12 A.   It was between an eight ball to a half ounce.

13 Q.   Who were some of the people you sold to?

14 A.   It was a majority of people.  I mean, I really

15 couldn't --

16 Q.   Can you give a range maybe of the number of people you

17 were selling to?

18 A.   It was about 12 or 15 people.

19 Q.   Can you tell us about the arrangement that you had with

20 Martin, where you would meet.

21 A.   Yeah.  I mean, if I, like -- if I need it, I'd call him

22 up and he'd be at his house or wherever he would want me to be

23 and he would tell me when to come.  I'd come and either I'd --

24 I'd give him what money I had and he'd give me some.  Or

25 he'd -- or he'd just front it all to me at once and then I'd

1  pay him later.  And just whatever, you know, I could do.

2  Q.   You mentioned his house.  Where is his house?

3  A.   It's off of 221 above the dumpsters.

4  Q.   Where specifically on the property did you meet with him?

5  A.   It was a little outbuilding behind his house.

6  Q.   Can you tell us about the quantities, whether you can

7  tell us about the total amount throughout all your dealings

8  with him or tell us amounts and the frequency.  How would you

9  quantify it?

10 A.   I mean, it was -- I mean, when I first started it was

11 just like, you know, a gram or two at first.  And then after

12 that when I started selling quite a bit for him, it was

13 probably, like, I don't know, maybe an ounce every two weeks

14 for about maybe a year, I guess.  It wasn't, you know...

15 Q.   What's the most you ever received from him at one time?

16 A.   I'd probably just say a half ounce because -- I wouldn't

17 think it was much more than that.

18 Q.   Well, were you ever moving 1 ounce -- a whole ounce for

19 him at a given time?

20 A.   No.

21 Q.   What's the most -- even if you didn't personally

22 distribute the methamphetamine, what's the largest amount you

23 ever saw him with?

24 A.   It's hard to say.  It was -- it was probably a half pound

25 or more.

JAMES HAWKINS - DIRECT

1  Q.   And can you describe that incident.

2  A.   Yeah.  He had it in a trash bag and he brought it out and

3  showed it to me.  And he actually had two trash bags and he

4  said it was two different kinds.  You know, one was better

5  than the other.  And that -- he was just whatever I wanted.

6  And I mean, it was quite a bit.  I couldn't give you a number

7  of what it was now because I'd be lying so I'm just going to

8  say, you know, it was a lot.  I mean, it was in a trash bag.

9  Q.   But you -- would it be fair to say that you have a rough

10  idea of, for example, an eight ball versus an ounce based on

11  your experience?

12  A.   Yeah, I mean -- yeah, I mean, it was way more than an

13  ounce.  I mean, I'd say it was probably a half pound to a

14  pound easy.

15  Q.   Do you remember when that was that you saw the two trash

16  bags?

17  A.   It was in early 2011.  I mean, I'm pretty sure.

18  Q.   Did you find out from Martin where he was getting his

19  methamphetamine from?

20  A.   No.

21  Q.   Do you know where he was from?

22  A.   He said he was from Texas.  That's all I really know.  I

23  mean --

24  Q.   Do you know if he ever did any kind of cross border

25  travel?

1  A.    He said he went to Mexico every Christmas.

2  Q.    Did he ever discuss what, if anything, he took with him?

3  A.    No, he never did discuss it.  But I mean, I heard that

4  he, you know, traveled with all kinds of --

5            MR. CANALES:  I'm going to object, Your Honor.

6  Hearsay.

7            THE COURT:  Sustained.

8  Q.    Well, before telling us what you heard, from whom did you

9  hear this?

10  A.    I really can't remember.  It was a person buying off of

11  him too.

12  Q.    Okay.  So it was somebody who was arguably within this

13  conspiracy?

14  A.    Yeah, I'd probably say so, but I ain't going to say for

15  sure because I can't really remember.  It's been a little

16  while back.

17  Q.    But are you confident --

18  A.    Yeah.

19  Q.    -- it was somebody who was buying from Martin?

20  A.    Oh, yeah, yeah.

21            MR. KAUFMAN:  Your Honor?

22            THE COURT:  Overruled.

23  Q.    What did you hear from this person who was buying from

24  Martin?

25  A.    He said he'd load up around every Christmas lots of money

1 and whatever else he needed and take it across the border.

2 That's whatever he built up over the year.  That's what I

3 heard.

4 Q.   Did you personally ever see Martin with any amounts of

5 money?

6 A.   I did see him with quite a bit of money one time.  He

7 wanted us to help him count it out.  We helped him count it

8 out.  It was quite a bit of money.  I can't really say a

9 number.  It was in the thousands.  I mean, it was 15 some

10 thousand, I'd say, or more.

11 Q.   When you say "we," who was we?

12 A.   It was this other guy named Marley, Chris Marley.  But he

13 ain't on the conspiracy, I don't think.

14        MR. KAUFMAN:  Nothing further.  Thank you.

15                    CROSS EXAMINATION

16 BY MR. CANALES:

17 Q.   You were making reference that you heard something from

18 somebody who was involved in this conspiracy of yours.

19 A.   Excuse me?

20 Q.   Who is this person?

21 A.   I can't really quite remember who it was.  I mean, it

22 might have been that Chris Marley that told me.  I can't

23 remember.  There's quite a few people that knew Martin at the

24 time and I knew him too.

25 Q.   Yes, but right now you're testifying to something

JAMES HAWKINS - CROSS

1  specific and you say it might be Chris Marley, might not be

2  Chris --

3           MR. KAUFMAN:  Objection.  Argumentative.  It's been

4  asked and answered.

5           THE COURT:  Overruled.

6           THE WITNESS:  Could you ask me again?

7  Q.   You're not sure?

8  A.   Could you ask the question again.

9  Q.   You're not sure who told you?

10  A.   No, I'm not sure.

11  Q.   So as far as we know, it could be somebody outside of

12  this county or from another state or having nothing to do with

13  this case, right, as far as you know?

14  A.   As far as I know, he might not have nothing to do with

15  this case, but I'm pretty sure he bought off Martin.

16  Q.   Okay.  But you're pretty sure he bought off Martin, but

17  you don't remember who it is.  How is that?

18  A.   That's correct.  How is that?

19  Q.   Well, I'm asking you.  That's what you said.

20  A.   Right, exactly.  Because there was a lot of people at the

21  time.

22  Q.   Okay.  Now, you're from --

23           THE COURT:  Wait just one second.

24           (Pause.)

25           THE COURT:  Members of the jury, I'll ask you to

JAMES HAWKINS - CROSS

1  disregard the testimony this witness gave concerning what this

2  other unidentified person may have told him about moving money

3  to Mexico at Christmas.  That will be stricken.

4  Q.   (By Mr. Canales) Sir, did you ever deal with Danny Eller?

5  A.   No, I did not.

6  Q.   Do you know him?

7  A.   I met him while I was in jail.

8  Q.   Did he tell you a story as to why he was in jail?

9  A.   No, we never really talked.  I mean, we may when we

10 processed, but other than that -- we was in a pod for like a

11 month together, but I never really talked to him much.  All I

12 knew is he was from my county and that was it.

13 Q.   All right.  I'm sure you had the opportunity to talk

14 about this case and any other case.

15           MR. KAUFMAN:  Objection.  Asked and answered.

16           THE COURT:  Overruled.

17 Q.   Did you have the opportunity, the time, the free time to

18 talk about this --

19 A.   Yeah.  I mean, yeah, we could have talked about it, I

20 guess, if we wanted to.

21 Q.   All right.  How about Bobby Shore?

22 A.   No, I never was around Bobby Shore except for in the

23 holding cell back there.

24 Q.   But do you know Bobby Shore?

25 A.   I did know him on the outside.  I just knew him briefly.

1   I mean, not really knew him knew him.  I mean, I knew who he

2   was.

3   Q.   How about Ms. Caudell, Clara Jean Caudell?

4   A.   Who?

5   Q.   Clara Jean Caudell.

6   A.   Yes, I used to work with her.

7   Q.   Okay.  Now, let me ask you this question.  Sir -- sir,

8   you gave a statement on November the 9th, right?

9   A.   Yes.

10  Q.   And during the statement on November the 9th --

11       MR. KAUFMAN:  Objection.  Ambiguous as to year.

12  Q.   The same statement that the prosecutor was asking you

13  questions from.  The same date.  November the 9th, 2012.

14  A.   Yes.

15  Q.   Can we refer back to that date?

16  A.   Yes.

17  Q.   Okay.  Same date, same everything.

18       Okay.  You had -- you stated that -- you named other

19  people.  I mean, didn't you?  You talked about Chad Yates.

20  A.   Yes.

21  Q.   Okay.  As a matter of fact, during your conversation --

22  during your conversation with the police, weren't you stating

23  you were buying pounds?

24  A.   That would be false.  I was buying ounces at the time,

25  yes.

1  Q.   So if the report states that you bought 2 or 3 pounds
2  from Yates during the two months prior to -- the two months
3  prior to -- two months prior, that would be untrue?
4  A.   Not at one time.  I mean, it might have been over a
5  period of time.
6  Q.   I don't know.  But if there is information that you
7  stated that you bought between 2 and 3 pounds of meth from
8  Yates during the past two months, would that be true or not
9  true?
10  A.   It would probably be true, yes.
11  Q.   So that you were dealing with pounds?
12  A.   I mean, no, I wasn't dealing with pounds.  I mean, I was
13  dealing with ounces, but over a period of time I might have
14  bought 2 pounds.
15  Q.   You might have bought maybe?
16  A.   Yeah, maybe.
17  Q.   Okay.
18  A.   I can't say exactly.
19  Q.   That was your supplier.  He was your supplier, Yates,
20  right?
21  A.   Yes.
22  Q.   Okay.  Did Yates have anything to do with my client?
23  A.   Do what?
24  Q.   Did Yates have anything to do with my client?
25  A.   No, he did not.

1  Q.   Okay.  Let me ask you about this.  If your report states

2  that you saw my client with pounds of meth, would that be true

3  or not true?

4  A.   That would be -- I ain't going to say it's true because I

5  don't know how much was there.  I mean, it could have been --

6  it could have been pounds.  It could have been two pounds, I

7  don't know.

8  Q.   How about if you said 10 pounds?

9  A.   It could -- it could have been, I don't know.

10  Q.   So you don't know the difference between half a pound --

11  A.   I mean, it was in a trash bag and there was a lot there.

12  He wouldn't let me see all of it so I'm going to say I don't

13  know.

14  Q.   You don't know?

15  A.   Exactly.

16  Q.   All right.  Okay.  Like you stated earlier, you've set a

17  lot of people up before, right?

18  A.   Yes.

19  Q.   Okay.  You say you helped set someone up, right?

20  A.   Yes.

21  Q.   You said, "I've also had someone try to buy off of me."

22  A.   Yes.

23  Q.   That "I've given information on people."

24  A.   Yes.

25  Q.   And something about cash, right?

1    A.    Yes.

2    Q.    Okay.  Let me ask you this.  What's your motivation every

3    time you've done those things?

4    A.    Every time I've done that?

5    Q.    Yeah.

6    A.    I was hoping to get help from them, you know, to help get

7    a little time off.

8    Q.    Did you get time off for that?

9    A.    I haven't yet, no.

10   Q.    You haven't?

11   A.    No, I haven't.

12   Q.    So have you been sentenceed?

13   A.    No, I ain't.

14   Q.    You pled guilty when?

15   A.    In July.

16   Q.    Of last year or 2012?

17   A.    No, it was last year.

18   Q.    Okay.  And has your sentence been reset several times?

19   A.    Do what?

20   Q.    Has your sentence date been changed?

21   A.    It ain't been set none yet.

22   Q.    Oh, so it's just out in the open?

23   A.    Yeah, it's still -- it's still -- I'm still waiting.

24   Q.    So no date has been given to you.

25   A.    No.

JAMES HAWKINS - CROSS

1  Q.   Okay.  Have you had a chance to meet with the

2  prosecutors -- with the prosecutor, excuse me?

3  A.   Yes, I met with him once.

4  Q.   When was the last time?

5  A.   It was about a month ago.

6  Q.   Were you told what to expect in today's trial?

7  A.   They told me the questions I'd probably get asked and --

8  from them and they give me a brief thing how it would probably

9  go and I said okay.

10 Q.   So they gave you the questions?

11 A.   Yeah, they basically asked me, you know, make sure

12 everything was correct that they was asking me.

13 Q.   In other words, you know, I'm just -- you got prepped up.

14 They gave you the question and then you responded to them.

15 A.   They just was asking me about my statements and stuff I

16 give them.

17 Q.   I know.  But in other words, did they give you the

18 questions?

19 A.   I mean, yeah, I mean, they asked me a couple questions

20 and I answered them, yes.

21 Q.   Okay.

22 A.   But it wasn't the exact same ones, I don't believe.

23 Q.   In other words, what they asked you today is the same

24 thing you talked about during that meeting?

25          MR. KAUFMAN:  He just answered, Your Honor.  We

1    object.

2    Q.   Is that correct?

3            THE COURT:  Overruled.

4            THE WITNESS:  That is not correct because they did

5    ask me a few -- it was -- actually, the way I remember it, it

6    was different questions than what they asked me today.

7    Q.   Oh, different.  Totally different?

8    A.   Well, I mean, some of them was, but some of them wasn't.

9    I mean, there might have been a reference to some of them.

10   Q.   What they asked you today, is that the first time you

11   heard it?

