UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA        )        DOCKET NO. 5:12-CR-49-1
                                )
        vs.                     )
                                )
MARTIN MARTINEZ SALDANA,        )
                                )
        Defendant.              )
_____)

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
MAY 4, 2015

APPEARANCES:

On Behalf of the Government:

        STEVEN KAUFMAN, ESQ.
        United States Attorney's Office
        227 West Trade Street, Suite 1700
        Charlotte, North Carolina

On Behalf of the Defendant:

        DENZIL H. FORRESTER, ESQ.
        Law Office of Denzil Forrester
        P.O. Box 32511
        Charlotte, North Carolina

        JESUS RICARDO CANALES, ESQ.
        Law Office of Rick Canales
        845 East Harrison Street
        Brownsville, Texas

                Cheryl A. Nuccio, RMR-CRR
                Official Court Reporter
                United States District Court
                Charlotte, North Carolina

<u>P R O C E E D I N G S</u>

1

2      THE COURT:  Okay.  Are the parties ready to begin?

3      MR. KAUFMAN:  Yes, Your Honor.

4      MR. CANALES:  We are, Judge.

5      THE COURT:  All right.

6      MR. KAUFMAN:  At the appropriate time the parties

7  have come to certain agreements regarding the guidelines

8  calculations which we can address at the appropriate time.

9      THE COURT:  All right.  I'll count on you to bring

10  those up at the appropriate time.

11      The court notes that the verdict came in in this

12  case March 7, 2014, which established the factual basis for

13  sentencing.

14      So Mr. Saldana, I see you have the headphones on.

15  Is there an interpreter?

16      Oh, there you are, I'm sorry.  All right.

17      Do you have a copy of the presentence report there

18  at counsel table?

19      THE DEFENDANT:  Yes.

20      THE COURT:  Okay.  Have you gone over that document

21  carefully with your attorneys, Mr. Saldana?

22      THE DEFENDANT:  Yes.

23      THE COURT:  Have you discussed it with them in

24  detail?

25      THE DEFENDANT:  Yes.

1     THE COURT:  All right.  Now, the charges on which

2  you were convicted included count one, conspiracy to

3  distribute and possess with intent to distribute

4  methamphetamine, and count five, possession of an unregistered

5  firearm.

6     Do you understand the nature of those charges and

7  the possible penalties?

8     THE DEFENDANT:  Yes, sir.

9     THE COURT:  And are you fully satisfied with the

10  services of your attorney in this matter?

11     THE DEFENDANT:  Yes, sir.

12     THE COURT:  Now, the defendant has made certain

13  objections to the presentence report.  Would you care to be

14  heard on the outstanding objections?

15     MR. FORRESTER:  May it please the court, Denzil

16  Forrester along with Mr. Rick Canales.

17     I think this is the appropriate time where the

18  prosecutor might want to address the court concerning those,

19  Your Honor.

20     THE COURT:  All right.  Very well.

21     MR. KAUFMAN:  Thank you.

22     Your Honor, I spoke to Mr. Forrester and

23  Mr. Canales.  Obviously, there's been -- there have been

24  several pleadings leading up to the sentencing today and what

25  the parties are proposing is a -- essentially a stipulation

1     for purposes of sentencing.

2           Specifically, Mr. Saldana is not waiving his rights

3     to challenge any potential arguable legal issue with regard to

4     his trial, but for purposes of sentencing, the agreement is

5     that the United States will not be going forward -- I'm

6     reviewing the PSR, document 104, page 13.

7           First, the United States will not be going forward

8     with the specific offense characteristics in paragraphs 48,

9     49, and 50.  48 being the importation of methamphetamine for

10     two levels, maintaining a premises for purposes of

11     manufacturing or distributing a controlled substance, also two

12     levels, and the criminal livelihood enhancement which would be

13     two levels.

14           In return, the defendant is going to be withdrawing

15     his objections.  And I should say that as part of this deal,

16     that the United States is not saying that -- affirmatively

17     saying that there is -- that there is no facts supporting

18     them.  We're simply not going forward on those enhancements.

19           And similarly, the defense is not acknowledging per

20     se anything regarding the other specific offense

21     characteristics either.  This is more just for purposes of the

22     sentencing hearing and the evidence that we want to move

23     forward on so that we can have a resolution of the disputed

24     matters.