12   A.   No, it wouldn't be the first time.  I mean, they -- there

13   was similarities to it.

14   Q.   All right.  You knew.

15   A.   Yeah, I mean, I knew basically.

16   Q.   All right.  Mr. Hawkins, you've admitted to -- you've

17   admitted -- you've admitted -- you know what you -- did you

18   plead guilty to 500 grams but less than 1500 grams?

19   A.   Yes, I did.

20   Q.   You pled -- admitted that was your liability, less than

21   1500 grams.

22   A.   Yes, 500 to 1500 grams, yes.

23   Q.   Okay.  How many grams do we have in a pound?

24   A.   How many in a pound?

25   Q.   Yeah.

1  A.   Let's see.  There's 16 ounces in a pound.  I don't know.

2  I'd have to figure it up.  I mean, I couldn't give you off the

3  top of my head.

4  Q.   And if I'm wrong, I apologize.  Is it a thousand grams?

5  A.   Well, I never dealt in pounds.  I mean, I dealt in

6  ounces.

7  Q.   Tell me if I'm wrong.  28 grams equals an ounce; is that

8  correct?

9  A.   What?

10  Q.   28 grams equals an ounce.

11  A.   I think it's more like 28.

12  Q.   Okay.  And I'm using this math and if I'm wrong, please

13  tell me.  28 grams equals an ounce.

14  A.   Yeah.

15  Q.   16 ounces equals a pound.

16  A.   Yeah.

17  Q.   So 2.2 pounds equals a thousand grams, right?

18  A.   If you say so.

19  Q.   So if -- on 2 pounds we have a thousand grams, right?

20  A.   Uh-huh.

21  Q.   You've told the prosecutors that you, even just with one

22  person alone, you had been moving -- you bought at least 2

23  pounds, right?

24  A.   I mean, yeah.

25  Q.   Yates.

1   A.   That was just -- it was a rough figure, but yeah.   I

2   mean...

3   Q.   All right.   And you also told them that you had other

4   sources, right?   You said Saldana as well, right?

5   A.   Yeah, in past years, yes.

6   Q.   And just those numbers alone are in the hundreds, right?

7   A.   I mean, yeah, probably, yeah.

8   Q.   And the pounds, right, pounds?   If you add them all up,

9   it's several pounds.

10  A.   I don't know about -- yeah, I mean, over the years, over

11  a seven, eight year period, probably, yes.

12  Q.   But then you got a good deal.

13          MR. KAUFMAN:   Your Honor, objection.

14  Q.   Is that correct?

15          THE COURT:   Are you objecting?

16          MR. KAUFMAN:   Objection.

17          MR. CANALES:   Basis?

18          THE COURT:   Are you objecting?

19          MR. KAUFMAN:   Yes, Your Honor, we object.

20          THE COURT:   Sustained.

21  Q.   You got a good deal.

22          MR. KAUFMAN:   Objection, Your Honor.

23          THE COURT:   I'd like to hear a new question --

24          MR. CANALES:   Yes.

25          THE COURT:   -- so I know what the objection is to.

JAMES HAWKINS - CROSS

1    MR. CANALES:  Yes.

2   Q.   I mean, you -- do you agree you got a good deal?

3   A.   I mean, I'd like to had a better deal, but, yeah, I guess

4   it was a good deal.

5   Q.   Okay.  I mean -- I mean, your liability, it's -- fine.

6        And now, that was -- that was one deal.  But now you're

7   expecting another deal, right?

8   A.   I can only hope.

9   Q.   And what are you hoping for?  You got one when you pled.

10  Now you're waiting for another one.  What's the other one?

11  A.   Anything.

12  Q.   What's anything?

13  A.   I mean, I don't know.  I mean, it ain't --

14  Q.   Are you expecting to get more -- do you expect to get --

15  A.   I'm just hoping.  I don't expect nothing.

16  Q.   What --

17       THE COURT:  Let him answer the question.

18  Q.   You're hoping for the government to file a motion for

19  downward departure, yes or no?

20  A.   Yes, I hope.

21       MR. CANALES:  No further questions, Your Honor.

22                    REDIRECT EXAMINATION

23  BY MR. KAUFMAN:

24  Q.   Mr. Hawkins, has anything been promised to you?

25  A.   No.

1    Q.    You were asked questions about Mr. Yates as if Mr. Yates

2    is still out there.  Is he?

3    A.    Far as I know he's not.

4    Q.    And why do you have personal knowledge as to why he

5    probably isn't?

6    A.    Because I just recently went to the same jail he was at

7    and they told me that he's locked up there and they didn't

8    want us both together.

9    Q.    And in fact, were you part of helping law enforcement to

10   have him arrested?

11   A.    Oh, yes.

12   Q.    And did you -- when you were talking about the amount of

13   drugs that you received from Mr. Yates, was that leading up

14   until your debriefing in November of 2012?

15   A.    Yeah.

16   Q.    And to your understanding, at that point in time, was

17   Mr. Saldana in Mexico?

18   A.    I can't remember.  I think he was supposed to went to

19   Mexico.  I can't remember.

20   Q.    And did you only have one source of supply for

21   methamphetamine?

22   A.    No, I've had a few over the years.  I mean, it's been

23   different people, you know.

24   Q.    And have they ever overlapped?

25   A.    I mean, in the county, yes.

JAMES HAWKINS - REDIRECT

1   Q.   With regard to the drug amounts, if you -- your plea

2   agreement is to 15 -- 500 to 1500 grams; is that fair to say?

3   That's the equivalent of more than 3 pounds of

4   methamphetamine.

5   A.   I mean, yeah, probably.

6   Q.   And if the amount of drugs that were mentioned in your

7   plea agreement were higher, would that change the statutory

8   sentence in this case to your knowledge?

9   A.   No, I wouldn't think.

10   Q.   You earlier testified that you haven't been made any

11   promises or guarantees.  What's your understanding as to the

12   one thing that's required of you here today?

13   A.   Is to tell the truth.

14   Q.   And what would happen if you didn't?

15   A.   It would be -- it would be another charge.  I'd get more

16   time out of it.  So I don't want to do that.

17   Q.   The defense lawyer was asking you about sentence

18   reductions.  Who's the one person who actually determines what

19   your sentence will be?

20   A.   I was told the judge is the only person that could.

21   Q.   Do you know which judge that is?

22   A.   It is the same judge.

23   Q.   Judge Voorhees?

24   A.   Yes.

25         MR. KAUFMAN:  Nothing further, Your Honor.

JAMES HAWKINS - REDIRECT

1            RECROSS EXAMINATION

2   BY MR. CANALES:

3   Q.   Sir, 2.2 pounds equals a thousand grams.  Then 4.4 pounds

4   equals 2,000 grams, agreed?

5   A.   If you say so.

6   Q.   Okay.  And you said that Martin was your source.  You

7   stated that Chuck Yates was your source.  And then right now

8   you said you had other sources as well.

9   A.   Over the years, yes.

10  Q.   So over the years you've way moved pounds and pounds

11  of -- thousands and thousands of grams of meth; is that

12  correct?

13  A.   I mean, I've moved a little bit, but not a lot, yes.

14  Q.   Is that correct what I'm telling you?

15  A.   I wouldn't say it's correct.  A lot.  I mean, what you're

16  saying is -- sounds like truckloads.  No, I don't think I've

17  moved that much.  I mean, at first, I mean, I might have moved

18  maybe a pound a year.  And then for, like, a year or maybe two

19  years, I didn't -- probably wasn't even that.  And then this

20  last year in 2011 is when I started getting the most -- I mean

21  2012 -- it was '13.  Between 2012 and 2013 I started getting a

22  lot more.

23  Q.   In pounds?

24  A.   No, it was in ounces.

25  Q.   Well, 1 pound a year for two years, that's 2 pounds.

1    Then how much did you move in 2012?

2    A.    Excuse me, what --

3    Q.    One pound a year for two years equals 2 pounds.

4    A.    Yeah.  See, I was dealing with Martin before then.  And

5    it was in 2011 I quit for two -- almost a year.  And I met

6    Chad Yates and I started selling again.

7    Q.    Just Yates alone, when you told the officers just one

8    supplier alone, you were moving between 2 to 3 pounds of meth

9    during the past two months.

10   A.    Nah, I told him that -- he asked me for a rough estimate

11   and I told him I couldn't give him one.  And he -- and they

12   just figured up probably about 2 pounds and I said that's

13   probably about right.

14   Q.    If I showed you a report that was produced --

15            MR. KAUFMAN:  Objection.

16            THE COURT:  No, he answered your question.

17   Q.    So if the report -- if there is a report stating that you

18   moved 2 to 3 pounds of meth from Yates during the past two

19   months, that's incorrect?

20   A.    I mean, it could be and it might not be, I don't know.  I

21   can't tell you that.

22   Q.    All right, then.  So then, if you know it was in the

23   pounds, meaning it was in the thousands of grams, plead

24   between 500 to 1500, that's one big, humungous break, wasn't

25   it?

JAMES HAWKINS - RECROSS

1       MR. KAUFMAN:  Objection.

2       THE COURT:  Sustained.

3       THE WITNESS:  No.

4   Q.   Okay.

5       THE COURT:  Well, wait a minute.  I sustained the

6   objection.

7       THE WITNESS:  Okay.

8       THE COURT:  So disregard the last answer.

9       You've been over this, counsel.

10      MR. CANALES:  Yes, Your Honor.  One last question.

11  Q.   You say you're hoping that your sentence will be reduced.

12      THE COURT:  You've been over that.

13  Q.   Do you know about how much?

14      MR. KAUFMAN:  Objection.

15      THE COURT:  Sustained.

16      MR. CANALES:  No further questions.

17      THE COURT:  You may step down.

18      (Witness stepped down.)

19      MR. KAUFMAN:  Your Honor, in speaking with court

20  staff, I believe there's one housekeeping issue I'd like to

21  address.

22      Pursuant to the stipulation and Government's Exhibit

23  32 that the defense and the United States have entered into,

24  there is one last laboratory report, 16F, which we now move

25  into evidence to -- move its admission and publication to the

1    jury.

2              THE COURT:  Okay.  Let it be admitted.

3              (Government's Exhibit No. 16F was received into

4    evidence.)

5              MR. KAUFMAN:  Your Honor, with the admission of that

6    last exhibit, the United States rests.

7              THE COURT:  All right.  Thank you.

8              Members of the jury, we'll take our midafternoon

9    break.  I'd ask you to be ready to come back in approximately

10   20 minutes.  Thank you for your attention to the case thus

11   far.

12             (Jury exited the courtroom.)

13             THE COURT:  Okay.  Motions?

14             MR. FORRESTER:  Yes, Your Honor.  At this time we

15   would move for a Rule 29 motion.  If I can -- with the court's

16   indulgence.

17             Well, let me go over this, Your Honor.

18             First is for certainly we see where Danny Eller

19   talks about -- sure, he talks about he gets 3.5 on a regular

20   basis of grams of meth from Mr. Saldana.  That's fine.  But

21   the government didn't go any further than that and say, you

22   know what, does Saldana know that you intend to redistribute

23   that?  Certainly we hear Eller says, Hey, I consumed that much

24   on that sort of regular basis.  As a matter of fact, he said,

25   you know what, I consume about that much and there's a little

1   bit more extra that I sell.  But there's no testimony saying

2   that I, Danny Eller -- he, Danny Eller, knows that basically

3   Saldana knows I'm going to redistribute that.  Basically,

4   there's testimony saying Danny Eller is a user.  Saldana is a

5   user.

6         In reference to Bobby Shore, there's testimony from

7   Bobby Shore, yes.  And it's testimony -- here again, we have

8   to view it in the light most favorable to the government.

9   What I'm giving to Your Honor is like this.  There is no

10  testimony from Bobby Shore saying that, yes, Saldana knew I

11  intended to pass this on.  Bobby Shore uses drugs.  As a

12  matter of fact, there's an issue about whether he's an addict

13  or not or something to do with it.  And then they ask whether

14  Saldana is.  But certainly, Bobby Shore uses drugs.

15        When we're dealing with Mr. Hawkins here -- and I'll

16  get to Pina in a second.  But when we're dealing with

17  Mr. Hawkins, Mr. Hawkins talks about, yeah, he's my supplier,

18  meaning my client, okay.  But let's face it.  He's moving

19  pounds from some guy, I believe it's Chris Yates, in the same

20  period of time that he says he's ramping up his business to

21  move -- I mean, to move weight.  Weight means a lot of drugs

22  with Mr. Saldana.  I think certainly he self-impeaches

23  himself.  The government -- we didn't need us -- you didn't

24  need me, the defense, to impeach that.  So I think the

25  government's own witness, he discounted his own credibility.