25           What would result, according to this agreement, is

1  46, for purposes of the calculations, the base offense level
2  would be 38.
3          THE COURT:  Wait just a second.
4          All right.  Go ahead.
5          MR. KAUFMAN:  Paragraph 47, the weapon enhancement
6  would apply for two levels.
7          And the adjustment for role in paragraph 52 would
8  increase by four levels.
9          Therefore, in paragraph 54, the adjusted offense
10  level would be reduced by six levels from a 50 to a 44.
11          And 61 --
12          THE COURT:  Wait a minute.
13          MR. KAUFMAN:  Sorry, Your Honor.
14          THE COURT:  Let's go down to page 13.  You've got 38
15  as the base offense level.
16          The dangerous weapon enhancement applies so that's
17  two more.
18          The importation in 48 does not apply so that's two
19  off, right?
20          MR. KAUFMAN:  Yes, Your Honor.
21          THE COURT:  And 49, premises liability does not
22  apply so that's two more off, right?
23          MR. KAUFMAN:  Yes, Your Honor.
24          Now, then, criminal livelihood in paragraph 50, that
25  comes off.

1          MR. KAUFMAN:  Correct, Your Honor.

2          THE COURT:  So that's six off so far.

3          Still have the organizer or leader adjustment.

4          So that -- paragraph 54, then, would be 44; is that

5    correct?

6          MR. KAUFMAN:  That's correct, Your Honor.

7          THE COURT:  All right.  Now you may continue.

8          MR. KAUFMAN:  And the similar change, Your Honor,

9    would take place for paragraph 61, the highest offense level

10   also being 44.

11         And the parties understand that paragraph 64 states

12   that the maximum is 43, so any other figure above that would

13   be reduced to 43.

14         My understanding is that the defense is taking the

15   position that this stipulation will assist them in their

16   variance argument with the court.

17         THE COURT:  All right.  So there's no change in 64.

18         MR. KAUFMAN:  64 will remain a 43.

19         THE COURT:  Right.

20         MR. KAUFMAN:  And I think that there should be no

21   other changes to the PSR calculations.  Page 21 where it

22   discusses the sentencing options would remain the same.

23         THE COURT:  Okay.  Mr. Forrester.

24         MR. FORRESTER:  Yes, Your Honor.

25         Your Honor, first I'll note that Mr. Saldana's two

1  daughters are not here.  It's not necessarily that they don't

2  support him.  It's the fact that they -- at least one of them

3  sat here during the trial and the other one came partially for

4  trial, but it was too troubling.  And based on his

5  recommendation they are not here, but they certainly do

6  support him in spirit.

7          That being said, we stand here with a 45-year-old

8  man who's certainly been convicted of drug trafficking in meth

9  and -- pure meth also.  I say that to say that certainly I

10  submitted a sentencing memorandum.  In that memorandum, Your

11  Honor, document 110, it talks about certainly the

12  possibility -- and now so, more than possibility, the

13  likelihood of him being victimized in custody.  And I say this

14  because -- and case law backs me up.  It's not necessarily

15  some sort of conjecture the defense attorney is making.

16  Certainly the case law cited, it says inherently prison is a

17  dangerous -- that's the *Tokash* case on page 6 out of the

18  Fourth -- I'm sorry, Seventh Circuit where it says prison is

19  certainly a dangerous -- inherently dangerous place.  So that

20  lays the premise that certainly he's heading to a dangerous

21  place.

22          However -- and this is both a departure and a

23  variance.  I say this to say that in the sentencing guidelines

24  5H1.4 dealing with physical appearance and any sort of, I

25  guess, ability or inability, it's a discouraged factor.  So we

1   will say that and admit to that.  However, where it exists in
2   an extraordinary degree, then it is recommended or then
3   there's -- clearly one can argue for it and the sentencing
4   judge can make a decision based on the argument.

5           Our argument is that this man is slight and trim,
6   angular, fragile, not because God made him that way, but he
7   was the victim of a robbery in Mexico.  Now, certainly it's in
8   the presentence report that it was a robbery.  One can dispute
9   who were the robbers or who they weren't, but certainly it's
10  in there that he was with his parents at his parents' house.
11  He goes back -- or at least he used to go back to Mexico, even
12  though he's an American citizen right now, to visit his
13  parents, 62 and I believe 89 years of age, and he was shot
14  multiple times.  As a matter of fact, he was also stabbed at a
15  later point.

16          However, we take a look at the exhibits and we see
17  someone who has scars all over his body.  We're talking about
18  left leg, right leg, back, abdomen.  Someone who at some point
19  will be exposed to a showering room or a facility where others
20  will see him, will see his vulnerability and he will -- he's
21  going to be subject to aggression.