1    So even in the light most favorable to the
2  government, I think that comes out as zero sum game.  Ten
3  minus ten equals zero, basically, concerning Mr. Hawkins.
4    Now we'll go back to Mr. Pina.  Mr. Pina, if you --
5  certainly -- if you're going to -- if Your Honor is going to
6  believe Mr. Pina -- or Pina, rather, Jose Pina, Sr.  He said
7  basically, look, I told them my son has nothing to do with it.
8  He says, I'm 100 percent honest.  I've always been honest.
9  Okay.  And he also testified up until this year, up until
10  recently this year -- we're young into March.  We're young
11  into this year.  He's double dealing with the government.  So
12  his testimony has to be -- forget about this guy.  It has to
13  be just basically null.  Just ignored.
14    What we have here concerning -- there's no
15  conspiracy.  The government hasn't carried their prima facie
16  case for any sort of drug conspiracy.  The only evidence I've
17  heard is basically that, look, we have a guy.  He's a
18  landlord.  And he's almost like a workaholic because we hear
19  he works.  And he has sheds so you could presume he's doing
20  other things.  Actually, we see a picture of his shed and
21  there are workbenches there inside.  All we have concerning
22  any sort of drug conspiracy is the fact that he's a user.  He
23  worked with people at Adams Construction, and some of them
24  came in to testify, and they use drugs.
25    You know, it's almost like it's not uncommon -- it's

1    not uncommon for people who work in the same place to party

2    together.  Now, here's the thing.  Not saying it's common that

3    they'll party and use meth, but they'll party and drink

4    Budweisers and whatever their preference.  But it's not

5    uncommon.

6          I would say to you, Your Honor, the government has

7    not proven a prima facie case of any sort of methamphetamine

8    conspiracy.

9          Now, we move on to possession of a weapon in

10   furtherance of a drug deal, a meth deal.  Certainly I think

11   it's laughable, and even the agent testified, certainly, that

12   there's only one guy and he didn't even have to say it, maybe

13   he does.  But because maybe his guy is different from my guy,

14   the Lone Ranger who carries one bullet in a gun.  And that's

15   a -- it's a Hollywood fantasy.

16         We have -- it thoroughly came out through testimony

17   that Mr. Saldana had four weapons.  Okay.  At least by sight

18   two of them were relics.  Relics meaning 50 years or older.

19   We had a little western revolver, if you can call it that.  I

20   don't even think John Dillinger would have used it in the

21   '30s.  Then we have the shotgun which was dismantled.  The

22   only thing we know of is with all four of them -- then we have

23   the other two small .22s.

24         The only thing we know is this.  They all -- they

25   each had one round of cartridge for each of them.  So

1    basically, when we talk about having a weapon in our
2    possession, a defendant, in furtherance of drug activity, two
3    things.  We're not talking about carrying, use or carry.  What
4    we're talking about is just the possession of the weapons.
5    Certainly the implicit consideration is that you're either
6    going to be able to grab that weapon and use it or you're
7    going to use it for deterrence.  And to be any sort of
8    deterrence, someone would have to see the weapons.  And not
9    only if they see the weapon, they would have to be intimidated
10   by the weapon.  Certainly no one is going to be intimidated by
11   Mr. Saldana with even his infirmities.

12           But you have four weapons spread over and one bullet
13   each.  So you're seeing a situation that he kept these
14   weapons -- forget about the fact that the address, Ervin Houck
15   Road or Drive.  Some said road, some said drive.  But the
16   connection to the weapon is Betty Houck.  Betty Houck where
17   basically -- whether you want to call it -- they -- I think in
18   civil law it would be devolved to them, but basically was
19   passed on.  There's no necessarily sort of trust document, but
20   it was passed on presumably from Ervin to Betty and then from
21   Betty to basically someone she befriended and actually lived
22   with.  Okay.

23           THE COURT:  Remember, this is a Rule 29 motion.  And
24   the question is the sufficiency of the evidence taking all of
25   the evidence into account and giving it a presumption -- or

JAMES HAWKINS - RECROSS

1   rather, taking it in its most favorable light to the
2   government.  So what you're doing is largely a jury argument.
3   I think that could be wasting our time if that's all it is.  I
4   do want to hear you out.  I just wanted to make that point.
5            MR. FORRESTER:  I guess I was just going count by
6   count.  But taking all the elements, I think -- and just to
7   address the failure to register the weapon.  There wasn't any
8   information coming in to state that -- whether Betty Houck
9   attempted to register it or Mr. Saldana knew of that,
10  basically that responsibility.
11           So I think in light of all the evidence, Your Honor,
12  we would ask you to dismiss the charges.
13           THE COURT:  Okay.  Thank you.  The motion will be
14  denied, the evidence being sufficient to go to the jury as to
15  all three counts.
16           Now, then, my obligation would be to speak to the
17  defendant about his right to testify if he sees fit.  Do
18  defense counsel have anything to convey to the court at this
19  time about defendant's intentions in that regard?
20           MR. FORRESTER:  Your Honor, may I have a few minutes
21  with your indulgence?
22           THE COURT:  Yes, sir, you may.
23           (Defense counsel conferred.)
24           MR. CANALES:  Your Honor, we would ask the court to
25  inform my client of his right to testify, Judge.

1          THE COURT:  All right.  Okay.  I'll speak slowly for
2   the interpreter.

3          Okay.  Mr. Saldana, I want to advise you that you
4   have a right to testify in your own behalf.  That means you
5   would take the stand and be sworn by the clerk of court and be
6   asked questions by your attorneys and then the government
7   would have an opportunity to cross examine you.  You have that
8   right.

9          Now, then, when someone in your position as a
10  defendant thinks about whether or not to testify in his own
11  defense, it's appropriate and desirable for you to consult
12  with your attorneys as to their opinions on whether that would
13  be helpful to your case or not.  In other words, that's a good
14  thing for you to do is ask for their advice.

15         Now, for their part they have an obligation to give
16  you their best consultation on that subject based on their
17  experience and their training as to whether in this particular
18  case it would be a good idea for you to take the stand and
19  testify in your own defense.

20         Now, what I would like for you to be especially
21  aware of is that no matter what your attorneys might tell you
22  about whether they think it's a good idea or not considering
23  all of the pros and cons of taking the stand, that it is
24  nevertheless your decision.  In other words, your attorneys
25  cannot make that decision for you.  They can give you their

1   best advice; but having done that, it's up to you to decide

2   whether to take the stand or not.  And whatever they may have

3   told you about whether they think it's a good idea for you to

4   take the stand, if you did decide to take the stand, they

5   would obviously support you and ask the questions designed to

6   bring out your testimony.

7           Do you think you understand your right to testify?

8           THE DEFENDANT (Interpreter):  Yes.

9           THE COURT:  All right.  And have you consulted

10  sufficiently with your attorneys so that you know what their

11  views are on that matter?

12          MR. CANALES:  Your Honor, I'm sorry, Judge, if I

13  may?

14          (Counsel and defendant conferred.)

15          THE DEFENDANT (Interpreter):  Yes, I've consulted

16  with my attorneys.

17          THE COURT:  All right.  Now, let me ask the

18  attorneys if the defendant's decision is to testify or not and

19  after you've done that, I'll ask him if that is in fact his

20  decision.

21          MR. CANALES:  For the record --

22          THE COURT:  Yes, sir.

23          MR. CANALES:  -- we have spoken.  I've explained to

24  him his right to testify.  But he's making his own independent

25  decision, Your Honor.

1    THE COURT:  All right, sir.  And what is that
2  decision?

3    MR. CANALES:  I would ask the court if the court can
4  ask what is his independent decision.

5    THE COURT:  Well, I'm asking you as his attorney --

6    MR. CANALES:  Yes, Your Honor.

7    THE COURT:  -- whether or not it is his decision to
8  testify or not.

9    MR. CANALES:  His decision is not to testify, Your
10  Honor.

11    THE COURT:  Decided not to testify?

12    MR. CANALES:  Yes, Your Honor.

13    THE COURT:  All right.  Now I'm asking you,
14  Mr. Saldana, if that is, in fact, your decision?

15    THE DEFENDANT (Interpreter):  Yes.

16    THE COURT:  All right, sir.  Thank you very much.

17    Anything further on that matter that counsel might
18  wish for the court to take up?

19    MR. FORRESTER:  Well...

20    (Defense counsel conferred.)

21    MR. CANALES:  Your Honor, for the record, Judge, if
22  I may, so my client may answer this -- agree or disagree with
23  my following comments.

24    My client, for the record, has been advised of the
25  possible maximum sentence in this case, what the possible

1  consequences of a plea would be on this case, also what the
2  possible consequences would be with a plea bargain agreement
3  that was offered by the state.  And for the record, that plea
4  bargain agreement was repeatedly given to my client.  That was
5  declined.  And just for the record, that he was well informed,
6  Your Honor, of everything that, you know -- the difference
7  between going to trial or not going to trial, pleading guilty
8  and not pleading guilty.  Maximum possible if you go to trial
9  or the possible -- the range of punishment if he would plead.
10 And in writing as well, Judge, it was given to him.
11         THE COURT:  I understand.  And earlier after
12 calendar call you all were given adequate opportunity to
13 confer further with the defendant with his relatives as
14 necessary to discuss those matters.
15         MR. CANALES:  And I thank the court for giving me at
16 least four hours to do that.  Thank you.  At least.
17         THE COURT:  Now, will the defendant be offering any
18 evidence at all?
19         (Defense counsel conferred.)
20         MR. CANALES:  No, Your Honor.
21         THE COURT:  All right.  So the defense rests?
22         MR. CANALES:  We rest.
23         MR. FORRESTER:  Renew --
24         THE COURT:  And we can do that before the jury.
25         And we'll take a short break.

1              Now, then, the parties have had access to the jury

2    instructions.  Are you ready to talk about those?

3              MR. KAUFMAN:  Yes, Your Honor.

4              MR. CANALES:  Not quite yet, Judge.  If you would

5    just give us a couple of minutes.

6              THE COURT:  Yes.  Wait just one minute.

7              (The court and the law clerk conferred.)

8              THE COURT:  How long is it the wish of the parties

9    to have to argue?

10             MR. FORRESTER:  Your Honor, I would love for the

11   court to give me 40 minutes.

12             THE COURT:  I think that's rather lengthy for this

13   case.  Thirty.

14             MR. FORRESTER:  Okay.  Thank you.

15             MR. KAUFMAN:  And, Your Honor, what I'd propose to

16   do as ordinary is to -- whatever I don't use for my initial

17   closing, to reserve for my rebuttal closing.  And I will

18   not -- I will not be just trying to reserve an excessive

19   amount for that rebuttal closing.

20             THE COURT:  I understand that, right.

21             MR. KAUFMAN:  Thank you, Your Honor.

22             THE COURT:  So it will be 30 minutes.  And if the

23   parties -- either party reaches the 25 minute point, the clerk

24   will advise you that you have 5 minutes remaining.

25             MR. FORRESTER:  Thank you.

1    MR. CANALES:  Judge, is the court going to bring in

2  the jury, we rest, and immediately start closing arguments?

3    THE COURT:  I'm sorry, say that again.

4    MR. CANALES:  I'm asking the court's procedure.  The

5  court is going to bring the jury.  We rest in front of the

6  jury.

7    THE COURT:  Yes, sir.

8    MR. CANALES:  Then we close in front of the jury.

9  But then are we going to be asking to start immediately doing

10  closing?

11    THE COURT:  Then we could go into arguments if

12  that's suitable.

13    MR. CANALES:  Can we take like a two minute break,

14  Judge, before we start doing that?

15    THE COURT:  Oh, we're going to take a break, right.

16    MR. CANALES:  Just like a five minute break at the

17  most.

18    THE COURT:  That's a sure thing.

19    MR. CANALES:  Thank you, Judge.

20    (Brief recess at 3:17 p.m.  Jury not present.)

21    THE COURT:  Okay.  The court would propose to bring

22  the jury back and let the parties rest in front of the jury.

23  And then the court would give the first 28 pages of the jury

24  instructions which might be referred to as boilerplate to a

25  degree.

JAMES HAWKINS - RECROSS

1      The only comment I would have about those from my
2  part would be to bring up the matter of expert witness
3  testimony.  That's on page 24 of these instructions.  The
4  court was not asked to designate anybody as an expert witness
5  and therefore the court didn't declare anybody an expert.  But
6  my question for the parties would be whether they would want
7  me to give the expert testimony instruction with reference to
8  Agent Harmon?  And I believe I would leave out any reference
9  to the Santa Muerte.
10          MR. CANALES:  Your Honor, may it please the court.
11          THE COURT:  Yes, sir.
12          MR. CANALES:  On the issue on page 24.
13          THE COURT:  24, 25, and 26 have to do with expert
14  witness.
15          MR. CANALES:  Page 24 --
16          THE COURT:  24 and 25, sorry.
17          MR. CANALES:  Talking about the expert opinions
18  received in evidence in this case by Agent Dustin Harmon.  And
19  and also specifically about the Santa Muerte, Judge, and the
20  narco-trafficking patron saint.
21          THE COURT:  That can come out.
22          MR. CANALES:  Excuse me, Judge?
23          Yes, please, Your Honor.
24          THE COURT:  So we'll just take out pages 24 and 25
25  all together?

1          MR. CANALES:  Just both pages all together.

2          THE COURT:  All right.  Both pages come out, then.

3          At this point are there any comments about the

4     balance of the instructions?  Now, I'm not sure whether we

5     will get to that today.  It would appear not likely.  We'll

6     bring the jury back in the morning to finish the jury

7     instructions and have deliberations in the morning.

8          MR. CANALES:  Can we take a shot and try to do it

9     today, Judge?

10          THE COURT:  Beg your pardon?

11          MR. CANALES:  Do you think we could try and finish

12     today?

13          THE COURT:  You want to try and do it today?  Yeah,

14     we can try.

15          MR. CANALES:  I'm sure that opposing counsel would

16     agree.

17          THE COURT:  Would there be any comments?  You've had

18     these instructions now for a day or so.  Any comment about the

19     balance of the instructions?