22          And I think it's -- also, this man -- though he
23  didn't testify or didn't take the stand, certainly we heard
24  when he answered the court, he's a soft spoken person.  And
25  not saying that he wasn't found guilty of the crime by a jury,

1    it's saying that certainly it's taken his outward

2    manifestations to others, other predators what he is going to

3    look like.

4         And I think he stands -- right now we're talking

5    about a man who is looking at life, 45-year-old man who's

6    looking at life.  So certainly -- and obviously, we're arguing

7    for some sort of reduction in that.  But as it is right now,

8    we're talking about a guy who's being -- or has the potential

9    of being punished on a daily basis because of his inability to

10   defend himself.

11        Also, the fact that he has gunshot wounds on him

12   pretty much says he was either marked for death and people

13   will say whether he was an informant or whether he should be

14   marked for death, just the fact.  It's almost like watching

15   some sort of Discovery Channel or National Geographic Channel

16   where we see where there are sea creatures or land creatures

17   in the wild, they will attack the baby fawn, they will attack

18   the impala, sick impala.  It doesn't matter.  That's the sort

19   of environment it is.

20        Particular to him, he is of Hispanic surname and he

21   will be expected to either join up into a gang.  If he chooses

22   not to, certainly -- and here again, I speculate on that

23   because he wouldn't add to a gang in his frail structure, but

24   if he chooses not to, then they're labeled as solo so therein

25   lies another problem even if he were -- did not suffer from

1  these physical ailments.  And by no means am I saying he's an

2  invalid.  What I am saying he's not apt at physically taking

3  care of himself.  So would almost naturally be in a situation

4  where because of heritage, he's either being perceived as

5  discounting his heritage or others will say, hey, he's a prey

6  so let's pick on him.  Let's vent our frustration in this

7  group and we'll take it out on him because he matches that

8  group physically.

9        I say that to say that certainly during this whole

10 ordeal, you can say, well, through the investigation we

11 certainly don't see anything of violence perpetrated by

12 Mr. Saldana.  What we do see is certainly he had a collection

13 of firearms that he won in some sort of, I'm not sure, raffle.

14 It was almost -- the way he got it was some sort of in kind

15 service, whether he put up something in a potluck or church

16 raffle, I'm not sure.  And so he got it and he would -- and

17 here again, I'm not -- he would shoot it off, so the

18 presentence report says, in leisure.  But we don't see a

19 person who certainly associated with guns for the more

20 malicious side of them.  And I think the jury agreed with us

21 when they voted on the 924(c) charge, Your Honor, which was

22 dismissed -- I mean, not dismissed.  He was acquitted on.

23        So I think we sit here -- or stand here with a man

24 who certainly though he's convicted of getting involved in the

25 distribution of poison, he certainly is not one of the more

1  sinister or I would say violent persons that certainly we've
2  seen in this courtroom.
3         So I would ask the court to depart downward and
4  depart downward taking in mind the -- well, after we depart
5  based on the departure, Your Honor, at 5H1.4, if Your Honor
6  could take a look at the variance and certainly render a
7  sentence that's not greater than necessary but certainly
8  something to show respect for the law.
9         And I would say knowing the fact that he has high
10  blood pressure, he's on different sort of medications, his
11  circulation is very poor, his life expectancy is not as high
12  as others in the prison population.  So not only is he going
13  to be under stress worrying about his life and any sort of
14  abuse, he knows that time is ticking because of these inherent
15  illnesses that he suffers from.
16         And also, additionally, he misses his family.
17         He has used alcohol in excess and he has used meth.
18  He's a user of meth.  We see that in the presentence report.
19  So we'd ask the court to recommend some sort of substance
20  abuse program for him.
21         He has lived in this area even though he at one
22  point lived in Roanoke, Virginia.  He lived in the West
23  Jefferson area, Your Honor, so we'd ask the court to recommend
24  a BOP facility close to this area, Your Honor.
25         Thank you.

1          THE COURT:  All right.  Thank you.

2          Okay.  Anything further before I ask the defendant

3  if he wants to speak to the court?

4          MR. FORRESTER:  Nothing from the defense, Your

5  Honor.

6          THE COURT:  All right.  Would you like to say

7  anything to the court, sir?