20          MR. KAUFMAN:  Your Honor, a couple days ago I sent

21     an email to counsel and to Ms. Goodrich and I believe that

22     that was all incorporated, so those were the only issues we

23     had raised.

24          THE COURT:  All right, sir.

25          We've given these instructions numerous times in

JAMES HAWKINS - RECROSS

1  cases of this type.

2          (Pause.)

3          MR. CANALES:  Your Honor, I've read the instructions

4  and I have no objections, Your Honor.

5          THE COURT:  All right, sir.  Thank you.

6          We're ready to bring in the jury, then.

7          MR. CANALES:  Yes, Your Honor.

8          MR. KAUFMAN:  Yes, Your Honor.

9          THE COURT:  May we have the jury, please.

10          (Jury entered the courtroom.)

11          THE COURT:  Ms. Goodrich.

12          (The court and the law clerk conferred.)

13          THE COURT:  Now, members of the jury, let's see.

14  Let me make sure this is working.

15          We'll move along.  I must add that I apologize that

16  this case has taken longer than we anticipated when we began

17  it.  That unfortunately happens from time to time.  We simply

18  didn't anticipate it.  But it's necessary, or course, to take

19  the time that it requires when the case begins to finish it as

20  it would best be finished.

21          Now, then, I believe the government has rested.

22          MR. KAUFMAN:  Yes, Your Honor, we have.

23          THE COURT:  And will the defendant have evidence?

24          MR. CANALES:  We rest, Your Honor.

25          THE COURT:  All right.  So both sides have now

1  rested, members of the jury.  So as I told you at the outset

2  of the case when I was giving you preliminary jury

3  instructions that you would be given the instructions of the

4  court and also hear the arguments of the counsel before you

5  began your deliberations.

6        Now, what I propose to do is give you the first part

7  of the jury instructions at this time, then you'll hear the

8  parties argue their cases to you, and then we'll move along

9  from there.

10        Now, then, you have heard all the evidence and

11  you'll shortly be hearing the arguments of counsel.  And I'll

12  give you now the law that applies in this case.  This is your

13  road map to follow as you deliberate.

14        I'll first instruct you on some rules for jury

15  consideration of cases of this type, including how to assess

16  the credibility of witnesses.  Then I'll discuss the offenses

17  charged in the case and give you the elements of each charge

18  and follow the directions to guide you in your deliberations.

19  The latter part of that I'll give you after the arguments.

20        Now, then, it's your duty and your responsibility in

21  the trial to find the facts.  You may find those facts only

22  from the evidence which was presented during the trial.  The

23  evidence consists only of the testimony of the various

24  witnesses who were called and sworn and testified in your

25  presence, the exhibits which were admitted into evidence by

1   the court, and the stipulations of fact that the parties made.

2          I would advise you that the instructions that the

3   court is now giving you and will give you after the arguments

4   will be available to you in written form in the jury room as

5   you deliberate, so that may affect your decision whether or

6   not to make notes at this time while I'm giving you the jury

7   instructions.  That's entirely up to you.  But I would want

8   you to know that.  So if you -- if there's something I say to

9   you about any particular point and you want to consult the

10  court's instructions on that point during deliberations,

11  you're free to do that because you'll have a written copy of

12  the instructions.

13         Now, in reaching your decision as to the facts, it's

14  your sworn duty to follow the law as the court instructs you.

15  You will apply the law given to you by the court to the facts

16  which you find from the evidence and reach your verdict

17  accordingly.

18         Counsel may refer to some of the governing rules of

19  law in their arguments to you, but if there appears any

20  difference to you between the law as stated by counsel and

21  that given to you by the court, of course, you are to be

22  governed by these instructions.

23         You're not to single out any one instruction alone

24  as stating the law but must consider all of the instructions

25  as a whole.  And you may not substitute or follow any personal

1    or private notion as to what the law is or ought to be.

2           You are required to perform these duties without

3    bias, prejudice or sympathy for or against any party.  The law

4    does not permit jurors to decide cases on the basis of bias or

5    prejudice or sympathy or any perceived public opinion, or on

6    any basis other than solely upon the basis of the facts and

7    the law that arise in this particular case.

8           Now, this case involves three charges by bill of

9    indictment of conspiracy to possess with intent to distribute

10   a mixture and substance containing a detectable amount of

11   methamphetamine in violation of two statutes which you'll be

12   hearing more about, possession of a firearm in furtherance of

13   a drug trafficking crime, or aiding and abetting that offense,

14   and possession of a firearm made in violation of the National

15   Firearms Act or possession of an unregistered firearm in

16   violation of the law brought against the defendant, Martin

17   Martinez Saldana.

18          You are instructed that an indictment is but a

19   formal method of accusing a defendant of a crime.  It is

20   not -- rather, it is used to inform the defendant of the

21   charges against him and bring him to trial.  It is not

22   evidence of any kind against him nor does it permit any

23   presumption or inference of guilt.  In other words, an

24   indictment is consistent neither with guilt or lack of it.  It

25   simply puts that question at issue for your decision.

JAMES HAWKINS - RECROSS

1          At arraignment the defendant entered a plea of not
2    guilty to these charges and thereby made a general denial of
3    the accusations contained in the bill of indictment.  So it's
4    up to you, the jury, to decide if, in fact, defendant is
5    guilty or not guilty of the charges outlined in the bill of
6    indictment.

7          A separate crime or offense is charged in each of
8    the three counts of the indictment.  Each charge and the
9    evidence pertaining to it should be considered separately.
10   The fact that you may find an accused person guilty or not
11   guilty as to one of the offenses charged should not control
12   your verdict as to any other offense charged.

13         Every defendant in a criminal case, and, of course,
14   the defendant here, is presumed to be innocent of a crime at
15   the outset and this presumption continues throughout the
16   course of the trial.  This presumption will end as to any
17   count only if you reach the jury room and arrive unanimously
18   at the conclusion, if you do, that the government has shown to
19   your satisfaction that defendant is guilty beyond a reasonable
20   doubt as to that count of the indictment.

21         This burden on the government does not change at any
22   time during the course of the trial.  The presumption of
23   innocence in favor of a defendant is not a mere formality to
24   be disregarded by the jury at its pleasure.  It is, rather, a
25   substantive part of our criminal law.  Accordingly, the

1  government must prove each of the elements of the crime

2  charged beyond a reasonable doubt before there can be a

3  conviction on the count under consideration by the jury.

4        Now, since at the outset the law presumes the

5  defendant to be innocent, he begins the trial with a clean

6  slate.  The presumption of innocence is therefore sufficient

7  to acquit the defendant unless overcome by evidence of guilt

8  proven beyond a reasonable doubt.

9        The law permits only the evidence actually presented

10 to the jury to be considered in support of the charge against

11 him.  If the evidence is sufficient to overcome the

12 presumption of innocence and to convince you beyond a

13 reasonable doubt of the guilt of the defendant as to the

14 charge, then it would become your duty to find him guilty of

15 that charge.  If you have a reasonable doubt as to the guilt

16 of the defendant on a given charge or charges, then it would

17 be your duty to give him the benefit of that doubt and acquit

18 him accordingly.

19        Now, the government has the burden of proving to you

20 its contentions and each element of the offenses charged

21 beyond a reasonable doubt.  The term "reasonable doubt" means

22 just what it says.  It's a doubt based upon reason and common

23 sense.  Its meaning is no doubt self-evident and understood by

24 you and the court will not attempt to define it any further.

25        There are two types of evidence a jury may assess in

1    determining whether the government has met its burden of

2    proof.  One is direct evidence, such as testimony of an eye

3    witness.  The other is circumstantial proof -- evidence which

4    is proof of a chain of circumstances pointing to the

5    commission of the offense.  Circumstantial evidence is

6    evidence of facts or circumstances from which the existence or

7    nonexistence of other facts in controversy may be inferred.

8           As a general rule, the law makes no distinction

9    between direct and circumstantial evidence, but simply

10   requires that before convicting a defendant, the jury must be

11   satisfied of his guilt as to the count under consideration

12   beyond a reasonable doubt from all the evidence in the case.

13          Circumstantial evidence may in some cases point to a

14   wholly incorrect result.  Yet, this is equally true of

15   testimonial evidence.  In both types of evidence you are asked

16   to weigh the chances that the evidence correctly points to the

17   establishment of the facts to -- or rather, against the

18   possibility of inaccuracy or ambiguous inferences.  With both

19   types of evidence you must use your experience with people and

20   events in weighing the evidence.

21          Now, where there is a question as to what took

22   place, you must determine the credibility of the witnesses.

23   The court instructs you that you are the sole judges of the

24   credibility of the witnesses and the weight that their

25   testimony deserves.  While there is no absolute guide by which

1 you determine truthfulness or lack of it in a witness, the

2 court will point out to you several general principles which

3 you should consider as you pass upon this phase of the case.

4 Among the things you may properly consider in

5 determining credibility are:

6 Whether the witness has any motive or reason for

7 being truthful or untruthful.

8 Next, the witness's interest, if any, in the outcome

9 of the case.

10 Next, whether there has appeared from the witness's

11 attitude or conduct any bias or prejudice or feeling which may

12 cause that person's testimony to be influenced.

13 Also, whether the testimony bears the earmarks of

14 truthfulness.

15 And to what extent, if any, the testimony is

16 corroborated or confirmed by other testimony which is not

17 questioned.

18 Or to what extent, if any, it is corroborated or

19 confirmed by known or admitted facts.

20 You may also consider the intelligence and mental

21 capacity of a witness, and the witness's opportunity to have

22 accurate knowledge of the matters to which the person

23 testifies.

24 So I instruct you that you may believe all that a

25 witness says or none, or believe part and disbelieve part.

1  You may consider the interest which the witness may have in

2  your verdict, the demeanor of the witness on the stand, the

3  reasons for his or her testimony, and the means by which the

4  witness may know the things to which he or she has testified.

5          If you find a witness is interested in your verdict,

6  it's your duty to scrutinize that testimony closely.  But if

7  after you have done so and if you find he or she is telling

8  the truth in whole or in part, then you would give that

9  testimony the same weight you would that of a disinterested

10  witness.  In short, it's your duty to find the truth of this

11  matter.

12          The testimony of a witness may be discredited or

13  impeached by evidence showing that the witness has been

14  convicted of a felony, a crime for which a person may receive

15  a prison sentence of more than one year.  Prior conviction of

16  a crime that is a felony is one of the circumstances which you

17  may consider in determining the credibility of a witness.

18  It's the sole and exclusive right of the jury to determine the

19  weight to be given to any prior conviction as impeachment and

20  the weight to be given to the testimony of anyone who has

21  previously been convicted of a felony.

22          Now, while you should consider only evidence

23  presented during the trial, you are permitted to draw such

24  reasonable inferences from the testimony and exhibits as you

25  feel are justified in the light of common experience.  In

1  other words, you may make deductions and reach conclusions

2  which reason and common sense lead you to draw from the facts

3  which have been established by the testimony and evidence in

4  the case.

5         Now, the testimony of an informant, that would be

6  someone who provides evidence against someone else for money

7  or to escape punishment for his own misdeeds or crimes or for

8  other personal reason or advantage, must be examined and

9  weighed by the jury with greater care than the testimony of a

10 witness who is not potentially so motivated.

11        And likewise, aside from an informant, the testimony

12 of an alleged accomplice must be weighed carefully.  An

13 accomplice is someone who said he or she participated in the

14 commission of a crime, and the testimony of such a person

15 likewise must be examined and weighed with greater care than

16 that of a witness who did not participate in the commission of

17 that crime.

18        People who may be considered in this case as alleged

19 informants or accomplices might include Jose Francisco Pina,

20 Sr., Bobby Shore, Danny Eller, James Hawkins, and Clara

21 Caudell.

22        Now, then, the jury must determine whether an

23 informer's or accomplice's testimony has been affected by

24 self-interest or by an agreement made with the government or

25 by his or her own interest in the outcome of the case or by

1    prejudice against the defendant.

2            Now, the testimony of a drug or alcohol abuser must

3    be examined and weighed by the jury with greater care than

4    that of a witness who does not abuse drugs or alcohol.  You

5    must determine whether the testimony of a drug or alcohol

6    abuser has been affected by drug or alcohol use or the need

7    for drugs or alcohol.

8            The testimony of a witness may be discredited or

9    impeached by showing that he or she previously made a

10   statement which is inconsistent with his or her present

11   testimony.  The earlier contradictory statement, if any, is

12   admissible only to impeach the credibility of the witness and

13   not to establish the truth of the earlier statement.  It's the

14   province of the jury to determine the credibility, if any, of

15   a witness who has been impeached.

16           And if a witness is shown knowingly to have

17   testified falsely concerning any material matter, you have a

18   right to distrust such witness's testimony in other

19   particulars.  And you may reject all of the testimony of that

20   witness or give it such credibility as you think it deserves.

21           Now, the defendant, Martin Martinez Saldana, has

22   elected not to testify in this case.  The court instructs you

23   that a defendant such as Mr. Saldana has a constitutional

24   right not to take the stand and testify and not to speak at

25   all or offer any evidence, the burden of proof being entirely

JAMES HAWKINS - RECROSS

1  upon the government.  So you must draw no adverse inference of
2  any kind from his exercise of the privilege not to testify.
3  This right is a fundamental one in America's criminal law and
4  one which cannot be disregarded by the jury at its pleasure.