8          THE DEFENDANT:  No, sir.

9          THE COURT:  All right.  Thank you.

10          Mr. Kaufman.

11          MR. KAUFMAN:  Thank you, Your Honor.

12          We submit that the guideline sentence of life is

13  appropriate in this case.  It is sufficient but not greater

14  than necessary.  Why is that?  Well, I think defense counsel

15  used an appropriate expression talking about distribution of

16  poison.  All controlled substances are very serious.  The

17  controlled substances that Mr. Saldana distributed, you know,

18  if one were to look at a spectrum, methamphetamine is an

19  extremely dangerous narcotic.  It's an extremely serious

20  problem in our northern counties here in the Western District

21  of North Carolina, an extremely serious one.  And Mr. Saldana

22  was distributing that poison, more than 5,900 grams of it.

23          And what kind of poison?  It was characterized as

24  ice which means that it was at least 80 percent pure.  As Your

25  Honor may recall from the trial, and, actually, it's listed --

1   some of the samples that were actually seized by law
2   enforcement are listed in paragraph 39 of the PSR. I had
3   never before seen a purity level of 100 percent. And in fact,
4   as there was testimony elicited during the trial, the lab
5   sheets were above a hundred percent because there is that
6   margin of error. So we're talking about basically, though,
7   totally pure methamphetamine. Huge amounts.
8        And so when we look at the idea of a variance, what
9   is extraordinary that should lead to a reduction more than
10  just the one level, if you will, from 44 to the 43 which
11  happens just as a guidelines factor, what would merit any
12  further reduction beyond that?
13       It appears that the defense had referenced the two
14  daughters. That's not extraordinary. Many drug traffickers
15  have families, and families who have stories that are actually
16  a little somewhat compelling. They're presumably with a
17  caretaker now and have been for some time. This is not an
18  extraordinary scenario. And ultimately, that's part of the
19  gamble that a drug trafficker takes when they commit their
20  crime.
21       The other basis, if I'm characterizing it correctly,
22  is the defense argument that Mr. Saldana is somehow more
23  susceptible to harm while in the Bureau of Prisons. There's
24  several factors that the defense discussed and we submit that
25  these are not extraordinary in any way and maybe even

1  factually don't really apply to Mr. Saldana such that a
2  variance would be appropriate.

3         With regard to his physical appearance, you know,
4  he's in court.  We have his biographical information in the
5  PSR.  He's 5'8", 170 pounds.  He is not a slight man.  There
6  is nothing unusual or uncommon about that.  To our knowledge,
7  he has never received any sort of threats.  And that does
8  often happen in a case where drugs and/or money are seized
9  from a defendant because their source is expecting to receive
10  that money as payment or expecting to receive payment for the
11  drugs that were seized if they were fronted to that defendant.
12  That's actually quite common.  But even in this case we
13  haven't gotten any indication that that does exist.  So there
14  have been no actual threats.

15         There's no evidence that -- while the evidence does
16  indicate because of the purity, Agent Harmon testified about
17  purity levels of methamphetamine, that the distribution chain
18  was actually quite short between the Mexican super lab and his
19  receipt of it, there is not an indication that he was dealing
20  directly with cartel members; that there were intermediate
21  traffickers.  There's no indication that he was directly
22  dealing with violent gangs other than, importantly, the
23  shooting.  And while he may have characterized it at one point
24  as being a robbery, as we submitted in our response to the
25  defendant's sentencing memorandum, there's that transcript --

1    I'm looking at document 111 on page 2.  There is a quote where

2    he was -- when Mr. Eller was asking Mr. Saldana about how it

3    all happened and he said there were two big gangs.  It's gang

4    related?  And he said, Yeah, it's gang.

5              So that kind of cuts against the idea that he was

6    just a robbery victim.  But if anything, it shows a little bit

7    more, if you will, a toughness, that he was being involved in

8    some sort of gang shootout.

9              We have to keep in mind, too, that Mr. Saldana was

10   not a mule.  He was not a follower, somebody who might be more

11   susceptible to bullying or fighting in prison.  In fact, he

12   was a leader/organizer.  So that shows that he doesn't have

13   some sort of extraordinary weakness.  In fact, if anything, he

14   has the leadership.

15             Again, also, the expression that he's marked for

16   death because of his scarring.  If anything, I would submit

17   that that scarring along with his description of being caught

18   in a gang shootout shows that there's some street cred.  That,

19   if anything, he's got kind of a toughness, if you will, as a

20   result of being shot and being able to speak about it after

21   the fact.