5          While we were hearing evidence, you were told that
6  the parties had agreed or stipulated to certain facts.  This
7  means simply that they both, both parties, accept those facts.
8  There is no disagreement as to those facts so there is no need
9  for evidence beyond the stipulation itself by any party on the
10 points stipulated.  You must accept the stipulated facts as
11 such even if nothing more was said about them one way or
12 another beyond the stipulation itself.

13         During the trial you heard recordings of
14 conversations alleged by the government to have been between
15 Bobby Shore and a speaker that the government contends is the
16 defendant, Martin Martinez Saldana, and another between Danny
17 Eller and a speaker the government contends is the defendant
18 likewise.  These conversations were legally recorded by the
19 government.  They are a proper form of evidence for the trial
20 and may be considered by you just as any other evidence.

21         Evidence was also presented as you listened to the
22 digital audio recordings in the form of transcripts which you
23 were able to review as the recordings were being played.  And
24 they also sought to identify the speakers engaged in the
25 conversations.  As I instructed you earlier, you are permitted

1  to use the transcripts for the limited purpose of helping you

2  follow the conversations as you listened to the tape

3  recordings and also help keep track of the speakers.  The

4  transcripts, however, are not evidence.  The tape recording or

5  digital recording is the primary evidence of its own contents.

6       Whether a transcript correctly or incorrectly

7  reflects the conversation or the identities of the speakers is

8  entirely for you to decide based upon what you've heard about

9  the preparation of the transcripts and upon your examination

10 of the transcripts in relation to what you heard on the tape

11 recording.  If you decide the transcripts are in any respect

12 incorrect or unreliable, you should disregard them to that

13 extent.

14      Differences in meaning between what you hear in the

15 recording and read in the transcript may be caused by such

16 things as the inflection in the speaker's voice.  You should,

17 therefore, rely on what you heard rather than what you read

18 when there is a difference.

19      Keep in mind that the defendant is not on trial for

20 any offense not charged in the bill of indictment, nor should

21 you draw any inference concerning guilt or lack of guilt of a

22 crime charged in this case based on evidence, if there was

23 any, of the defendant's involvement with any other offense not

24 charged in this bill of indictment.  You must not convict the

25 defendant unless the government has proved beyond a reasonable

1   doubt each and every essential element of the particular crime

2   charged in this bill of indictment against a defendant.

3           Now, during the trial I instructed you to exclude

4   from consideration certain statements made from the witness

5   stand.  It's your duty to follow that instruction and consider

6   only the evidence which was duly allowed from the witnesses

7   presented to you.

8           Now, the punishment provided by law for the offense,

9   or any of them, charged in the indictment, should there be a

10  verdict of guilty as to any offense, is a matter exclusively

11  within the province of the court and should never be

12  considered by the jury in any way in arriving at an impartial

13  verdict as to the guilt or innocence of the accused.

14          Thank you for your attention to this part of the

15  jury instructions.  Under our rules the parties -- I should

16  say the government has the first opportunity to argue its case

17  to you.  Then the defendant will have an opportunity to make

18  argument and also respond to government arguments.  Finally,

19  the government will have a brief period in which to respond to

20  defense arguments.

21          Is the government ready to proceed?

22          MR. KAUFMAN:  We are, Your Honor.  I'm just making

23  sure that I have a power point closing.  It's hopefully coming

24  up on the screen in just a moment so please don't count this

25  against my time.

1          (Pause.)

2          MR. KAUFMAN:  It appears we're ready, Your Honor.

3  Thank you.

4          THE COURT:  All right.  You may proceed.

5          MR. KAUFMAN:  Yes, Your Honor.

6          Ladies and gentlemen, at the risk of not having

7  anybody looking at me but at the screen, I would like to now

8  go through this power point closing and I'll walk you through

9  it.  There is limited time so I may be going through

10 relatively quickly.

11         But basically, again, the charge here is not

12 possession of drugs.  This is a conspiracy count.  We

13 discussed that even as early as during voir dire, jury

14 selection, that the whole point of this first count in the

15 indictment is the criminal agreement, the criminal enterprise.

16         And what exactly is a conspiracy?  It's a lot like a

17 web.  Some people talk about it like a business.  It can be

18 seen as like a web where you have multiple people who can be

19 involved.  And to be part of the agreement, to enter into that

20 agreement, you don't have to be two strands -- if you want to

21 look at the web diagram.  You don't have to be two pieces --

22 two strands connected to each other.  There can be stages of

23 separation.  Ultimately, the whole object of this conspiracy

24 is to distribute and to possess with intent to distribute

25 methamphetamine.

1    And all people within the conspiracy are responsible

2 for the acts of others as long as it's reasonably foreseeable

3 as part of the conspiracy. And ladies and gentlemen, what's

4 not reasonably foreseeable as part of a drug trafficking

5 conspiracy?

6    Bobby Shore is a little sideways here, but

7 ultimately here's our little web that you've heard from as

8 part of the conspiracy. Lots of other names have come up as

9 well. Just throwing out a couple. You've heard about most

10 recently Chad Yates and some other folks. But these are the

11 ones who have been kind of highlighted as part of this larger

12 web involved in this methamphetamine trafficking conspiracy.

13    And what's it about? Is it about the drugs? Is

14 that what this is? The stated object is drugs. But

15 ultimately, it's just a means to an end. It's about the

16 money. Lots and lots of money. Law enforcement in this case

17 has actually seized $50,000 from the defendant's property.

18 But you've heard testimony about even larger amounts. Most

19 recently Mr. Hawkins was talking about the counting of money.

20 And yes, I believe he said it was some amount, $15,000 or

21 more.

22    You've heard about lots of weights involved. And

23 what we do is we call those weights historical weights, the

24 amounts that people have themselves taken responsibility for

25 and how much they've said they've trafficked during the course

1  of the conspiracy that involved Mr. Saldana.

2          Now, this one is a very interesting conspiracy

3  because it's not that the individuals that you're hearing from

4  are on the fringe of the conspiracy.  They're really in the

5  heart with Mr. Saldana.  You're hearing and you've heard in

6  this case testimony about a conspiracy where he's really kind

7  of the hub, if you will, for the redistribution to Mr. Shore,

8  to Mr. Eller, to others who then repackage in smaller amounts

9  and it goes down to, if you will, the street level as we call

10 it.

11         So in terms of the facts of the case, you've heard

12 that Mr. Saldana was on law enforcement's radar screen as

13 early as 2008.  There was information, intelligence.  Nothing

14 enough to establish probable cause for an arrest of him.  And

15 you also heard law enforcement explain that the way -- there

16 are multiple investigations going on at a given time.  And not

17 to use that in a defensive manner, but simply to say that you

18 heard from Agent Harmon that you want to expand.  You don't

19 want to just arrest somebody the moment you can.  You're

20 trying to find out all the co-conspirators.  Trying to expand

21 it.  And ultimately you want to work it up, up, up, closer to

22 the source of supply.

23         2008, 2010, 2011, 2012, and, yes, then came some

24 buys from somebody who was known to be involved with

25 Mr. Saldana.  And that's the way you do it.  You work your way

1  up.  You work your way towards the source.  August, September,

2  there was seven transactions.  And yes, the seven transactions

3  were with Mr. Shore, not with Mr. Eller.

4       And I put on the screen, some of the images that

5  you'll be seeing, the net weight of the drugs and then below

6  that the actual weight and the percentages.  These are what we

7  sometimes call drugs on the table.  All of these bags that

8  were shown to Sergeant Williams -- I'll just pull out one.  We

9  call these drugs that are on the table.  You've got historical

10  because we don't have them in the courtroom.  We have the

11  testimony about it.  And then we've got what's on the table.

12       And so these slides here that are talking about

13  weights are the drugs that are on the table.  And if you need

14  to, for example, see the crystalline nature of them, you know,

15  you'll be allowed to take a closer look.

16       But you can't forget that this is just the

17  methamphetamine that was seized.  We also heard testimony

18  about pounds here.  All of these witnesses who said, yes, the

19  conspiracy involved over 500 grams.  And yes, I took

20  responsibility for it.  I did it with him.  It was over

21  500 grams, which is the statutory threshold that you're being

22  asked.

23       But when you heard the testimony about the number of

24  times they did an ounce or a half an ounce, the frequency and

25  the duration -- ladies and gentlemen, I saw you all taking

1 notes and I appreciate that. It shows that you were very

2 attentive to the facts. You'll be able to do the math and see

3 that the historical weights are extraordinary.

4         And certainly, the amount that we have in these

5 particular exhibits, based on the quantity and the purity,

6 it's far in excess of 50 grams which is also one of the

7 statutory thresholds that you are going to be asked to

8 consider.

9         With regard to Mr. Eller, three transactions. And

10 you've got the weight there. Consistent with his testimony.

11         Then there was the search of his residence. And

12 this is important because, again, this is a person that when

13 we talk about credibility, corroboration, these are important

14 concepts. In theory, if you find -- if there is no other

15 evidence in a vacuum and one witness takes that stand and

16 swears under oath to tell the truth, whole truth, and nothing

17 but the truth, and based on their demeanor, the details that

18 they say, if they -- you, as the judges, essentially, the

19 judges of the facts in this case, that's what a jury is, you

20 find that their testimony is credible beyond a reasonable

21 doubt, that's all you would need to find the defendant guilty.

22 That would be a legally sufficient verdict.

23         That's not what we're suggesting is the case here.

24 Obviously, we've been here for three days and there's a lot

25 more evidence. But certain elements are corroborating and

1    credibility factors.  What did Mr. Eller do?  When he was

2    caught he immediately confessed.  He gave a detailed

3    debriefing.  And he was able to then conduct transactions

4    consistent with the information he provided to law

5    enforcement.  I've been dealing X amount of times, X amount of

6    quantities over certain frequencies with Mr. Saldana, who,

7    currently, has been going back and forth, especially in the

8    recent past, to Mexico and leaving Jose in charge.  He was

9    able to then after that statement prove it's truthful by

10   making those controlled purchases from Jose Pina.

11            Very importantly, and I foot stomp this with regard

12   to the evidence here, those two recordings.  I mean, you've

13   got the defendant's own statements here.  That's his voice

14   talking to the people.  There's no, well, what are the

15   interests here?  It's the defendant's own words.

16            Asking Mr. Eller -- he's very concerned about

17   Mr. Eller.  Why would he be concerned about Mr. Eller?  Why is

18   he repeatedly asking?  Consciousness of guilt.  He -- the

19   reason is because Mr. Saldana is guilty.  He's part of the

20   conspiracy and he's worried.  He's trying to suss out

21   Mr. Eller who's come to his home.

22            Mr. Saldana actually, when you review this again --

23   and I do ask you to listen to these two recordings again.

24   There's a lot of evidence in this case.  I'm not trying to

25   diminish any of the other evidence.  And the sworn testimony

1  from the law enforcement witnesses and the cooperating

2  defendants.  But for now let's talk about these recordings.

3  Please review them again.

4          Mr. Saldana is the one who brings up the whole issue

5  in the first place.  This isn't Danny raising it trying to

6  bait Mr. Saldana, which would be fine if he did.  But

7  Mr. Saldana is the one who is worried about all this law

8  enforcement activity.

9          A second time he's asking and Mr. Saldana is the one

10  who raises, Oh, if people -- they got caught.  Okay.  What did

11  they get them for?

12          Eller says methamphetamine.

13          Does Mr. Saldana bat an eye?  No.  How much?  What's

14  the weight?

15          He starts talking about Jose stopped by.  How long

16  has it been since you stopped?

17          Stopped what?

18          Stopped buying from his employee, from Jose Pina.

19  That's what he's trying to find out.  When was the last time

20  that he bought?

21          And then Saldana, he's just kind of playing along.

22  He just doesn't trust Eller.  Just lay low.  Don't try and do

23  any more deals.

24          He asked him a third time in the recording, he said,

25  Yeah, I'll have Jose give you a call, which is interesting

1   too.  Whether he calls him or not, he's confirming with

2   Mr. Eller that he had that relationship, that Mr. Jose was

3   doing things on Mr. Saldana's behalf.  Mr. Pina was doing

4   things on Mr. Saldana's behalf.

5          Okay.  Bobby Shore.  The very next day we've got the

6   search.  And what does Bobby Shore do going to his

7   credibility?  He confesses.  He gives a detailed debriefing.

8   He too says he's getting it from Mr. Saldana.

9          And then that recording.  Mr. Saldana raises the

10  issue of Danny.  He's concerned because Danny was close.  He

11  knows that there's a problem.  Identifies him by name.  He's

12  having trouble with the full name.  He recognizes that blue

13  truck that belongs to Danny.  Saldana is confirming that he's

14  controlling Pina selling to Eller.  I'll let the other guy

15  know to call you.

16         And he's talking now to Bobby Shore.  And

17  remember -- and he's trusting Mr. Shore.  He wants Shore to

18  help Saldana.  He wants to help him find out more about Danny.

19  He's not a hundred percent sure that he's working for the

20  police or he was even stopped, but he wants to try and find

21  out.

22         And Mr. Saldana in that conversation with Mr. Shore

23  confirms, I don't know if you -- I didn't know if you were

24  messing with him.  I was.  Now, he's making these admissions

25  to Bobby Shore.  Very important here.  He trusts him.