22             And the idea about gang membership, that he be

23   susceptible and he would have to join a gang for survival,

24   honestly, that would apply to anybody.  Mr. Saldana is not

25   unique in terms of needing to associate with a gang and being

1  considered an outsider. That's true of anybody. We're not --
2  we don't believe that a variance should be given to everybody
3  so that -- obviously, we don't want people to be in prison
4  gangs, but the way to stop that is not to say you can have a
5  variance so that you can feel that you're getting a benefit
6  for not being in a gang. People either are or are not but
7  it's not something unusual for Mr. Saldana so that -- such
8  that he should receive a variance.

9        I think those were the two primary areas that the
10 defense was asking for a variance.

11       Mr. Saldana, he exercised his right, which he's
12 entitled to do, to go to trial, but he has not provided
13 information to the government to assist the United States.
14 There aren't any compelling factors that we can think of in
15 terms of something extraordinary beyond other defendants who
16 come before the court that would merit a variance.

17       Thank you.

18       THE COURT: All right, sir. Thank you.

19       Anything further before the court states a sentence?

20       MR. FORRESTER: Just one thing I would like to add,
21 not to counter that. At some point he did receive custody of
22 his two daughters, just to speak to that. At least some court
23 in North Carolina or even the mother found that this man was
24 worthy of a second chance in life.

25       That's all, Your Honor. Thank you.

1          THE COURT:  All right, sir.  Thank you.

2          Concerning the motion for departure under guidelines

3     5H1.4, the court declines to grant such a departure having to

4     do with the defendant's physical circumstances either with

5     reference to his medical issues described in the presentence

6     report such as high blood pressure and blood circulation being

7     poor and urinary difficulties.  These appear to be

8     successfully addressed by medication.  And then he has certain

9     numbness and circulation and other difficulties as a result of

10    being shot in an altercation in Mexico and also a stabbing by

11    a coworker in 1989.

12         But taken together, these don't create a case of any

13    compelling force for a downward departure either for the

14    medical concerns themselves or for any implications for

15    vulnerability in custody.  Defendant's physical appearance and

16    the medical conditions are not extraordinary in degree and do

17    not make a compelling case for a particular vulnerability in

18    the prison environment as the government effectively argues.

19         The evidence, for example, of scars could be taken

20    as a mark of toughness as well as it could a mark of

21    vulnerability or, as the government says, perhaps street cred.

22         And further, that the argument concerning gangs

23    could apply to every inmate in terms of the argument of the

24    defendant such as pressure to join a gang or not and the,

25    perhaps, consequences thereof.  That is simply not persuasive.

1  And it doesn't differentiate the defendant in a way that might
2  justify a downward departure.
3          Now, the government, then, moving on to arguments
4  for a variance downward -- do we have any -- by the way, do we
5  have any new family members here?
6          MR. FORRESTER:  No, Your Honor.
7          THE COURT:  All right.  Thank you.
8          So in terms of the variance, the nature of the
9  offense is extremely serious which is a strong argument
10 against a downward variance because the meth problem is an
11 extremely serious one.  Made more so, perhaps, by the
12 exceptional purity of the drug being moved by the defendant,
13 but even that -- if that's a marginal factor, the quantity is
14 an exceptionally high amount to be moving some 5,900 grams,
15 and moved through numerous traffickers under the defendant.
16         Defendant most assuredly was a leader and he
17 effectively used his real property to hide proceeds of the
18 illegal enterprise and facilitate the distribution in all the
19 ways set forth in the presentence report.
20         The fact that defendant had a family and custody of
21 two daughters does not change the analysis concerning a
22 downward variance.  Defendant certainly would have been aware
23 of the risk to his family that he might be apprehended in drug
24 dealing.  So that is an unfortunate and perhaps tragic
25 consequence of his activities, even though activities on the

1    real property in question would have been evident to those who
2    dwelled there.

3         Defendant further argues that defendant has a lower
4    life expectancy because of his medical issues, but that does
5    not present a circumstance justifying a downward variance.
6    Even if it is correct, that's speculative.

7         So the court's view is that the nature of the
8    offense argues for a life sentence for the reason that I
9    have -- reasons that I have articulated.  The history and
10   characteristics of the defendant are not compelling in a
11   downward variance direction.  It appears that he made use of
12   his naturalized citizenship to move back and forth from Mexico
13   even though he says that was to tend to his mother.  The fact
14   that he was involved in the shootout shows that on at least
15   one occasion he was in the midst of a gang blowup of sorts
16   while in Mexico.