1        He says, I'm not working with nobody, just you.

2   That's what Mr. Saldana says because he trusts Mr. Shore.  And

3   yes, Mr. Shore does have a prior felony drug conviction.  And

4   I would ask you whether this recording corroborates him.  If

5   you're a drug dealer, wouldn't you almost trust somebody who's

6   already been through the system a little bit more?  He trusts

7   Bobby Shore and he says that he does.  And you can tell that

8   he does because he's much more open with Mr. Shore than he was

9   with Mr. Eller.

10       And he's also saying, I'm afraid they might squeal.

11  They might tell on me.  That is -- again, what do we call

12  that?  Consciousness of guilt.  If you haven't done anything

13  wrong, then you don't have to worry about somebody squealing

14  on you.

15       And then he confirms again that Jose Pina will sell

16  to him.  Says, I'll let him know.  I'll let him know.  I'll

17  let him know.

18       Shore goes, Yes.

19       Saldana, But, yeah, just be careful just like we

20  were saying.

21       The cooperating witnesses, we've got Danny Eller,

22  Bobby Shore, Clara Caudell, James Hawkins, and Jose Pina.

23  They've all testified under oath.  Again, you got to see what

24  their demeanor was.  They got to explain their understanding

25  as to they better be telling the truth because they have

1    everything to lose by not being a hundred percent truthful and
2    they have everything to gain by giving truthful information.
3    They haven't been promised anything, but they are hoping.
4    They are hoping that Judge Voorhees will reduce their sentence
5    if they are given -- giving truthful information.
6            And then there's Martin Saldana.  He's not really a
7    cooperating witness, but he is certainly a very strong witness
8    against himself.
9            His phone, he's got his selfies on there.  And Agent
10   Harmon testified about the certified subscriber records.  This
11   is consistent with trying to avoid detection.  The phone that
12   he was using was in another person's name.  And importantly,
13   not his only -- not -- not only, one, not his address, but,
14   also, two, a fake, nonexistent address.
15           Now, this is kind of -- I'm a little closer.  I
16   don't know if you all can see this.  But in his phone he had
17   contact information for all these people, Bob Shore, Clara
18   Caudell, Danny Eller, and then Jose Pina, and Jimmy Hawkins
19   which he's got him by his full name.
20           Importantly, in his phone he had this photograph.  A
21   little bit blurry, but what do we see in it?  There are the
22   gloves.  Latex gloves.  He's sitting right next to them.  And
23   what are those used for?  You've heard testimony about trying
24   to avoid contact with the skin.  It can be absorbed by the
25   skin.  Those gloves were used for packaging and then

JAMES HAWKINS - RECROSS

1    ultimately transporting, distributing methamphetamine.

2            Remember also the roll of that cellophane that was

3    just above on the ledge just next to the latex gloves and the

4    roll of black tape.  This is all the same stuff.  You can look

5    through the physical exhibits and you'll see the very same

6    materials.  Not the gloves, but you will see the wrapping that

7    was put around the methamphetamine is consistent with what was

8    in his shed.

9            In terms of the law, I'm foot stomping the first

10   count.  All these charges are important, significant charges.

11   I may emphasize the conspiracy count just a bit here.

12           So, the idea is you're trying to commit a crime

13   that's based on the agreement.  That's ultimately what the

14   issue here is.  The agreement itself is criminal.  The fact

15   that there was actual distribution, well, that just further

16   supports that there was a conspiracy because people acted on

17   it.  It's not a requirement under the law, but it is proof

18   that there was a criminal agreement because people acted on

19   it.  When I say "people," these witnesses.  And in fact, the

20   defendant himself was selling the drugs himself.

21           Federal conspiracy law.  It goes beyond what a

22   defendant personally did, what he personally touched.  Very

23   important, again, as we discussed during the jury selection

24   process.  You all agreed that you understood that it's the

25   agreement; that you weren't going to hear that he was seen

1    with drugs by law enforcement, seen with drugs in his hand, or

2    having put it in a particular location.  It's established by

3    the witness testimony.

4           Again, it's the reasonably foreseeable.  And

5    everything here is reasonably foreseeable because these were

6    his own customers.  And with regard to Jose Pina, Sr., his

7    employee, if you will.

8           The law does cover a broad range of conduct.  The

9    idea that it's just an agreement that's the crime might sound

10   somewhat extraordinary when usually an ordinary person might

11   think about having drugs, selling drugs in their hand, on

12   their person.  But this is the law and this is what Congress

13   designed the law to be.

14          The agreement, how do we know there was an

15   agreement?  Because this isn't a conspiracy based on one

16   transaction.  This is an ongoing relationship with multiple

17   people, a subordinate, and with customers over years of time.

18   Multiple transactions.  We have recorded conversations that

19   are corroborating that.

20          In terms of the second element, knowingly joined.

21   Again, it's ongoing activities.  He wasn't being coerced.  He

22   didn't have a gun to his head saying you've got to do these

23   distributions.  He was doing it because he had a motive.  He

24   wanted money.  We heard in the recordings he was talking about

25   his unemployment benefits and his very detailed knowledge that

1  those were about to be reduced from 500 to 300 dollars.

2          The object of the conspiracy.  It was to distribute

3  methamphetamine.  And he personally, based on the sworn

4  testimony and the corroborating evidence, he was the one who

5  was personally selling a great deal of it when he was present

6  here, and he directed somebody to do it when he was in Mexico.

7          Drug amounts.  We've already touched upon that.  And

8  there's no question that what was being sold here was

9  methamphetamine.

10          In terms of the possession of a firearm in

11  furtherance of drug trafficking, again, this is not based on

12  him having it in his pocket or holding it out at somebody or

13  doing anything like that.  This is about possession in

14  furtherance of.

15          And you heard from Agent Harmon that a drug

16  trafficker will have firearms for protection purposes, to

17  protect themselves, their drug proceeds, their drugs

18  themselves, anything of value that they may have gained from

19  drug trafficking.  From whom?  Unfortunately, from law

20  enforcement, from competitor drug dealers, would be robbers.

21  During the recording, remember, he said he got shot.  In one

22  of them he said he got caught, it sounded like he was saying

23  between two drug gangs in Mexico.  But he also at another

24  point made it sound like he said he had been robbed in Mexico.

25          So those are the reasons why.  Those are why

1    firearms are tools of the trade.  You heard about the distinct
2    nature of the short-barreled shotgun.  And what's the purpose
3    of that?  To cause as much dispersion and damage in a wide
4    range.  And, very importantly, to have it so that it can be
5    easily concealed.
6            Multiple firearms.  And, yeah, he told -- when law
7    enforcement showed up with that search warrant, they were
8    going to go through the place.  He told them about what they
9    were going to find in the drawer.  There was three firearms
10   and then there was the other handgun, the revolver, that was
11   between the box spring and the mattress.
12           We know that he had cash at his home.  He even had
13   it buried.  You know, the $50,000.  He was trying to protect
14   it by hiding it and he had a backup plan.  He had the
15   firearms.
16           And yes, ladies and gentlemen, at the time of the
17   search, were there a lot of -- were they loaded?  No.  Was
18   there a cache of large amounts of ammunition?  No.  Did he
19   know that things were starting to change on December 12th from
20   the suspicious conversation with Eller on the 11th and then on
21   the 12th in the morning was with Bobby Shore and then the
22   arrest happened on the 12th of December in the evening.
23           With regard to the final count, this one, I'm not
24   going to touch upon it too much because basically everything
25   was stipulated to except for one element which was the knowing

1  possession.  And how do we establish that?  Well, the
2  surrounding circumstances of it being in his drawer are
3  enough.  But law enforcement interviewed him and he admitted
4  that he knowingly was possessing it.  So there we go.
5           Ultimately, ladies and gentlemen, what should be
6  your conclusion in this case?  We submit that it should be,
7  with regard to all three counts in the indictment, a verdict
8  of guilty.  Thank you.
9           MR. FORRESTER:  Good afternoon, ladies and
10  gentlemen.  Once again, my name is Denzil Forrester.  I
11  represent Mr. Martin Martinez Saldana along with Mr. Rick
12  Canales.
13           Your Honor, court personnel, prosecutor:
14           I am going to use my notes and I have to.  There are
15  so many notes and I somewhat have to address what the
16  prosecution just said, so -- however, as promised, I would
17  return and I would argue why Mr. Saldana is not guilty of the
18  crime.  Not only that, why the government has not proven that.
19           Basically, we heard a lot of testimony.  And I
20  said -- when I did my opening, I concentrated on the testimony
21  coming from the witness stand.  And I said, basically, you
22  have to pay attention because testimony is ultimately based on
23  what we experience and mainly what we perceive.  So most of it
24  came from people who experience something.  Some of it came
25  from people because of their position in law enforcement.

JAMES HAWKINS - RECROSS

1    However, as the prosecution just said, some of it came from

2    what you would call percipient witnesses.  However, in this

3    situation -- and I'll go over what I mean by percipient

4    witnesses.  People who can perceive, hear, smell, touch,

5    sound.  That's what I mean by percipient witnesses.

6            But His Honor instructed you that you've got to be

7    careful when you deal with informants.  And that's because in

8    the legal community, in the law enforcement community, they

9    know the informants are not percipient witnesses.  They are

10   witnesses that will do anything just to get a time cut or just

11   for that hope or promise.  Their religion is that hope.  Like

12   anyone, we all have -- well, I shouldn't say we all have

13   religion.  That has nothing to do with this.  But it's based

14   on faith and belief.  Their religion is based on their hope

15   and expectation of what's going to happen.

16           So this case mainly deals with the government trying

17   to basically do what they couldn't do.  They could not

18   perceive so they had to rely on people who are going to

19   deceive you.  I'm not talking about the case agents who

20   testified.  I'm talking about the informants who testified.

21           But I think -- it's not even my thought.  The

22   prosecution knew that their case was weak.  It was an empty

23   barrel.  You ever rattle an empty barrel?  Makes a lot of

24   noise.  And they told you that in jury selection.  They told

25   you they're only going to have testimony which maybe came from

1   informants, recordings, that I'll get to, that pretty much

2   didn't say anything, and photographs.  They told you that.

3          And the reason why because they knew their case was

4   going to be based on smoke and mirrors.  Basically, tricks.

5   And they even said it.  About Santa Muerte and all these other

6   things and witchcraft and all that.  So it's not just me

7   saying -- I can't make this up.  They said it.  They said it.

8          We'll first start off with the case agents.  We'll

9   start off with the case agents who basically were here to

10  administer and help the government prove some sort of

11  conspiracy, possession of an unregistered weapon, knowing

12  possession, and also possession of a firearm, not only of one,

13  but of four, in furtherance of a drug crime.

14         I will say this.  Mr. Saldana was not involved in a

15  conspiracy and the government couldn't prove it.  And I'll

16  tell you why.  There was no conspiracy.  You heard the

17  witnesses testify.  We'll start off with Mr. Eller.

18         Danny Eller said he was a drug user.  He testified

19  he got roughly 3.5 on a regular basis and he used that much,

20  and he said a little bit more he sold.  There is no

21  indication, no testimony from Danny Eller that Mr. Saldana --

22  if you want to believe what the government is arguing, that

23  Mr. Saldana knew he was going to pass that on.  Basically --

24  so based on his testimony, what we know is that -- if you want

25  to believe the government's case, is that you have a meth user

1  and another meth user just partying, sharing their stash.

2  That's what you know.  It's a one-way street.

3          What you know going back to the government witnesses

4  are this -- I'm talking about the agents -- is that they never

5  provided this jury with anything concerning my client being

6  involved in a conspiracy.  And they had many excuses.  They

7  had a pole camera.  They said we put up a pole camera because

8  it was too expensive to have two guys in the woods.  So based

9  on that, two guys in the woods didn't develop anything.  So

10 they resort to a pole camera.  The pole camera didn't resort

11 to anything.

12         They tried to obtain two dirty calls.  Here's a guy,

13 the indictment says from 2011, however, you hear the

14 prosecution talking about from 2008.  We'll get back to that,

15 prosecution and all that.  But here's the thing.  Here's a guy

16 they can't develop two dirty calls in all that time?  But they

17 want you to complete that bridge and develop it in three days.

18         No Title III wiretaps.  Here again we hear

19 bureaucracy.  Bureaucracy.

20         I think that it's fair to say if the government and

21 Your Honor instructed this court not to make a ruling based on

22 sympathy, then I don't think bureaucracy, we're out of money,

23 we don't have manpower for two guys to be in the woods, I

24 think that is -- they're trying to give you excuses to

25 engender sympathy.

JAMES HAWKINS - RECROSS

1          Let's start off with Mr. Harmon, his testimony,

2   because I will submit to you the agents did not give you

3   anything.  Mr. Harmon with all his training, 17 years in law

4   enforcement, Bogata, Columbia, but now he's back to what he

5   called God's country.  He's certainly someone you have to

6   watch out.  I don't mean as far as he came up here telling

7   lies.  I don't mean that.  But certainly you have to watch out

8   because he's so diplomatic, he tried to have the jury enamor

9   themselves with him by saying God's country.  I'm sure if he's

10  in South America, he's going to call that God's country.  I'm

11  sure if he's in Virginia, he's going to call that God's

12  country.

13         But let's get back to what he's saying.  He's

14  saying, look, about the informants, their desire is to have a

15  reduction.  Believe him when he says that.  Their desire is to

16  have a reduction.  And basically, you heard other people say

17  that it's his job right now to cooperate.

18         Mr. Harmon -- Agent Harmon says it's not an uncommon

19  occurrence for them to mitigate their roles.  Fancy word

20  meaning to lessen their roles.  Basically, he's saying, look,

21  they might lie.  Okay.  They might lie.