17        The defendant is indeed, given the quantity, a
18   kingpin by any definition and therefore a guideline sentence
19   is appropriate, particularly to promote respect for the law
20   and afford deterrence to others who might be tempted to engage
21   in similar conduct.  Also to protect the public from further
22   crimes of this defendant.

23        And the fact that defendant had certain legitimate
24   jobs, likely providing a cover for his drug dealing, is not
25   persuasive to justify a variance.

1    So having these factors in mind, the court will
2  sentence as follows:

3    Pursuant to the Sentencing Reform Act of 1984, the
4  *Booker* case, and 18, U.S. Code, 3553(a), defendant is
5  committed to custody for a term of life on count one and a
6  term of 120 months on count five to be served concurrently.

7    The court recommends the substance abuse program,
8  18, U.S. Code, 3621(e)(2).

9    The court further recommends participation in
10 educational and vocational opportunities while incarcerated.

11    Upon release he'll be on supervised release for five
12 years should it become appropriate.  This term consists of a
13 term of five years on count one and three years on count five,
14 all running concurrently.

15    Within 72 hours of release from custody, he shall
16 report in person to the probation office in the district to
17 which he is released.

18    And while on supervised release, he shall not commit
19 another federal, state or local crime, and shall comply with
20 the standard conditions adopted by this court.

21    He shall pay the United States the special
22 assessment of $200, payable immediately.

23    He does not have the ability to pay a fine or
24 interest because of his economic circumstances.

25    He shall forfeit his interest in any properties

1    identified by the United States.

2            Payment of the criminal monetary penalties are due

3    and payable immediately, they having to do with the

4    assessment.

5            The court recommends he be placed as close to West

6    Jefferson, North Carolina, as possible.

7            You have a right to appeal, Mr. Saldana.  To do that

8    you would have to give a written request for appeal -- or

9    notice of appeal within 14 days after the court files its

10   sentencing judgment resulting from today's hearing.  You may

11   appeal without prepayment of costs if you are found to be

12   indigent after filing an affidavit of indigency.  Your

13   attorneys or the clerk of court would fill out a notice of

14   appeal for you if you asked one of them to do that or you may

15   file it yourself.

16           Would counsel want to make a notice of appeal at

17   this time?

18           MR. FORRESTER:  Your Honor, I'm in this district so

19   I can wait until the judgment has been --

20           THE COURT:  Certainly.  I just thought I'd ask.

21           Anything further?

22           MR. KAUFMAN:  Your Honor, I don't know if this is a

23   necessary step, but I'd ask that Your Honor's preliminary

24   order of forfeiture, document 112, be incorporated into the

25   final judgment.

1           THE COURT:  All right, sir.  I will do that.

2           MR. KAUFMAN:  Thank you, Your Honor.

3           THE COURT:  So ordered.  Thank you all.

4           MR. CANALES:  May I be excused, Your Honor?

5           THE COURT:  Thank you, sir.

6           (Brief recess at 2:57 p.m.  Court back in session at

7    3:26 p.m.)

8           THE COURT:  Okay.  May we start by noting first of

9    all that counsel have reassembled.  Mr. Kaufman and counsel

10   for the defendant and the defendant is present here in open

11   court with the assistance of an interpreter.

12          And I will apologize to the defendant for having to

13   reassemble this group, but I do so for what might be termed a

14   ministerial or administrative omission on my part and that is

15   to note that after we took the agreement by stipulation

16   concerning enhancements in the case, I did not make note for

17   the record that the court adopts the presentence report for

18   all purposes of sentencing.  But I did do so having disposed

19   of objections by way of the stipulation and there having been

20   no further objections.

21          Anything further from counsel for either side?

22          MR. FORRESTER:  No, Your Honor.

23          MR. KAUFMAN:  No, Your Honor.

24          MR. CANALES:  No, Your Honor.

25          THE COURT:  All right.  Thank you all and I

```
 1   appreciate the cooperation.
 2               MR. CANALES:   Thank you.
 3               MR. KAUFMAN:   Thank you.
 4               MR. FORRESTER:   Thank you.
 5               (End of proceedings at 3:28 p.m.)
 6                              *****
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16          Dated this 10th day of August 2015.

17

18

19                          s/Cheryl A. Nuccio
                          _____
20                          Cheryl A. Nuccio, RMR-CRR
                          Official Court Reporter
21

22

23

24

25