22         He never seen Saldana possess drugs.  And then it

23  goes into the -- at least seven times he apologizes for not

24  remembering Pina Jr.'s role adjustment.  He does not know Jose

25  Pina's alias, Mancilla or Mancilla, because a double L is like

1   a Y or J.  Here's the chief agent in this case saying, I don't

2   know, I don't know.

3           Then he goes on to say, look, he didn't speak with

4   the neighbors because, remember, they can't perceive.  That's

5   why they need other people.  But he didn't talk with the

6   neighbors.  And the neighbors are independent.  They don't owe

7   anything to the government so they don't have to come here and

8   say like Pina said, "I'm a hundred percent honest."  You

9   didn't talk to the neighbors, Agent Harmon.  Why?  He didn't

10  think it was relevant.

11          I'll tell you this.  That is him being very modest.

12  I told you he's a great diplomat.  It's not that he didn't

13  think it was relevant.  It's because he knew he cannot put the

14  screws on the neighbors like you can put on informants.

15          Wasn't sure -- he also testified he wasn't sure who

16  the shed belongs to.  But it was fine for him to assume.  He

17  said he assumed because Saldana owned the property, so

18  basically he assumed it was rented to Pina and Saldana had

19  control over the property.

20          But that's incorrect.  We heard basically when Betty

21  Houck said Pina won't give me a key.  That goes to who

22  controlled that property.  Jose Pina.  He controls the

23  property.  Even when he's in custody he controlled the

24  property.  He has his girlfriend, Ms. Blevins, come back and

25  dig up the holes and take money out, not to turn over to the

1    government, but to use for their own purpose.  And like the

2    prosecution said, this is about money.  The end game is about

3    money for his informant.

4            But check this, no one puts a check on it.  Because

5    Jose Francisco Pina, Sr., he came here and testified and he

6    said they know I did all this after I was arrested and after I

7    agreed to testify.  So they knew I was no good then.  And they

8    still put him on the stand.  Why?  Because they needed someone

9    to connect to Saldana and that bridge just broke.  That bridge

10   just broke.  You can see that Pina was going to say anything

11   that glorifies him.  Such as I wouldn't date a woman unless

12   she was honest.  Never.  So honest that even if you believe

13   him that the money belonged to Saldana, she's going to steal

14   from Saldana.  So honest that he's trying his best to get a

15   time reduction.  And instead of saying let me turn this over

16   to the government because if we come clean and we're going to

17   tell the whole truth and nothing but the truth, let us tell

18   all of it, not part of it.

19           So Agent Harmon was correct, they do mitigate.  They

20   do lessen things.  Or I would say they do fabricate and

21   mischaracterize different things.  Just like this whole

22   testimony has been from all the informants.

23           They talk about it's a collaborative effort in

24   closing the case.  Really?  Then he finally said it's his

25   call.  It's his call.  They debated about that.  Let's --

1  remember, Agent -- well, Detective Sergeant Jeremy Williams
2  said on January 1st of 2012, We didn't have enough.  And
3  that's a bold statement.  That's a bold statement.  Why?
4  Because check out the mentality of the government.

5          Let me just hold on right there concerning they
6  didn't have enough and they made a decision.  But you have to
7  understand, part of this is subliminally, almost like read
8  between -- not read between the lines, but they're trying to
9  send messages like Coca-Cola at the movies.  They're saying
10 he's guilty.  Basically they're saying we assume his guilt.
11 They do.

12          You heard the prosecution ask the question to the
13 agent.  When you see a guilty guy doing something, do you
14 arrest him?  I thought guilt or innocence is up to you.  Your
15 job.  But you have a United States prosecutor saying,
16 basically, we believe in guilt by assumption.  Do you arrest
17 them?  But even based on their standard, what happens?  They
18 didn't even have enough on January -- in January of 2012 to
19 arrest.

20          Why did they arrest?  They arrest because supposedly
21 he's going to Mexico.  But we hear plenty of times he goes to
22 Mexico and returns.  As a matter of fact, when do they arrest
23 him?  What month?  December.  But we heard testimony this same
24 afternoon he goes to Mexico at Christmas time.  They arrested
25 him because money was running out, time was running out and so

1  they had to do something.  And they knew this case was half

2  baked and they're bringing it to you.  Hopefully you will have

3  their assumptions.

4         What do they call their assumptions?  The

5  prosecution -- the prosecutor just told you what they called

6  assumptions.  They call their assumptions reasonable

7  foreseeability.  It was reasonably foreseeable.

8         Okay.  Some of their other assumptions.  Remember

9  the agents testified all Hispanics return to Mexico?  He

10 happens to be a U.S. citizen.  You heard on the tape he says

11 he's coming back.  But that's their assumption.  The whole

12 thing is assumption by assuming guilt.  It's an assumption.

13 And you know what?  Basically, because of the weakness of

14 their case, you sometimes are left with what you're left with,

15 a desperate act.  A desperate act.

16        The other assumption that I thought -- well, the

17 other thing that the prosecutor said when he says all

18 co-conspirators, he's assuming everyone is a co-conspirator.

19 And we see this.  Where's Chris Yates?  We heard Jimmy or

20 James Hawkins talk about I'm getting 2 to 3 pounds in a

21 two-month period of time from Chris Yates.  Where is he at?

22 Okay.  He's finally in jail.

23        We heard James Hawkins say, I don't know -- Saldana

24 doesn't know who Yates is.  But they're basically throwing a

25 whole net, and he said it himself.  Conspiracy is a big net.

JAMES HAWKINS - RECROSS

1    And basically, conspiracy is an agreement between two or more

2    people.  And you don't have to know everyone.  However, you

3    certainly have to have some sort of contact or conspiratorial

4    agreement between somebody.  Let's go over all of the

5    government's lay witnesses, all of their non-uniform, working

6    people, lay witnesses.

7            Let's talk about Clara Caudell.  You've got to give

8    her heart.  If you heard her testimony, she said I'm not going

9    to stay in jail anymore.  It was basically saying at first I

10   wouldn't cooperate.  But brother, let me tell you something.

11   When she's up there in Virginia, it's cold at night.  She's

12   not eating the food she wants.  She's missing her drugs.  Her

13   knees are going to get weak.  And she's back here -- what did

14   she say?  Everybody -- she wants out just like everybody else.

15           Two kinds of people at the Bureau of Prisons.  Those

16   who cooperated with the government or those who wished they

17   cooperated with the government.  That's basically the name of

18   their game.  Okay.  It's not basically a carrot and donkey

19   where the donkey is following.  It's basically a race horse.

20   You beat that race horse through intimidation, through letting

21   them know you're not going to see your family.

22           Let's go on with Mr. Eller.  The recording --

23   because here's the thing.  This isn't -- I can't make this up.

24   The recording.  Eller goes in there to say, hey, look, let's

25   do something.  And basically, you hear nothing.  However, what

1  you do hear -- you hear nothing concerning a conspiracy.  What
2  you do hear is this.  Two meth heads saying, look, I'm getting
3  out of -- well, they don't come out and say I'm getting out of
4  using meth.  He's basically, look, guys have been arrested.
5  You understand what's going on here.  Maybe I need to go to
6  rehab.  Okay.  Maybe I need to go to rehab.  That's what you
7  hear.

8          However, the next day what you hear, what you find
9  out is that basically Saldana -- Mr. Saldana was on to Eller.
10  He was on to Eller.  Because he said that to Bobby Shore.  So
11  what you have, you have the best evidence.  They want to
12  surveil.  They have it.  They have Mr. Saldana to the extent
13  they want to push a conspiracy.

14          And let me just say this.  An agent and a suspect
15  cannot form a conspiracy.  An agent and someone working for
16  them cannot form a conspiracy.  Cannot form a conspiracy.  So
17  basically, what you have is this.  They have their best eyes,
18  their best ears on him.  What does he say to Bobby?  He says,
19  I don't want anything.  You understand?  He basically -- Bobby
20  tries -- Bobby Shore tries to engage him in that.  He's like,
21  no.  Look, no.

22          The government because of their one-sided blind
23  determination, they can't figure out that he's saying, look,
24  dude, I don't want to mess with anyone.  I don't want to deal
25  with anyone.  I don't want to drug deal -- I don't want to

1  associate with anyone.  If you had them privately, they would
2  say, hey, whoa, there is no agreement there.  There is no
3  starter there.  In fact, there's no indicia, no evidence that
4  anything is there.  The only thing you hear is this.  Look, he
5  talks about the other guy, Pina.  And he talked about
6  surveillance.
7      If Saldana is living there, he is in a good position
8  to see what Pina is doing.  And is it a problem?  Don't hate
9  my guy because he don't want to be a snitch on what he sees.
10 Okay.
11     But look, here's the thing.  You love their
12 witnesses.  What did Pina Sr. say?  My son has nothing to do
13 with it.  Basically, no one wants to be a snitch.  No one
14 wants to be an informant.  But basically, he's forced.  And
15 the thing is he had to do what he had to do.  It was basically
16 come into court and talk about how the fact that he's
17 100 percent honest and he's a middleman and he's supposedly
18 the second in charge.
19     Notice how short his examination, his direct
20 examination was.  Let me tell you something.  Is it because
21 they ran out of money?  Is it because of some sort of
22 bureaucracy?  Or is it because the prosecution knew that,
23 look, I have a liar on the stand.  I've got to be careful
24 because --
25     MR. KAUFMAN:  Objection.

1          MR. FORRESTER:  -- it's more than what I can do.

2          THE COURT:  That's not an appropriate word,

3    counselor.

4          MR. FORRESTER:  I have someone who is not

5    100 percent trustworthy.  And not only is he not a hundred

6    percent trustworthy, he said two agents knew that, and one of

7    them is here with us today.  One of us -- one of them is here

8    with us today.

9          I will say this, talking about the gun.  We'll start

10   off with the name Houck.  Ervin Houck.  We find out that there

11   is reasonable -- it's reasonable to believe the guns came from

12   him.  And from him they went to Betty Houck.  And from Betty

13   Houck it went to Mr. Saldana.  Okay.  Remember, the street is

14   named after him.  What is -- what's -- the gem in that is

15   this.  Those individuals, okay, saw a hard working man, 20

16   years at Adams, 20, 28 years or so.  He's a hard working man,

17   okay.  To where, basically, like, we don't need these relics.

18   One of them is 50 years old.  Just pass it on to him.  The

19   other two supposedly he gained in some sort of bingo game or

20   whatever.  It wasn't like he went out, hey, I'm a drug dealer,

21   let me go get guns, okay.

22         Even so, he's -- he's going to go get guns.  If

23   you're going to go get guns in furtherance to protect

24   yourself, you're going to get guns to intimidate people and

25   you're going to get guns to protect yourself.  You've got a

1  broken shotgun that basically you got to assemble in the

2  middle of the night and you've got one shot with it.  You've

3  got two other -- you have three other weapons.  Single shot

4  each.  So hold on.  They're turning -- not only do they talk

5  about Santa Muerte and all these spiritual.  They're turning

6  this into Hollywood now.  My client is now the Lone Ranger.

7  He's trying to intimidate people with his one silver bullet

8  for each gun.  Or even not.  Suppose no one knows about it.

9  But basically -- because no one -- there's no testimony anyone

10 knew.  Okay.

11      But here's the thing.  He's going to use it in

12 furtherance of drug activity?  You're going to protect

13 yourself if someone breaks in?  Boom.

14      Let me get -- we heard the man -- we heard Bobby

15 talk about -- I'm sorry, I shouldn't --

16      THE CLERK:  Five minutes, counselor.

17      MR. FORRESTER:  We heard the witness said he got

18 shot up.  What we heard on tape, they're saying, look, man,

19 you're beaten up.  You look bad.  That's in furtherance?  No.

20 That's their suspicions turning into guilt already which is

21 your job.

22      Let's talk about the shotgun.  How big of a deal is

23 it for possession?  Betty Houck lived there.  Betty Houck

24 lived there.  So she just, hey, it's there, just leave it.

25 I'm sure Mr. Saldana knows federal law and said, hey, let me

1  wake up and go register this gun.  The fact is they haven't

2  proved anything.

3          But let me go back to my opening statement.  I'll

4  tell you this.  In my opening statement, I said this:  Pay

5  attention to who is saying Saldana committed a crime.  Because

6  no one else -- Bobby Shore didn't say, hey, I get drugs from

7  Saldana and then I pass it on or he knows I pass it on.  No

8  one else said that.

9          The only person who said something to that effect is

10  Pina.  Pina said I knew him for six months and I'm living in

11  his house.  And he says, yeah, basically, he pressured me to

12  do this.  Really, Pina, he pressured you?  He pressured you?

13          Or basically -- see, he's their star witness.  He's

14  their star witness.  Because basically they're saying, hey,

15  isn't that -- the jury is going to believe that is Saldana's

16  homeboy.  No.  No.  These things will come back to haunt and

17  they did come back.  They did come back.

18          We don't see anything as far as Mr. Saldana engaged

19  in any sort of drug activity.  You heard a witness -- you

20  heard the agent talk about it's a big Ziplock bag.  What

21  happened when they went to his house?  No big Ziplock bag.

22  Why is that?  That's no evidence of him storing anything.

23          What you might have is this.  You have Pina and his

24  son living on the property and basically doing their stuff.

25  And someone who's probably scared out of his mind to say

JAMES HAWKINS - RECROSS

1    stuff.  And not only scared out of his mind, but because he

2    understands, look, you don't inform on anyone.  And so he

3    cannot be whipped and he cannot be promised any sort of

4    anything.  You can't buy or sell him.

5            These other guys, bought and sold.  And they're

6    coming in here to sing anything they want to because they want

7    home.  Just like Ms. Caudell, Clara.  She is at BOP and she

8    wants home.

9            I will say this to you.  The government has not

10   proven beyond their doubt -- beyond a reasonable doubt that

11   Mr. Saldana is guilty of anything except for being humble and

12   kind enough to let two strong men intimidate him and for him

13   to shut his mouth.

14           Ladies and gentlemen, thank you for your duty.  But

15   as we said before, it's not guilt by suspicion.  It's not

16   guilt by what the prosecution says.  It's guilt beyond a

17   reasonable doubt, and they even told you they failed in their

18   job because of money, bureaucracy, time, and manpower.

19           Thank you.

20           MR. KAUFMAN:  Ladies and gentlemen, the burden of

21   proof beyond a reasonable doubt, it's the standard that

22   applies in all prosecutions in this country, at the local,

23   state, and federal level.  We acknowledged it from the

24   beginning.  We welcome it.  And we've met that burden.

25           Now, this case is not about the Lone Ranger.  It's

1  not about Barney Fife either, is it?  But what we have here is

2  the defense argument, what did it boil down to?  Where were

3  the specifics?  Okay.

4        Did they talk about the details of any of these

5  recordings?  And I would ask you the first pieces of evidence

6  to review when you go into the deliberation room, please

7  listen to both of those.  Do they address any quotation, any

8  statement that the defendant has made in those two recordings?

9  There's no evidence to contradict that that's him.  Okay.  Is

10  there anything addressed in the defense's argument?  They

11  can't.  The devil is in the details.

12        And it's such compelling evidence, isn't it, ladies

13  and gentlemen?  I mean, when he says, Jose, yeah, I told him

14  not to give any meth to Danny.  Okay.  Listen, he doesn't say

15  the word "meth," but that's what they're talking about.  Okay.

16  Please, this is very important, these details.  The defense

17  didn't even address it because they can't.  It's such powerful

18  evidence.

19        And then with regard to the witnesses, are they

20  saying that the law enforcement officials didn't do things

21  right or they did?  It's a little unclear.

22        With regard to the cooperating witnesses, we have

23  multiple people.  And the defense kind of tried to paint a

24  broad brush and say, well, they're all motivated.  They're all

25  lying because they want to get out of prison.  Do they want to

JAMES HAWKINS - RECROSS

1  get out of prison?  Of course.  That's common sense.  But

2  they're very aware -- and I have to say I love rule number 1

3  and rule number 2.  Who knew that was going to come out.  But

4  they knew what the rule was.  They swore on this Bible.  The

5  truth, the whole truth, and nothing but the truth.  And rule

6  number 2:  Remember rule number 1.  It's that simple.

7          And they knew that they had everything to gain if

8  they told the truth because the judge would assess the

9  credibility, determine based on factors, which the defense

10  never raised with you just now.  They never talked about the

11  things that you as the judges of the facts have to do.  You

12  have to see that they swore an oath to tell the truth, the

13  whole truth, and nothing but the truth, and they spoke.

14          Their demeanor.  Did these people seem guarded?  Did

15  they seem evasive?  Or did they seem like they were trying to

16  be open and admitting things, just like they did when they

17  were stopped by law enforcement and admitted their own

18  conduct.  Corroborating.  It's a statement against their own

19  interests to give a confession.  It corroborates the facts

20  that they give.  And remember, too, when they give those

21  statements, they know that's their one shot.  Okay.

22          Did any of these people lie about who was involved?

23  Did they talk about the wrong person?  Well, then, they would

24  know that they're in trouble because that's their one shot if

25  they say it's the wrong person.

1    But how did they look?  Remember how they testified.

2  What was your feeling?  What was your gut?  Because gut is

3  important here.  It really is very important.  Did you feel

4  that these people were honest?  I mean, they're not lawyers.

5  They're not, you know, experienced defense lawyers or two

6  defense lawyers.  Did you feel as regular people they were

7  being honest with you?

8    And with regard to them saying no one is saying it

9  was a conspiracy.  First of all, with regard to conspiracy,

10  yes -- can you conspire with an agent of law enforcement?  No.

11  But all of these witnesses, they were co-conspirators until

12  they were arrested.  Okay.  So that whole course of purchasing

13  from Mr. Saldana, yes, that is a conspiracy.  And you can have

14  it between just two people.  And here we have him selling to

15  multiple people.  And then closer to the time of the arrest he

16  was doing it through a third party, through his subordinate,

17  Jose Pina.  Who, according to the defense's argument, it

18  seemed like the whole case to them was about Jose Pina.  It's

19  not Jose Pina.  It's about all these other witnesses who

20  testified.

21    And yes, Mr. Hawkins said he was buying from him and

22  reselling.  Mr. Eller said that too.  Ms. Caudell said that

23  too.  This wasn't just for personal use.  We're talking about

24  ounces.  You heard what is it for a gram of methamphetamine?

25  A hundred dollars.  When you have an ounce, 28 grams, that's

1  not personal use.  That's not personal use.  That's with

2  intent to distribute.  And you'll be instructed by Judge

3  Voorhees that one of the ways that you can conclude that this

4  was for distribution is not only because the witnesses

5  testified under oath to that effect, but the mere mass, the

6  mere amount of these drugs is indicative of that.

7          Also, all the other presence of the way things are

8  wrapped.  The wrapping material that he even had in his own

9  shed.

10          Now, with regard to Mr. Pina, because I just want to

11 address it because they're making such a big deal.  The money,

12 okay.  Think about it.  He was cooperating.  No one else told

13 us about the money.  There was no one else to tell us because

14 he was really the only one who knew.  If it was his money,

15 wouldn't he just wait?  Wouldn't he wait?  Get it eventually,

16 the drugs eventually?  No, he did fess up.

17          And yes, did he tell us right away?  Did he tell us

18 the very first time that he met with us?  No.  Did he come

19 clean about it?  Yes.  But we didn't have any indication of it

20 being there.  We would never have known but for him.  Again,

21 it goes to his credibility because it wasn't his.  Yeah, there

22 were problems, yeah, but he basically came clean on it.  And

23 is he a perfect witness?  No.  He was working for a drug

24 trafficker and he was selling to other people.  We're not

25 going to get the greatest citizens of the community in a drug

1    trafficking case.  How do you get to meet a drug trafficker?

2    With other drug traffickers.  That's how you do it.

3              Now, with regard to, you know, the shooting, the

4    evidence of that, this is not an innocent man just out of the

5    blue being shot.  This is a man who lives by the gun and you

6    can die by the gun.  Live by the sword, you die by the sword.

7    And he's very lucky that he didn't die.  But he's in a very

8    dangerous business.  And that's what can happen.

9              With regard to the timing of the arrest, remember,

10   yes, he was going back and forth.  But December 12th was a

11   very different date because what would happen if he had gone

12   to Mexico?  Okay.  All these people, they're gone.  He would

13   have heard.  He's got his ears out.  What happened with Eller?

14   Well, Eller on the 12th was going to jail and not getting out.

15   Same thing with Shore.  Caudell was already, right, in

16   Virginia?  Hawkins was as well.  Okay.  So everyone is gone.

17   He's not going to come back.  He's got his Mexican phone.

18   Remember the phone number that Ms. Caudell was communicating

19   with him?  He's not going to come back.  Yeah, maybe he would

20   come back and forth a lot.  But you know, he wasn't going to

21   come back this time.

22             And again, he wants to continue having the drug

23   transactions and maybe he'll set up a business where he can

24   continue working with Jose.  But if they think that the source

25   isn't going to be on scene, if the owner of the business isn't

1  going to be present, what happens to that business?  He wants

2  to keep the customers still coming.  What does he have to do?

3  He has to sell at the very least the inventory on hand.

4         It's a business model, ladies and gentlemen.  It

5  happens to be an illegal one, but all of this makes sense.

6  All of the facts in this case are actually very consistent

7  with what was going on, what the witnesses said and with what

8  law enforcement very reasonably did in terms of determining

9  what to do.

10         In terms of drug amounts, this idea that defense

11  just said these were user amounts.  Mr. Eller talking about a

12  half an ounce to an ounce.  Bobby Shore.  And yes, 4 ounces to

13  6 ounces is exactly what he told law enforcement and that's

14  accurate.  That's not personal use.

15         With regard to the pole camera and surveillance, you

16  heard testimony from Sergeant Detective Williams that you have

17  to be careful because to do physical surveillance personally

18  or by a pole camera, just the installation of it, what

19  happens?  Especially in this area.  You get burned.  That's

20  the term.  And we know what that means.  There goes the

21  investigation.  You want people to act in a way that they

22  don't know that they're being watched.  It's not a matter of

23  money.

24         And wiretaps.  Again, Mr. Saldana was careful.  He

25  used an intermediary, Mr. Pina.  There were no phone calls.

1    We couldn't do a wiretap.  It would never be approved.  You

2    heard the testimony about that.  It was impossible.

3         And was there a little luck?  Yeah, there was a

4    little luck.  Law enforcement got -- had multiple people

5    getting intel since 2008.  They got people who were actually

6    going to be ready to testify.  And yes, Mr. Eller on the

7    December 11th recording and Shore on the 12th and they learned

8    he was going to be going back to Mexico and it was time.

9         With regard to the starting time in 2008, all that

10   conduct leading up until the charged time period in the

11   conspiracy is very relevant and it corroborates the existence

12   of the conspiracy.

13        With regard to Mr. Pina, I think counsel

14   misconstrues how Spanish -- Hispanic names work with the two

15   first names and the -- the paternal last name, the maternal

16   last name.  It's a nonissue.

17        The shed.  Again, remember where the drugs and the

18   money were found.  And where is the shed?  All of this

19   stuff -- even if you think, okay, Jose Pina was allowed to

20   rent from the summer of 2012 for about six months.  All this

21   stuff was on Mr. Saldana's part of the property, that first

22   part before you drive down to the trailer.  Wasn't on anything

23   to do with Jose's.

24        And with regard to that surveillance, oh, they

25   should have gone to the neighbors.  Look at the map.  Where

1  are the neighbors?  Tell me where the neighbors' houses are on

2  that.  What were they going to see?

3          And again, this case is not about CSI with regard to

4  anything else that the defense is trying to argue.  Well, how

5  come they didn't do this, that and the other?  As we discussed

6  during jury instruction -- sorry, during jury selection, we

7  all agreed that CSI is fiction.  And yes, sometimes there are

8  various techniques that can be used if possible, like

9  wiretaps.  Are they real?  Sure they are.  Fingerprints?

10  Well, you heard from Sergeant Detective Williams that the lab

11  won't even do it on plastic bags it's so hard to get.  And

12  based on his training and experience, you're not going to get

13  it.  Sometimes you might get these things, but you don't --

14  the key thing is it's not any particular kind of evidence.

15          Ladies and gentlemen, that burden beyond a

16  reasonable doubt, if you are firmly convinced of the

17  defendant's guilt, it is your duty, your sworn duty as jurors

18  in this case to convict.  That is what the law is.

19          Ladies and gentlemen, I don't want to take up your

20  time anymore.  There's going to be a lot of evidence that you

21  can go back through.  I would, again, ask you to start with

22  the recordings.  And then think about the cooperating

23  defendants -- cooperating witnesses, that is, who testified,

24  what their demeanor was.  Was there actually any inconsistency

25  between what they told law enforcement before and what they

JAMES HAWKINS - RECROSS

1    stated when they testified on the stand?  And importantly, are

2    both of those, do they ring true?  Do they ring true to you?

3    What's your gut say?

4          After reviewing all the evidence, the testimony, we

5    ask you to return the only verdict that we submit is the

6    conclusion that you can come to based on this evidence:

7    Guilty.

8          Thank you.

9          THE COURT:  Thank you, gentlemen, for the arguments.

10         Ladies and gentlemen, the time being 5:00 and it

11   appears the main part of the instructions will take something

12   north of a 30-minute period, we'll go ahead and adjourn for

13   the evening and do those instructions first thing in the

14   morning at 9:30.  Then you'll have the case for deliberation

15   shortly after 10:00.  Thank you.  Remember all the usual

16   instructions, please.

17         THE CSO:  They're asking about weather.

18         THE COURT:  Don't take any chances.  We want you to

19   come as soon as you can get here.  Come as soon as you can get

20   here.  Be safe about it.

21         (Jury exited the courtroom.)

22         THE COURT:  Are they all gone?

23         THE CSO:   yes, sir.

24         THE COURT:  Okay.  All the jurors have departed.

25   Thank you very much.

JAMES HAWKINS - RECROSS

1      The record will reflect that there were no
2  objections to the first part of the jury instructions.  If
3  counsel have anything you'd like to convey to the court about
4  the balance of the jury instructions between now and 9:30,
5  please communicate that to us by email and we'll take that up
6  before 9:30.
7           (Evening recess at 5:07 p.m.)
8                          * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16          Dated this 10th day of August 2015.

17

18

19                          s/Cheryl A. Nuccio

20                          _____
                            Cheryl A. Nuccio, RMR-CRR
                            Official Court Reporter
21

22

23

24

25